UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Pipe Line Contractors Association,
1700 Pacific Avenue, #4100
Dallas, Texas 75201-4675.

Plaintiff,

v.

Case No. 1:07-cv-00973

United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO,
901 Massachusetts Avenue, NW
Washington, D.C. 20001 and its constituent Local Unions

Defendants.

## MOTION TO COMPEL DEFENDANT TO SUBMIT TO ARBITRATION

Plaintiff, Pipe Line Contractors Association ("PLCA"), by and through its undersigned counsel, respectfully moves this Court for an Order compelling Defendant, the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO and its constituent Local Unions (together "UA" or "Union") to submit to the grievance/arbitration process set forth in the parties' collective bargaining agreement. This case is before the Court pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Plaintiff alleges that Defendant has violated and continues to violate the parties' collective bargaining agreement by unilaterally

increasing the hourly rental rate paid by PLCA contractors to Union welders for the use of the welders' welding rigs. Plaintiff filed a grievance stemming from Defendnat's breach pursuant to the grievance/arbitration provision of the parties' collective bargaining agreement, but Defendant has, to date, refused to comply with the mandatory grievance and arbitration process.

For the reasons set forth in the accompanying Memorandum of Law and Points of Authority, the rig rental rate dispute at issue is an arbitrable grievance under the broad arbitration provision. As such, Plaintiff respectfully requests an Order compelling Defendant to submit the rig rental dispute to arbitration, as required by the parties' collective bargaining agreement. Plaintiff also respectfully requests that this Court award it reasonable attorneys' fees associated with the filing of this motion, as Defendant's refusal to arbitrate is in bad faith and vexatious.

Respectfully submitted,

Lawrence D. Levien, Esq. (DC Bar No. 191528)

AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 887-4000 (telephone)
(202) 887-4288 (facsimile)

Dated: June 4, 2007          Counsel for PLCA, Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Pipe Line Contractors Association,
1700 Pacific Avenue, #4100
Dallas, Texas 75201-4675.

Plaintiff,

v.

Case No. 1:07-cv-00973

United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO, and its constituent Local Unions,
901 Massachusetts Avenue, NW
Washington, D.C. 20001

Defendants.

**MEMORANDUM OF LAW IN AND POINTS OF AUTHORITY IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL ARBITRATION**

## I. STATEMENT OF THE CASE

This case is before the Court pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Plaintiff, Pipe Line Contractors Association ("PLCA") has previously filed with this Court a complaint under Section 301 alleging that the Defendant, the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO and its constituent Local Unions (together "UA" or "Union"), has violated and continues to violate the parties' collective bargaining agreement by unilaterally attempting to increase the hourly rental rate paid by PLCA contractors to UA welders for the use of the welders' welding rigs. Prior to filing said Complaint, Plaintiff has

filed a grievance regarding Defendant's breach pursuant to the grievance/arbitration provision of the parties' collective bargaining agreement, but Defendant has, to date, refused to comply with the mandatory grievance and arbitration process. Plaintiff now respectfully requests an Order compelling Defendant to comply with the broad grievance/arbitration provision of the collective bargaining agreement and submit to arbitration regarding the rig rental rate issue, and award Plaintiff costs and attorney fees due to Defendants' bad faith refusal to arbitrate.

This Court has jurisdiction under Section 301 of the LMRA, 29 U.S.C. § 185(a), 29 U.S.C. § § 1331 and 1337, and because this complaint arises under the LMRA and NLRA, federal statutes regulating commerce. Venue is proper in the District of Columbia pursuant to 29 U.S.C. § 185(a) because this Court has jurisdiction over the parties. Venue is also proper in the District of Columbia pursuant to 28 U.S.C. 1391(b) because the Defendant is principally located in the District of Columbia and the events giving rise to this action occurred at least in part within the District of Columbia.

## II. STATEMENT OF FACTS

### A. Background

The PLCA is a longstanding association of contractors who contract to perform the construction and maintenance of cross country pipelines, which are used to transport any transportable materials. The PLCA currently has approximately fifty three (53) member contractors. *See* Declaration of PLCA Managing Director J. Patrick Tielborg ("Tielborg Decl.") at ¶ 4, attached hereto at Exhibit ("Ex.") 1. The individual pipeline projects for which PLCA members contract generally span anywhere from several hundred feet in length to over one thousand miles. Jobs over 100 miles are often done by multiple contractors. *See* Tielborg Decl. at ¶ 3. Larger pipeline projects require major logistical and infrastructure work which can cost

anywhere from eighty (80) million dollars to two hundred and fifty (250) million dollars. *See* Tielborg Decl. at ¶ 3.

The PLCA membership elects a president annually, and also has several committees responsible for various aspects of PLCA business. *See* Tielborg Decl. at ¶ 4. One of PLCA's committees is its Labor Committee, which is responsible for negotiating all labor contracts. *See* Tielborg Decl. at ¶ 5. The Labor Committee is comprised of between five and thirteen PLCA member contractors, who are appointed by the PLCA President, subject to PLCA Board of Directors approval. *Id.* Labor Committee members serve one year on the committee. *See* Tielborg Decl. at ¶ 5. PLCA affairs are managed on a daily basis by the Managing Director and General Counsel J. Patrick Tielborg, who has held this position since 1978. *See* Tielborg Decl. at ¶ 1. Tielborg is responsible for nearly all aspects of PLCA's business, including coordinating the Labor Committee, assisting the Labor Committee in negotiating all PLCA contracts with labor unions, and policing and enforcing said contracts on behalf of PLCA. He serves at the direction of the PLCA Board of Directors. *See* Tielborg Decl. at ¶ 2.

PLCA contractors contract with the UA to provide welding and maintenance services on their various pipeline projects across the United States. *See* Tielborg Decl. at ¶ 6. As such, PLCA and the UA are, and have since approximately 1950, been party to a collective bargaining agreement ("CBA") which sets forth terms and conditions governing welders' employment. *See* Tielborg Decl. at ¶ 7. This CBA is known as the "National Pipe Line Agreement" ("NPLA"). *See* Tielborg Decl. at ¶ 7. While PLCA is a signatory to the NPLA, each individual PLCA member contractor is also a signatory to the NPLA (by individually signing an acceptance of Agreement form). *See* Tielborg Decl. at ¶ 7. Accordingly, PLCA represents the interests of, and acts on behalf of, each individual signatory contractor. *See* Tielborg Decl. at ¶ 7.

Under the NPLA, UA welders are paid an hourly wage, hourly fringe benefits (pension, welfare, and training) and a per diem amount. *See* Tielborg Decl. at ¶ 8. In addition to the hourly wage and per diem, since approximately 1960 the contractors have also paid the welders an additional hourly rate for the use of the welders' welding rigs in the performance of their duties for the contractor(s). *See* Tielborg Decl. at ¶ 9. PLCA contractors depend on the use of the welders' individual welding rigs because each welding rig is a significant capital investment, which the individual contractors generally cannot afford to absorb. *See* Tielborg Decl. at ¶ 10. This dependence is especially true on projects which require fifty (50) or more welders, each welder necessitating separate ownership of a welding rig. *See* Tielborg Decl. at ¶ 10. Thus, given the expense involved, converting and maintaining a fleet of welding rigs for use on projects is simply not financially or logistically feasible for each individual contractor. *See* Tielborg Decl. at ¶ 12. Moreover, the welders generally insist on using their own welding rigs on the job because, in addition to using the welding rig apparatus in the performance of their job, they use it as transportation to and from the jobsites on a daily basis and to and from home at the start and end of the job. *See* Tielborg Decl. at ¶ 12.

Despite the high costs and various risks associated with pipeline projects of the magnitude that PLCA contractors undertake, PLCA and the UA have generally maintained an excellent working relationship. *See* Tielborg Decl. at ¶ 13. Indeed, there have been no instances of a work stoppage in the past thirty (30) years, and there have been relatively few instances of labor strife. *See* Tielborg Decl. at ¶ 13. As such, the parties have been able to maintain a working relationship which allowed for the open discussion of ideas and problems, as well as a relatively informal manner of dealing with any problems or issues. *See* Tielborg Decl. at ¶ 14. Such an informal working relationship has allowed for the NPLA to be somewhat of a "work in

progress," with provisions and attachments being added and removed as issues arise. *See* Tielborg Decl. at ¶ 14.[1]

B. PLCA's Submission to the IRS

In 2001, the parties began discussing approaching the IRS for a ruling regarding the treatment of the rig rental reimbursement payments for tax purposes. *See* Tielborg Decl. at ¶ 15, 16, 18. Of greatest concern to the parties was the fact that various non-union contractors were attempting to use excessive rig rental payments to disguise wages. *See* Tielborg Decl. at ¶ 16. Both PLCA contractors and the UA were extremely concerned about this guise, since it threatened to undermine the negotiated NPLA pay scales and the economic viability of the unionized business. *See* Tielborg Decl. at ¶ 16. In addition, however, the actions of the non-union contractors also threatened the very practice of welders renting out their rigs, because the Department of Labor had begun investigating and cracking down on excessive rig payments as a result of the non-union contractors' practices. *See* Tielborg Decl. at ¶ 16. This development is evidenced by several cases of which both PLCA and the UA were aware and had discussed. *See* Tielborg Decl. at ¶ 17.

The UA had also expressed concerns that its welders were being audited as a result of the rig rental income reported by the contractors on Form 1099s not matching the depreciation deductions that were being taken by the welders on their rigs. *See* Tielborg Decl. at ¶15. After discussing this issue on numerous occasions, the parties jointly agreed that PLCA would apply to the IRS for a ruling regarding the tax treatment of the rig rental payments. *See* Tielborg Decl. at ¶ 18.

[1] For example, during the negotiations for the 2005-2010 contract, the parties also agreed in principle to amend Article XI (L), the provision dealing with "hot work," as well as the premium dealing with "splatter pay." *See* Tielborg Decl. at ¶ 14. Although these changes have been agreed, they have yet to be actually made in the NPLA. *Id.*

PLCA's submission to the IRS was made over the summer of 2001. Although PLCA made the formal application to the IRS, its submission clearly evidences the UA's underlying concerns about non-union contractors and the disguising of wages as rig rental payments, and evidences that the submission was essentially a joint effort. *See* PLCA IRS Submission, attached hereto as Ex. 2.

After PLCA's application to the IRS, the parties negotiated regarding the rig rental rate. *See* Tielborg Decl. at ¶19. On December 18, 2001, PLCA Managing Director Tielborg and UA General President Martin Maddaloni executed a "Special Agreement" to the NPLA which established an hourly rig rental rate of $12 per hour. *See* Letter from Tielborg to UA GP Maddaloni RE: "Negotiated" Changes to the National Pipeline Agreement, Dated December 18, 2001, attached hereto as Ex. 3. This Special Agreement was executed so as to ensure that there was uniformity in the amounts being paid for the rig rentals, and that those welders working on Small Diameter pipe lines were receiving the same rig rental rate as welders working on other projects under the NPLA. *See* Tielborg Decl. at ¶ 19. The new rig rental rate was subsequently acknowledged and recognized in a follow-up letter from Tielborg to John Budzinski, then UA Pipeline and Gas Distribution Representative. *See* Letter from Tielborg to Budzinski, dated January 22, 2002 RE: "Negotiated Changes" to National Pipe Line Special Agreement, attached hereto as Ex. 4. As UA Pipeline and Gas Distribution Representative, Budzinski was an international representative who reported directly to the UA General President and was responsible for overseeing and coordinating all pipeline work nationally, including all work done for PLCA contractors, as well as participating in the negotiations for labor contracts with PLCA and other employers. *See* Tielborg Decl. at ¶ 20. Given that two high ranking officials from the

UA, including the General President, acknowledged and consented to the newly negotiated rig rental rate, PLCA had no reason to doubt its validity. *See* Tielborg Decl. at ¶ 21.

C. IRS Revenue Procedure 2002-41

The IRS issued Revenue Procedure 2002-41 on May 23, 2002 which, based on input from all concerned parties, set a "substantiated" rig rental rate of $8.00 per hour if the contractor provided the fuel, and $13.00 per hour if the welder provided his or her own fuel. *See* Revenue Procedure 2002-41, attached hereto as Ex. 5. Upon issuance of this Revenue Procedure, the parties quickly agreed that the IRS rate was to be the set hourly rig rental rate, and began paying accordingly . *See* Tielborg Decl. at ¶ 22. To that end, and to ensure that the IRS rate was uniformly adopted, UA Local 798 Business Manager Scott North issued a letter to PLCA contractors setting forth the new hourly rig rental rate. *See* Letter from Scott North dated June 19, 2002, attached hereto as Ex. 6. On June 12, 2002, Tielborg sent PLCA regular members a letter referring to this letter from Scott North and stating that PLCA and the UA "reached an agreement that the UA Local 798 suggested rig rental rates ***for both mainline and the Special Agreement*** will become effective for all work bid on or after July 1, 2002." *See* Letter from Tielborg to PLCA Members, dated June 12, 2002, attached hereto as Ex. 7 (emphasis added). Although it may appear that the agreement regarding the rig rental rate was in effect only between PLCA and UA Local 798, such an argument cannot be sustained. Indeed, in a subsequent letter from Tielborg to then UA Director of Pipeline, John Budzinski, the parties agreed to the following:

> "Rig Pay. Rig pay (for work bid on or after 7/1/02) will not be less than $13 per hour and the Welder will furnish the fuel, unless job specific considerations are agreed upon at the time of the contractor bidding the job."

*See* Letter from Tielborg to Budzinski, signed by Budzinksi, dated 6/26/2002, attached hereto as Ex. 8. Budzinski signed this "Special Agreement" acknowledging an agreed upon hourly rig rental rate of $13/hour (*i.e.*, the IRS substantiated rate), in his capacity as Director of Pipeline for the UA, not as a representative of Local 798. Therefore, any argument that the agreement was between PLCA and UA Local 798 only must be dismissed.

D. IRS Substantiated Rate as the Contractual Rate

From the time the Revenue Procedure 2002-41 was issued in May 2002, until approximately January 2007, the parties abided by the IRS substantiated rate with respect to the hourly rig rental rate. *See* Tielborg Decl. at ¶ 23. Indeed, to the PLCA's knowledge, with a few exceptions governed by local conditions, no other rate has been paid to UA welders for their welding rigs since the IRS established a substantiated rate.[2] *See* Tielborg Decl. at ¶ 23.

In 2004, the UA and PLCA executed a new one-year (1 year) agreement, and part of this agreement again included a "Special Agreement for Small Diameter Pipe Between the Pipe Line Contractors Association and the United Association of Journeymen and Apprentices of the

---

[2] There are several regions where the rig rental rates were higher than those paid elsewhere in the country. For example the rates in California, Washington, and Oregon have historically been higher for various reasons. However, following the issuance of Revenue Procedure 2002-41, even these states began abiding by the IRS substantiated rate, despite efforts and arguments to the contrary. For example, in 2003 several UA Locals in California attempted to demand a rig rental rate in excess of the IRS substantiated rate. *See* Tielborg Decl. at ¶ 24. These California locals claimed that the IRS substantiated rate was lower than the rate that they had previously been receiving *in the California region. Id.* However, PLCA Managing Director J. Patrick Tielborg advised UA Pipeline and Gas Representative John Budzinski via memorandum that exceeding the IRS substantiated hourly rate could possibly result in the entire rig rental payments becoming taxable to the welders and cautioned against any actions or demands that would jeopardize the IRS safe harbor. *See* Letter from Tielborg to Budzinski, dated May 5, 2003 RE: "Rig Rental," attached hereto as Ex. 14. The California locals stopped demanding an increased rate when it was made clear to them that an agreement had been reached to all UA welders' benefit. *See* Tielborg Decl. at ¶ 24.

Plumbing and Pipefitting Industry of the United States and Canada" ("2004 Special Agreement"). *See* "Special Agreement" Dated July 1, 2004, attached hereto as Ex. 9; *see also* Tielborg Decl. at ¶ 25. Subsection (h) of this special agreement contains language that is identical to the language agreed to by UA Director of Pipeline John Budzinski in 2002 (*see* Ex. 8 *supra*). Because the parties had been abiding by the IRS substantiated hourly rate for all rig rentals relating to work under the NPLA, neither party felt it necessary to include a provision in the 2004-2005 NPLA setting the IRS substantiated rate as the agreed upon rate. *See* Tielborg Decl. at ¶ 25.

E. The Current NPLA

The 2004-2005 NPLA was essentially a "stop-gap" agreement executed to prevent any labor strife while the parties contemplated and began negotiating a new NPLA. *See* Tielborg Decl. at ¶ 25. The parties began negotiating toward a new contract in the summer of 2005, but negotiations did not go well. *See* Tielborg Decl. at ¶ 26. However, because negotiations were ongoing, and to avoid any disruptions on the many PLCA jobs, the parties agreed upon and executed an Extension Agreement, which was to last through September 2005. *See* Tielborg Decl. at ¶ 26. Negotiations continued throughout August and September 2005, and although the main sticking point in the negotiations was wages, the issue of the rig rental rate did arise on at least several occasions throughout the negotiating period. On September 21, 2005, after many proposals and counter-proposals, new UA Pipeline and Gas Distribution Representative Phil Stephenson notified PLCA that the UA was terminating the Extension Agreement of July 2005, thus the NPLA would expire as of October 30, 2005 if the parties did not reach agreement on a new contract.

Negotiations on a new NPLA continued into October 2005. Specifically, the parties met in Hollywood, Florida on October 18 and 19 at the Diplomat Hotel to continue working toward a new contract. *See* Tielborg Decl. at ¶ 30. During the October 18, 2005 negotiating session, UA Pipeline and Gas Distribution Representative Phil Stephenson distributed a "Negotiation Agenda" which listed various items about which the UA wanted to negotiate. Among the items the UA deemed negotiable during these meetings was "rig pay." Indeed, not only did the UA specifically raised the issue of rig pay during these meetings, but over the course of the negotiations during the summer of 2005, the issue of rig pay, and specifically of welders losing money on the operation and maintenance of the welding rigs, arose several times. For example, in September 2005, UA Local 798 Business Manager Scott North sent a letter to PLCA outlining that, based on Local 798's calculations, UA welders were operating welding rigs at a loss. The demonstrated UA concerns over the alleged losses sustained in connection with the rig rental rate, coupled with the inclusion of the rig rental rate on the UA's negotiation agenda, clearly evidence that it was the UA's intention at the outset of these negotiations to seek an increase in the rig rental rate.

Following several hours of negotiating, the UA presented PLCA with a proposal which included a six and one half percent wage increase the first year, and a five and one half percent wage increase in each of the second and third years of the contract, as well as certain other provisions, including concessions from the contractors on fuel costs related to the welding rigs. *See* Tielborg Decl. at ¶ 31. Continuing efforts at negotiating were unsuccessful. After discussing the UA's proposal with members of the PLCA Labor Committee, on October 19, 2005, PLCA Managing Director Tielborg advised UA Pipeline and Gas Distribution Representative Stephenson that PLCA would not agree to the proposed contract. *See* Tielborg

Decl. at ¶ 32. Stephenson stated that if PLCA did not agree to the proposed increase, UA welders would cease work as of January 1, 2006. *See* Tielborg Decl. at ¶ 32. This ultimatum resulted in a stalemate in negotiations over the contract. *See* Tielborg Decl. at ¶ 33.

In an effort to keep negotiations progressing, Tielborg advised Stephenson that he wanted to speak with UA General President William Hite to discuss the direction in which the negotiations were headed. *See* Tielborg Decl. at ¶ 33. The parties remained in their separate hotels, the PLCA members in the Marriott and the UA members at the Diplomat, to await word as to whether the UA General President would agree to meet with Tielborg. *See* Tielborg Decl. at ¶ 35. Approximately one hour later, around 9:00 a.m., James ("Jim") Buchanan, Business Manager for UA Local 597, who was already in Florida for the UA General Executive Board Meeting, contacted Tielborg at the Marriott and requested a meeting with Tielborg, Bob Westphal (then PLCA President) and Charles Joyce (then head of the PLCA Labor Committee). *See* Tielborg Decl. at ¶ 36. Tielborg, Joyce and Westphal agreed, and went to the Diplomat Hotel at the specified meeting time. *See* Tielborg Decl. at ¶ 38.

Buchanan initially met alone with Tielborg, Westphal, and Joyce and advised them that he had been designated to speak for UA General President Hite during the negotiations. He informed them that, with the exception of Phil Stephenson, he would be excluding the UA negotiating committee from the rest of the negotiations and that he would be doing the talking for the UA. *See* Tielborg Decl. at ¶ 38. Based on this representation by Buchanan, Tielborg, Westphal and Joyce rightfully believed that Buchanan had the authority to negotiate and agree to terms on behalf of the UA. *See* Tielborg Decl. at ¶ 39. Buchanan then allowed Phil Stephenson into the room, however, Stephenson spoke little and only with Buchanan's approval during the meeting. *See* Tielborg Decl. at ¶ 40. During this meeting, Buchanan, acting on behalf of the UA

General President Hite, told Tielborg, Westphal, and Joyce that if PLCA would agree to a 5 year contract with a 5% annual total package increase for the first year and 4 1/2 % for the second and third year and a wage re-opener provision for the last two years, there would be an agreement and there would be "no work stoppage." *See* Tielborg Decl. at ¶ 41.

As part of this discussion, Buchanan modified the UA's demand for an increase in the rig rental rate and/or additional hours of rig pay. In fact, Buchanan explicitly stated that under the proposed agreement, the rig rental rate would remain the IRS substantiated rate and would only be an issue for welders who were required to travel excessive distances (*i.e.*, more than two hours to the job site). *See* Tielborg Decl. at ¶ 41. In such circumstances, Buchanan requested only that PLCA contractors "be reasonable" with respect to such welders and evaluate their rig pay on a case by case basis. *See* Tielborg Decl. at ¶ 41. Based on this discussion, it was Tielborg, Westphal and Joyce's rightful understanding that, aside from certain welders who were traveling excessive distances, the rig rental rate would remain the IRS substantiated rate that had been in effect for over three years. *See* Tielborg Decl. at ¶ 42.

During this meeting between Buchanan, Stephenson, Tielborg, Westphal and Joyce, the parties were able to reach an agreement in principle on the specific terms of the current CBA, as proposed by Buchanan. As part of the agreement reached with Buchanan, the parties agreed to each appoint three members to a "Steering Committee" which would meet over the course of several weeks to work on the language and drafting of the actual NPLA, and address any discrepancies or other issues which arose prior to execution of the final agreement. *See* Tielborg Decl. at ¶ 44.

The Steering Committee met on at least eight occasions between December 2005 and late January 2006. *See* Tielborg Decl. at ¶ 44. On January 25, 2006, a draft NPLA was circulated to

the PLCA Labor Committee, which contained all changes that had been made to the document. Significantly, in at least two places in the draft agreement, the parties had included the specific IRS substantiated rate as the rate to be paid for the rental of welding rigs. *See* Mainline Mechanized Welding Agreement at 2 and National Station Agreement at 8, attached as part of the Draft NPLA, attached hereto as Ex. 10. Although this language was initially included, it was ultimately removed and replaced with more general language because under the IRS Revenue Procedure, the substantiated rate was to change in 2007 and the parties did not want to create confusion in the agreement as to the appropriate rate should such a change occur. *See* Tielborg Decl. at ¶ 45.

The current NPLA was ultimately executed on January 30, 2006, to be retroactive to November 1, 2005. *See* Tielborg Decl. at ¶ 46. In keeping with past practice, the rig rental rate is again included in the current agreement, with it being specifically addressed in at least two Attachments which specifically address the rig rental rate issue. Attachment 4 ("Mechanized Welding Agreement") to the current agreement specifically provides that:

> "Welder/Technicians will be paid rig pay as follows: (1) standby - $8.00 per hour plus fuel provided by the Employer so long as the rig is on the jobsite and available for work: (2) Used – on the same basis as paid under the National Pipe Line Agreement."

*See* Attachment 4, attached hereto as Ex. 11. Again, the $8.00 per hour rate (with Employer providing the fuel) referenced in Attachment 4 is the IRS substantiated hourly rate. It also provides that where the welding rigs are actually used, the hourly rate will be paid on the same basis as paid under the NPLA. *Id.* Similarly, in Attachment 2 ("Special Agreement for Station Work") provides that "[R]ig pay to be paid on the same basis as the National Pipe Line Agreement." *See* Attachment 2, attached hereto as Ex. 12.

It is significant to note that these various Special Agreements and Attachments, which were included in the NPLA beginning in 2001, were executed in spite of an Attachment contained in the NPLA which states that "the parties do not negotiate rig rates." *See* Attachment 7 to NPLA, dated June 17, 1999, attached hereto as Ex. 13. Attachment 7 was included in the NPLA prior to the parties seeking a ruling from the IRS on the rig rental rate, and prior to the issuance of Revenue Procedure 2002-41, which established a set substantiated rate. *See* Tielborg Decl. at ¶ 27. However, as discussed above, since May 23, 2002, when the IRS issued Revenue Procedure 2002-41, the parties have abided by the rate established therein, and all subsequent agreements have either tacitly or explicitly acknowledged such through the inclusion of the various Special Agreements and Attachments which either implicitly or explicitly set forth the IRS substantiated rate as the agreed upon rig rental rate. That Attachment 7 was not amended when the more recent Attachments were added is not indicative of the parties' intent to have it remain in effect, but rather reflects the parties' informal attitude toward the "updating" of the NPLA as circumstances warrant. *See* Tielborg Decl. at ¶ 27.

F. The Current Dispute

As part of the agreement reached in January 2006, the parties agreed that the Steering Committee would remain intact and meet over the course of the CBA to address any potential issues arising under the NPLA, or any other concerns of either party. *See* Tielborg Decl. at ¶ 47. Accordingly, the parties met in May 2006 to discuss several issues. Among those issues discussed were per diem payments for missed tests, issues relating to helpers, journeyman issues, "past practice", "hot pay," equal pay for those welders working on 16" and under pipeline, and rig issues. Although the rig issue was discussed during this Steering Committee meeting, there were no demands made with respect to an increase, nor was PLCA given any indication that a

significant dispute existed regarding the terms of the rig rental payments, other than a minority

group of welders was not satisfied with the IRS substantiated amount. *See* Tielborg Decl. at

¶ 47.

 The Steering Committee met again in Chicago, Illinois on October 16, 2006. At this

meeting, the UA expressed concern that the welders were not being adequately compensated for

their welding rigs. In support of this contention, the UA distributed a "Rig Rental Report"

prepared by UA Local 798, which concluded that "Local 798's rig rates are about 1/3 what they

should be in the current market." The UA also concluded that two extra hours per day of rig

pay were appropriate when the living accommodations are greater than fifty (50) miles from the

warehouse or assembly point.

 Following the October 16, 2006, Steering Committee meeting in Chicago, UA Pipeline

and Gas Distribution Representative Phil Stephenson contacted PLCA Managing Director

Tielborg and requested a meeting to specifically discuss only the rig rental rate issue. *See*

Tielborg Decl. at ¶ 49. Although PLCA believed that the parties had already reached an

agreement on this issue in the current NPLA, PLCA agreed to meet with the UA given the

parties' longstanding history and its desire to maintain an amicable relationship. *See* Tielborg

Decl. at ¶ 49. The parties agreed that the UA Negotiating Committee and PLCA's Labor

Committee would meet at the Dallas, Texas Airport Hyatt Hotel on November 29, 2006. *See*

Tielborg Decl. at ¶ 50..

 At this November 29, 2006, meeting in Dallas, the UA for the first time made a demand

for an increase in the rig rental rate from the IRS sanctioned $15.00 per hour to $25.00 per hour.

*See* J. Patrick Tielborg's Notes dated November 29, 2006, ("11/29 Notes"), attached hereto as

Ex. 14. This increase was sought ostensibly to cover the welders' increased costs associated

with operating and maintaining the welding rigs. *Id.* During these discussions, UA representatives made clear that if PLCA did not acquiesce and agree to the demanded increase, PLCA contractors would encounter a shortage of welders and/or welding rigs on their jobs in the near future. *See* Tielborg Decl. at ¶ 51; *see also* 11/29 Notes.

Members of the PLCA Labor Committee were taken aback by the unilateral demand for an increase because although the issue had been discussed previously, it was PLCA's understanding that the current agreement addressed the rate, so any change(s) would have to be for future contracts. *See* Tielborg Decl. at ¶ 52. Accordingly, PLCA refused to agree to the UA's demanded increase in the rig rental rate. *See* Tielborg Decl. at ¶ XX. In the face of PLCA's opposition to its demand for an increased rig rental rate, the UA then sought an alternative increase in the per diem amount paid to the welders under the CBA. *See* 11/29 Notes. PLCA again refused such an increase, as it also would have amounted to a re-opening of the CBA, which PLCA was unwilling to entertain. *See* Tielborg Decl. at ¶ 53, 54.

Beginning on January 7, 2007, the UA and UA welders (Local 798 members), by UA instruction, began demanding the increased $25.00 per hour rig rate. *See* Tielborg Decl. at ¶ 55. Many PLCA contractors were forced to pay the unilaterally increased amount (under protest) for fear that the UA welders would not show up for already bid projects, or would show up without their welding rigs. *See* Tielborg Decl. at ¶ 55. In addition to the increased hourly rate, UA Local 798 began requiring certain PLCA contractors to pay an additional two hours of rig pay as a "Western Fuel Adjustment."

Notably, despite the UA's claim that the rig rental rate was not negotiated, and is therefore not a part of the NPLA, the UA's Director of Gas and Pipeline Distribution has acknowledged in writing that the IRS substantiated rate is in fact the parties' contractual rig

rental rate. Specifically, UA Director of Gas and Pipeline Distribution Phil Stephenson sent a letter to UA Local 342 Business Manager Stephen Mikich on April 24, 2006, nearly three months after the parties executed the 2005-2010 NPLA. *See* Letter from P. Stephenson, dated April 24, 2006, attached hereto as Ex. 15. In this letter, Stephenson states:

> "To my knowledge, the only changes are that the rig rental rate has risen to $14.00 per hour if used and the rig rental rate is $8.50 per hour for mechanized welding jobs where the rig is parked. *These are the negotiated rates on the current National Mainline Pipeline Agreement.*" (emphasis added)

*See* Ex. 15. In this letter, Stephenson is clearly advising a UA Business Manager that the rig rental rate (where the welding rig is being used) is the IRS rate of $14.00 per hour, which was negotiated and is included in the parties' NPLA.

G. Contractual Grievance Procedure and PLCA Grievance Filed

The NPLA contains a very broad grievance/arbitration clause. Specifically, Article XVIII(B) of the NPLA provides:

> "Any other grievance, dispute, difference of opinion or controversy of any kind or character between the Union and the Association and/or individual Employer signatory hereto involving or relating to the interpretation or application of the terms of this Agreement, and the relations between the parties arising during the term of this Agreement which cannot be settled by the parties, shall be settled by the arbitration procedure which is set out below."

On January 10, 2007, PLCA filed a grievance regarding the UA's unilateral increase in the rig rental rate, in accordance with Article XVIII of the NPLA. *See* January 10, 2007, Grievance, attached hereto as Ex. 16. PLCA's grievance alleged that the UA had unilaterally increased the agreed upon rig rental rate, in breach of the NPLA. An amended grievance was filed on February 2, 2007, to include UA Local 798's unlawful imposition of a "Western Fuel Adjustment" for PLCA contractors in New Mexico and Arizona. To date, the UA is refusing to

comply with the arbitration procedures set forth in the NPLA, claiming that the rig rental rate is not an arbitrable issue under the NPLA. While the UA is refusing to properly arbitrate PLCA's grievance, the UA and UA welders continue to demand, in breach of the NPLA, twenty-five ($25) dollars per hour for the rental of welding rigs.

## III. ARGUMENT

### A. Standard for Compelling Arbitration

As an initial matter, the determination of whether a dispute is arbitrable under a collective bargaining agreement is a question of law for the court, unless the parties unmistakably agree to submit the issue of arbitrability to arbitration. *See AT&T Technologies Inc., v. Communication Workers of America,* 475 U.S. 643, 650 (1986); *see also Washington Mailers Union No. 29 v. Washington Post Company,* 233 F.3d 587, 589 (D.C. Cir. 2000). Once a court has determined that there is no specific provision of the collective bargaining agreement which requires an arbitrator to determine the arbitrability of a dispute, the court must engage in a two-step analysis.[3] *See United Parcel Service, Inc., v. International Brotherhood of Teamsters, AFL-CIO,* 999 F. Supp. 70, 73 (D.D.C. 1998). First, it is well-settled that arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit. *See AT&T Technologies Inc.,* 475 U.S. at 648. Therefore, a court must first determine whether the parties to the dispute are also party to a collective bargaining agreement and its arbitration clause. *See United Parcel Service, Inc.,* 999 F. Supp. at 73.

If the court determines that the parties are subject to a collective bargaining agreement, it must then ascertain whether the dispute giving rise to the lawsuit turns on issues that lie within the "zone of arbitrable issues" established by the collective bargaining agreement's arbitration

[3] There is no provision in the NPLA mandating that the arbitrability of a dispute be determined by an arbitrator.

clause. *Id.* In reaching such a determination, a majority of courts have recognized that where a collective bargaining agreement includes an arbitration clause, a presumption of arbitrability arises. *See, e.g., Washington Mailers Union No. 29*, 233 F.3d at 589 ("[A]nd if a contract includes an arbitration clause, a presumption of arbitrability arises ..."); *United Parcel Service, Inc.,* 999 F. Supp. at 73 ("[W]hen considering whether the issues underlying a dispute lie within the zone of arbitrable issues created by the agreement, courts apply a very strong presumption in favor of arbitration."); *TRT Telecommunications Corp., v. Local 111, American Communications Association*, 719 F. Supp. 1, 4 (D.D.C. 1989)("[W]here it has been established that the contract contains an arbitration clause, there is a presumption of arbitrability ..."). Indeed, it is widely accepted that "[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Technologies, Inc.*, 475 U.S. at 650; *see also American Postal Workers Union, AFL-CIO v. United States Postal Service*, 372 F. Supp. 2d 83, 89 (D.D.C. 2005); *Washington Mailers Union No. 29*, 233 F. 3d at 589; *TRT Telecommunications Corp.*, 719 F. Supp. at 4. Doubts as to whether the issue in dispute is covered by the arbitration clause should be resolved in favor of coverage. *AT&T Technologies, Inc.*, 475 U.S. at 650. And notably, in determining whether a dispute should be subject to arbitration, courts may not consider the merits of the underlying claim. *Id.* Indeed, whether a claim is arguable or not, or even frivolous, is not for the court to decide, but rather the arbitrator. *Id. See also, Washington Mailers Union No. 29*, 233 F.3d at 589.

Many courts have interpreted the strong presumption in favor of arbitrability as mandating arbitration unless there is clear evidence excluding the issue in dispute from arbitration. *See, e.g., AT&T Technologies, Inc.*, 475 U.S. at 650 ("[I]n the absence of any express

provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."); *United Parcel Service, Inc.*, 999 F. Supp. at 73 ("[A] dispute will be deemed to be arbitrable unless the parties' collective bargaining agreement clearly identifies a class of issues that lie outside the arbitration zone, and it is equally clear to the court that the dispute giving rise to the lawsuit turns on issues that belong in that class."); *TRT Telecommunications Corp.*, 719 F. Supp. at 4 ("Under this narrow standard, weighted in favor of arbitration, the Court must determine only whether 'because of express exclusion or other forceful evidence, there is no reasonable interpretation of the Agreement which would permit arbitration.'"). This is especially true where the arbitration clause is broad, and provides for arbitration of any differences arising with respect to the interpretation of a contract or the performance of obligations arising under the contract. *AT&T Technologies, Inc.*, 475 U.S. at 650.

B. Given The Presumption Of Arbitrability That Arises From The Broad Arbitration Clause In The Collective Bargaining Agreement, The Court Should Compel The UA To Submit To Arbitration

It is undisputed that PLCA and the UA are party to a collective bargaining agreement which contains an arbitration clause governing disputes under the NPLA, and that there is no provision in the NPLA requiring that an arbitrator determine the arbitrability of particular disputes. Thus, this Court need only determine whether PLCA's grievance is within the "zone of arbitrable issues" created by the parties' arbitration clause. As discussed above, the NPLA arbitration clause mandates arbitration for "[A]ny other grievance, dispute, difference of opinion or controversy of any kind of character between the Union and the Association and/or individual Employer signatory hereto involving or relating to the interpretation or application of the terms of this Agreement, and the relations between the parties" arising during the term of the collective bargaining agreement. PLCA's position is that the rig rental rate is an explicit term of the parties'

collective bargaining agreement, as is evidenced by the language in various attachments to the NPLA. Conversely, the UA is taking the position that the rig rental rate is not an explicit term of the NPLA, and cites to a specific, earlier dated attachment of the agreement in support of its position. Resolution of this dispute, therefore, irrefutably turns on the *interpretation* of the various provisions of the NPLA, and makes it subject to arbitration.

Even if the dispute over the rig rental rate did not turn exclusively on an interpretation of the collective bargaining agreement, arbitration of the dispute would nonetheless be proper. Indeed, the parties' arbitration clause is so broad, explicitly encompassing *any* grievance, dispute, difference of opinion or controversy of any kind between the UA and PLCA/individual employer signatories and involving the interpretation or application of the NPLA and the relations between the parties, that any dispute in the relationship can arguably be said to be arbitrable. Such is undoubtedly the intent of arbitration clauses worded as broadly and as all-encompassing as the clause at issue here.

Given the strong presumption of arbitrability that arises from the existence of the broadly worded arbitration clause, an order compelling arbitration should only be denied if the UA can show an "express exclusion or other forceful evidence" demonstrating that there is no "reasonable interpretation" of the NPLA which would permit arbitration. *See TRT Telecommunications, Corp.*, 719 F. Supp. at 4. It cannot. There is no express provision in the NPLA excluding disputes concerning rig rental rates from the arbitration clause, nor is there evidence of any intent to exclude disputes stemming from the interpretation of the various attachments to the NPLA.

Moreover, even assuming *arguendo* that the UA is correct on *the merits of the grievance* and Attachment 7 (the 1999 attachment stating that the parties do not negotiate rig rates) has

somehow withstood an IRS ruling setting a rig rental rate, no less than three separate agreements between the parties establishing a rig rental rate, and a well-documented history (since 1999) of the parties negotiating a rig rental rate, that fact alone has absolutely no bearing on whether the rig rental rate is an arbitrable dispute under the NPLA. Indeed, at most, Attachment 7 and the UA's claims thereunder create an ambiguity with respect to the *interpretation of the NPLA* (*i.e.*, ambiguity as to whether the rig rental rate is a part of the NPLA and should be subject to its arbitration clause). In such circumstances, it is well-settled that doubts as to the coverage of an arbitration clause should be resolved in favor of coverage. *See AT&T Technologies, Inc.*, 475 U.S. at 589; *see also International Union, United Government Security Officers of America, vv. Clark*, 412 F. Supp. 2d 138, 146 (D.D.C. 2006)("[T]hus, as Plaintiffs correctly point out, 'even if this Court finds the language in the CBAs at issue ambiguous or susceptible of more than one interpretation, it still must hold that Defendant must arbitrate the dispute before suing in court.'").

Simply stated, despite what will likely be the UA's argument to the contrary, it is not the province of this Court to resolve any ambiguity that may or may not be created by the existence of Attachment 7, nor is it the Court's duty to otherwise interpret the NPLA or to determine whether or not PLCA's position regarding the rig rental rate dispute even has merit. The Court's only duty is to determine whether the disputed issue *could arguably* be covered by the most broadly worded of arbitration provisions. *AT&T Technologies, Inc.,* 475 U.S. at 589.

C. The Court Should Award Plaintiff Attorney Fees And Costs Associated With The Filing Of This Motion

Many courts, including courts in this Circuit, have recognized that although the NLRA does not authorize the granting of attorney fees for violations of Section 301 of the Act, a court

can nonetheless grant fees under its equity powers if the party violates Section 301 in "bad faith, vexatiously, wantonly, or for oppressive reasons." *See National Ass'n of Letter Carriers v. United States Postal Service*, 192 U.S. App. D.C., 590 F.2d 1171, 1174 (D.C. Cir. 1978); *Washington Hospital Center v. Service Employees Int'l Union, Local 722*, 241 U.S. App. D.C. 186, 746 F. 2d 1503, 1510 (D.C. Cir. 1984)(*citing Varnes v. Local 91, Glass Bottle Blowers' Ass'n of the United States and Canada*, 674 F.2d 1365, 1369 (11th Cir. 1982)); *American Federation of Musicians, Local 2-197 v. The St. Louis Symphony Society,* 203 F.3d 1079, 1081 (8th Cir. 2000); *McKesson Drug Company v. Int'l Bhd. Of Teamsters, Local Union No. 730*, 957 F. Supp.1, 5 (D.D.C. 1997).

In this case, the UA is refusing to arbitrate an inherently arbitrable issue in the hopes of stalling and dragging out the process, and in doing so, force PLCA contractors to negotiate a new rig rental rate, or open the Agreement to increase the per diem amount. Such tactics are the epitome of bad faith. *See, e.g., Int'l Bhd. Of Teamsters Local 174 v. Northwest Infrastructure Inc.,* No. C06-1122P (W.D. Wash. January 19, 2007)(awarding attorneys' fees to union where employer had no legal authority for its positions and actions were intended to drag out the dispute). Indeed, this conclusion is supported by Phil Stepenson's letter of April 24, 2006 in which Stephenson acknowledges that the rig rental rate is $14.00 per hour (if the rig is being used) and that "[T]hese are the negotiated rates on the current National Mainline Pipeline Agreement." *See* Ex. 15, supra. That the Director of Gas and Pipeline Distribution for the UA knows that the $14.00 IRS rate is the "negotiated rate" on the current NPLA is evidence that the UA knows the rig rental rate is an arbitrable dispute, despite its current claims to the contrary.

Moreover, the UA is stalling the grievance process by refusing to arbitrate so that UA welders can continue to demand and collect the unlawfully increased rate in violation of the

CBA, and at considerable expense to PLCA contractors, which can rightfully be deemed an "oppressive reason."

Finally, even if the UA's refusal to arbitrate the rig rental rate grievance is not undertaken intentionally in bad faith, an award of attorney fees is nonetheless appropriate. Indeed, under the standard set forth in *National Letter Carriers, supra*, and *Washington Hospital Center, supra*, subjective bad faith is not required for an attorneys' fees award to be warranted. *See Washington Hospital Center*, 746 F.2d at 1509-10. Indeed, it is sufficient that the losing party's actions were "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Id.* As demonstrated above, because of the broadly worded arbitration clause contained in the CBA governing the relations between PLCA and the UA, virtually any dispute relating in any conceivable way to the interpretation of the agreement and the relations of the parties to the agreement is an arbitrable dispute. Therefore, any claim by the UA that a grievance arising out of conflicting interpretations of the CBA regarding the rig rental rate is not an arbitrable dispute is inherently unreasonable and simply lacks foundation. As such, because this motion was necessitated by Defendant's refusal to arbitrate, whether intentionally in bad faith or not, this Court should award Plaintiff attorneys' fees associated with the filing of this motion, in addition to ordering the Defendant to submit to arbitration.

## IV. CONCLUSION

Given that PLCA and the UA are undeniably party to a valid collective bargaining agreement, and said agreement contains a broadly worded arbitration clause requiring the arbitration of any grievance, dispute, difference of opinion or controversy *of any kind* arising between PLCA and the UA that involves or relates to the interpretation or application of the CBA, this Court should issue an Order compelling the UA to submit to arbitration as the rig

rental rate dispute clearly turns on the interpretation of the parties CBA, and award Plaintiff attorneys' fees and costs as appropriate.

Respectfully submitted,

Lawrence D. Levien, Esq. (DC Bar No. 191528)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 887-4000 (telephone)
(202) 887-4288 (facsimile)

Dated: June 4, 2007 Counsel for PLCA

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 4, 2007 a copy of Plaintiff Pipe Line Contractors Association's Motion to Compel Defendant to Submit to Arbitration, Memorandum of Law in Support of and Proposed Order were served via overnight delivery, upon the following:

United Association of Journeymen and
Apprentices of the Plumbing and Pipefitting
Industry of the United States and Canada, AFL-CIO
901 Massachusetts Avenue, NW
Washington, D.C. 2001

Nicole M. Morgan
Nicole M. Morgan

# EXHIBIT 1

# CASE NO. 1:07-cv-00973

**DECLARATION OF J. PATRICK TIELBORG IN SUPPORT OF PLCA'S UNFAIR LABOR PRACTICE CHARGE**

I, J. Patrick Tielborg, having personal knowledge of the facts contained in this declaration and being competent to testify to them, hereby state as follows:

1. I am Managing Director and General Counsel for the Pipe Line Contractors Association ("PLCA"). I have held this position, or the position of Executive Director since 1978.

2. In my capacity as Managing Director and General Counsel, I manage PLCA's daily affairs. Additionally I am responsible for coordinating the PLCA Labor Committee activities, assisting the Labor Committee in negotiating all PLCA contracts with labor unions, including those with the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO ("UA" or "Union"), and policing and enforcing said contracts. I serve at the direction of the PLCA Board of Directors.

3. PLCA is a longstanding association of contractors who contract to perform the construction and maintenance of cross-country pipelines. These pipelines are used to transport any transportable materials. The individual projects for which PLCA members contract generally span anywhere from several hundred feet in length to over one thousand miles. Projects consisting of more than one hundred miles are often done by multiple contractors. Such larger pipeline projects require major logistical and infrastructure work, which can cost anywhere from $80 million dollars to $250 million dollars.

4. PLCA currently consists of fifty-three (53) regular member contractors. PLCA membership elects a president annually, and also has several committees responsible for PLCA business.

5. PLCA's Labor Committee is responsible for negotiating all labor contracts. The PLCA staff is responsible for resolving any labor disputes which may arise between the member contractors and their employees. The Labor Committee is comprised of between five and thirteen PLCA member contractors, who are appointed by the PLCA President, subject to PLCA Board of Directors approval. Labor Committee members serve one year terms on the committee.

6. PLCA contractors through the collective bargaining agreement utilize UA members to provide welding and maintenance services on the various pipeline projects across the United States. Non-PLCA contractors who sign the NPLA

would also utilize UA members for pipeline projects on the same basis and under the same terms and conditions as PLCA contractors.

7.    PLCA and the UA have been party to a collective bargaining agreement governing the terms and conditions of welders' employment since approximately 1950. This collective bargaining agreement is known as the National Pipe Line Agreement ("NPLA"). While PLCA is a signatory to the NPLA, each individual PLCA member contractor, except those appointed to the Labor Committee, must independently become a signatory to the NPLA, by individually signing an acceptance of Agreement form). Accordingly, PLCA represents the interests of, and acts on behalf of, each individual signatory PLCA contractor.

8.    Under the NPLA, UA welders are paid an hourly wage, hourly fringe benefits (including pension, welfare, and training) and a per diem amount.

9.    In addition to the hourly wage and per diem, since approximately 1960, PLCA contractors have also paid the welders an additional hourly rate (by separate check) for the rental of the welders' welding rigs, which are used in the welders' performance of their duties for the contractors.

10.    PLCA contractors depend on the use of the welders' individual welding rigs because each welding rig is a significant capital investment, which the individual signatory members cannot generally afford to absorb. This is especially true on larger projects (*e.g.*, fifty or more welders), with each welder necessitating separate ownership of a welding rig.

11.    UA Local 798 is by far the dominant local in the union. It has a forty-two (42) state jurisdiction, and approximately eighty-five to ninety percent (85-90%) of UA welders that work on PCLA contractor jobs are affiliated with UA Local 798. UA Local 798 is officially referred to as "Pipeliners Union 798."

12.    Given the number of rigs that would be required by each individual PLCA contractor, converting and maintaining a fleet of welding rigs is not financially or logistically feasible for most contractors. Additionally, it has been my experience that the welders generally prefer to use their own welding rigs on the job because in addition to using the welding rig apparatus while performing their work, they also use it as transportation to and from the job sites on a daily basis to and from home at the start and end of each job. Moreover, since the 1960s the UA has taken the position that all pipeline jobs covered under the National Pipe Line Agreement will require rental of UA rigs (*i.e.* all jobs are "rig jobs").

13.    During my time with PLCA, the UA and PLCA have generally maintained an excellent working relationship. There have been no instances of work stoppage in the past thirty (30) years, and there have been very limited instances of labor strife.

14.    Because of this excellent working relationship that has developed over many years, PLCA and the UA have a history of open discussions concerning problems

and ideas, and we have a relatively informal manner of dealing with problems should they arise. This informal manner has historically also applied to our dealings with respect to the NPLA, and has allowed it to be somewhat of a "work in progress" with changes, additions and deletions being made on an ongoing basis. For example, during the 2005-2010 negotiations, the UA and PLCA agreed in principle to amend Article XI (L) of the NPLA, the provision dealing with "hot work," as well as the premium dealing with "splatter pay." Although these changes have been agreed to, they have not yet actually been made to the NPLA. These types of ongoing changes have been common in my experience with the PLCA and the UA.

15.    Over the course of the approximately forty years the practice of contractors renting welding rigs from the welders was in effect, several issues arose which caused problems for both the welders and PLCA contractors. By the late 1990s, there was a general confusion by both welders and contractors as to how the rig rental payments were to be treated for federal income tax purposes. Additionally, many welders were being audited by the Internal Revenue Service ("IRS") because the depreciation they were claiming on their welding rigs was not matching the income reported by the contractors to the IRS.

16.    Also, in or around 2000, it became clear to both the welders and the contractors that certain non-union contractors were using excessive rig rental payments to disguise wages. This practice threatened to hurt the UA's business (and welders) through the undermining of its wage scale. It also had the potential to result in the loss of rig rental payments as a tool for reimbursement because the excessive payments were drawing investigations by the Department of Labor for potential Fair Labor Standards Act violations, and such a crackdown could result in less compensation and zero return on their investment for the welders, as well as either huge capital expenditures by the contractors for welding rigs or decreased projects. As a result, both the UA and the PLCA were very concerned about the competition from non-union contractors and their use of excessive rig rental payments to disguise wages.

17.    I was personally aware of several cases which came about as a result of non-union contractors paying excessive rig rental payments to welders in an attempt to disguise wages. Also, I had many discussions with UA counsel Ellen Boardman about these cases and their potential impact on the UA/PLCA dealings.

18.    After discussing this issue on numerous occasions, in 2001, PLCA and the UA agreed that PLCA would seek a ruling from the IRS on how such rig rental payments were to be treated for income tax purposes. PLCA made the formal submission to the IRS, but the UA was integrally involved in securing the ruling. Indeed, it is my understanding that the IRS consulted representatives from the UA regarding this issue before reaching any decision and/or issuing any ruling.

19.    Following the summer 2001 submission to the IRS, PLCA and the UA negotiated regarding the rig rental rate. In December 2001 PLCA and UA General President

Maddaloni executed a Special Agreement which established an hourly rig rental rate of $12 per hour. This agreement was executed so as to ensure that there was uniformity in the amounts being paid for the rig rentals, and that those welders working on Small Diameter pipeline projects were receiving the same rental rate as welders working on other projects under the NPLA.

20. These negotiations took place over the fall of 2001. The UA was represented in the negotiations by UA Director of Pipeline and Gas Distribution John Budzinski. Budzinski was an international representative who reported directly to the UA General President and was responsible for overseeing and coordinating all pipeline work nationally, including all work done for PLCA contractors. The UA Director of Pipeline also participates in the negotiations for labor contracts with PLCA and other employers.

21. PLCA and the UA reached an agreement on the rig rental rate on December 18, 2001. It was acknowledged and consented to by then UA President Martin Maddaloni, and UA Director of Pipeline Budzinski. As such, neither I, nor anyone at PLCA had any reason to doubt the agreement's validity.

22. On May 23, 2002, the IRS issued Revenue Procedure 2002-41, which established a "substantiated rate" for the hourly rig rentals, and essentially made such payments "non-events" for federal income tax purposes. When the IRS issued this revenue procedure, PLCA and the UA agreed that the IRS substantiated rate would be the accepted hourly rig rental rate. To that end, I sent all regular PLCA members a letter on June 12, 2002 informing them that PLCA and the UA had reached an agreement that the UA Local 798 suggested rig rental rates for both mainline and the Special Agreement would become effective for all work bid on or after July 1, 2002. The UA Local 798 suggested rate was the IRS substantiated rate. This understanding between PLCA and the UA (that the IRS substantiated rate was now the accepted, established rate) was codified in an agreement executed by myself and John Budzinski of the UA on June 26, 2002.

23. From the time the IRS issued Revenue Procedure 2002-41, both PLCA and the UA abided by it. UA welders were paid the substantiated amount set forth in the revenue procedure. Indeed, to my knowledge, with a few exceptions governed by local conditions, no other rate has been paid to UA welders for their welding rigs since 2002-41 was issued.

24. Despite the generally strict adherence to 2002-41, there are a few regions where the rig rental rates were higher than those paid elsewhere in the country. The rates paid in California, Washington and Oregon have historically been higher due to local conditions. However, following the issuance of Rev. Proc. 2002-41, even the welders and contractors in these states began abiding by the IRS substantiated rate, despite their efforts to the contrary. For example, in 2003 several California UA Locals demanded a rig rental rate in excess of the IRS rate, claiming that the IRS rate was lower than the rate that they had previously been paid. Upon this demand, I immediately notified UA Director of Pipeline Budzinski via

memorandum that exceeding the IRS substantiated rate could possibly result in the entire rig rental payments becoming taxable to the welders and cautioned against any action or demands that would jeopardize the IRS safe harbor. The California Locals dropped their demand for increased rig rental payments.

25.  In 2004-2005, PLCA and the UA executed a one-year collective bargaining agreement which again included the IRS substantiated rate. Said rate was set forth in another "Special Agreement." Because of the understanding of the parties that the IRS substantiated rate was the established, agreed upon rate for all work performed under the National Pipe Line Agreement, PLCA and the UA did not feel it was necessary to include a specific provision in the CBA other than the Special Agreement. Moreover, this agreement was essentially a "stop-gap" agreement executed to prevent any labor discord while the parties began contemplating a new NPLA.

26.  In summer 2005, PLCA and the UA began negotiating toward a new NPLA. Initially, negotiations did not go well. Because negotiations were ongoing however, PLCA and the UA agreed upon and executed an Extension Agreement, which was to last through September 2005.

27.  In 1999, for various reasons, PLCA and the UA included Interpretation Attachment in the CBA which stated that the parties "do not negotiate rig rentals." This Attachment was included before the parties had jointly agreed to apply to the IRS for a ruling on the rig rental rate, and before the parties jointly agreed to abide by Revenue Procedure 2002-41. Following the issuance of Revenue Procedure 2002-41, Attachment 7 should have been amended to delete the above language, especially in light of changes in the Agreement. Amending Attachment 7 to delete the language concerning rig rentals was simply something that the parties had not yet gotten around to, much like updating the NPLA to address the agreed upon changes concerning "hot work" and "splatter pay.".

28.  In late September 2005, the new UA Director of Pipeline Phil Stephenson advised me that the UA was terminating the July 2005 extension agreement. Again, as Director of Pipeline and Gas Distribution, Stephenson was an international representative who reported directly to the UA General President. He was responsible for overseeing and coordinating all pipeline work nationally, including all work done for PLCA contractors.

29.  The September 2005 termination of the extension agreement placed a new importance on the negotiations, and reaching an agreement on a new NPLA, as a failure to do so had the potential to result in labor shortages, work stoppages, and general uncertainty in the pipeline industry. Such would have been devastating to PLCA contractors' business.

30.  On October 18-19, 2005, the parties held negotiating sessions at the Diplomat Hotel in Hollywood, Florida. The PLCA negotiating committee (Labor Committee) attending the negotiations consisted of Greg Curran, Charles Joyce,

Dave Stotz, Chris Leines, Robert Westphal, Don Thorn, James Nolan II, Brian Ganske and myself. The UA negotiating committee was comprised of Phil Stephenson, Mike O'Connell, Scott North, and Tom Gallo.

31.    Following several hours of negotiating, UA Director of Pipeline Phil Stephenson made a proposal on behalf of the UA. That proposal included a 6 1/2 % wage increase for the first year of the agreement, and a 5 1/2% increase for the following two years, as well as certain other provisions, including concessions from the contractors on fuel costs for the welding rigs. The rig rental rate was a specific topic of discussion and negotiation during the negotiations for the current 2005-2010 CBA. On its negotiating agenda, the UA had specifically included a reference to "rig pay."

32.    Upon reviewing the UA's proposal, PLCA's negotiating committee directed me to advise Phil Stephenson that PLCA would not agree to the proposal. Stephenson told me that if PLCA did not agree to the proposed wage increases and other concessions, UA welders would cease work as of January 1, 2006.

33.    Stephenson's position following PLCA's rejection of the UA's proposal resulted in somewhat of a stalemate in negotiations and in an effort to keep negotiations progressing, I requested to speak directly with UA General President William Hite.

34.    Stephenson advised me that he did not think UA General President Hite would agree to meet with me but that he would relay my request.

35.    While we were waiting to hear if GP Hite would agree to meet with me, the PLCA negotiating committee remained at their hotel (the Marriott) and the UA reps remained at the Diplomat.

36.    Approximately one hour after I requested to speak with UA President Hite, Jim Buchanan, UA Local 597 Business Representative contacted me at my hotel and requested a meeting with myself, PLCA Labor Committee Chairman Charlie Joyce, and PLCA President Bob Westphal at the Diplomat Hotel.

37.    I contacted Charlie Joyce and Bob Westphal and told them of Buchanan's request. We went to the Diplomat to meet Buchanan at the specified time. While waiting outside the room to meet with Buchanan, we heard loud discussions coming from inside the room where the UA negotiating committee had been caucusing.

38.    We met alone with Buchanan initially, at which time he advised us that he had been designated by UA President Hite to represent him [Hite] and the UA in the contract negotiations. Buchanan advised us that he would be conducting the negotiations on behalf of UA President Hite, and that no one from the UA negotiating committee, with the exception of Phil Stephenson, would be allowed in the negotiating room.

39. Based on this conversation with Buchanan, it was my understanding that Buchanan had the authority to act on behalf of GP Hite, and had authority to negotiate and agree to terms on behalf of the UA.

40. Buchanan then let Phil Stephenson into the room where we were meeting, but Stephenson spoke little during this negotiating session and only with Buchanan's approval.

41. During our meeting with Buchanan, he stated that if PLCA would agree to a 5 year contract with a 5% annual total package increase for the first year, and a 4 1/2% for the second and third year, with a wage re-opener provision for the final two years, there would be a deal and there would be "no work stoppage." Also during this conversation, Buchanan advised us that the rig rental rate would only be an issue for welders who were required to travel excessive distances to their jobs. He stated that if PLCA would agree to consider such instances on a case by case basis and "be reasonable" in dealing with those welders, the rig rental rate would otherwise not be a problem.

42. From this meeting with Jim Buchanan, it was my understanding that, aside from certain welders who were traveling excessive distances, the rig rental rate issue had been resolved and that the status quo, *i.e.*, paying the IRS substantiated rate, would remain in effect for the upcoming NPLA.

43. It was also my understanding during the meeting with Buchanan that he was acting on behalf of the UA General President and the UA and had authority to enter into an agreement, at least in principle.

44. Once we had reached an agreement on the contract in principle, the parties agreed to designate a "steering committee" which would meet to clarify any language, and resolve any minor outstanding issues with respect to the agreement. This Steering Committee was comprised of myself, Chris Leines and Don Thorn for PLCA, and Tom Gross, James Moss, and Jack Holley for the UA. It met on at least eight occasions between November 2005 and January 2006 when the 2005-2010 NPLA was finally executed.

45. The draft NPLA circulated in early January 2006 explicitly contained the IRS substantiated rate as the rate to be paid for the rental of welding rigs. This language was ultimately removed and replaced with more general language because under the IRS Revenue Procedure, the substantiated rate was to change in 2007 and we did not want to create confusion in the agreement as to the appropriate rate should such a change occur.

46. The 2005-2010 NPLA was executed on January 30, 2006, and contains at least two references to the rig rental rate (Attachments 2 and 4). Because of the understanding that the IRS rate was to remain in effect, and the assurances by Buchanan that the rig rental rate would not be an issue, I did not feel it was

necessary to include a specific provision setting forth the IRS substantiated rate in the body of the NPLA.

47.  Once the CBA was executed, the parties agreed that the steering committee would continue to meet periodically to address issues that may arise under the agreement. Such meetings occurred in May 2006 and October 2006. Although the rig rental issue was discussed during these meetings, there were no demands made with respect to an increase, but James Moss, with the UA Steering Committee advised us that there was a minority group of welders in UA Local 798 pushing for rig increase. We thought with the 2005-2010 NPLA, the rig issue was settled.

48.  During the October 2006 Steering Committee meeting, the UA for the first time confirmed Moss' previous assertion that among a minority group of welders in Local 798 there existed a concrete unhappiness with the current rig rental rate, however, no demands were made with respect to an increase, nor were any offers made.

49.  Following the October 2006 Steering Committee meeting, UA Director of Pipeline Phil Stephenson contacted me and requested a meeting to specifically discuss the rig rental rate issue. Although it was the PLCA's belief that an agreement on this matter existed, I agreed to coordinate a meeting in light of the excellent relationship between PLCA and the UA.

50.  On November 29, 2006, at the UA's request, I and members of the PLCA Labor Committee met with members of the UA Negotiating Committee in at the airport Hyatt Hotel in Dallas, Texas. At this meeting, the UA informed us that as of January 6, 2007, it would unilaterally increase the rig rental rate from the IRS sanctioned $15 per hour to $25 per hour. I advised the UA that such an increase was not in keeping with our agreement and stated that PLCA contractors would not pay such an increased rate. I also advised them that such an increase may result in the entire rig rental rate being taxable to the welders.

51.  UA Director of Pipeline Phil Stephenson made clear that if PLCA did not pay the increased amount, PLCA contractors would encounter a shortage of welders and/or welding rigs on their jobs in the near future.

52.  I and other members of the PLCA Labor Committee were taken aback by the unilateral demand because it was PLCA's understanding that the current NPLA addressed the rig rate issue and than any change would have to be for future contracts. Accordingly, the PLCA Labor Committee refused to agree to the demanded increase.

53.  When it became clear that the PLCA would not acquiesce to the demand for a unilateral increase, UA Director of Pipeline Phil Stephenson then sought an alternative increase in the per diem amount received, so as to avoid the potential tax issues associated with an increased rig rate.

54. Our Labor Committee refused, as increasing the per diem would mean that PLCA would be agreeing to re-open the CBA, which was less than a year old.

55. The issue was not resolved in November 2006, and as of January 6, 2007, UA welders have been demanding $25 per hour for their welding rigs. Many PLCA contractors have been forced to pay the increased rate for fear of the welders striking and/or withholding their welding rigs, which would effectively shut down the contractors' projects. Contractors working in California, Illinois, and Wisconsin, outside Local 798 jurisdiction have been paying only the agreed upon $15/per hour IRS substantiated rig rental rate.

56. In addition to the increased rig rental rate, UA Local 798 has begun requiring PLCA contractors to pay an additional two hours of rig pay as a "Western Fuel Adjustment." Local 798 has now dropped this adjustment.

57. PLCA was not a party to 1996 GCM LEXIS 7.

I hereby declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED ON: March 21, 2007

J. Patrick Tielborg

J. Patrick Tielborg

# EXHIBIT 2

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

ATTORNEYS AT LAW

ROBERT S. STRAUSS BUILDING
1333 NEW HAMPSHIRE AVENUE, N.W.
WASHINGTON, D.C. 20036
(202) 887-4000
FAX (202) 887-4288
www.akingump.com

AUSTIN
BRUSSELS
DALLAS
DENVER
HOUSTON
LONDON
LOS ANGELES
MOSCOW
NEW YORK
NORTHERN VIRGINIA
PHILADELPHIA
SAN ANTONIO
WASHINGTON, D.C.

RIYADH (AFFILIATE)

DIRECT DIAL NUMBER (202) 887-4064
E-MAIL ADDRESS dalexander@akingump.com

September 12, 2001

IRS Office of Chief Counsel
Division Counsel/Associate Chief Counsel (TEGE)
Attn: Ms. Mary Oppenheimer
1111 Constitution Avenue, N.W., Room 5213
Washington, D.C. 20224

**Re:** ***IRS Issue Resolution Pilot Program***

Dear Ms. Oppenheimer:

Enclosed are 11 copies of our Memorandum and Attachments. If you have any questions, please let me know.

Sincerely,

Donald C. Alexander

DCA/imk
Enclosures

cc: Daniel J. Micciche, Esq.
PLCA IRS Pilot Program Committee

#503999
(Clt 004488-0001 – PLCA)

# INDUSTRY ISSUE RESOLUTION PILOT PROGRAM
# PIPE LINE CONTRACTORS ASSOCIATION

## INFORMATION BOOKLET

# INDEX

I. Memorandum to Jack Schroeder, Mary Oppenheimer, and the Internal Revenue Service.

ATTACHMENTS

A. Photograph of Mechanic's Rig

B. Estimate of Cost of Mechanic's Rig

C. Rig Rental and Insurance Agreement

D. Photograph of Welding Rig

E. Estimate of Cost of Welding Rig

F. Welding Rig Rental Estimate – United Rentals

G. Welding Rig Rental Estimate – Hertz

H. Pickup Rental and Insurance Agreement

I. Pickup Rental Estimate – Thrifty

J. Pickup Rental Estimate – Arena

# TAB 1

# MEMORANDUM

**TO:**  Jack L. Schroeder, Director, Field Operations
Mary Oppenheimer, Division Counsel/Associate Chief Counsel (TEGE)
Internal Revenue Service

**FROM:**  Akin, Gump, Strauss, Hauer & Feld, L.L.P. on behalf of the Pipe Line Contractors Association

**DATE:**  September 13, 2001

**RE:**  Internal Revenue Service Industry Resolution Pilot Program

---

## I.   ISSUE.

In recent years, the Internal Revenue Service (the "Service") has questioned the longstanding practice of pipeline contractors treating amounts paid to employees for rental of mechanics' rigs, welding rigs, and pickup trucks as rental payments and reporting them on IRS Form 1099. The issue is whether this practice must be changed by requiring these amounts to be treated as wages or expense reimbursements subject to the accountable plan rules under Section 62(c) of the Internal Revenue Code.

## II.   STATEMENT OF FACTS.

### A.   The Pipe Line Contractors Association.

The Pipe Line Contractors Association ("PLCA") is a non-profit organization composed of 54 companies engaged in the pipeline construction business. PLCA contractors employ approximately 5,000 union-represented workers to work on various pipeline construction projects. PLCA contractors perform most of the major mainline cross-country pipeline construction in the United States. Headquartered in Dallas, Texas, the PLCA's purposes include resolving problems common to all pipeline construction firms in the industry, and negotiating and administering the National Pipe Line Agreements. Those collective bargaining contracts cover the entire industry and are negotiated with the four international unions that are recognized as having jurisdiction in the pipeline construction industry: the Laborers International Union of North America; the International Union of Operating Engineers; the International Brotherhood of Teamsters, AFL-CIO; and the United Association of Journeyman and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada.[1]

---

[1] The PLCA provided copies of these agreements to the Internal Revenue Service Team during the Industry Issue Resolution Pilot Program meeting on June 27, 2001.

### B. Facts Generally Common To The Pipeline Construction Industry.

Generally, pipeline contractors are hired by oil and/or gas companies (i.e., project owners) to build natural gas or liquid pipelines. When a contractor is the successful bidder on a project or is otherwise hired to construct a pipeline, it hires a variety of workers to assist in completion of the project, including welders, welder helpers, spacers and stabbers (workers who align and position the pipe prior to welding), heavy equipment operators ("operators"), laborers, mechanics, and truck and bus drivers ("teamsters"). These workers are hired on a per project basis, and are treated and paid for their services as employees rather than independent contractors. The duration of pipeline construction projects ranges from a few days to six to nine months or longer. It is common for pipeline workers to work for several different pipeline contractors during the course of a year. It is also common for pipeline workers to work for the same contractor on more than one occasion during a twelve-month period. Pipeline workers generally work a six-day work week and a ten-hour work day, but it is not uncommon for them to work up to 12 hours a day and 70 hours a week. Their workday starts upon their departure from the warehouse or assembly point on the job and ends on the work site/right-of-way.

#### 1. Overview of the Pipeline Construction Process.

The pipeline construction process requires orderly and sequential coordination of various crafts and workers. The workforce is divided into multiple crews or work gangs, which work along a right-of-way in an assembly line fashion. First, a land clearing crew, consisting of operators and laborers, clears the land by removing trees, fences, and other objects. Next, a land-grading crew, consisting of operators, teamsters, and laborers, prepares the land by smoothing it, and a crew made up of the same type of workers digs a ditch in which the pipeline will be laid. A pipe-stringing crew, consisting of operators, teamsters, and laborers, then lays pieces of pipe or "pipe joints" end-on-end along the right of way. Each pipe joint can be forty or sixty feet in length or longer and six to forty eight inches in diameter. Then a pipe-bending crew, consisting of operators and laborers, bends the pipe joints so, once they have been welded together and lowered into the ground, they will lie evenly in the ditch.

After the pipe is bent to match the terrain of the land, the pipe gang, made up of welders, spacers, and stabbers (collectively referred to as "journeymen"), and welder helpers, operators, and laborers, positions the pipe, aligns it, and makes the initial welds. The pipe gang is actually responsible for two welding operations. One crew makes the root bead, also called the stringer bead. After release of the line-up clamp that holds together the two joints of pipe while the stringer bead is made, a second crew follows immediately behind the stringer bead crew and makes the hot-pass weld. Next, another welding crew – the firing line – takes over. The firing line builds on the weld material already in place. These additional welds, known as filler beads, are usually made continuously over the previous weld. The final welding pass, called the cap bead, completes welding out the pipe.

Next, a tie-in crew and a road-crossing crew, both made up of welders, welder helpers, operators and laborers, connect the pipeline at road and creek crossings. A lowering-in crew, consisting of operators and laborers, then lowers the pipeline into the ditch. Finally, a back-fill and clean-up crew covers the pipeline and re-seeds or sods the land. Once this is complete, the construction process is finished, and the pipeline is ready for testing, and ultimately, use by the project owner.

On a large job, up to twelve crews work in tandem following one another as the land is cleared and the pipeline is laid. The "spread" – that is, the necessary equipment and crew needed to build a pipeline, can consist of up to 100 or more pieces of equipment, a few hundred workers, and a hundred or more miles of pipeline. At any given time, workers and equipment can be spread over many miles on the project (e.g., 20 to 30 miles).

**2. Mechanics and Mechanics' Rigs.**

Mechanics are responsible for maintaining and repairing the equipment used in the pipeline construction process. Mechanics use "rigs," in repairing and maintaining the numerous pieces of heavy machinery that are used in building pipelines. (See Photograph of Mechanic's Rig, attached hereto as Attachment A.) Mechanics' rigs are necessities for pipeline contractors, as they cannot afford to have substantial and costly equipment used in the pipeline process not in service. On large projects, pipeline contractors need up to eight to ten mechanic's rigs or more, so the project will operate smoothly and efficiently. Pipeline contractors generally will rent mechanics rigs from mechanics who own the rigs.

Because the equipment on which mechanics work is very substantial in terms of size and cost, the mechanic's rigs are quite substantial. A mechanic's rig weighs several thousand pounds and roughly costs about $100,000. (See Estimate of Cost of Mechanic's Rig, attached hereto as Attachment B.) Contractors do not finance the rigs. A mechanic's rig is composed of a two-ton truck, a mechanic's bed, a five-ton crane, an air compressor, a welder, and various other tools and machines (e.g., leads, torches, grinders, wrenches, ratchets, sockets, hammers, impact wrenches). The average working life of this equipment is 10 to 15 years. The mechanics who rent rigs to the contractors are responsible for purchasing and stocking their rigs, and they assume all costs associated with acquiring, operating, repairing, and maintaining their rigs. In addition, the mechanics are responsible for purchasing all necessary insurance for their rigs. (See Rig Rental And Insurance Agreement, attached hereto as Attachment C.)

Mechanics are paid from $25 to $30 an hour for their labor, depending on the location of the project, and a separate rate for rental of their rigs. The rental rate for mechanics' rigs is determined between the mechanic and the pipeline contractor, and is evidenced by a written agreement. (See Rig Rental And Insurance Agreement, attached hereto as Attachment C.) This rate varies from $75 to $125 a day, depending on the location of the project. Although it varies from mechanic to mechanic, mechanics generally work approximately eight months a year, six days per week. Accordingly, mechanics' rigs are rented for approximately 200 days a year. Assuming a rental rate of $100 per day, the annual rig rental would be $20,000. In addition, it is fairly common for mechanics to perform services outside the pipeline industry (such as in the highway construction industry) and to use or rent their rigs while performing such services. Mechanics often have an independent repair business, usually run out of a shop or garage near their home, in which they use or rent the rig in repairing heavy equipment and machinery on a for-hire basis.

Although overtime (time and a half and sometimes double time) is paid with respect to the mechanics' wages, it is not paid for rental of mechanics' rigs. (See National Pipe Line Agreement with the International Union of Operating Engineers, Article VII.) Furthermore, mechanics are paid "waiting time" if they reach a job site but cannot work because of occurrences such as weather conditions, but there are no rental payments with respect to mechanics' rigs during this non-working time. (See National Pipe Line Agreement with the

International Union of Operating Engineers, Article VIII.) The amounts paid to the mechanics as wages are reported on IRS Form W-2, and the amounts paid as rig rentals are reported on IRS Form 1099.

**3. Welders and Welding Rigs.**

Welders perform all of the welding on the project. These individuals are highly skilled, and when hired to perform welding services that is the only function they perform at the job site. Although the number of welders hired to construct a pipeline varies, there can be 30 to 50 welders or more working on a large project. Before welders can be certified to work on a project, they must take a welding test, required by the project owner. Pipeline contractors administer the tests in conjunction with project owners' inspectors. Although contractors monitor the welders' work once they begin welding on a project, the project owner hires third-party inspectors whose job it is to check whether a weld is satisfactory and meets the project owner's specifications.

There are two classifications of welders within the industry: "rig welders" and "single hand" welders. "Rig welders" provide their own welding equipment or "rig", which they lease to contractors, while "single hand" welders use contractor-provided equipment, which is either purchased or rented by the contractor from another source. There are more rig welders than single hand welders in the industry. Some projects require contractors to furnish rigs. Most of the pipeline construction projects in Alaska are single hand projects, which means that the contractor furnishes welding equipment and does not rent welding rigs from employees. In addition, Carl E. Smith, Inc., a pipeline construction company in West Virginia, is exclusively a single hand contractor that does not rent welding rigs from its employees.

A welding "rig" is composed of a truck (generally a ¾ or one-ton pickup), a welding machine that is mounted on the truck, welding tanks, gauges, hoses, torches, and various other specialized welding tools (e.g., grinders, cutting torches, welding leads, welding hoods and gloves). (See Photograph of Welding Rig, attached hereto as Attachment D.) Rig welders have approximately $40,000 to $60,000 invested in this equipment. (See Estimate of Cost of Welding Rig, attached hereto as Attachment E.) Contractors do not finance the rigs. The average working life of this equipment is eight to ten years.

The welding machine on a rig can be removed from the truck on which it is mounted. For example, in areas of rough terrain, the contractor may remove welding machines from trucks, mount the welding machines on sleds, and pull them behind tractors or other pieces of heavy machinery. In addition, if a truck breaks down, the contractor may transfer the welding machine from the broken truck to another welding rig. Contractors may also transfer a pipe gang welder's machine to the tack rig when needed.

The welders who rent their welding rigs to the contractors are responsible for purchasing all welding equipment (except welding rods, which are supplied by the contractors) and stocking their rigs before arriving at the job site each day. They assume all costs associated with acquiring, operating, repairing, and maintaining their rigs. They are also responsible for purchasing all necessary insurance for their rigs. Welding rigs are substantial pieces of equipment, as the welding machine alone weighs 900 to 1400 pounds. Welders are not the exclusive operators of their rigs. Welder helpers frequently drive their welders' rigs, but only the owners of the rigs (not welder helpers) are paid rig rental.

generally rent 60 to 75 percent of the pickups used on a project from employees and furnish the other 25 to 40 percent.

Pickups weigh a few thousand pounds and cost from $20,000 to $35,000. Contractors do not finance the pickups. The average working life of a pickup on a pipeline project is three to five years. The employees are responsible for purchasing, repairing, and maintaining their pickups. In addition, the employees are responsible for purchasing all necessary insurance for their pickups. (See Pickup Rental And Insurance Agreement, attached hereto as Attachment H.)

The rental rates charged by pipeline employees are reasonably comparable to those charged by third party rental agencies. (See Letters on pickup rental rates, attached hereto as Attachment I and J.) Employees typically rent their pickups to the contractors for around $30 a day, while rental companies such as Thrifty and Arena charge between $35 and $40 a day. Although there is some difference between the rates charged by rental agencies and individuals, the difference is probably attributable to higher cost infrastructures for rental agencies, such as advertising costs, and the fact that rental agencies generally rent newer equipment than individuals.

Pickups are only rented for working time. Pickups are not rented when they are transporting workers to and from their houses or hotels. Employees who rent pickups are paid from $25 to $30 an hour for their labor, depending on the location of the project, and a separate daily rate for rental of their pickups. Workers who rent pickups to pipeline contractors are paid the same wages as those employees who do not provide pickup trucks. The rental rate for pickups is determined between the employee and the contractor, and is evidenced by a written agreement. Although overtime (time and a half and sometimes double time) is paid with respect to the employees' wages, it is not paid for the rental of the pickups. (See National Pipe Line Agreement with the International Union of Operating Engineers, Article VII.) Further, the employees are paid "show up time" or "waiting time" if they reach a job site but cannot work because of occurrences such as weather conditions, but there are no rental payments with respect to pickups during this non-working time. (See National Pipe Line Agreement with the International Union of Operating Engineers, Article VIII.) Because of the uncertainty that now exists concerning the appropriate tax treatment of payments for the rental of pickups, most pipeline contractors report pickup rentals on IRS Form 1099, while some report these amounts on IRS Form W-2.

## III. LEGAL ANALYSIS.

### A. Introduction.

As stated above, the issue is whether the longstanding practice of the pipeline industry to report payments to certain employees for the use of heavy equipment as rentals reported on Form 1099 must be changed to treat such amounts as wages or expense reimbursements subject to the accountable plan rules under IRC § 62(c). This issue has various facets: (1) Rev. Rul. 68-624, 1968-2 C.B. 424, and payments made for services and property; (2) the classification of revenues paid to a person in a dual capacity; (3) the continued validity of Rev. Rul. 68-624 in light of legislative changes since its issuance; (4) the effect of court decisions addressing somewhat similar circumstances; and (5) certain consequences of a holding that the Industry's longstanding practice must be changed.

### B. Rev. Rul. 68-624

Rev. Rul. 68-624 presented the same basic issue as that in the Pipe Line case, but in a considerably more difficult factual context. A Missouri corporation hired a truck and driver to haul stone at a fixed amount per load, and the question presented was what part of the total amount paid should be considered to be wages. There was no rental agreement or separation of payment for property from that for services. Nevertheless, the Service held that if the contract of employment did not specify a reasonable division of the total amount paid between wages and equipment, a proper allocation could be arrived at by reference "to the prevailing wage scale in the particular locality for similar services in operating the same class of equipment or the fair rental value of similar equipment." Thus, the Service concluded:

1. That payments to an employee for the interrelated furnishing of services and property should be divided for federal tax purposes between that portion paid for services and that portion paid for property; and

2. That if the contract of employment did not specify a reasonable division, the division could be arrived at by either

   (a) Using the prevailing wage scale in the locality for similar services, or

   (b) Using the fair rental value of similar equipment.

In the Pipe Line situation, unlike that in Rev. Rul. 68-624, the contractual arrangement provides a reasonable allocation. The employee is paid his wages as compensation for his services. Under his rental agreement, he is paid rent as compensation for furnishing valuable equipment. That his compensation for services is based upon the prevailing wage scale for similar services is demonstrated by the fact that he receives exactly the same compensation, no less and no more, as an employee rendering similar services but not renting equipment. *Baker v. Barnard Construction Co., Inc.*, 863 F. Supp. 1498 (D.N.M. 1993) (fact that welders without welding rigs were paid same hourly wage as welders who supplied rigs demonstrated that wages of welders who supplied rigs were not understated).

Rev. Rul. 68-624 clearly involved an interrelationship between the furnishing of services and the furnishing of property. Nevertheless, this ruling, issued ten years after Rev. Rul. 58-505 (discussed below), did not find the interrelationship to be determinative of (or even relevant to) classification of such revenue. Yet it has been suggested that such an interrelationship might require that what would otherwise be rental payments for valuable property must be characterized as compensation for services if the property and services are provided by the same taxpayer to the same employer-renter.[2]

### C. The Effect of Rev. Rul. 58-505 Where Valuable Property as Well as Services are Provided.

Rev. Rul. 68-624 did not mention Rev. Rul. 58-505, 1958-2 C.B. 728, issued a decade earlier, in which the Service analyzed the status of two individuals who were president and

[2] On initial review, this might seem odd; if an employee owning a welding rig should work for pipe line construction company A but should rent his rig to construction company B, then he would receive wages from A and rentals from B. Why should his rentals be changed to wages if the employee should provide his welding rig and his services to the same construction company?

secretary of an insurance company and who also sold insurance under the company's standard agent's contract. First, the Service commented in Rev. Rul. 58-505 that if "the services in the two capacities are separate and distinct, that is, if there is no interrelation either as to duties or remuneration in the two capacities, then the status of each type of service must be considered separately." Finding that the services performed as officers and as insurance agents were not "interrelated", the Service held that the individuals were employees with respect to their officer salaries, but independent contractors with respect to their insurance commissions.[3] Thus the Service accepted the proposition that in the performance of services an individual may have a dual relationship with the entity compensating him or her, first as an employee and second as an independent contractor.

In reaching its conclusion in Rev. Rul. 58-505, the Service relied on Rev. Rul. 58-360, 1958-2 C.B. 423. There, the Service considered fees received by federal court reporters from the preparation and sale of official transcripts and salaries received by such reporters for performing their basic duties in transcribing court proceedings. The Service held that the court reporters "operate in a dual capacity. They are employees with respect to the performance of their basic duties ... and independent contractors with respect to the preparation and sale of official transcripts."

Thus, in both rulings, the Service found that the taxpayers were acting in dual capacities. In Rev. Rul. 58-360, and perhaps Rev. Rul. 58-505, dual capacity existed even though the second capacity would not have existed but for the first capacity. The court reporters in Rev. Rul. 58-360 would not have been able to sell the transcripts but for their initial work as court reporters transcribing the proceedings. In Rev. Rul. 58-505, the officers of the company might not have been considered for their positions but for the fact that they were also insurance salesmen for the company, and vice versa.

Rev. Rul. 58-505 dealt with taxpayers who performed more than one *service* for the company. Here, only one service is provided. Rev. Rul. 58-505 and the cases that have cited it support the proposition that a provider of services may act in a dual capacity. While there does not appear to be any authority for extension of Rev. Rul. 58-505 to situations involving the provision of services and the rental of valuable property, we believe that such extension of both the holding and the dictum of Rev. Rul. 58-505 would support treating payments for services as compensation and payments for property as rentals.[4]

### D. Some Further Illustrations of Dual Capacity Payments and Revenues.

In numerous situations other than that described above, a taxpayer acts with another person in more than one capacity. A shareholder may sell or buy or rent property to or from a corporation. A shareholder may be an employee of a corporation. A shareholder-employee may sell or dispose of his shares to a third party. If a payment to a taxpayer is in excess of the amount that would be paid pursuant to a transaction with a third party, the payment may be recharacterized by the Service as having been paid or received by the taxpayer in another

---

[3] Rev. Rul. 82-83, 1982-1 C.B. 151 ("it is a question of fact in all cases whether officers of a corporation are performing services within the scope of their duties as officers or whether they are performing services as independent contractors").

[4] *Idaho Ambucare Center, Inc. v. United States*, 57 F.3d 752 (9th Cir. 1995); *Western Management Inc. v. United States*, 45 Fed. Cl. 543 (Ct. Fed. Cl. 2000).

capacity. Some examples of this basic doctrine follow, and nearly always the Service, not the taxpayer, calls for recharacterization of a transaction by applying dual status.

**1. Bargain Purchases or Rentals of Corporate Property by Shareholders.**

Section 301 of the Code applies to distributions by a corporation "with respect to its stock." According to the regulations, § 301 "is not applicable to an amount paid by a corporation to a shareholder unless the amount is paid to the shareholder in his capacity as such." Reg. § 1.301-1(c). Instances of constructive or disguised distributions are commonly encountered in the context of closely held corporations. The hallmark of a constructive distribution is value passing from, or a sufficiently specific economic benefit conferred by, the corporation to the shareholder, for which the shareholder does not give equivalent value in exchange. *See United States v. Philip K. Smith*, 418 F.2d 589, 593 (5th Cir. 1969).

The regulations state that a corporation's sale of property to its shareholders for less than fair market value is a "distribution" under Section 301 equal to the difference between the property's value and the amount paid. Reg. § 1.301-1(j). *See Harry L. Epstein*, 53 T.C. 459 (1969) (*acq.* and *nonacq.*) (bargain sale to trust for children of shareholder); *Green v. United States*, 460 F.2d 412 (5th Cir. 1972) (bargain sale to children of taxpayer-shareholder constituted a taxable dividend to shareholder).

Like a bargain purchase, a bargain lease or uncompensated use of corporate property by a shareholder will be characterized as a constructive distribution to the extent of the spread between the property's fair rental value and the amount paid by the shareholder. *See* Rev. Rul. 58-1, 1958-1 C.B. 173 (bargain apartment rental); *58th St. Plaza Theatre, Inc. v. CIR*, 195 F. 2d 724 (2d Cir. 1952), *cert. denied*, 344 U.S. 820, *reh'g denied*, 344 U.S. 882 (1952) (lease to shareholder's wife).

**2. Excessive Payments by Corporation on Purchasing or Leasing Shareholder's Property.**

Shareholders may also receive too much consideration from the corporation on a sale or lease of the shareholder's property to the corporation. The crucial test is whether the parties arrived at fair terms in their purported sale, lease, or license transaction; otherwise, the arrangement may be recharacterized as a device for the payment of a dividend. *See, e.g., Goldstein v. CIR*, 298 F.2d 562 (9th Cir. 1962) (excess portion of amount paid by corporation to shareholder for property must be reported as constructive dividend, not as capital gain on sale).

**3. Excessive Salaries Paid to Shareholders or Their Relatives.**

Under Section 162(a), a corporation is entitled to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." In the closely held C corporation context, shareholders may attempt to overstate their salary income to obtain a deduction for the corporation and avoid paying two levels of tax. *See, e.g., Charles Schneider & Co. v. Commissioner*, 500 F.2d 148 (8th Cir. 1974), *cert. denied* 420 U.S. 908 (1975). Of the total amount paid to a shareholder in a tax year, the portion that is treated for federal tax purposes as paid to the shareholder in his or her capacity as an employee (or independent contractor) is determined by reference to what is reasonable compensation for the services rendered. Any excess amounts (*i.e.,* amounts not attributable to services) are recharacterized as

distributions received with respect to the shareholder's stock. If compensation or fees for a particular service paid to a shareholder-employee are found to exceed reasonable allowance, the corporation cannot deduct the excess amount. Reg. § 1.162-7, provides in relevant part that, "if ... the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers of employers, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock."

Among the factors the Courts consider in determining whether an amount paid to a shareholder-employee is excessive, is "the prevailing rates of compensation for comparable positions in comparable concerns." *Mayson Mfg. Co. v. Commissioner*, 178 F.2d 115, 116 (6th Cir. 1949). *See Quarrier Diner, Inc.*, ¶ 63,069 P-H T.C. Memo. (1963) (excessive salaries to sons were dividends to father).

**4. Corporate Reorganizations.**

Rev. Proc. 86-42, 1986-2 C.B. 722 recognizes that in a reorganization, a shareholder may receive consideration in more than one capacity. In order to ensure that the continuity of interest requirement is not circumvented by disguising cash payments for stock as compensation for services, and to ensure that compensation for services is not disguised as an amount received in exchange for stock, the Service requires the following representations: "none of the compensation received by any shareholder –employees of target will be separate consideration for, or allocable to, any of their shares of target stock; none of the shares of acquiring stock received by any shareholder-employees will be separate consideration for, or allocable to, any employment agreement; and the compensation paid to any shareholder-employees will be for services actually rendered and will be commensurate with amounts paid to third parties bargaining at arm's length for similar services." Rev. Proc. 86-42, 1986-2 C.B. 722, 729 at § 7.08(1).

**E. Legislative Changes Since 1968.**

It has been contended that amendments to IRC section 62 since Rev. Rul. 68-624 was issued have revoked such ruling by implication or have, at least, rendered it obsolete. Such is not the case. While these amendments did change the tax treatment of reimbursed business expenses of employees, they did not expand the scope of such expenses. What was not a reimbursed business expense before such amendments did not become such an expense after their enactment.

**1. Section 62 As In Effect in 1968**

In 1968, when Rev. Rul. 68-624 was issued, the relevant portion of section 62 read as follows:

> **SEC. 62. ADJUSTED GROSS INCOME DEFINED.**
>
> For purposes of this subtitle, the term "adjusted gross income" means, in the case of an individual, gross income minus the following deductions:
>
> (1) TRADE AND BUSINESS DEDUCTIONS.—The deductions allowed by this chapter (other than by part VII of this subchapter) which are attributable to a trade or business carried on

by the taxpayer, if such trade or business does not consist of the performance of services by the taxpayer as an employee.

(2) TRADE AND BUSINESS DEDUCTIONS OF EMPLOYEES.—

(A) REIMBURSED EXPENSES.—The deductions allowed by part VI (sec. 161 and following) which consist of expenses paid or incurred by the taxpayer, in connection with the performance by him of services as an employee, under a reimbursement or other expense allowance arrangement with his employer.

**2. Section 62 As Amended by the 1986 Act.**

The above language remained unchanged until enactment of the Revenue Act of 1986. Then section 62(a)(2)(A)[5] was slightly modified to read as follows:

(2) CERTAIN TRADE AND BUSINESS DEDUCTIONS OF EMPLOYEES.—

(A) REIMBURSED EXPENSES OF EMPLOYEES.—The deductions allowed by part VI (section 161 and following) which consist of expenses paid or incurred by the taxpayer, in connection with the performance by him of services as an employee, under a reimbursement or other expense allowance arrangement with his employer.

The language of section 62(1) was unchanged and remains unchanged.[6]

**3. Section 62 As Amended by the 1988 Act.**

In 1988 a sentence dealing with third-party reimbursements (not applicable here) was added at the end of section 62(a)(2)(A). Otherwise it was unchanged. A new section 62(c) was added, reading as follows:

CERTAIN ARRANGEMENTS NOT TREATED AS REIMBURSEMENT ARRANGEMENTS.—For purposes of subsection (a)(2)(A), an arrangement shall in no event be treated as a reimbursement or other expense allowance if—

(1) such arrangement does not require the employee to substantiate the expenses covered by the arrangement to the person providing the reimbursement, or

[5] Because of the addition of a new subsection dealing with qualified performing artists, it became necessary to insert "(a) General Rule" in this otherwise-unchanged introductory language in section 62.

[6] Section 62(1) became 62(a)(1) for the reason stated in footnote 5 above.

> (2) such arrangement provides the employee the right to retain any amount in excess of the substantiated expenses covered under the arrangement.
>
> The substantiation requirements of the preceding sentence shall not apply to any expense to the extent that substantiation is not required under section 274(d) for such expense by reason of the regulations prescribed under the 2nd sentence thereof.

The 1988 change treated employee reimbursement arrangements that did not meet its requirements as giving rise to income to the employee not fully offset by deductible expenses. The expenses were treated as miscellaneous itemized deductions, subject to a floor of 2% of adjusted gross income.

Its introductory language ("for purposes of subsection (a)(2)(A)"), confines section 62(c)'s application to expenses paid or incurred by the taxpayer in connection with the performance of services under a reimbursement or other expense allowance arrangement with his employer. This language is identical to that in effect in 1968, and it could have no greater scope.[7] The change simply made it clear that if expenses were incurred by an employee under a reimbursement or other expense allowance arrangement with his or her employer, the arrangement had to meet particular standards to escape section 62. Nothing in the legislative language suggests that section 62(c) changed the basic characterization of the revenues considered in Rev. Rul. 68-624; had Congress wished to accomplish such a result it could easily have done so by characterizing all revenue received by an employee performing services and providing property to his employer as compensation for services.

**4. Legislative History of Section 62.**

Nor is there anything in the relevant legislative history which would support such an interpretation. Instead, the 1986 Act's Conference Report (II-32-34) makes it clear that Congress simply wanted to deal with "above-the-line" expenses and "below-the-line" expenses. Footnote 4 on page II-33 reads as follows:

> The conference agreement does not modify the above-the-line deduction under sec. 62(2)(A) for certain reimbursed expenses of an employee (allowable under part VI of the Code) under a reimbursement or other expense allowance with his or her employer. (The Treasury may prescribe regulations under which expenses of an employee reimbursed by a third party are to be treated as expenses described in sec. 62(2)(A).) If the employee has a reimbursement or other expense allowance arrangement with his or her employer, but under the arrangement the employer does not reimburse the full amount of such expenses, the unreimbursed portion paid by the employee is allowable only to the extent (if any) otherwise allowable as an itemized deduction (e.g., after taking into account the percentage reduction rule, if applicable to the expense), and subject to the floor provided under the conference agreement.

[7] If anything, the 1986 changes would narrow the scope of employee reimbursed expenses by adding the word "certain" to the title of section 62(a)(2)(A).

H.R. Conf. Rep. No. 99-841 (1986).[8]

Section 62(c) was not in either the House nor the Senate version of the 1988 Act. It was added in conference, and the sole legislative history is found on pp. 202-6 of the Conference Report. It contains no language whatever suggesting that the concept of reimbursed employee business expenses should be expanded to include rentals of equipment by a person furnishing both equipment and services. As the Conference Report states:

> Under the conference agreement, otherwise allowable employee business expenses are deductible above-the-line as reimbursed expenses only if incurred pursuant to a reimbursement or other expense allowance arrangement that requires the employee to substantiate expenses covered by the arrangement to the person providing the reimbursement. Pursuant to this rule, to be deductible above-the-line such expenses either must be actually substantiated to the person providing the reimbursement, or must be deemed substantiated under the rule described below relating to per diem and other fixed arrangements.

H.R. Conf. Rep. No. 100-998, at 204 (1988).

As shown above, amendments to section 62 from 1968 through the current date changed the *treatment* of employee business expenses but did not change the *definition* of employee business expenses. Nothing in this legislation revokes, obsoletes or modifies Rev. Rul. 68-624, nor has the Service revoked or modified such Revenue Ruling. Therefore, to this day Rev. Rul. 68-624 remains outstanding and effective. As Reg. § 601.601(d)(2) provides, a Revenue Ruling is an official interpretation by the Service and is published for the information and guidance of taxpayers, and taxpayers may rely on such revenue rulings in determining the tax treatment of their own transactions. *See, e.g., Estate of McLendon v. Commissioner*, 135 F.3rd 1017 (5th Cir. 1998); *Beneficial Foundation, Inc. v. United States*, 8 Cl. Ct. 639 (1985) 85-2 U.S.T.C. 9601.

**F. Relevant Court Decisions**

**1. Escobar**

Nor does case law call for a result different from that of Rev. Rul. 68-624. *Escobar v. Commissioner*, T.C. Memo 2000-176 (May 25, 2000), deserves scrutiny for it has been cited in support of the proposition that if an employee renders services and supplies heavy equipment in connection with the rendition of such services, all remuneration from the employer must be treated as wages. The *Escobar* case was decided by a Special Trial Judge and the petitioners were three Mexican truck drivers who appeared *pro se*. They had to use an interpreter. These three individuals were vastly outmatched by three attorneys assigned to the small case by IRS

---

[8] Similarly, the Administration's proposal that resulted in the 1986 changes contained nothing whatever about broadening or extending the concept of employee business expenses. *See The President's Proposals to the Congress for Fairness, Growth and Simplicity*, pp. 104-5. Nor did the 1985 Ways and Means Committee Report on what became the 1986 Tax Reform Act, instead the focus was on simplifying tax administration by imposing a 1% floor upon the deduction of the small amounts typically involved. Report 99-426, 99th Cong., 1st Sess.108-110.

Chief Counsel. As one might expect, there was much confusion in the halting efforts by the three Mexicans and their interpreter to cope with a Tax Court trial, and the Special Trial Judge let the Service put on its case first. The drivers were probably independent contractors, but they claimed that they were employees, presumably trying to escape self-employment taxes. Through making informal leases of their tractors to the trucking companies that hired them to make deliveries, they purported to satisfy ICC and insurance requirements. Mr. Escobar treated as his rental income an amount equal to his vehicle expenses, claiming reliance on "the actual cash value method" of measurement. (Escobar brief, p. 17.)

With its battery of three lawyers, Chief Counsel put on a very professional case. The drivers did not. Rev. Rul. 68-624 was not discussed nor cited by either side. The Special Trial Judge took particular note of Mr. Escobar's contention that under his method of accounting, the lease of his tractor could never produce a profit. More significant, an IRS lawyer elicited the following from his primary witness, the owner of the trucking company:

> Do you pay the owners/operators a certain amount of money for the use of their equipment, as opposed to them picking up the load and providing the service as a whole?
>
> No. We only pay per the function that they performed.

(Record, p. 34.)

The Service's brief in *Escobar* placed primary reliance upon regulations defining "activity" for the purpose of IRC § 183, dealing with activities not engaged in for profit. Much of the remainder of the brief was devoted to demonstrating the inadequacy of the taxpayers' records, and exploring their informal relationship with the trucking companies. They were paid by the load, not separately for services and the rental of property, and there was no consistent reporting for tax purposes. The "leases" of the tractors were simply fronts for regulatory and insurance purposes.

Almost as deficient in the English language as they were in courtroom experience, the taxpayers lost.[9]

The very Regulations relied on by the Service in *Escobar*, however, provide instructive guidance here. These regulations state:

> Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that its characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183.

[9] In concluding his "Cross Brief", Mr. Escobar correctly states: "Petitioners have been at a great disadvantage in this proceeding due to not having adequate counsel and due to language constraints.

Reg. § 1.183-1(d)(1).

Under the section 183 regulations, the taxpayers' characterization in the Pipe Line situation—two activities—must be accepted. The taxpayers' characterization is clearly not artificial, and the facts and circumstances of the Pipe Line situation fully support such dual characterization.

**2. Trans-Box**

Also, the *Trans-Box Systems, Inc.* case, 84 A.F.T.R 2d (RIA) 99-6479, *aff'd* 225 F.3d 664 (9th Cir. 2000), provides no guidance here. Trans-Box was a courier service which hired drivers to pick up and deliver documents and packages. Some of its drivers used Trans-Box vehicles but others used their own personal vehicles. Drivers of company-owned vehicles were paid $6.25 an hour, and drivers who used their own vehicles were paid $8.95 per hour. Trans-Box considered 45% of the $8.95 hourly wage to be taxable wages and the remaining 55% to be non-taxable "lease payments". As the District Court pointed out, this allocation would result in an hourly rate of $4.03, less by $2.22 than the wage paid to drivers of company cars and less by $0.22 than the then minimum wage.

Trans-Box's primary argument was that the requirements for an accountable plan under IRC section 62 were satisfied. Its alternative argument was that its drivers were independent contractors for purposes of the lease agreements and, therefore, section 62 did not apply.

The District Court had little trouble in disposing of Trans-Box's arguments. Trans-Box required neither an accounting nor any substantiation from its drivers and no adjustments, up or down, were made to the flat amounts allocated to vehicle expenses. Thus, the accountable plan requirements were not satisfied. Moreover, there was no factual support for the claim that the drivers were independent contractors; as District Judge Thelton Henderson stated:

> Trans-Box has failed to create a triable issue of fact regarding whether the owner-operators were, at last for some purposes, treated as independent contractors, not employees. The facts in the record point to the conclusion that Trans-Box treated the owner-operators as employees for all purposes. They were paid hourly wages recorded on W-2 forms. Trans-Box never filed a 1099 Form for the owner-operators, which would be required if they were indeed independent contractors. Even in the present litigation, Trans-Box's primary argument is that the owners-operators were employees for all purposes, but that Trans-Box complied, or complied substantially, with the requirements of section 62. In other words, Trans-Box is arguing both that its owner-operators were treated as employees and that they were not. While Trans-Box is free to argue alternative, and even conflicting legal arguments in support of its case, serious questions about the veracity of its allegations are raised because Trans-Box's alternative argument relies upon conflicting versions of the material facts at issue.

84 A.F.T.R.2d at 99-6482 and 99-6483.

On appeal, Trans-Box repeated the arguments unsuccessfully made to the District Court. Neither the taxpayer nor the Justice Department mentioned Rev. Rul. 68-624 in its briefs. In an unreported *per curiam* decision,[10] the Ninth Circuit summarily rejected Trans-Box's contentions, pointing out that Trans-Box failed to comply, or even substantially comply, with the accountable plan requirements, that the drivers were under the "absolute control" of Trans-Box in the operation of their vehicles, that the leases were illusory, and that no 1099s were filed.

Our issue is not whether the accountable plan requirements are satisfied but instead whether such requirements are applicable to payments for renting heavy equipment. Our issue is not whether the Pipe Line employees are independent contractors, but instead whether employees who provide heavy and valuable equipment necessary to pipeline construction (i) may be reasonably compensated, through rentals, for the value of such equipment, and (ii) if so, whether such rentals must be reclassified as compensation for services.

3. **Shotgun Delivery**

Similarly, the District Court decision of *Shotgun Delivery, Inc. v. United States*, 85 F. Supp.2d 962 (N.D. Cal. 2000), is not instructive on the issue under consideration here. Shotgun Delivery, Inc., employed drivers who generally used their own vehicles to make pick-ups and deliveries of packages. The drivers were paid commissions equal to 40% of the total delivery charges and received two checks, wage checks calculated at an hourly rate and second checks representing the excess of the 40% commission over the wage checks. As the court noted:

> Shotgun paid no additional compensation to its drivers for the "lease" of their vehicles. *See*, Farin Deposition at 34-35. Shotgun merely leased the vehicles owned by its drivers as required by the California Public Utilities Commission for the sole purpose of establishing the financial responsibility of Shotgun for the vehicle while it was used for deliveries. *See,* Farin Deposition at 33; Farin Exh. N.

85 F. Supp.2d 962 (N.D. Cal. 2000)

The sole issue presented to the court was whether Shotgun's reimbursement system constituted a valid accountable plan under IRC section 62 and, of course, the Court concluded that it did not.

4. **Welch**

The only case squarely in point is *Michael D. Welch v. Commissioner*, 76 T.C.M. 354 (1998). Mr. Welch, a carpenter, was hired by movie production companies to coordinate the construction of sets. His informal contracts ("deal memos") set forth the rate at which he would be paid for his services and the rate at which he would rent tools and equipment, such as tool rentals for $100 a day and truck rentals for $125 a week. The production companies sent him

[10] 225 F.3d 664 (9th Cir. 2000).

Forms W-2 to reflect wages paid to him and Forms 1099 to reflect rentals paid to him. He reported the rental income and expenses on Schedule C. Initially, the Service disallowed Mr. Welch's Schedule C loss on the grounds that it was incurred in a passive activity. Then the Service also claimed that the rental income reported on Schedule C was merely reimbursement for employee business expenses. Thus, the issue under review here was directly presented to the Tax Court, and the Special Trial Judge's opinion is directly in point:

> We now examine respondent's alternative theory that petitioner was merely incurring employee business expenses, which were partially reimbursed and the excess is deductible on Schedule A. This issue requires us to determine whether the expenses claimed were properly attributable to a separate activity of renting the equipment or whether the expenditures [*11] pertained to petitioner's activity of being an employee. The latter expenses are deductible on Schedule A as an itemized deduction. After a careful review of this record, we conclude that the expenses claimed on Schedule C for car and truck, equipment rental use, and location travel pertain to the rental activity and are allowable as Schedule C deductions.

76 T.C.M. 356.

The other side of the *Welch* case is also significant. Section 469 and the regulations issued thereunder[11] contain detailed rules specifically directed toward rentals of tangible property accompanied by personal services. This elaborate structure is spelled out in the *Welch* case. A rental activity is a passive activity, and therefore subject to the passive loss disallowance rules, unless under the applicable regulations it is not considered to be a rental activity. The standards for distinguishing between rentals considered to be passive activities and rentals not so considered turn on factors including the average period of customer use of the property and whether significant or extraordinary personal services are provided by or on behalf of the owner of the property in making the property available for use by customers.[12] Of course, the Pipe Line situations involve significant (or extraordinary) personal services provided by the owner of the property in connection with the use of the property. If the performance of personal services by the property owner converted the rentals into reimbursements for employee business expenses, section 469's elaborate structure would be undermined. The Tax Court examined the *Welch* facts and found that the loss disallowance rules of section 469 were inapplicable. Therefore, Mr. Welch received a deduction for the excess of the cost of providing his car, truck and other equipment over the rental payments which he received.

As stated above, a conclusion that all amounts received by an individual who supplies valuable property and renders services must be treated as compensation is not required by the law, is not supported by legislative history, and would significantly curb the application of section 469. Moreover, section 469 became part of the Internal Revenue Code in 1986. It was materially modified in 1988 by the same Congress as that which enacted section 62(c). The regulations establishing the detailed treatment of rental activities were last amended in 1995. Surely if section 62(c) had been intended to supersede these regulations, and establish a single

[11] Reg. § 1.469-1T(c)(3). These Regulations were issued under a broad delegation of authority. Sec. 469(l)(1), originally sec. 469(k)(1).

[12] Reg. § 1.469-1T(e)(3)(ii).

rule for the treatment of all rentals accompanied by services of the property owner, the regulations would have been amended to reflect such change.

### G. Some Consequences of Treating Rentals as Compensation.

Requiring payments for the use of substantial property provided by one who also renders services to be treated as compensation would have grave consequences that deserve careful consideration before any such notion should be adopted.

#### 1. Effect on Qualified Retirement Plans.

A primary example is in the application of the detailed rules governing qualified retirement plans. These consequences probably can be seen most clearly by considering the basic definition of compensation used to apply the limitations of Code section 415. Treas. Reg. § 1.415-2(d)(2)(i) defines compensation for this purpose to include "reimbursements or other expense allowances under a nonaccountable plan (as described in § 1.62-2(c))." Thus, expense reimbursements under an accountable plan, like rental and royalty payments, are excluded, but expense reimbursements under a nonaccountable plan are not. Therefore, if rental payments related to the performance of services by the property owner must be considered to be reimbursements or expense allowances and are paid under a nonaccountable plan, the compensation of the person supplying both services and valuable property would be materially increased for purposes of applying the limitations of Code section 415.

While multiple definitions of compensation are used in the area of qualified plans, most of those definitions either require or permit the use of a definition that satisfies Code section 415. The most important of those that do not is probably the definition used to enforce the limitations on employer deductions for contributions to a profit sharing or stock bonus plan. Treas. Reg. section 1.404(a)-9(b)(1) defines compensation for this purpose as "compensation otherwise paid or accrued" by the employer to covered employees. Thus, the result would presumably be the same: rentals, royalties and expense reimbursements under an accountable plan are excluded, but expense reimbursements under a nonaccountable plan are not. Determining whether or not rental payments must be considered expense reimbursements and paid under an accountable plan is not the proper one for determining whether or not an employee's compensation should be significantly increased for Subchapter D purposes, particularly since the more valuable the rental property, the less likely that the arrangement would satisfy the three accountable plan tests set forth in the Regulations.

Adopting a theory that would result in increasing compensation for employees who rent substantial property to their employers would have effects that are both far-reaching and haphazard. By expanding the compensation an employer is deemed to pay its employees, it would permit the employer a larger deduction for contributions to its qualified defined contribution plans. It also would permit the employer to allocate a greater benefit under its qualified plans to individuals providing both valuable property and services. It could result in moving individuals to the unwelcome status of highly compensated, which could limit the individuals' ability to make salary deferrals and receive matching contributions and permit the employer to discriminate against such individuals under the plan. In brief, there would be a substantial disparity between the person who renders services and provides valuable property and the person who renders the same services but provides no property. Is this a sound result?

**2. Effect on the Exclusion for Foreign Earned Income Under Section 911.**

Similar problems would arise when the issue is whether revenues from foreign sources qualify for the substantial exclusion provided by IRC § 911. This provision exempts from an individual's taxable income up to $90,000 of annual "foreign earned income," defined as earned income attributable to services performed within a foreign country. The term "earned income" means "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered." IRC § 911(d)(2)(A). Under the theory that rentals for valuable equipment supplied by an employee must be characterized as reimbursements or expense allowances, would such rentals be added to a qualifying individual's exempt income under section 911?

Also, section 911 contains its own rule that applies if capital as well as services produce the revenues to be tested for qualification. *See* section 911(d)(2)(B). The Regulations issued to interpret this provision read as follows:

> (2) *Earned income from business in which capital is material.* In the case of an individual engaged in a trade or business (other than in corporate form) in which both personal services and capital are material income producing factors, a reasonable allowance as compensation for the personal services actually rendered by the individual shall be considered earned income, but the total amount which shall be treated as the earned income of the individual from such trade or business shall in no case exceed thirty percent of the individual's share of the net profits of such trade or business.

Reg. § 1.911-3(b)(2).

Would these Regulations be overridden by a new broad reach of employee reimbursed business expenses? If so, wouldn't this materially expand the exclusion under section 911 even though the statutory provision was not changed?

## IV. CONCLUSION.

Companies engaged in the pipeline construction industry rent substantial equipment (i.e., mechanics' rigs, welding rigs, and pickup trucks) from employees. The wages paid to workers who rent equipment are the same as the wages paid to workers who do not rent equipment. The equipment is rented pursuant to written leases at rates comparable to rates charged by third parties. The rental of equipment by pipeline contractors from their employees is a longstanding, industry-wide practice. For years, the contractors reported the amounts paid as wages on IRS Form W-2, and the amounts paid as rentals on IRS Form 1099.

As shown above, there is clear authority for the position that the payment of wages and rental payments for substantial equipment are separate and distinct for tax purposes. Rev. Rul. 68-624, directly supporting this proposition, has not been revoked, overruled, or obsoleted, and the only case directly on point, *Welch*, held that equipment rentals and services were separate activities. The enactment and amendment of the accountable plan rules in 1986 and

1988 changed the tax treatment of reimbursed expenses of employees; they did not expand the scope of such expenses.

Furthermore, requiring that rental payments for the use of substantial property be treated as compensation would result in unintended and undesirable consequences, such as increasing the amount of deductible contributions under qualified retirement plans and increasing amounts treated as excluded foreign source income under Section 911(d).

Accordingly, we respectfully request, in light of the uncertainty created by recent examinations and field service advice memoranda, that the Service confirm that it continues to be acceptable for the pipeline construction industry to report wages paid to employees on W-2 and rentals paid for the use of substantial equipment on Form 1099.

#503541 v.2

# TAB A



5/25/2001 07:48

ATTACHMENT "A"

PL-000082

# TAB B

May 31, 2001

THE ATTACHED PICTURES ARE OF A 1 TON MECHANIC'S RIG. THE VARIOUS COMPONENTS ARE SET OUT BELOW:

| | |
|---|---|
| 1 TON HD3500 CHEVROLET CAB & CHASSIS | $35,000 |
| MECHANIC'S BED | $10,000 |
| AIR COMPRESSOR | $ 3,000 |
| WELDING MACHINE | $ 3,500 |
| CRANE, 3200# LIFT | $ 7,500 |
| CRANE OUTRIGGERS | $ 200 |
| **BASE UNIT** | **$59,200** |

**TOOLS & SUPPLYS**

AS PIPELINE MECHANICS ARE EQUIPPED TO WORK ON ALL EQUIPMENT FROM TRUCKS TO HEAVY EQUIPMENT, THE FOLLOWING IS A PARTIAL LIST OF TOOLS REQUIRED FOR A PIPELINE MECHANIC TO REPAIR AND MAINTAIN JOB EQUIPMENT. THE COST IS APPROXIMATELY $35,000 TO $50,000 DEPENDING ON QUALITY.

*SOCKETS FROM ¼" TO 1"*
- SHORT & DEEP SOCKETS
- 6 & 12 POINT SOCKETS
- IMPACT SOCKETS
- 1" DRIVE
- METRIC SOCKETS

*SCREW DRIVERS*
- ALL SIZES, PHILLIPS, FLAT & TORQUE

*PLIERS*
- ALL SIZES IN NEEDLE NOSE, DIKES, VISE GRIPS, SNAP RING, SLIP JOINT, WATER PUMP

*HAMMERS*
- ALL SIZES AND TYPES

*PRY BARS*
- ALL SIZES AND TYPES

*RATCHETS*
- SHORT TO LONG HANDLE
- EXTENSIONS ALL LENGTHS AND SIZES

**ATTACHMENT "B"**

*POWER DRILLS*
¼ THROUGH ½
BITS

*TAPS AND DIES*
ALL SIZES

*COMBINATION WRENCHES*
ALL SIZES

*TORQUE WRENCHES*
ALL SIZES

*PULLERS*
U-JOINT, SLACK ADJUSTERS, ETC.

*CHISELS AND PUNCHES*
ALL SIZES

*CLAMPS*
ALL SIZES

*COME ALONGS*
SEVERAL

*WELDING EQUIPMENT*
TORCHES, GAUGES, HOSE, HOODS, GOGGLES, GRINDERS

*CLUTCH LINE UP TOOLS*

*SPECIAL APPLICATION TOOLS*

*HYDRAULIC JACKS*
ALL SIZES

*TESTERS*
VOLT METER, OHM METER, BATTERY TESTER

*REELS*
WELDING, AIR HOSE, CUTTING HOSES

*PORTA POWER JACKS*
SEVERAL

# TAB C

# RIG RENTAL AND INSURANCE AGREEMENT

[For Compliance with Federal and State requirements]

______________________________ and Employee agree as follows:
(Company)

1. The hourly rental rate paid by ______________________ for the use of
(Company)
Employee's rig begins at the assembly point and ends on the work site/right-of-way and such rental pay will only apply for working time on the job. This payment will be reported on Federal Tax Form #1099.

2. Employee warrants and certifies that he/she:

(1) is the rig's legal owner ______________________________;
(year and make of truck)
(2) will insure the safe maintenance of such equipment; and
(3) will provide full insurance coverage as required by law and will comply with all state and federal motor vehicle laws, as well as all safety policies of ______________________.
(Company)

**PROOF OF INSURANCE <u>MUST</u> BE ATTACHED TO THIS AGREEMENT <u>PRIOR</u> TO RIG BEING PLACED IN SERVICE ON THIS PROJECT**

DATE:__________________ Employee:______________________ (Print Name)

______________________ (Signature)

Social Security No. : ________________

******************************************************************************

A. Employee classification: ______________________________

B. Describe rig and all equipment rented: ______________________________

C. Rate per hour: ______(Company provides fuel): ________ (Welder provides fuel)

D. Per week maintenance: ______________________________
(Includes oil, grease, filters, wash job)

E. Job name/number: ______________________________

Received by authorized company representative: ______________________
(Signature)
Date: ________________

**Original to Home Office / Copy to Field Office / Copy to Employee**

ATTACHMENT "C"

# TAB D



5/26/2001 14:13

ATTACHMENT "D"

PL-000089

# TAB E



 National Pipeline Welding School

Board of Trustees
W. Scott North Co-Chairman
H. Charles Price Co-Chairman
John Bodzinski
James E. O'Mara
Paul Somerville
R.H. Mogg

Welding School
Bob Kime Director
Richard C. Ludlow Director of Training
Wayne Williams Senior Instructor
Tommy Harrell Instructor
Ronald Evans Instructor
Danny Hendrix Instructor

May 24, 2001

Pat Tielborg
Pipeline Contractors Association
1700 Pacific Avenue, Ste 1400
Dallas, TX 75201-4675

Dear Pat,

Here is an estimate of what it costs to rig-up a welding rig from scratch. This is just the basic rig, not including any hand tools or welding supplies.

| | |
|---|---|
| 4-wheel drive cab-chassis truck | 33000.00 |
| Miller Pipe-Pro 304 | 11243.00 |
| 200 ft. welding lead | 550.00 |
| Cutting Rig W/Hand Torch | 600.00 |
| Welding Bed (not including labor) | 2500.00 |
| Remote Rheostat for welding machine | 600.00 (Miller Price) |
| Grinder | 195.00 |
| Total | 48688.00 |

This does not include pipe jacks 750.00, bevel machines (with are part of the rig on non-union jobs) 800.00 to 1000.00 per pipe size or any hand wrenches and tools that you are required to have which carry a substantial price tag.

If I can be of further assistance, feel free to contact me.

Sincerely,

Richard Ludlow
Director of Training

4845 S. 83rd E. Ave. | Box 470950 | Tulsa, Oklahoma 74147-0950 | (918) 622-0210 | Fax (918) 280-4899 | www.pipl...

# TAB F



United Rentals
5860 Paramount Blvd.
Long Beach, CA 90805
Tel: 562 663-1500
Fax: 562 663-1516
www.unitedrentals.com

May 31, 2001

sent via fax 949/951-3661

Ed Hamud
ARB Inc
PO Box 5166
Lake Forest CA 92630

Dear Ed:

Thank you for the opportunity to quote ARB Inc for equipment listed below:

4-Wheel Drive Cab Chassis Truck (1 Ton)
Equipped with: Welding Bed (Customer specs), Miller Pipe-Pro 304 Welder, 200 ft welding lead w/Tweco Connectors; Complete cutting rig w/torch; Remote rheostat for welder; Grinder

| | |
|---|---|
| One-year Guaranteed Rental | $2,975.00/month * |
| Two-year Guaranteed Rental | $2,540.00/month * |

* Plus sales tax

Sincerely,

Kelly Dingeman
Branch Manager

ATTACHMENT "F"

# TAB G



Hertz Equipment Rental Corporation
6333 S. Dixie Hwy., Erie, MI 48133
Telephone: (734) 848-3092

Attn: John Roberts
Welded Construction

| | | |
|---|---|---|
| 350 amp welder, Miller Big 40 | $290 | week |
| 1 ton truck, Ford F250 | $350 | week |

Thank You
Denis Aslinger

ATTACHMENT "G"

# TAB H

# PICKUP RENTAL AND INSURANCE AGREEMENT

______________________________ and Employee agree as follows:
(Company)

1. The rental paid by ______________________________ for the use of
(Company)
Employee's pickup begins at the warehouse and ends on the work site/right-of-way and such rental pay will only apply for **working time** on the job.

2. Employee warrants and certifies that he/she:

(1) is the pickup's legal owner ______________________________;
(year and make of truck)

(2) will insure the safe maintenance of such equipment; and

(3) will provide full insurance coverage as required by law and will comply with all state and federal motor vehicle laws, as well as all safety policies of ______________________________.
(Company)

**PROOF OF INSURANCE MUST BE ATTACHED TO THIS AGREEMENT PRIOR TO PICKUP BEING PLACED IN SERVICE ON THIS PROJECT**

DATE: ____________________ Employee: ______________________________ (Print Name)

______________________________ (Signature)

Social Security No. : ____________________

*************************************************************************

A. Employee classification: ______________________________

B. Describe pickup rented: ______________________________

C. Rate: ____________

D. Job name/number: ______________________________

Received by authorized company representative: ______________________________
(Signature)

Date: ____________________

**Original to Home Office / Copy to Field Office / Copy to Employee**

ATTACHMENT "H"

# TAB I

Pacific Northwest
Rentals & Leasing, Inc
Licensee
10800 N. E. Holman St.
P.O. Box 301156
Portland, OR 97294
503 254 6563

Out of Town Reservations
1-800-THRIFTY
www.thrifty.com

**Thrifty Car Rental**

TO: WELDED CONSTRUCTION
FAX (419) 874-3786

FORD PICKUP 8FT CARGO BED
$35.99 A DAY (24 HRS)
100 FREE MILES A DAY
.29¢ FOR EACH ADDITIONAL MILES

ATTACHMENT "I"

# TAB J



P.07

ARENA
LEASING & RENTALS INC.

Aug. 20, 2001

TO: John

FROM: Janet Deem

SUBJECT: Ram Pickup

THE COST ON THE SUBJECT VEHICLE IS AS FOLLOWS:

DAILY: 39.95 5995 for unlimited miles

200 MILES PER DAY FREE 20 FOR EACH EXCESS MILE

WEEKLY: 259.00

1050 MILES PER WEEK FREE 20 FOR EACH EXCESS MILE

AT THE TIME OF RENTAL WE REQUIRE A DRIVERS LICENSE, CREDIT CARD AND PROOF OF INSURANCE. ADDITIONAL DRIVERS MUST ALSO HAVE A DRIVERS LICENSE AND PROOF OF INSURANCE.

IF YOU HAVE ANY QUESTIONS OR WOULD LIKE TO PLACE A RESERVATION PLEASE CALL US AT 276-5056.

THANK YOU

Janet

ARENA RENTALS

824 Shiloh Springs Rd. • Dayton, Ohio 45415 • 513/278-5056

ATTACHMENT "J"

# INDUSTRY ISSUE RESOLUTION PILOT PROGRAM
# PIPE LINE CONTRACTORS ASSOCIATION

## INFORMATION BOOKLET

JUNE 27, 2001
WASHINGTON, D.C.

# INDEX

I. INDUSTRY ISSUE RESOLUTION PILOT PROGRAM LETTER REQUEST.

II. LIST OF ATTENDEES – JUNE 6TH MEETING

III. COPY OF U.A. NATIONAL PIPE LINE AGREEMENT

IV. STANDARD COPY OF RIG RENTAL AGREEMENT

V. PRE-JOB CONFERENCE REPORTS.

VI. SUGGESTED RIG RENTAL RATE:

1. ESTIMATED COST OF WELDING RIG

2. WELDING RIG RENTAL COST SURVEYS

3. HISTORICAL RIG RATES

VII. OPERATOR MECHANIC RIG COST.

VIII. PICKUP RENTAL COST SURVEYS

IX. GLOSSARY OF TERMS.

X. OVERHEAD SLIDES FROM PRESENTATION ON JUNE 6, 2001

XI. CASES AND RULINGS CITED IN OVERHEAD PRESENTATION

# TAB 1

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
ATTORNEYS AT LAW
A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
1700 PACIFIC AVENUE
SUITE 4100
DALLAS, TEXAS 75201
(214) 969-2800
FAX (214) 969-4343
www.akingump.com

AUSTIN
BRUSSELS
DALLAS
DENVER
HOUSTON
LONDON
LOS ANGELES
MOSCOW
NEW YORK
NORTHERN VIRGINIA
PHILADELPHIA
SAN ANTONIO
WASHINGTON, D.C.

RIYADH – IN AFFILIATION WITH THE LAW OFFICE OF ABDULAZIZ H. FAHAD

WRITER'S DIRECT DIAL NUMBER (214) 969-2797
WRITER'S E-MAIL ADDRESS dmicciche@akingump.com

February 28, 2001

**Via Facsimile (202-283-8427 and Email pftg2@irs.gov)**

Internal Revenue Service
Attn: Richard Druk
Large and Mid-Size Business Division LM: PFTG
Mint Building, 3rd Floor M-3-321
111 Constitution Avenue NW
Washington, D.C. 20224

**Re: Industry Issue Resolution Pilot Program**

Dear Mr. Druk:

Pursuant to Notice 2000-65, on behalf of the Pipe Line Contractors Association ("PLCA"), we submit this request for consideration under the Industry Issue Resolution Pilot Program. PLCA is a non-profit organization composed of 52 companies engaged in the pipeline construction business. PLCA contractors employ approximately 5,000 union workers to work on various construction projects. PLCA contractors employ substantially all of the union pipeline workers on the large major pipeline projects in the U.S., including those who built the Alaska Oil Pipeline in 1975-78. If the Alaska gas line is built, it is anticipated that approximately 10,000 additional employees could be employed by PLCA contractors.

## Issue

The issue is whether amounts paid by an employer to an employee for the rental of rigs and other equipment should be treated as wages and reported on Form W-2; as employee expense reimbursements subject to the accountable plan rules under Section 62(c) of the Internal Revenue Code; or as rental payments for equipment and reported on Form 1099.

## Need for Industry Issue Resolution

As a result of several recent administrative rulings set forth below, there is uncertainty about the appropriate tax treatment of payments made to employees for the rental of rigs and trucks, and this uncertainty has resulted in frequent examinations of the issue. This issue affects a significant number of taxpayers within the industry, many of which are large businesses, and factual determination is a major component of the issue.

## General Factual Pattern

Many companies engaged in the pipeline construction business employ union workers to work on various construction projects. Many of these employees (the "Employee-Owners") own rigs and other equipment (the "Rigs and Other Equipment") that they lease to employers on an hourly basis. The Rigs and Other Equipment are used to transport workers and equipment to, and to perform welding services at, the various work sites along the pipeline. This practice has been in effect for many years, because it is much more cost effective for employers to lease the Rigs and Other Equipment from the Employee-Owners than for the employers to purchase or rent (from another source) similar equipment to perform these functions. The Employee-Owners are treated by the employers as employees for federal employment tax purposes and are paid the same wages as those employees who do not provide Rigs and Other Equipment. The Employee-

Owners are paid an additional amount for the rental of the Rigs and Other Equipment, which is reported as a separate rental payment on Form 1099.

**Discussion**

It is well established that if an employer pays an employee separate rental income for the use of employee-owned property pursuant to an arm's length arrangement, amounts paid under the arrangement are not considered wages for federal employment tax purposes. *See Welch v. Commissioner*, TC Memo 1998-310 (employee's receipt of rental payments from employer for use of production equipment considered received from separate rental activity); Revenue Ruling 68-624, 1968-2 C.B. 424 (employee's receipt of rental income for use of truck in employer's business not considered wages for federal employment tax purposes); Revenue Ruling 73-260, 1973-1 C.B. 412 (fair rental value of employee-owned truck used in employer's business excluded from wages); Private Letter Ruling 8427064 (IRS advised employee-owners of trucks used in employer's business to allocate compensation between wages and equipment rental based on prevailing wage scale or fair rental value of similar equipment in same locality); IRS Legal Memorandum (2000-7382) (TNT 179-55) (April 21, 1994) (amounts paid to employees for rental of heavy welding equipment are not wages but are rental payments reported on Form 1099). As a result, the employer must report such rental payments on an IRS Form 1099, and the employee is responsible for paying any taxes on the rental payments received.

Several recent IRS administrative rulings, FSA 199940002 (February 16, 1999), ILM 199921003 (February 2, 1999), and ILM 199917011 (January 13, 1999) ("collectively the 1999 IRS Rulings") hold that the IRS may treat "rental" payments as wages if the payments are not made pursuant to an "accountable plan." These rulings have created substantial uncertainty

about the appropriate tax treatment of payments made to employees for the rental of rigs and trucks, and this uncertainty has resulted in frequent examinations of the issue.

In the 1999 IRS Rulings, the IRS concluded that rental payments for equipment should be characterized not as rental payments for the use of property but rather as a reimbursement for employee expenses. Based on this premise, the 1999 IRS Rulings hold that rental payments for equipment are "wages" unless the accountable plan requirements of Section 62(c) are met. As noted above, there is a long line of cases and rulings which hold that separate rental payments to employees for equipment are not wages. The 1999 IRS Rulings acknowledge this point in passing and state that equipment rental payments made pursuant to an arm's length arrangement will not be treated as wages. Nevertheless the 1999 IRS Rulings have created substantial confusion over when a payment to an employee for the rental of equipment should be treated as an arm's length rental payment or as a reimbursement of employee expenses subject to the accountable plan rules.

## Conclusion

Because of the uncertainty that now exists in this area, we respectfully request consideration of the issue under the Industry Resolution Pilot Program. In our case, there is compelling evidence that the payments for equipment rentals are in fact true rental payments for the use of property since employees who rent equipment receive the same amount of compensation for services as employees who do not rent equipment, but receive additional payments for the rental of equipment.

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
INTERNAL REVENUE SERVICE
FEBRUARY 28, 2001
PAGE 5

Please feel free to contact us if you need further information. Thank you for your consideration.

(original signed by the undersigned)
Donald C. Alexander
Daniel J. Micciche
Akin, Gump, Strauss, Hauer & Feld, L.L.P.
1700 Pacific Avenue
Suite 4100
Dallas, Texas 75201

ATTORNEYS FOR PIPE LINE
CONTRACTORS ASSOCIATION

DJM/adr
#444659

PL-000109

# TAB 2

June 6, 2006
Wash DC
1750 Pennsylvania Ave

| NAME | COMPANY | Phone # |
|---|---|---|
| Audie Sturla | Employ Tax I.R.S. Santa Ana CA. | 714-836-2647 |
| David F. Cook | IRS-Detroit | 313-628-3401 |
| Richard A. Robinson | Senior Program Analyst IRS-Wash. D.C. | 202-283-8430 |
| Charlie Utter | IRS-Manhattan | 212-912-3032 |
| Jack L. Schroeder | IRS. - Detroit | 313-628-3660 |
| 6. Mary Oppenheimer | CC:TEGE D.C. | 202-622-6010 |
| 7. James Lanphear | IRS Appeals | 716-551-5330 ext. 23 |
| 8. Joe Spires | CC:TEGE D.C. | 202-622-6040 |
| 9. Marie Cashman | CC:TEGE DC | 202-622-6010 |
| 10. Don Alexander | Akin Gump | 202-887-4064 |
| 11 Dan Micciche | Akin Gump | 214-969-2797 |
| 12 Pat Tielborg | Pipe Line Contractors Assoc | 214-969-2700 |
| 13 Scott Summers | ARB inc. | 949/454-7149 |
| 14. Tom White | H.C. Price Co | 972/858/8800 |
| 15. Don Thorn | Welded Construction | 419/874/3548 |
| 16. Tom Buchanan | Pipe Line Contractors Assoc | 214-969-2700 |
| 17. Kevin Knopf | Treasury D.C. | 202 622 2329 |

Richard Robinson / Internal Revenue Service
1111 Constitution Ave. N.W.
The Mint Building
M-3-372
Attn: LMSB: PFT

# TAB 3

# NATIONAL PIPE LINE AGREEMENT

AGREEMENT made by and between the PIPE LINE CONTRACTORS ASSOCIATION, its contractor members and such other mainline pipe line contractors who execute an acceptance of the terms and provisions of this Agreement, hereinafter referred to as the "Employer," and THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, hereinafter referred to as the "Union."

WITNESSETH:

That, WHEREAS, the parties hereto desire to stabilize employment in the Mainline Pipe Line Industry, and agree upon wage rates, hours and conditions of employment;

NOW, THEREFORE, the undersigned Employer and the Union, in consideration of the mutual promises and covenants herein contained, agree as follows:

## I.

## COVERAGE

(A) This Agreement shall apply to and cover all transportation mainline pipe line and underground cable (cable covered only when cable work is combined with or an integral part of pipe line project) work coming within the jurisdiction of Union contracted for or performed by Employer within the continental United States as such work is more fully described in Paragraphs (B), (C), (D), (E) and (F) below. Work done in the State of Alaska shall also be covered by the terms of this Agreement; provided, however, that Employer and Union shall meet to agree upon the wage rates and any conditions relating to transportation, subsistence and camp jobs which may be necessary in that State. By mutual agreement, this contract may be extended to cover other territory.

(B) Transportation mainline pipe lines coming under this Agreement are defined as follows:

The construction, installation, double-jointing, rebevelling, treating, reconditioning, testing, taking-up, re-laying, or relocation of cross-country pipe lines or any segments thereof transporting coal, gas, oil, water* or other transportable materials, vapors or liquids, including portions of such pipe lines within private property boundaries up to the first metering station or connection.

The phrase "first metering station or connection" means that point where a valve, consumer connection, or town border station divides mainline transmission lines or higher pressure lateral and branch lines from lower pressure distribution systems. If a metering station or connection is located on such mainline transmission line or higher pressure lateral or branch line or between two or more mainline transmission lines or higher pressure lateral or branch lines

---

* (Parties will negotiate special wages and conditions for water lines.)

then such work is covered by this Agreement.

(C) Gathering lines which connect directly from the wells to the mainline pipe lines gathering lines to or from gasoline extraction and gas dehydration plants, gathering lines to o from gas storage fields and water flood lines are included.

(D) All marine work, including "push" jobs in-shore and work done from barges ir shore or off-shore, is covered by this Agreement.

(E) Fabrication and installation of all launchers, receivers and appurtenant piping an related facilities on mainline pipe lines including those portions within private property boundaries which are an integral part of the pipe line system. Employer shall have the right t perform all fabrication work on mainlines or pumping stations under either (1) the terms ar conditions of this Agreement, or (2) in a permanent fabrication shop under the terms and conditions of the National Minimum Standard Agreement for a Commercial Pipe Fabricatir Shop. All fabrication performed in a permanent fabrication shop must carry the Unite Association Union label.

(F) * All pumping stations.

(G) Welding on steel pipe supports as well as the setting, adjusting, aligning, repairii and maintaining of associated rollers is work that is covered by this Agreement.

(H) Such pipe line construction, installation, repair, maintenance, replacement reconditioning as may be combined with or associated or comprising an integral part of other work more particularly and usually defined as Engineering or Building Construction, tank farms, refineries, plant to plant connecting lines within city limits and city distribution lines are r covered by this Agreement.

(I) For purposes of this Agreement, wherever the words "special work" are use they shall refer to and include the following work, and special provisions pertaining to such work are set out in Article XIX hereafter.

1. Gathering lines as described in Paragraph (C) above.
2. Marine work as described in Paragraph (D) above.
3. Short lines
4. Highway relocation
5. Change outs
6. Congested area work
7. Road crossings and cable
8. River crossings
9. Bridge crossings
10. Fabrication
11. Testing and rehabilitation

* (See U.A. National Station Agreement)

12. Take-up and salvage
13. Double jointing in the field
14. Water lines including pipe made of material other than steel

(J) If and when Employer shall perform work covered by this Agreement under its own name, under the name of another, as a corporation, company, partnership, enterprise, or any combination, including a joint venture, this Agreement shall be applicable to all such work performed under the name of Employer or the name of any other corporation, company, partnership, enterprise, combination or joint venture.

(K) All of the work covered by this Agreement shall be done under and in accordance with the terms and conditions of this Agreement, whether done by Employer or any subcontractor of said Employer.

(L) In order to preserve work customarily performed by employees working under this Agreement, it is agreed that as a primary working condition, all double-jointing and rebevelling of pipe shall be performed by an Employer bound to this Agreement, except as otherwise mutually agreed upon in writing by the Union and the Pipe Line Contractors Association with relation to any particular job or project. It is further agreed that no subterfuge shall be used to avoid the intent and scope of this provision, and this Agreement shall apply to all firms, corporations or contractors owned, financed or in any way controlled by an employer bound to this Agreement. A violation of this provision shall be considered a material breach of the Agreement and shall be grounds for the Union's immediate cancellation of the Agreement with the individual Employer which has violated this provision. The Union's right to terminate the Agreement under this provision shall not be exclusive and shall not impair any and all remedies which the Union might otherwise seek for a breach of this provision.

(M) In the event new methods or new equipment (including double-jointing racks) for welding or lining up pipe are utilized, the manning of such equipment and the methods to be used in operating such equipment shall be agreed upon by the Pipe Line Contractors Association and the Union.

(N) If an automatic welding process is successfully developed, and its use on work covered by this Agreement results in the displacement of employees who would otherwise have been hired to perform such work, at the request of either party, representatives of the Pipe Line Contractors Association and the Union will meet for the purpose of determining an equitable means of continuing the benefits to which such employees are entitled under the Pipe Line Industry Benefit Fund and the Pipe Line Industry Pension Fund.

(O) In no event shall Employer be required to pay higher rates of wages, or be subject to more unfavorable working rules than those established by Union for any other employer engaged in similar work.

(P) If any provision of this Agreement is in conflict with the laws or regulations of the United States or of the State in which the work is to be performed, such provision shall be superseded by such law or regulation, but all other provisions of this Agreement shall continue in full force and effect; provided that in no case shall wage rates be paid which are lower than those set out in this Agreement.

(Q) Employer and Union agree that neither of them shall take any action or refuse to take any action which shall discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, age, color, religion, sex, national origin or disability.

(R) This Agreement shall supersede all other agreements between Employer and any local of the Union for any work covered herein and described above.

(S) In order to be more competitive in certain areas in the country, the Pipe Line Contractors Association and the United Association may mutually agree to put into effect special wages and conditions for specific areas or projects. These special wages and conditions will apply to the areas or projects involved for the period of time to be established by the principal parties.

(T) All personal nouns or pronouns used in this Agreement refer to both the male and female gender.

II.

UNION RECOGNITION, UNION SECURITY

(A) The Employer recognizes the Union as the sole bargaining representative for all the employees covered by this Agreement with respect to wages, hours and other terms and conditions of employment.

(B) It is the intent and purpose of the parties hereto that all of the terms and conditions of employment for work covered under this Agreement shall be set out herein, and that neither the Union nor any representative thereof shall demand of any individual contractor any wages, hours or other terms and conditions of employment not specified herein, nor shall any individual Employer or representative thereof offer any wages, hours or other terms and conditions of employment not specified herein.

(C) Job site agreements or understandings made in the field between union representatives and contractor representatives that are not covered by this Agreement or that are in variance with the terms and conditions of this Agreement will not be effective until a joint letter covering the matter and confirming the agreement or understanding has been signed by the Union and the Association.

(D) If, without prior mutual approval by the Pipe Line Contractors Association and the United Association, any individual Employer pays in excess of the wages set out in this Agreement in the form of extra money, extra hours, extra travel or stand-by time or in the form of a bonus by any subterfuge, and the Pipe Line Contractors Association and the United Association both agree that such excess payment is in violation of this Agreement, then such individual Employer shall be required to pay the same extra compensation to all journeymen covered by this Agreement and a proportionate additional compensation to all other employees covered by this Agreement, and such requirement shall continue until that particular job is completed. In no event shall any penalty payment be made by any Employer until such time as the International Representative of the United Association and the Managing Director of the Pipe Line Contractors Association have reviewed the facts and mutually agree that such payment is due. When no mutual agreement between the Pipe Line Contractors Association and the United Association can be reached, the question shall be resolved by arbitration in accordance with the procedure set out in Article XVII, Sections (C), (D) and (E) of this Agreement. It is understood and agreed, however, that any profit-sharing, retirement or pension plan which an individual Employer may have established and which has not been set up for one particular job shall not be considered an excess payment or bonus.

(E) All employees covered by this Agreement, as a condition of continued employment, shall, commencing on the 8th day following the beginning of such employment, or the effective date of this Agreement, whichever is later, acquire and, for the duration of this Agreement, maintain membership in the Union. This provision shall not apply in any State where such a requirement for continued employment is prohibited by law.

(F) The business representative of the Union shall have access to any job at any time, but shall notify the field office of his presence on the job.

III.

UNION DUES AND CHECK-OFF

(A) Upon request of the Local Union having jurisdiction of the work being performed, and upon presentation of proper authorization forms executed by the individual employees, the individual Employers agree to deduct from the wages of such individual employees Union initiation fees and dues, and shall pay over to such Local Union the amount so deducted.

(B) All sums of money withheld by an Employer from the paychecks of employees as Union initiation fees or dues for the benefit of the employees' local union shall be transmitted to the Local Union no later than thirty (30) days after the date on which said sums of money were withheld.

(C) If Employer fails to transmit all sums of money so withheld within the thirty (30) day period, he shall be subject to an additional payment of up to 15% of the amount due but not less than $100. If it becomes necessary for the Union to employ an attorney to collect such sums of money withheld by Employer, Employer shall also pay all court costs and attorneys' fees.

(D) Each Local Union shall have the authority to bring suit in a court of competent jurisdiction in the area where the Local Union has its headquarters for the purpose of collecting initiation fees and dues withheld but not transmitted within such thirty (30) day period.

(E) For the purpose of venue and jurisdiction, each individual Employer hereby designates and appoints the Clerk of the United States District Court for the Northern District of Oklahoma, or the Clerk of the United States District Court in the area where the job is located, as agent for the service of process, and the Local Union shall promptly furnish the delinquent Employer, by certified mail, a copy of all pleadings and notices of suit.

(F) The arbitration provisions in Article XVII of this Agreement shall not be applicable to the rights and liabilities created by this Article.

IV.

EMPLOYMENT, LAY-OFF AND DISCHARGE OF PERSONNEL

(A) Employer shall have full responsibility for management, and shall be the sole judge as to the number of employees required, subject to the conditions hereinafter stated.

(B) The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect past custom and practice in assigning the work to be done.

(C) The word "journeyman" shall mean all persons seeking employment as welders, spacers, stabbers, and persons carrying the line in pipe line construction. The word "helper" shall mean all persons seeking employment as welder helpers. The clamp man is classified as a graded helper.

(D) Employer shall be the sole judge as to the competency of any Employee and shall have the right to discharge any employee.

(E) At the start of each job all journeymen and welder helpers shall be hired by the employers signatory hereto in accordance with the following formula and subject to the conditions set out in Paragraph (G) hereinafter.

| Number of Employees Required | Number Hired Directly By Employer | Number Dispatched By Union | Number of Employees Required | Number Hired Directly By Employer | Number Dispatched By Union |
|---|---|---|---|---|---|
| 1 | 0 | 1 | 7 | 4 | 3 |

PL-000118

| | | | | | |
|---|---|---|---|---|---|
| 2 | 1 | 1 | 8 | 4 | 4 |
| 3 | 2 | 1 | 9 | 5 | 4 |
| 4 | 2 | 2 | 10 | 5 | 5 |
| 5 | 3 | 2 | 11 | 6 | 5 |
| 6 | 3 | 3 | 12 | 6 | 6 |

Thereafter, Employer shall have the right to hire the thirteenth (13th) journeyman and welder helper, and the Union shall dispatch the fourteenth (14th) journeyman and welder helper, and they shall alternate thereafter until the full crew has been employed.

(F) Once a job has started, replacements or additional journeymen and welder helpers needed will be hired either directly by the Employer or referred by the Union in accordance with the formula in effect at that time so that at all times the ratio of employees on the job shall be as set forth in the applicable formula.

(G) The conditions to be followed in the initial hiring or replacement of employees are:

1. Employer retains the right to reject any job applicant and may exercise the right before the Union dispatches any employees required by Employer. Upon request, Employer will confirm by letter or telegram any verbal rejections made.

2. The selection of applicants for referral by Union or hired directly by Employer shall not be based on, or in any way affected by, Union membership, bylaws, rules, regulations, constitutional provisions or any other aspect of or obligation of Union membership, policy or requirements.

3. There shall be no limitation on Employer's right to select employees with particular classifications or skills from among the employees hired by Employer direct. Nor shall there be any limitation on Employer's right to assign employees to particular classifications because of the employee's membership or non-membership in a particular local union.

4. The Union must dispatch the employees requested by Employer at the start of a job within forty-eight (48) hours. The Union must dispatch the employees requested after a job has started within twenty-four (24) hours. If such employees are not actually enroute to the job site within the time required, Employer may hire any employees from any source. In this event, Union shall not interfere with Employer's right to hire employees direct.

5. Union agrees that unless Employer requests otherwise, no journeymen or welder helpers will be dispatched to Employer's job until the welders required through the referral procedure have actually been dispatched.

(H) Employer shall be the sole judge as to the number of employees required. The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect past custom and practice in

assigning the work to be done. In addition to the welder foreman, the welders, and their helpers Employer shall be required to employ journeymen spacers, stabbers and persons carrying the line as needed.

(I) Once the original crew has been hired, Employer shall have the right to keep such crew intact for the duration of the job, regardless of the local union jurisdiction.

(J) Employer shall have the right to keep and transfer such original crew from one job to another within the jurisdiction of the same local union, provided journeymen are pai[illegible] waiting time for any days intervening between the two jobs, and travel pay in accordance wit[illegible] this Agreement.

(K) At the end of the job, Employer will lay off welders, journeymen and welde[illegible] helpers who are no longer needed. The layoff procedure should be such that the ratio of employees hired directly by Employer and those referred by the Union shall be the same as th[illegible] set out in the formula above.

V.

STEWARDS

(A) Union and Employer representatives shall mutually agree upon the appointment of a steward at the pre-job conference. Separate stewards shall not be required on remote segmen[illegible] of a mainline pipe line construction job if the steward on the mainline job is given sufficient time and transportation to perform his duties as steward among the employees on such remot[illegible] segments.

(B) Following the pre-job conference, the steward shall be placed on Employer's payroll on the date corresponding to one of the following three occurrences, whichever date [illegible] earliest.

1. The date of testing welders;

2. The date that rigging up welding equipment, such as sleds, tack rigs, h[illegible] pass rigs, etc., on the right-of-way begins;

3. The date on which Employer employs the second utility welder in riggi[illegible] up any other equipment on the right-of-way.

(C) The steward shall be a working steward and shall perform his duties the same [illegible] any other journeyman, and shall not be discharged for Union activities. The steward's dut[illegible] shall not include any matters relating to referral, hiring, retention, termination, or discipline of employees.

(D) The steward shall not be permitted to take time away from his job duties to handle

administrative work for the Union. The steward will be allowed a reasonable time to process grievances or complaints. Whenever the steward is occupied away from his job duties, his helper may be assigned to other work.

(E) It is agreed that the steward has no authority from Union to cause a work stoppage.

(F) Where the steward has been regularly working on a job and for some unanticipated reason does not show up for work on a particular day, the employees shall start and continue to work and the welder foreman shall notify the local union office of the steward's absence.

(G) The steward shall remain on Employer's payroll until the tie-in work has been completed. After the firing line has finished its work, the steward may, at Employer's option, be used as one of the tie-in welders.

VI.

FOREMEN

(A) The appointment of all foremen is the responsibility of Employer. Such appointments shall not be interfered with by Union. Such foremen may be paid on an hourly, weekly or monthly basis, as determined by Employer.

The welder foreman shall be covered by the Pipe Line Industry Benefit Fund or the Pipe Line Industry Pension Fund. Contributions shall be made by Employer for the same number of hours that the job is set up on per week except as provided in (B).

(B) When twelve (12) or fewer welders are employed, the welder foreman will be allowed to work with the tools, at the discretion of Employer. Such working foreman shall be paid a minimum of 50 cents per hour more than the regular journeyman rate and contributions shall be made by Employer to the Pipe Line Industry Benefit Fund and the Pipe Line Industry Pension Fund for all hours worked by such foreman.

VII.

JOB NOTIFICATION AND ENFORCEMENT

(A) Employer agrees to notify Union promptly before starting any job covered under the terms of this Agreement. It is a violation of this Agreement to start a job without prior notification or a pre-job conference.

(B) Employer and Union shall hold a pre-job conference before the start of any job and Union's representatives at such conference shall be authorized by Union to represent Union

for the entire area covered by the job. It shall be the purpose of the pre-job conference to agree upon such matters as the length of the work week, the number of men to be employed, the applicable wage rates in accordance with the contract, and any other matters not including any interpretation of the clauses of this Agreement, it being agreed that any interpretation of the Agreement should be made between the Pipe Line Contractors Association and the United Association, so that proper application thereof may be made on the jobs. No representative of any individual contractor and no representative of the Union shall demand at the pre-job conference or at any other time during the continuance of the job any term or condition not covered by this Agreement. A copy of the report made on each pre-job conference shall be furnished to the Pipe Line Contractors Association and the United Association, and no agreement made at any pre-job conference which adds to or modifies in any way the terms and conditions of this Agreement shall be binding on any individual contractor or the Union unless approved and ratified by the Pipe Line Contractors Association and the United Association.

(C)    Union agrees to send a copy of this Agreement to each of its locals having pipe line jurisdiction and agrees that the terms of this Agreement shall be recognized by each local union. The enforcement of this Agreement by Union is vested in the local union designated by the Union to handle work covered under this Agreement.

VIII.

ASSEMBLY POINT AND WAREHOUSE

(A)    The time of each employee shall start in the morning at his designated Assembly Point, which shall be agreed upon at the pre-job conference, but which in no event shall be on the pipe line right-of-way.

(B)    If possible, there should be only one Assembly Point for all employees and in no event shall there be more than two Assembly Points.

(C)    If one city, town or community large enough to provide living accommodations for all employees is located near the job site, then one Assembly Point may be designated not more than ten (10) miles outside the city limits and all employees shall report to and their time shall begin at that Assembly Point. This distance may be increased beyond the ten (10) miles when circumstances warrant as agreed to by the principal parties.

(D)    If one such city, town or community is not located near the job site, then one Assembly Point may be designated which is approximately the same distance from several cities, towns or communities where living accommodations are available.

(E)    If living accommodations for all of the employees cannot be found in the one large city, town or community contemplated in Paragraph (C), or in several cities, towns and communities contemplated in Paragraph (D), then a second Assembly Point which qualifies according to either Paragraph (C) or Paragraph (D), so far as available nearby living accommodations is concerned, may be designated by Employer, to which only the remaining

employees shall report and at which only their time shall begin.

(F) Notwithstanding the provisions of Paragraphs (C), (D), and (E) above, contractors bidding work in remote areas of the western part of the country may use assembly points closer to the job site so that non-productive riding time may be eliminated or reduced. It is agreed that the number of miles involved will vary.

(G) Employer shall make suitable and prompt transportation available from each Assembly Point agreed upon to the job site and back. The time of the employees shall end at quitting time on the job site; however, the lunch period which may start at anytime between 11:45 A.M. and 12:15 P.M. and continue for 30 uninterrupted minutes (pipe gang/firing line excluded) shall be excluded. The Employer shall return the employees to the Assembly Points in the shortest possible time. It is intended that the lapse of time used to transport the employees from normal quitting time at the job site back to each Assembly Point shall not exceed the lapse of time from starting time at each Assembly Point in the morning to the job site.

IX.

WORKING AND SAFETY RULES

(A) There shall be no inequitable minimum or maximum amount of work which an employee may be required to perform during the working day, and there shall be no restriction imposed against the use of any type machinery, tools or labor saving devices, except as provided in Article I, Paragraph (L), above. At the discretion of Employer, employees may be changed from one classification to another within the jurisdiction of the Union. During emergencies, any employee of Employer may be assigned to any work; provided, however, that no employee's hourly rate shall be lowered under this provision, and provided further that in the event an employee is assigned to work calling for a higher rate of pay, he shall receive such higher rate for hours so employed.

(B) Stringer bead and hot-pass welders and helpers can be required to weld back on incompleted welds, as long as their wage rate is not lowered.

(C) All maintenance and repair of micro-wire equipment from the lugs out shall be done either by the welder using such equipment or, at Employer's option, by some other journeyman.

(D) Employer shall have the right to make and revise from time to time safety and working rules which are not inconsistent with any of the terms of this Agreement. Union agrees to cooperate in the enforcement of such safety and working rules. Employer, Union, and all employees shall at all times abide by all Federal and State Safety Regulations.

(E) No employee will be required to take a physical examination as a prerequisite to employment.

(F) No foreman or other employee shall be subject to any penalties or fines assessed by Union so long as he is in compliance with the terms and conditions of this Agreement.

X.

WAGE RATES AND CLASSIFICATIONS

(A) The hourly wage rates and fringe benefits shown in Exhibits "A" and "B" shall apply to journeymen and helpers respectively for the periods indicated.

(B) The graded helper rate shall be 35 cents per hour above the welder helper rate.

(C) No premium shall be paid for any job assignment unless specifically provided in this Agreement.

(D) Journeymen employed as "stringer bead" welders and journeymen who are regularly employed as "hot-pass" welders shall receive 50 cents per hour more than other journeymen.

(E) Welders running "stringer bead" or "hot-pass" on "cutouts" or "tie-ins" on a production basis shall be paid 50 cents per hour above the journeyman rate. "Production basis" shall mean those situations where one or more welders have been assigned to welding the stringer bead or hot-pass as a permanent or semi-permanent assignment, and to cover areas of skips and/or large amounts of pups in one location. It is not intended to cover the temporary assignment on a daily basis in a cut-out or tie-in crew where any such assignment is for the express purpose of expediting the movement of the tie-in tractors.

(F) Whenever an extra welder helper is employed using a power buffer or power grinder immediately behind the stringer bead and/or hot-pass welders, and the pipe gang is set up on a production basis, he shall be paid $1.00 per hour above the helper rate. Whenever an extra welder helper is employed using a power buffer or power grinder anywhere else on the job, he shall be paid the graded helper rate.

The $1.00 premium set out above will not apply on work listed in Article I, Paragraph (H). (Exception for marine work, see Article XIX, Marine No. 8.)

(G) The helper assigned to operate the bending mandrel of the bending machine shall be paid the graded helper rate.

(H) Pre-heating with oxygen or acetylene torches and stress relieving shall be assigned to a journeyman. Preheating with liquefied petroleum gas shall be performed by the welder's assigned helper. If an extra welder helper is hired to perform this work he shall be paid at the

regular helper rate. Setting the heat on welding machines and hooking and unhooking of welding machines to tow cats shall also be performed by the welder's assigned helper.

(I) Journeymen acting as job stewards shall wherever possible be assigned to the firing line and shall be paid 50 cents an hour above the journeyman rate for all hours worked by him or for the number of hours up to a maximum of thirteen (13) worked by any UA journeymen on the job except the UA mechanic and except for journeymen and/or welders working on testing. Provided that if the UA mechanic performs any welding after the end of the regular shift, such hours shall be counted in computing the steward's pay. It is intended that the steward shall, wherever possible, and at Employer's option, actually work the number of hours for which he is paid.

(J) In the event back welding is performed inside the pipe under either or both of the following conditions, then Employer will pay such welder engaged in back welding at a wage rate $1.00 per hour above his regular rate for the job only for the days on which such back welding is performed. If the welder helper is required to go inside the pipe for the purpose of brushing, buffing and grinding the weld, he shall receive a wage rate 35 cents per hour above the regular helper rate for the days involved.

1. If Employer elects, as a regular procedure, to back weld each line-up, then one welder will be selected each day to perform all of such back welding. This condition is not intended to apply to occasional back welding performed by the pipe gang to repair a bead, to rectify a "hi-lo" condition or wall thickness change, etc.

2. Whenever a welder is required to back weld a completed weld behind the firing line.

(K) Welders working on "hot work" shall be paid $1.00 an hour above the regular journeyman rate and helpers working on "hot work" shall be paid the graded helper rate for each day engaged in such work. Journeymen and helpers on "hot work" shall not receive such premium pay unless required by Employer to be in the area of danger. "Hot work" is defined as work on lines in service where there is the danger of fire or explosion. Premium pay shall not be required on work on lines not in service where such lines have been purged with air movers, water or other acceptable methods. Even if such lines have been purged by such methods, if fire or explosion results, then premium pay shall be required.

(L) The pay day shall be once each week, unless the Employer agrees to allow employees one draw on money earned; under such conditions, pay day may be once every two weeks. Employees are to be paid during their regular shift. When employees are laid off or discharged, their check for wages due them at the time of the layoff or discharge must be delivered during their regular shift.

(M) When no work is performed on pay day, Employer shall not be required to deliver checks for wages before the expiration of the number of hours which would ordinarily have been worked during that day.

(N) Employer shall make arrangements in each locality where employees ar employed to enable such employees to cash their pay checks, at no cost to the employees.

(O) The wage rate for all employees covered by this Agreement shall be that of th County or State in which the pipe gang is currently working or in which it was located when the pipe was laid out.

XI.

OVERTIME AND HOLIDAY PAY

(A) The work week shall begin Monday and shall end Sunday. All hours worked b an employee in excess of eight hours per day and in excess of forty straight time hours per week and all hours worked on Sunday shall be paid for at the rate of time and one-half the straight tin rate. Work performed on Christmas, Thanksgiving, Labor Day, New Year's Day and July shall be paid for at double the straight time hourly rate; provided, however, that in the event one of the holidays hereinabove named occurs during the first forty hours of any work week, hou worked on such holidays shall not be counted in computing the forty hours after which th employee is entitled to a rate of time and one-half the straight time rate.

(B) If one of the holidays named in Paragraph (A) above falls on Sunday, it shall b observed on Monday. Accordingly, if such an event occurs, work performed on Sunday shall be paid for at the regular rate for that day; work performed on Monday will be paid for at dout the straight time hourly rate. If no work is performed on Monday, no pay other than waiting time to journeymen shall be required.

XII.

WAITING TIME

(A) Journeymen shall be paid waiting time for any days lost during the norn scheduled work week. For any day lost during any one work week, the waiting time paymen shall be a lump sum which is the equivalent of five (5) hours' pay at the straight time r te applicable on that particular job.

(B) The applicable waiting time for each State is based on the journeyman rate and i the stringer bead, hot-pass, steward or other premium rates. In no event shall the waiting ti payment be included in counting the eight or forty hours after which overtime is payable.

(C) If no work is performed on a holiday designated by this Agreement, journeyn shall be paid waiting time. However, if an official holiday as designated by this Agreement comes on a Sunday, and the Employer is working a regular six day week, such journeymen not be paid waiting time for that day.

PL-000126

(D) If the regularly scheduled work week is less than seven (7) days, journeymen shall not be paid any waiting time for the days lost which are not part of the regularly scheduled work week.

(E) If a journeyman's Assembly Point is moved from one location to another he shall be paid eight hours at the straight time rate whether any working time is actually lost or not. Such hours shall not be counted in computing the forty hours after which overtime is payable, and no contributions shall be required to the Pipe Line Industry Benefit, Pension and Advancement Funds for such moving time hours.

(F) If the Assembly Point for a helper or graded helper on loop work is moved in excess of 100 miles such helper or graded helper shall be paid four hours at the straight time rate whether any working time is actually lost or not. Such hours shall not be counted in computing the forty hours after which overtime is payable, and no contributions shall be required to the Pipe Line Industry Benefit, Pension and Advancement Funds for such moving time hours.

(G) If one or more days of work are lost during the work week and journeymen are paid waiting time for such lost days, then Employer may require journeymen to make up such lost days in the future by working on days which are not part of the regularly scheduled work week without incurring any liability for payment of waiting time on such days not worked in the future. However, once the contractor declares a make-up day, such day must then be worked or, if no work is provided on such day, then waiting time will be paid.

(H) Even if no days are lost during the regularly scheduled work week, those journeymen regularly employed in utility, tie-in crews, gate or valve settings, road crossings or fabrication work may work on the days not part of the regularly scheduled work week or on holidays without the Employer becoming liable for waiting time payments to the other journeymen. Those journeymen regularly employed as stringer bead welders, hot pass welders, firing line welders, spacers, stabbers or clamp men may be worked in tie-in crews, gate or valve settings, road crossings, or utility or fabrication work on the days not part of the regularly scheduled work week or on holidays, when needed, without the Employer becoming liable for waiting time payments to other journeymen provided each journeyman in the classifications needed is given equal opportunity to work, starting with the firing line.

(I) If the regularly scheduled work week is less than seven (7) days, in emergencies, when the Business Agent of the Local Union is notified beforehand, Employer may require journeymen to work on the days not part of the regularly scheduled work week without incurring liability for waiting time payments on future such days not worked.

(J) In the absence of an emergency if Employer is working a regularly scheduled work week which is less than seven (7) days and works the pipe gang and/or firing line two (2) consecutive weeks on days which are not part of the regularly scheduled work week he will incur liability for waiting time payments on such days not worked in the future on said job.

XIII.

TRAVEL EXPENSES

(A) The journeyman will receive 30¢ per mile travel pay via the nearest route from the city where he is hired to the job site. The journeyman will be entitled to travel pay to the job site (initial travel pay) and an equal amount of travel pay upon completion of the job (return travel pay). The journeyman WILL NOT receive either initial or return travel pay unless he remains on the job from the date he is hired until the job is completed, or until he is released by employer. If he fails to complete the job for any reason he shall not be entitled to any travel pay.

(B) Journeymen or helpers hired directly by Employer or dispatched by Union to jobs in the continental United States from Alaska will only be entitled to receive travel pay from the point at which they enter the continental United States to the job site.

(C) When a job converts from micro-wire to stick rod and vice versa, all journeymen welders shall be entitled to travel pay at that time. However, other journeymen employed will be entitled to travel pay only as otherwise provided in this Agreement.

(D) The welder helper will receive 20¢ per mile travel pay via the nearest route from the city where he is hired to the job site. The welder helper will be entitled to travel pay to the job site (initial travel pay) and an equal amount of travel pay upon completion of the job (return travel pay). The welder helper WILL NOT receive either initial or return travel pay unless he remains on the job from the date he is hired until the job is completed, or until he is released by employer. If he fails to complete the job for any reason he shall not be entitled to any travel pay.

(E) The cost of any transportation provided by Employer shall be charged against the travel expense to which a journeyman or helper is entitled under this clause; provided, however, that such charge shall not exceed the cost of a commercial airline ticket.

(F) Travel expense provided for herein shall not be applicable when the employee's Assembly Point is moved from one location to another on the same job.

(G) When a helper is hired direct by Employer or dispatched by Union, and no work at all is available for him, he shall be paid eight (8) hours at the straight time rate applicable for that job. If work is available for the helper, but not on the day assigned for his arrival to the job site, then he shall be paid four (4) hours' pay at the applicable wage rate for that job at the straight time rate for each day for which work is not provided.

(H) Whenever any dispute arises over travel pay, the final decision shall be made by agreement between a representative of the Pipe Line Contractors Association and a representative of the Union.

XIV.

REPORTING TIME PAY

(A) After a welder helper has been hired and ordered to report for work at the regular starting time, and no work is provided for him on the day that he has so reported, he shall receive pay equivalent to four (4) hours at the rate applicable for that day. This pay shall be provided notwithstanding he has not been ordered to report for work on that particular day, if the welder helper has been working regularly and the Employer has failed to notify him not to report for work the preceding day at or before the end of his regular shift or 5:30 p.m., whichever is later. The reporting time pay of four hours at the straight time rate is based upon the basic helper rate and not any premium rate.

(B) Any welder helper who reports to work and for whom any work is provided, regardless of the time that he works, shall receive the equivalent of not less than four (4) hours pay.

(C) Any welder helper who reports to work and works more than four (4) hours in any one day shall receive pay equal to the number of hours for that day for which the job has been set up not to exceed ten (10) hours.

(D) If a journeyman who is entitled to waiting time performs some work during the day and is then prevented from completing a full day's work for any reason, he shall receive five (5) hours pay at the rate for that work day. If he works more than four hours and is then prevented from completing a full day's work for any reason, then such journeyman shall be entitled to receive pay equal to the number of hours for that day for which the job has been set up; provided, however, that such journeyman shall not leave the job site unless specifically directed by his foreman. If he leaves the job site or stops work without being directed to do so by his foreman, he shall be entitled to receive pay only for hours actually worked.

(E) If, under any of the circumstances described above, any employee leaves the job site or stops work without being directed to do so by his foreman, he shall be entitled to receive pay only for hours actually worked.

(F) Fringe contributions shall be required on any hours paid under these provisions even though not actually worked. Hours paid for under this provision shall be counted in computing the forty (40) hours after which overtime is payable.

(G) It is expressly provided, however, that when any employee refuses to work or to continue to work or work stoppage conditions brought about by a third party or third parties prevent or make ill-advised in the opinion of the Employer the performance of any work or the continuance of work once started, no pay for time not worked shall be required under any of the above enumerated conditions.

(H) Where notification of the men is required under this Agreement to the effect that work shall not be performed on a particular day, notification of such fact to the steward shall be

sufficient notification to the men, provided such notification is made during working hours.

XV.

TESTING TIME

(A) Before any welder is given a test (single or multiple) for qualification he shall be placed on Employer's payroll.

(B) Single Test. Where a welder successfully completes a single qualification test he shall be entitled to receive pay equal to the number of hours for that day for which the job has been set up (defined as normally scheduled work day); however, Employer may require the welder to work any remaining hours of the normally scheduled work day after completing his test without additional pay. A welder will be entitled to additional pay for any hours he is required to work beyond the normally scheduled work day. If a welder fails a single qualification test he shall receive four (4) hours pay at the straight time rate. No fringe benefit contributions are required on a failed test.

(C) Multiple Tests. If a welder is required to take more than one test for qualification at the start of the job he shall be entitled to receive:

1. Four (4) hours pay at the straight time rate with no fringe benefit contributions if he fails the first test; or

2. Pay equal to the number of hours for that day for which the job has been set up (normally scheduled work day) provided he successfully completes the first test.

The welder will be paid work time and fringe benefit contributions under this Agreement for any additional tests required regardless of the outcome of the tests and regardless of the day taken. Welders, however, must pass all required tests to be eligible for employment.

(D) Welders will not be entitled to any separate test pay for single or multiple tests other than as set out in this Article.

(E) Welders reporting for qualification tests must arrive at the job site at the designated work time on the day designated by Employer for their arrival. If not, they shall not be entitled to receive waiting time pay for that day.

(F) A welder shall be tested or placed on waiting time upon arrival at the job site, provided that it is the day designated by Employer for his arrival. Hours paid for under this provision shall be counted in computing the 40-hour week.

(G) Welder helpers who perform no work while the welder is taking a qualification test are entitled to no pay.

XVI.

WORK STOPPAGES, SECONDARY BOYCOTTS AND JURISDICTIONAL DISPUTES

(A) No local union nor the International Union, nor any representative of either, shall cause or promote a strike, slowdown, stoppage of work or any interference, directly or indirectly, with the operation and progress of the work; nor shall any Employer or the Pipe Line Contractors Association engage in any lockout during the life of this Agreement, it being the good faith intention of the parties hereto that by the execution of this Agreement industrial peace shall be maintained. All grievances, disputes, differences of opinion and other questions concerning this Agreement shall be settled in accordance with the procedure for settlement of grievances and disputes set out in Article XVII below. Any settlement where hours or pay are involved shall be retroactive.

(B) If either the local union or the International Union or any representative of either causes or promotes a strike, slowdown, stoppage of work or any interference with the operation or progress of the work, or if the Employer breaches this Agreement, then the Employer (where the Union interfered with the work) or the International Union (where Employer has breached the Agreement) may at its option declare the provisions of Article XVII inoperative and seek whatever remedy may be available from the National Labor Relations Board or any Federal or State court having jurisdiction of the matter.

(C) It shall not be a violation of this Agreement or of the no-strike clause if members of the United Association refuse to cross a picket line established by another craft union within the pipe line industry.

(D) Questions regarding the interpretation of this Agreement are to be resolved by the parties to this Agreement in accordance with Article XVII. Questions regarding work coverage or jurisdictional disputes between or among local unions affiliated with the United Association will be resolved by the United Association, and shall be binding on all parties to this Agreement. Work coverage or jurisdictional disputes between local unions affiliated with the United Association shall not be cause for work stoppages.

XVII.

PROCEDURE FOR SETTLEMENT OF GRIEVANCES AND DISPUTES

(A) Any grievances, disputes or differences of opinion which arise between the contractors' supervisory personnel and Union representatives in the field shall be settled on the job, wherever possible; provided that such settlements shall not vary any of the wages, terms or conditions of this Agreement.

1.    Any employee who believes that he has a grievance shall first take the matter up with the welder foreman.

2.    If the matter is not satisfactorily adjusted by the foreman, the grievance shall be referred to the job steward. The job steward and the foreman will attempt to resolve the grievance.

3.    If the grievance is not settled between the steward and foreman, the Employer's superintendent will be summoned to enter the discussion. When the matter cannot be settled at this level, it will be referred to the Union's Business Agent and Employer's superintendent.

4.    In the event the grievance, dispute, or difference of opinion shall not have been satisfactorily settled during the preceding steps within forty-eight (48) hours, then the Union representative shall refer it to the appropriate International Union representative, and the Employer's superintendent shall refer it to the Managing Director or Executive Director of the Pipe Line Contractors Association. These parties shall immediately make every effort to settle the difference, grievance or dispute.

(B)    Any other grievance, dispute, difference of opinion or controversy of any kind or character between the Union and the Association and/or individual Employer signatory hereto involving or relating to the interpretation or application of the terms of this Agreement, and the relations between the parties arising during the term of this Agreement which cannot be settled by the parties, shall be settled by the arbitration procedure which is set out below.

(C)    If, within forty-eight (48) hours, no adjustment or settlement is reached by the procedure set out above, the matter shall immediately be referred in writing to an Arbitration Board consisting of six (6) members, all of whom shall be familiar with the mainline, cross country pipe line construction industry, three (3) to be appointed by the International Union, and three (3) by the Pipe Line Contractors Association. These six (6) individuals shall constitute the Arbitration Board.

(D)    The Members of the Arbitration Board shall not have the power to amend or alter the provisions of this Agreement but shall within fourteen (14) days of their appointment determine the procedure that they will use in considering the evidence and render a decision based on the evidence submitted by the parties, such decision to be consistent with the terms and provisions of this Agreement. The decision of the Arbitration Board shall be binding upon both parties.

(E)    In the Unlikely Event that the six (6) member Arbitration Board is unable to reach a decision, then either party may institute the following procedure:

1.    Within seven (7) days after notification by the Arbitration Board that it is unable to reach a decision, the Pipe Line Contractors Association and the International Union shall attempt to mutually agree upon one (1) person to whom the matter shall be referred.

2. If within forty-eight (48) hours no mutual agreement has been reached by the procedure set out above, the Association will immediately contact the Federal Mediation & Conciliation Service to obtain a list of three (3) individuals with as much experience and knowledge as possible in the pipe line construction industry. A copy of this list will be furnished to the Union, and thereafter, the Association and Union shall attempt to mutually agree upon one (1) of the individuals listed. If no agreement can be reached, the Union and the Association will each strike one (1) name from the list and the remaining individual will be the Arbitrator.

3. A statement of the facts shall be presented to the Arbitrator within forty-eight (48) hours after his selection either:

(a) Jointly, if the Union and the Association mutually agree; or

(b) Separately, if no mutual agreement and the Association will submit a written statement of the facts setting out the Employer's position and the Union will submit a written statement setting out the Union's position.

4. All information submitted to the Arbitrator will be in writing. No personal appearances or oral testimony will be allowed. The Arbitrator will then issue, within five (5) days, a decision based upon the evidence submitted.

(F) The Union and Employer involved shall bear the expense of their appointed Arbitrators. In the event an Arbitrator from the Federal Mediation & Conciliation Service is selected, then the Union and Employer shall be jointly responsible for that person's expenses.

(G) In the event Employer fails or refuses to comply with the grievance procedure set out hereinabove, the provisions of Article XVI shall not be binding upon the Union. If Union fails or refuses to comply with the grievance procedure set out hereinabove, then Employer shall have the right to declare this entire Agreement null and void.

XVIII.

JURISDICTIONAL DISPUTES

The Pipe Line Contractors Association and the four International Unions with which National Pipe Line Agreements have been negotiated have established a Policy Committee for the purpose of hearing and considering matters of concern to the pipe line construction industry, such as jurisdictional disputes and any other matters affecting the welfare of the industry.

Whenever a jurisdictional dispute arises between Union and any other union over proper jurisdiction of work assigned by an individual contractor, no work stoppage shall occur, and the individual signatories hereto agree to abide by any decision reached by the Policy Committee.

The Policy Committee decisions are incorporated and made a part of this Agreement, and should be referred to specifically as if set out herein. The Policy Committee decisions may be

obtained by contacting the Union or the Pipe Line Contractors Association.

XIX.

SPECIAL WORK

(A) Whenever the Employer performs any of the special work described in Article I, Paragraph (H) above, the special provisions set out herein shall apply and, to the extent they differ from the provisions in other parts of this Agreement, they shall supersede such provisions.

(B) The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect past custom and practice in assigning the work to be done.

TAKEUP JOBS (SALVAGE PIPE)

1. Roughcutters will be paid $1.00 per hour above the regular helper rate.

2. One helper will be employed for each roughcutter.

3. Bevelers will be paid $1.00 per hour above the regular helper rate.

4. Utility Welder or some other journeyman designated by Employer will act in the capacity of foreman. In the event the pipe being salvaged is also being re-laid or re-conditioned as part of the same job, and where the distance is such that the welder foreman is readily available, then no other welder foreman will be required.

RECONDITIONING

(A) Over the Trench — Line In or Out of Service.

1. Journeymen welders will be used for all welding.

2. One helper will be hired for each welder.

3. One journeyman other than the welders will be employed.

4. Welder foreman.

(B) In the Yard (Where Manual Double Jointing Is Performed)

1. Welders may make their own stringer beads and finish welds.

2. One helper will be employed for each welder. Helpers will be employed to roll all pipe on the welding rack.

3. Bevelers will be paid $1.00 per hour above the regular helper rate.

4. One helper will be employed for every two bevelers.

5. Roughcutters will be paid $1.00 per hour above the regular helper rate.

6. One helper at a rate 35 cents per hour above the rate paid to other welder helpers on the job will be employed as attendant for oxygen manifold and acetylene generator.

7. Welder foreman.

8. It is recognized that rigging up of equipment on a double joint rack that is to be used in the lining-up and welding of pipe is the work of the United Association.

NOTE: When pipe is not being double jointed in the reconditioning yard, the journeyman and helper at a rate 35 cents per hour above the rate paid to other welder helpers on the job need not be employed.

NOTE: The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect past custom and practice in assigning the work to be done.

(C) Re-Laying Reconditioned Pipe.

1. If certain joints, portions of joints, or infrequent sections are removed to be replaced with new or better pipe, then when the pipe line is relaid, Employer shall have the sole right to determine the number and classifications of the employees to be hired; provided that Employer shall respect past custom and practice in assigning the work to be done so that welder helpers will not be assigned to work heretofore done by graded helpers or journeymen, and graded helpers will not be assigned to work heretofore done by journeymen.

2. The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect past custom and practice in assigning the work to be done.

MARINE BARGE AND MARINE PUSH-JOBS

On marine barge and marine push-jobs, Employer shall have the sole right to determine the number and classifications of the employees to be hired; provided that Employer shall respect past custom and practice in assigning the work to be done so that welder helpers will not be assigned to work heretofore done by graded helpers or journeymen, and graded helpers will not be assigned to work heretofore done by journeymen.

1. The contractor will make every effort to secure safe water transportation and adequate and safe loading and unloading facilities for the men (ladder on barges, docks, lifebelts, seating for all, radar where possible).

2. Employees will be paid riding time on the first trip from land to quarter boat, and on the last trip from quarter boat to dock of origin or back to the dock last left from.

3. Board and room shall be furnished at no cost to the men, when required to live on quarter boats.

4. Contractor will provide crew boats for trips to shore, except when the distance to be traveled to and from shore is excessive.

Contractor shall regulate time schedules and decide when crew boats will go to and from shore. If no work is done on a particular day, the men shall be paid for their full shifts unless they are brought to shore or given an opportunity to be brought to shore. In such event they shall be paid their regular waiting time only.

5. Contractor will make every effort to provide daily mail service and once a week laundry service. Laundry service will be paid for by the employee.

6. A crew room shall be made available for off-duty men, with reading material, radio and television; soft drinks and cigarettes will be made available at regular prices.

7. Marine push-jobs will also include shoves on a main line job where ramps or racks with dollies and rollers are set up as opposed to the pipe being carried in by tractors.

8. When the stringer bead welders' regularly assigned helpers are using a power buffer or power grinder, such helpers shall receive $1.00 per hour above the basic helper rate for that job. This premium applies in the "Pipe Gang" area only, and is applicable on "push" jobs in-shore and on work done from barges in-shore and off-shore.

## GATHERING LINES, RIVER & BRIDGE CROSSINGS, HIGHWAY RELOCATION, CHANGE OUTS, SHORT LINES AND WORK IN CONGESTED AREAS

1. Employer shall have the sole right to determine the number and classifications of the employees to be hired; provided that Employer shall respect past custom and practice in assigning the work to be done so that welder helpers will not be assigned to work heretofore done by graded helpers or journeymen, and graded helpers will not be assigned to work heretofore done by journeymen.

2. On River and Bridge Crossings and Highway Relocation work all welders will receive premium pay when running their own beads and finishing welds.

3. On all such work the manning shall be decided by the contractor, but it is recognized that the work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect past custom and practice in assigning the work to be done.

## DOUBLE JOINTING IN THE FIELD

Employer will respect Union jurisdiction for all double jointing in the field.

## HYDROSTATIC TESTING

1. Journeymen and/or welders and graded helpers will be employed to assist in the lining-up, beveling and testing of these lines. The Employer and the Union recognize that journeymen and welders who are qualified to perform hydrostatic testing on pipelines possess a special skill. Furthermore, the Union and the Employer recognize that safety requirements dictate that only qualified journeymen and/or welders will be employed to perform hydrostatic testing on pipelines. Employer in accordance with Article IV shall be the sole judge as to the competency of any journeymen or welders assigned for hydrostatic testing. Journeymen and/or welders for hydrostatic testing will be dispatched employees. The graded helper will be a contractor hire.

2. The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect past custom and practice in assigning the work to be done.

3. If any night work is performed under this section by employees of any other craft, a U.A. employee will be assigned to that crew.

## FABRICATION

1. Where a fabrication crew is set up, the following formula will be used to determine the number of journeymen and graded helpers required in addition to the welders and their helpers.

| Welders | Journeymen | Graded Helpers |
|---|---|---|
| 1-3 | 0 | 0 |
| 4 | 1 | 0 |
| 5-10 | 1 | 1 |
| 11 or more | 2 | 1 |

2. If the fabrication crew is set up as part of a mainline job, and where the distance is such that the welder foreman is readily available, then no other welder foreman will be required for the fabrication crew.

Employer may designate one welder to act as the lead welder or fabricator or tack and layout man and pay him a rate 50 cents above the regular journeyman rate.

3. In the event a welder is required to go completely inside the pipe in order to back weld on fabrication work, the Employer will pay such welder engaged in such back welding at the wage rate of $1.00 per hour above his regular rate for the job only for the days on which such back welding is performed.

## ROAD BORING, CASING AND CABLE

1. One welder and one helper shall work on road casings where the casing is to be welded.

2. On other types of casing where no welding is required, one journeyman and one helper shall be employed.

3. The welding and aligning of pipe for road casing and slick bore pipe shall be performed by a welder and helper as defined in this Agreement.

4. The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect past custom and practice in assigning the work to be done.

WATER LINES INCLUDING THE LAYING OF PIPE MADE OF MATERIAL OTHER THAN STEEL

It is recognized that the work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect past custom and practice in assigning the work to be done. Parties will negotiate special wages and conditions for water lines on a per job basis.

XX.

AUTOMATIC DOUBLE JOINTING RACKS

The manning requirements and other special provisions for double jointing racks are as follows:

(A) First O.D. Head Position

1. Two Journeymen

2. One welder

3. One graded helper to line up seams and to help with line-up.

4. Levers or buttons to be operated by one of the journeymen or the welder listed above.

(B) Second O.D. Head Position.

1. One welder

2. One graded helper

(C) I.D. Head Position

1. One I.D. head welder

2. One graded helper

NOTES: (The following notes apply to all double-jointing racks.)

1. One spell-off welder per rack per shift will be employed to relieve at all head positions. The spell-off welder will receive premium pay of 50 cents per hour above the journeyman rate only when he is required to go inside the pipe.

2. No additional helper shall be required for the spell-off welder.

3. One patch welder shall perform utility and cut-outs and patch welds on rack. This welder may be the steward. In the event, however, there is more utility or cut-out work than this one patch welder can reasonably perform during his regular shift, then another journeyman will be employed to help with this work, or at Employer's option the patch welder will be allowed to perform the extra work after his regular shift.

4. I.D. Head welder shall receive premium pay of 50 cents per hour above the journeyman rate.

5. Helpers shall roll all pipe from grinders through inspection.

6. Employees operating the automatic grinding stations on double-jointing racks will receive a rate 75 cents per hour below the applicable journeyman rate.

7. Other helpers or graded helpers shall be employed as needed, depending upon the work required.

8. It is understood that all fabrication of double-jointing racks, rigging them up in the field, tearing them down and moving will be done by the United Association personnel.

9. Premium pay will not be paid for back welding inside the pipe on double-jointing, nor shall any additional pay be due to welders for tearing down the rack on the theory of "welding back."

10. A U.A. mechanic will be allowed to do maintenance and repair welding on the rack whenever required.

## XXI.

## AUTOMATIC WELDING

Separate manning agreements have been reached on the Automatic Welding Processes, and these Agreements are incorporated and made a part of this National Pipe Line Agreement. Copies may be obtained by contacting the Union or the Pipe Line Contractors Association.

## XXII.

## PIPE LINE INDUSTRY FRINGE CONTRIBUTIONS

(A) All Employers working under the terms of this Agreement shall make contributions for each hour paid to employees covered hereunder, including hours paid to journeymen for waiting time, and for passing a test, and to welder helpers for reporting time:

1. For journeymen, the sum of $5.85 per hour to the Pipeline Industry Benefit Fund; for non-journeymen, the sum of $5.35 per hour to the Pipe Line Industry Benefit Fund. The Agreement and Declaration of Trust of the Pipe Line Industry Benefit Fund is incorporated and made a part of this Agreement by reference thereto.

2. For journeymen, the sum of $3.35 per hour to the Pipe Line Industry Pension Fund; for non-journeymen, the sum of $2.27 per hour to the Pipe Line Industry Pension Fund. The Agreement and Declaration of Trust of the Pipe Line Industry Pension Fund is incorporated and made a part of this Agreement by reference thereto.

3. For all employees, the sum of 50 cents per hour to the Pipe Line Industry Advancement Fund. The 50 cents contribution to the PLIAF will not be applicable on Special Agreement work. Contributions to the Pipe Line Industry Advancement Fund are irrevocable; however, this contribution is elective for any Employer who is not a member of the Pipe Line Contractors Association. The Pipe Line Industry Advancement Fund is administered by the Pipe Line Contractors Association and the rules and regulations of this Fund are incorporated and made a part of this Agreement by reference thereto.

4. For all employees, effective January 1, 2000, the sum of 5 cents per hour to the United Association Training Fund. The Agreement and Declaration of Trust of the United Association Training Fund is incorporated and made a part of this Agreement by reference thereto.

(B) For all employees, employer shall deduct and remit when authorized by employee amounts for the U.A. 401(k) plan. Amounts remitted for the 401(k) plan are deductions only. There are <u>no</u> matching employer contributions.

(C) The submitting of contributions/deductions provided for in this Article shall be governed by the provisions of Article XXIII.

## XXIII.

## SUBMITTING REPORTS AND CONTRIBUTIONS, LATE FILING CHARGES AND DELINQUENCIES

(A) All contributions due and owing to the Pipe Line Industry Benefit Fund and the Pipe Line Industry Pension Fund shall be deemed and are considered to be Trust Funds.

(B) Upon the written request of any employee who is a member of a local union having jurisdiction of work covered by this Agreement, the Director of the Benefit and Pension Funds provided for in this Agreement shall immediately transfer to the fringe funds established by the employee's local union all contributions made on his behalf to such Funds by Employers working under this Agreement, subject to approval by the Board of Trustees.

(C). Changes in the amounts to be contributed to each Fund may be made by agreement between the Pipe Line Contractors Association and the Union.

(D) The Pipe Line Industry Benefit Fund and the Pipe Line Industry Pension Fund shall be administered by a Board of Trustees consisting of three (3) members appointed by the Union, and three (3) representatives appointed by the Pipe Line Contractors Association.

(E) There have heretofore been prepared and executed Trust Agreements for the Benefit and Pension Funds. Such Trust Agreements set out the type of health and welfare, pension, training and other benefits which are provided by the Funds and the manner and procedure to be followed in qualifying for such benefits. The Trustees shall have the authority to determine the amount of each of such benefits which can be provided by the resources of the Funds and the time when such benefit payments may begin.

(F) Each Employer working under this Agreement agrees to be bound by the terms and provisions of the Trust Agreements referred to hereinabove, and to promptly pay all contributions to the office of the Pipe Line Industry Benefit Fund upon forms supplied by that office.

(G) If, in the opinion of the Board of Trustees of any of the above named Funds, any individual Employer has had a record of delinquent contributions to such an extent that it is necessary for the protection of the beneficiaries of such Funds that some security for the contributions be obtained, said Board of Trustees is authorized to require such individual Employer to deposit the sum of $300 per employee in an escrow account designated by the Director of the Funds. Upon completion of the job, any amounts in excess of the contributions due shall be refunded to the individual Employer.

(H) No Employer working under the terms of this Agreement shall be obligated or required to make any other contributions or payments in and to any other Trust Fund administered for the purpose of any of the provisions authorized pursuant to the National Labor Relations Act, as amended, when engaged in work covered by the terms of this Agreement.

(I) When a man is taken from any crew to be used temporarily as a welder helper, and such man's wage rate is higher than the welder helper wage rate, he shall be paid the higher wage rate; and if Employer is required to pay into other fringe funds for that man, Employer will not be required to make any contributions to the fringe funds called for in the National Pipe Line Agreement; provided, that contributions to the fringe funds called for by this National Pipe Line Agreement shall be required if the temporary welder helper has worked more than eight hours in that capacity. Nevertheless, if Employer has called upon Union to supply a permanent welder helper, and Union has failed to do so, Employer shall not be required to make such contributions for hours worked by the temporary welder helper.

(J) Each Employer shall report and pay regularly, and no less frequently than its regular payroll period, all contributions due.

(K) All contributions become delinquent after thirty (30) days from the end of the

reporting period, and a late report charge of up to 15% of the amount due but not less than $100.00 shall be paid into the Funds by said delinquent Employer; provided, further, that if it becomes necessary in the opinion of the Board of Trustees to refer such delinquency to an attorney for collection, said Employer agrees to pay all court costs and all attorneys' fees in addition to the late report charge.

(L) For the purpose of venue and jurisdiction, each individual Employer hereby designates and appoints the Clerk of the United States District Court for the Northern District of Oklahoma as agent for the service of process, and the Funds' Director shall promptly furnish all delinquent contractors, by certified mail, a copy of all pleadings and notices of suit.

(M) The arbitration provisions in Article XVII of this Agreement shall not be applicable to the rights and liabilities created by this Article.

## XXIV.

## SUBSTANCE ABUSE POLICY

A Substance Abuse Policy has been negotiated by the Pipe Line Contractors Association and the United Association and is attached hereto and made a part of this Agreement as Exhibit C.

## XXV.

## ALCOHOL MISUSE PREVENTION POLICY

An Alcohol Misuse Prevention Policy has been negotiated by the Pipe Line Contractors Association and the United Association and is made part of the Agreement. Refer to Exhibit F for information on this Policy.

## XXVI.

## HISTORICAL PRECEDENT

Since the inception of the National Pipe Line Agreements, which cover all mainline cross-country pipe line construction, only four (4) unions have been recognized, and all work relating to such pipe line construction has been performed by these four (4) unions. They are: The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, The United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, The International Union of Operating Engineers, and The Laborers International Union of North America. The recognition of only these four (4) unions on such work is hereby reaffirmed.

XXVII.

INTERPRETATIONS

Interpretations to this Agreement have been agreed upon between the Pipe Line Contractors Association and the United Association and are attached hereto and made a part of this Agreement as Exhibit D.

XXVIII.

INDIAN PREFERENCE IN EMPLOYMENT

The hiring procedures contained in this Agreement shall not apply in the "territorial jurisdiction" of any Indian Nation which has adopted an Indian Preference in Employment Law, provided that those persons covered by the law and seeking covered employment under this Agreement possess the "necessary qualifications" which are essential to the performance of that specific job.

XXIX.

EFFECTIVE DATE, TERMINATION AND RENEWAL

(A) This Agreement shall become effective May 1, 1999, when signed by the parties and shall remain in full force and effect until its termination as provided hereinbelow.

(B) The provisions of this Agreement shall continue in full force and effect until Ap[illegible] 2004, and thereafter from year to year unless terminated at the option of either party after sixty ( days' notice in writing to the other.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this 17th day of Ju 1999.

THE UNITED ASSOCIATION OF
JOURNEYMEN AND APPRENTICES OF T
PLUMBING AND PIPEFITTING INDUSTR
THE UNITED STATES AND CANADA

By: ______________________
Martin J. Maddaloni,
General President

PIPE LINE CONTRACTORS ASSOCIATION

By: ______________________________
H. Charles Price,
President

By: ______________________________
J. Patrick Tielborg
Managing Director and General Counsel

SPECIAL AGREEMENT FOR SMALL DIAMETER PIPE BETWEEN THE PIPE LINE CONTRACTORS ASSOCIATION AND THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA

The wage rates, fringes and conditions set out herein will apply for the Continental United and for the type of work described below. The terms and conditions of this Special Agreement remain in effect from May 1, 1999 until May 1, 2004 (subject to fringe reopener May 1, 2000, and reopener May 1, 2002 and 2003). Termination of this Special Agreement will be in accordance wi provisions of Article XXIX of the National Pipe Line Agreement.

a. States

All states in the Continental United States and the District of Columbia, except Calif Illinois, New Jersey, Oregon, Washington and Wisconsin.

b. Scope of Work

All pipeline 16" and under any length.

c. Wage Rates, Fringes and Conditions:

1. Wage rates and fringes for all States set out in a. above. (Effective May 1, 19

| | | |
|---|---|---|
| Journeymen | $ | 25.00 |
| Fringes | | 4.30 |
| | $ | 29.30 |

| | | |
|---|---|---|
| Helper * | $ | 9.15 |
| Fringes | | 3.22 |
| | $ | 12.37 |

* (Compare Laborer's Rate)

2. Conditions for all States set out above:

a. There will be no Graded Welder Helpers other than the Graded

Helper on hydrostatic testing, clampmen and the Graded Welder Helper using a power buffer or power grinder immediately behind the stringer bead and/or hot pass welders when the pipe gang is set up on a production basis. Such Graded Helpers will receive .35 per hour above the basic welder helper rate. The Grader Helper using a power buffer or grinder immediately behind the Stringer bead and/or hot pass welders under this section will receive $1.00 per hour above the basic Welder Helper rate.

b. The Contractor will determine the Assembly Point which will not exceed 25 miles from living accommodations, and in no event will the Assembly Point be on the right-of-way or move along the right-of-way.

c. The Welder Helper will receive the basic hourly rate listed hereinabove, or the Laborer's basic hourly rate for the area in which the job is located, whichever is greater. Fringes are not involved in the comparison.

d. The workweek will be a minimum of sixty (60) hours where the contractor has discretion in setting workweek hours.

e. Once a crew is hired the contractor can move that crew from job to job without change, regardless of location.

f. The contractor will have the right to hire five (5) of the first six (6) U.A. employees (of each class – journeymen, welders and helpers). After the sixth (6th) employee hired, hiring will be in accordance with hiring formula under the National Pipe Line Agreement so that 50/50 hire maintained after 12 employees.

All other terms and conditions of the National Pipe Line Agreement between the Pipe Line Contractors Association and the United Association will remain in effect.

IN WITNESS WHEREOF, the parties hereto have executed this Special Agreement For Small Diameter Pipe.

UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA

By: ______________________________
Martin J. Maddaloni,
General President

PIPE LINE CONTRACTORS ASSOCIATION

By: ______________________________
H. Charles Price,
President

By: ______________________________
J. Patrick Tielborg,
Managing Director and General Counsel

40393
06/18/01 10:51 AM

EXHIBIT "A"

RE: UNITED ASSOCIATION JOURNEYMEN HOURLY WAGE RATES AND FRINGES*

| | 5/1/99 - 5/1/00 | | 5/1/00 – 5/1/02 | |
|---|---|---|---|---|
| | Wages | Fringes | Wages | Fringes |
| Alabama | $37.69 | $9.75 | $38.94 | $9.75 |
| Alaska | -- | $9.75 | -- | $9.75 |
| Arizona | $38.39 | $9.75 | $39.64 | $9.75 |
| Arkansas | $37.69 | $9.75 | $38.94 | $9.75 |
| California | $38.39 | $9.75 | $39.64 | $9.75 |
| Colorado | $37.69 | $9.75 | $38.94 | $9.75 |
| Connecticut | $38.39 | $9.75 | $39.64 | $9.75 |
| Delaware | $37.94 | $9.75 | $39.19 | $9.75 |
| D.C. | $37.94 | $9.75 | $39.19 | $9.75 |
| Florida | $37.69 | $9.75 | $38.94 | $9.75 |
| Georgia | $37.69 | $9.75 | $38.94 | $9.75 |
| Idaho | $37.69 | $9.75 | $38.94 | $9.75 |
| Illinois | $37.94 | $9.75 | $39.19 | $9.75 |
| Indiana | $37.94 | $9.75 | $39.19 | $9.75 |
| Iowa | $37.94 | $9.75 | $39.19 | $9.75 |
| Kansas | $37.69 | $9.75 | $38.94 | $9.75 |
| Kentucky | $37.94 | $9.75 | $39.19 | $9.75 |
| Louisiana | $37.69 | $9.75 | $38.94 | $9.75 |
| Maine | $37.94 | $9.75 | $39.19 | $9.75 |
| Maryland | $37.94 | $9.75 | $39.19 | $9.75 |
| Massachusetts | $38.39 | $9.75 | $39.64 | $9.75 |
| Michigan | $37.94 | $9.75 | $39.19 | $9.75 |
| Minnesota | $37.94 | $9.75 | $39.19 | $9.75 |
| Mississippi | $37.69 | $9.75 | $38.94 | $9.75 |
| Missouri | $37.94 | $9.75 | $39.19 | $9.75 |
| Montana | $37.69 | $9.75 | $38.94 | $9.75 |
| Nebraska | $37.69 | $9.75 | $38.94 | $9.75 |
| Nevada | $38.39 | $9.75 | $39.64 | $9.75 |
| New Hampshire | $37.94 | $9.75 | $39.19 | $9.75 |
| New Jersey | $38.39 | $9.75 | $39.64 | $9.75 |

EXHIBIT "A"

RE: UNITED ASSOCIATION JOURNEYMEN HOURLY WAGE RATES AND FRINGES*

| | | | | |
|---|---|---|---|---|
| New Mexico | $37.69 | $9.75 | $38.94 | $9.75 |
| New York | $37.94 | $9.75 | $39.19 | $9.75 |
| North Carolina | $37.69 | $9.75 | $38.94 | $9.75 |
| North Dakota | $37.69 | $9.75 | $38.94 | $9.75 |
| Ohio | $37.94 | $9.75 | $39.19 | $9.75 |
| Oklahoma | $37.69 | $9.75 | $38.94 | $9.75 |
| Oregon | $37.94 | $9.75 | $39.19 | $9.75 |
| Pennsylvania | $37.94 | $9.75 | $39.19 | $9.75 |
| Rhode Island | $38.39 | $9.75 | $39.64 | $9.75 |
| South Carolina | $37.69 | $9.75 | $38.94 | $9.75 |
| South Dakota | $37.69 | $9.75 | $38.94 | $9.75 |
| Tennessee | $37.69 | $9.75 | $38.94 | $9.75 |
| Texas | $37.69 | $9.75 | $38.94 | $9.75 |
| Utah | $37.69 | $9.75 | $38.94 | $9.75 |
| Vermont | $37.94 | $9.75 | $39.19 | $9.75 |
| Virginia | $37.94 | $9.75 | $39.19 | $9.75 |
| Washington | $37.94 | $9.75 | $39.19 | $9.75 |
| West Virginia | $37.94 | $9.75 | $39.19 | $9.75 |
| Wisconsin | $37.94 | $9.75 | $39.19 | $9.75 |
| Wyoming | $37.69 | $9.75 | $38.94 | $9.75 |

**Contract Expires April 30, 2004**

*** Effective 5/1/00 --- plus $1.25**
*** Effective 5/1/01 --- Freeze**
***Effective 5/1/02 --- Wage Reopener**
*** Effective 5/1/03 --- Wage Reopener**

**NOTE: Major projects have special wages above those set out above. Contact PLCA or U.A. for changes.**

**5 cents Training Fund contribution included in $9.75 fringes effective January 1, 2000**

EXHIBIT "B"

RE: UNITED ASSOCIATION WELDER HELPER WAGE RATES AND FRINGES*

| | 5/1/1999-5/1/2000 | | 5/1/2000-5/1/2002 | |
|---|---|---|---|---|
| | Wages | Fringes | Wages | Fringes |
| | | | | |
| Alabama | $14.92 | $8.17 | $15.67 | $8.17 |
| Alaska | - | $8.17 | - | $8.17 |
| Arizona | $18.27 | $8.17 | $19.02 | $8.17 |
| Arkansas | $15.67 | $8.17 | $16.42 | $8.17 |
| **California: | | | | |
| Zone 1 | $24.54 | $8.17 | $25.29 | $8.17 |
| Zone 2A | $27.46 | $8.17 | $28.21 | $8.17 |
| Zone 2B | $26.26 | $8.17 | $27.01 | $8.17 |
| Zone 3 | $25.21 | $8.17 | $25.96 | $8.17 |
| Colorado | $17.85 | $8.17 | $18.60 | $8.17 |
| Connecticut | $21.59 | $8.17 | $22.34 | $8.17 |
| Delaware | $14.80 | $8.17 | $15.55 | $8.17 |
| D.C. | $17.24 | $8.17 | $17.99 | $8.17 |
| Florida | $16.07 | $8.17 | $16.82 | $8.17 |
| Georgia | $16.34 | $8.17 | $17.09 | $8.17 |
| **Idaho: | | | | |
| Zone 1 | $22.43 | $8.17 | $23.18 | $8.17 |
| Zone 2 | $21.08 | $8.17 | $21.83 | $8.17 |
| **Illinois: | | | | |
| Zone 1 | $20.79 | $8.17 | $21.54 | $8.17 |
| Zone 2 | $20.03 | $8.17 | $20.78 | $8.17 |
| Zone 3 | $23.82 | $8.17 | $24.57 | $8.17 |
| Zone 4 | $20.35 | $8.17 | $21.10 | $8.17 |
| Zone 5 | $20.03 | $8.17 | $20.78 | $8.17 |
| Zone 6 | $19.77 | $8.17 | $20.52 | $8.17 |
| Zone 7 | $20.66 | $8.17 | $21.41 | $8.17 |
| Zone 8 | $20.42 | $8.17 | $21.17 | $8.17 |
| Zone 9 | $20.36 | $8.17 | $21.11 | $8.17 |
| Zone 10 | $20.44 | $8.17 | $21.19 | $8.17 |

EXHIBIT "B"
RE: UNITED ASSOCIATION WELDER HELPER WAGE RATES AND FRINGES*

| | | | | |
|---|---|---|---|---|
| Zone 11 | $18.88 | $8.17 | $19.63 | $8.17 |
| Zone 12 | $18.78 | $8.17 | $19.53 | $8.17 |
| Zone 13 | $20.71 | $8.17 | $21.46 | $8.17 |
| Zone 14 | $19.64 | $8.17 | $20.39 | $8.17 |
| Zone 15 | $21.72 | $8.17 | $22.47 | $8.17 |
| Zone 16 | $19.79 | $8.17 | $20.54 | $8.17 |
| Zone 17 | $20.74 | $8.17 | $21.49 | $8.17 |
| Zone 18 | $21.44 | $8.17 | $22.19 | $8.17 |
| Indiana | $18.58 | $8.17 | $19.33 | $8.17 |
| **Iowa: | | | | |
| Zone 1 | $20.10 | $8.17 | $20.85 | $8.17 |
| Zone 2 | $15.68 | $8.17 | $16.43 | $8.17 |
| **Kansas: | | | | |
| Zone 1 | $19.16 | $8.17 | $19.91 | $8.17 |
| Zone 2 | $14.80 | $8.17 | $15.55 | $8.17 |
| Zone 3 | $14.80 | $8.17 | $15.55 | $8.17 |
| Zone 4 | $18.01 | $8.17 | $18.76 | $8.17 |
| Kentucky | $16.19 | $8.17 | $16.94 | $8.17 |
| Louisiana | $17.77 | $8.17 | $18.52 | $8.17 |
| Maine | $15.00 | $8.17 | $15.75 | $8.17 |
| **Maryland: | | | | |
| Zone 1 | $16.69 | $8.17 | $17.44 | $8.17 |
| Zone 2 | $19.03 | $8.17 | $19.78 | $8.17 |
| Massachusetts | $22.86 | $8.17 | $23.61 | $8.17 |
| Michigan | $21.03 | $8.17 | $21.78 | $8.17 |
| **Minnesota: | | | | |
| Zone 1 | $19.95 | $8.17 | $20.70 | $8.17 |
| Zone 2 | $14.70 | $8.17 | $15.45 | $8.17 |
| Mississippi | $16.02 | $8.17 | $16.77 | $8.17 |
| **Missouri: | | | | |
| Zone 1 | $23.35 | $8.17 | $24.10 | $8.17 |
| Zone 2 | $20.86 | $8.17 | $21.61 | $8.17 |
| Zone 3 | $19.82 | $8.17 | $20.57 | $8.17 |

EXHIBIT "B"

RE: UNITED ASSOCIATION WELDER HELPER WAGE RATES AND FRINGES*

| | | | | |
|---|---|---|---|---|
| Zone 4 | $18.42 | $8.17 | $19.17 | $8.17 |
| Zone 5 | $22.09 | $8.17 | $22.84 | $8.17 |
| Zone 6 | $20.74 | $8.17 | $21.49 | $8.17 |
| Montana | $17.24 | $8.17 | $17.99 | $8.17 |
| Nebraska | $15.62 | $8.17 | $16.37 | $8.17 |
| **Nevada: | | | | |
| Zone 1 | $22.25 | $8.17 | $23.00 | $8.17 |
| Zone 2 | $20.50 | $8.17 | $21.25 | $8.17 |
| New Hampshire | $16.83 | $8.17 | $17.58 | $8.17 |
| New Jersey | $23.04 | $8.17 | $23.79 | $8.17 |
| New Mexico | $16.33 | $8.17 | $17.08 | $8.17 |
| **New York: | | | | |
| Zone 1 | $26.59 | $8.17 | $27.34 | $8.17 |
| Zone 1A | $26.67 | $8.17 | $27.42 | $8.17 |
| Zone 2 | $24.54 | $8.17 | $25.29 | $8.17 |
| Zone 3 | $25.39 | $8.17 | $26.14 | $8.17 |
| Zone 4 | $25.61 | $8.17 | $26.36 | $8.17 |
| Zone 5 | $21.19 | $8.17 | $21.94 | $8.17 |
| Zone 6 | $20.86 | $8.17 | $21.61 | $8.17 |
| Zone 7 | $22.44 | $8.17 | $23.19 | $8.17 |
| Zone 7A | $19.92 | $8.17 | $20.67 | $8.17 |
| Zone 7B | $20.58 | $8.17 | $21.33 | $8.17 |
| Zone 7C | $20.83 | $8.17 | $21.58 | $8.17 |
| Zone 7D | $20.98 | $8.17 | $21.73 | $8.17 |
| Zone 7E | $21.79 | $8.17 | $22.54 | $8.17 |
| Zone 7F | $20.32 | $8.17 | $21.07 | $8.17 |
| Zone 7G | $23.22 | $8.17 | $23.97 | $8.17 |
| Zone 8A | $21.73 | $8.17 | $22.48 | $8.17 |
| Zone 8B | $21.88 | $8.17 | $22.63 | $8.17 |
| Zone 9 | $23.18 | $8.17 | $23.93 | $8.17 |
| Zone 10 | $21.49 | $8.17 | $22.24 | $8.17 |
| Zone 11 | $18.63 | $8.17 | $19.38 | $8.17 |
| Zone 12 | $19.95 | $8.17 | $20.70 | $8.17 |
| Zone 13 | $22.42 | $8.17 | $23.17 | $8.17 |

EXHIBIT "B"

RE: UNITED ASSOCIATION WELDER HELPER WAGE RATES AND FRINGES*

| | | | | |
|---|---|---|---|---|
| North Carolina | $16.44 | $8.17 | $17.19 | $8.17 |
| North Dakota | $14.80 | $8.17 | $15.55 | $8.17 |
| Ohio | $21.97 | $8.17 | $22.72 | $8.17 |
| Oklahoma | $16.38 | $8.17 | $17.13 | $8.17 |
| Oregon | $21.46 | $8.17 | $22.21 | $8.17 |
| **Pennsylvania: | | | | |
| Zone 1 | $20.92 | $8.17 | $21.67 | $8.17 |
| Zone 2 | $19.13 | $8.17 | $19.88 | $8.17 |
| Zone 3 | $19.60 | $8.17 | $20.35 | $8.17 |
| Rhode Island | $22.64 | $8.17 | $23.39 | $8.17 |
| South Carolina | $16.44 | $8.17 | $17.19 | $8.17 |
| South Dakota | $15.77 | $8.17 | $16.52 | $8.17 |
| Tennessee | $16.30 | $8.17 | $17.05 | $8.17 |
| Texas | $16.43 | $8.17 | $17.18 | $8.17 |
| Utah | $18.35 | $8.17 | $19.10 | $8.17 |
| Vermont | $17.50 | $8.17 | $18.25 | $8.17 |
| Virginia | $16.86 | $8.17 | $17.61 | $8.17 |
| Washington | $21.19 | $8.17 | $21.94 | $8.17 |
| West Virginia | $18.91 | $8.17 | $19.66 | $8.17 |
| Wisconsin | $19.16 | $8.17 | $19.91 | $8.17 |
| Wyoming | $18.09 | $8.17 | $18.84 | $8.17 |

**Contract Expires April 30, 2004**

*** Effective 5/1/02 --- Wage Reopener**
*** Effective 5/1/03 --- Wage Reopener**
**** See attached Pages 43-52**

**NOTE: Major projects have special wages above those set out above. Contact PLCA or U.A. for changes.**

**5 cents Training Fund contribution included in $8.17 fringes effective January 1, 2000**

EXHIBIT "B"

RE: UNITED ASSOCIATION WELDER HELPER WAGE RATES AND FRINGES*

** ZONES BY COUNTIES FOR WELDER HELPERS

**CALIFORNIA:**

Zone 1:

| | | | |
|---|---|---|---|
| Imperial | Los Angeles | Riverside | Santa Barbara |
| Inyo | Mono | San Bernadino | Ventura |
| Kern | Orange | San Luis Obispo | |

Zone 2A:

| | | |
|---|---|---|
| Alameda | Marin | San Mateo |
| Contra Costa | San Francisco | Santa Clara |

Zone 2B:

| | | | |
|---|---|---|---|
| Alpine | Kings | Nevada | Solano |
| Amador | Lake | Placer | Sonoma |
| Butte | Lassen | Plumas | Stanislaus |
| Calaveras | Madera | Sacramento | Sutter |
| Colusa | Mariposa | San Benito | Tehama |
| Del Norte | Mendocino | San Joaquin | Trinity |
| El Dorado | Merced | Santa Cruz | Tulare |
| Fresno | Modoc | Shasta | Toulumne |
| Glenn | Monterey | Sierra | Yolo |
| Humbolt | Napa | Siskiyou | Yuba |

Zone 3:

San Diego County Only

**IDAHO:**

Zone 1:

| | | | |
|---|---|---|---|
| Beneway | Clearwater | Latah | Shoshone |
| Bonner | Idaho* | Lewis | |
| Boundary | Kootenai | Nez Perce | |

*that part of Idaho County North of Parallel 46 in the State of Idaho

Zone 2:

Rest of State

ILLINOIS:

Zone 1:

Peoria County

Zone 2:

| | |
|---|---|
| Madison | St. Clair |

Zone 3:

| | | |
|---|---|---|
| Boone | Grundy | Lake |
| Cook | Kane | McHenry |
| DuPage | Kendall | Will |

Zone 4:

| | | |
|---|---|---|
| Bureau | LaSalle | Putnam |

Zone 5:

| | | | |
|---|---|---|---|
| Bond | Green | Monroe | Washington |
| Calhoun | Jersey | Montgomery | |
| Clinton | Macoupin | Randolph | |

Zone 6:

| | |
|---|---|
| Coles | Cumberland |

Zone 7:

| | |
|---|---|
| Mercer | Rock Island |

Zone 8:

| | |
|---|---|
| Fulton | Tazewell |

Zone 9:

| | | | |
|---|---|---|---|
| Carroll | Jo Daviess | Ogle | Whiteside |
| DeKalb | Lee | Stephenson | Winnebago |

Zone 10:

| | | | |
|---|---|---|---|
| Ford | Iroquois | Marshall | Stark |
| Hancock | Kankakee | McDonough | Warren |
| Henderson | Knox | McLean | Woodford |
| Henry | Livingston | | |

Zone 11:

| | | | |
|---|---|---|---|
| Clay | Fayette | Lawrence | Wabash |
| Crawford | Hamilton | Marion | Wayne |
| Edwards | Jasper | Richland | White |
| Effingham | Jefferson | | |

Zone 12:

| | | | |
|---|---|---|---|
| Alexander | Jackson | Perry | Saline |
| Franklin | Johnson | Pope | Union |
| Gallatin | Massac | Pulaski | Williamson |
| Hardin | | | |

Zone 13:

| | | | |
|---|---|---|---|
| Adams | Christian | Menard | Sangamon |
| Brown | Logan | Morgan | Schuyler |
| Cass | Mason | Pike | Scott |

Zone 14:

Vermillion

Zone 15:

| | | |
|---|---|---|
| Champaign | Dewitt | Platt |

Zone 16:

| | | |
|---|---|---|
| Clark | Douglas | Edgar |

Zone 17:

Shelby

Zone 18:

Macon Moultrie

**IOWA:**

Zone 1:

Scott

Zone 2:

Rest of State

**KANSAS:**

Zone 1:

Johnson Wyandotte

Zone 2:

| | | | |
|---|---|---|---|
| Anderson | Geary | Marshall | Reno |
| Chase | Jackson | McPherson | Republic |
| Clay | Jefferson | Miami | Riley |
| Cloud | Leavenworth | Morris | Saline |
| Coffey | Linn | Osage | Shawnee |
| Dickinson | Lyon | Ottawa | Wahaunsee |
| Douglas | Marion | Pottawatomie | Washington |
| Franklin | | | |

Zone 3:

| | | | |
|---|---|---|---|
| Allen | Cherokee | Harper | Neosho |
| Atchison | Cowley | Harvey | Sedgwick |
| Bourbon | Crawford | Kingman | Summer |
| Brown | Doniphan | Labette | Wilson |
| Butler | Elk | Montgomery | Woodson |
| Chatauqua | Greenwood | Nemaha | |

Zone 4:

Rest of State

MARYLAND:

Zone 1:

Calvert
Caroline
Charles
Dorchester
Kent
Montgomery
Prince Georges
Queen Annes
Somerset
St. Marys
Talbot
Winconico
Worchester

Zone 2:

Rest of State

MINNESOTA:

Zone 1:

Anoka
Carlton
Carver
Chisago
Cook
Dakota
Hennepin
Isanti
Itasca
Lake
Pine
Ramsey
Scott
Sherburne
St. Louis (North of T.55N)
St. Louis (South of T.55N)
Washington
Wright

Zone 2:

Rest of State

MISSOURI:

Zone 1:

St. Louis County

Zone 2:

Clay
Jackson
Platte
Ray

Zone 3:

Buchanan Cass Lafayette

Zone 4:

| | | | |
|---|---|---|---|
| Andrew | Dade | Holt | Ozark |
| Atchison | Dallas | Jasper | Pettis |
| Barry | Daviess | Johnson | Polk |
| Barton | DeKalb | Laclede | Saline |
| Bates | Douglas | Lawrence | Stone |
| Benton | Gentry | Livingston | St. Clair |
| Caldwell | Greene | McDonald | Taney |
| Camden | Grundy | Mercer | Vernon |
| Carroll | Harrison | Morgan | Webster |
| Cedar | Henry | Newton | Worth |
| Christian | Hickory | Nodaway | Wright |
| Clinton | | | |

Zone 5:

Franklin Jefferson St. Charles

Zone 6:

| | | | |
|---|---|---|---|
| Adair | Gasconade | Monroe | Schuyler |
| Audrian | Howard | Montgomery | Scott |
| Bollinger | Howell | New Madrid | Scotland |
| Boone | Iron | Oregon | Shannon |
| Butler | Knox | Osage | Shelby |
| Callaway | Lewis | Pemiscot | St. Francis |
| Cape Girardeau | Lincoln | Perry | Ste. Genevieve |
| Carter | Linn | Phelps | Stoddard |
| Charliton | Macon | Pike | Sullivan |
| Clark | Madison | Pulaski | Texas |
| Cole | Maries | Putnam | Warren |
| Cooper | Marion | Ralls | Washington |
| Crawford | Miller | Randolph | Wayne |
| Dent | Mississippi | Reynolds | |
| Dunklin | Moniteau | Ripley | |

**NEVADA**

Zone 1:

Clark Esmeralda Lincoln Nye

Zone 2:

Rest of State

**NEW YORK:**

Zone 1:

Bronx New York Queens Richmond
Kings

Zone 1A:

Nassau Suffolk

Zone 2:

Westchester Putnam

Zone 3:

Rockland

Zone 4:

Columbia (Townships of Ancram, Claverack, Clermont, Copake, Galatin, Germantown, Greenport, Hillside, Hudson, Livingston, Philmont and Taconic)

Dutchess

Zone 5:

Delaware Orange Sullivan Ulster
Green Otsego

Zone 6:

Erie

Zone 7:

Broome, Tioga (Townships of Richford, Berkshire, Newark Valley, Oswego, Tioga, Barton and Nichols)

Chenango (Townships of Columbus, Linklaen, Otselic, Smyrna, Pitcher, Pharsalis, Plymouth, North Norwich, German, McDonough, Preston, Norwich, Smithville, Oxford, Guilford, Greene, Conventry, Bainbridge and Afton)

Delaware (Townships of Sidney, Masonville, Walton, Tompkins, Deposit, Hancock and Colchester)

Zone 7A:

Herkimer, Oneida (Townships of Sangerfield, West Winfield, Bridgewater, Marshall, Paris, New Hartford, Whitestown, Marcy, Trenton, Deerfield, Forestport, Kirkland and Remsen)

Montgomery (Townships of St. Johnsville, Minden, Canajoharie, Palatine and Root)

Fulton (Townships of Stratford, Oppenheim, Caroga and Ephrata)

Madison, Oneida (Townships of Florence, Camden, Annsville, Lee, Ava, Boonville, Western Steuben, Vienna, Rome, Floyd, Westmoreland, Vernon, August and Verona

Zone 7B:

Onondaga

Zone 7C:

Clinton Essex Warren

Zone 7D:

Oswego

Zone 7E:

Franklin Jefferson Lewis St. Lawrence

Zone 7F:

Cortland, Tompkins, Tioga (Townships of Spencer and Candor)

Schuyler (Townships of Catherine)

Zone 7G:

Chenango (Townships of Sheburne, Columbus and New Berlin)

Delaware (Townships of Franklin, Hamden, Stamford, Delhi, Kortright, Harpersfield, Meredith and Davenport)

Zone 8A:

| | | | |
|---|---|---|---|
| Albany (Town Of Calonie) | Fulton | Montgomery | Schenectady |
| Colombia | Green (Catskill Township) | Rennselaer (See 8B) | Schoharie |
| | | Saratoga | Wsahington |

Zone 8B:

Albany (except Town of Colonie)

Columbia (Townships of Stuyvesant, Stockport, Kunderhook, New Lebanon, Canaan, Ghent, Chatham and Austerlitz)

Green (except Catskill Township)

Rennselaer (Townships of North Greenbush, East Greenbush, Scholack, Nassau, Stephentown and Town of Rennselaer)

Zone 9:

Niagara

Zone 10:

| | | | |
|---|---|---|---|
| Genessee | Monroe | Orleans | Wyoming |
| Livingston | | | |

Zone 11:

Allegany
Cattaraugus

Chataugua (Townships of French Creek, Clymer, Chautaugua, Gerry, Ellington, Ellery and Stockton)

Zone 12:

Chemung
Schuyler (except Township of Catherine)
Stueben

Zone 13:

Cayuga
Ontario
Seneca
Wayne
Yates

PENNSYLVANIA:

Zone 1:

Bucks
Chester
Delaware
Montgomery
Philadelphia

Zone 2:

Alleghney
Armstrong
Beaver
Bedford
Blair
Butler
Cambria
Cameron
Centre
Clarion
Clearfield
Clinton
Crawford
Elk
Erie
Fayette
Forest
Franklin
Fulton
Greene
Huntingdon
Indiana
Jefferson
Lawrence
McKean
Mercer
Mifflin
Potter
Somerset
Venango
Warren
Washington
Westmoreland

Zone 3:

Adams
Berks
Bradford
Carbon
Columbia
Cumberland
Dauphin
Juniata
Lackawanna
Lancaster
Lebanon
Lehigh
Luzerne
Lycoming
Monroe
Montour
Northampton
Northumberland
Perry
Pike
Schuykill
Snyder
Sullivan
Susquehanna
Tioga
Union
Wayne
Wyoming
York

EXHIBIT "D"

INTERPRETATIONS

EFFECTIVE JUNE 17, 1999

National Pipe Line Agreement Interpretations between the Pipe Line Contractors Association and the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada.

The Interpretations set out below have been agreed to by the Pipe Line Contractors Association and the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada and are made a part of the National Pipe Line Agreement as if set out therein.

1. Road Boring

When a Welder is assigned and working with the road boring crew on any particular day, he will be entitled to the hours of the road boring crew for that day. For example, if the full road boring crew continues to work after regular quitting time and the Welder assigned to that crew that day is sent in before quitting time or at quitting time and not allowed to remain with the crew while it continues working after regular quitting time, he will be entitled to any additional hours worked by that crew that day. If the Welder assigned to the road boring crew is temporarily reassigned to perform other work and the full road boring crew continues to work performing regular road boring crew work that day, the Welder will be entitled to the same hours worked provided he returns to that crew or is relieved by the contractor from returning to the road boring crew.

2. Welding Rigs

The PLCA and the United Association do not negotiate rig rentals; however, there are certain procedures applicable to rigs when performing work under the National Pipe Line Agreement. These are as follows:

(a) Rig Pay on Single Qualification Test - The Welder's rig will be entitled to be paid the same number of hours the man is paid on a single qualification test.

(b) Rig Pay on Multiple Tests - On multiple tests the Welder's rig will be entitled to be paid the same number of hours the man is paid for multiple tests.

(c) Gassing Up - All trucks and welding machines will be gassed up during regular working hours unless the contractor has negotiated a rental and fuel rate. Welders are entitled to a full tank of gas for their truck and welding machine on the same day they complete work on that job and they are laid off; this does not include the drag-up tank.

3. Dispatching Employees

The contractor will provide the Union with the same advance notice of starting date for the Union's quota to be dispatched as it provides for its contractor-hired employees.

4. Drug Testing

The Substance Abuse Policy negotiated by the Association (PLCA) and the United Association (UA) will be applicable on all jobs covered by the National Pipe Line Agreement. The Journeyman shall be paid waiting time for any days lost during the normal scheduled work week in those cases which require completed testing before employment. In such cases, the Journeyman shall receive for any day lost during any one work week the sum of five hours plus fringes, and the Helper will receive a sum of four hours plus fringes. No payment or fringe contributions will be made if a test is positive for a prohibited drug.

5. Reporting time for Welder Helper

The Agreement provides that the Welder Helper shall receive the equivalent of not less than four hours pay at the straight time rate for any hours he misses during the normal scheduled work week unless he is told the night before that there will be no work the following day. These four hours are cumulative.

6. Job Steward Hours

Under the National Pipe Line Agreement a journeyman acting as job steward is entitled to be paid for all hours worked by him or for the number of hours up to a maximum of thirteen (13) worked by any UA journeymen on the job except the UA mechanic and except for journeymen or welders working on testing.

It has been agreed by the PLCA and United Association that the maximum of thirteen (13) hours is based on a 10 hour work day, and that if the work day is set up on or extended to 11 hours or more the steward will be entitled to 3 hours above the number of hours the job is set up or extended, provided some other journeymen, except the UA mechanic, journeymen or welder on testing, works those hours. As an example, if the contractor sets the work week at 6-12's, and a UA journeyman other than the UA mechanic, journeymen or welder on testing works 16 hours the steward would be entitled to 15 hours.

In witness whereof the parties hereto have agreed to the interpretations set out above this twenty-seventh (27th) day of September, 2000.

PIPE LINE CONTRACTORS ASSOCIATION

By: ______________________________
Paul Somerville
President

By: ______________________________
J. Patrick Tielborg
Managing Director and General Counsel

UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA

By: ______________________________
Martin J. Maddaloni
General President

By: ______________________________
John Budzinski
Director of Pipeline & Gas Distribution

# TAB 4

# RIG RENTAL AND INSURANCE AGREEMENT

[For Compliance with Federal and State requirements]

_______________________________ and Employee agree as follows:
(Company)

1. The hourly rental rate paid by _______________________ for the use of
(Company)
Employee's rig begins at the assembly point and ends on the work site/right-of-way and such rental pay will only apply for working time on the job. This payment will be reported on Federal Tax Form #1099.

2. Employee warrants and certifies that he/she:

(1) is the rig's legal owner _______________________________;
(year and make of truck)

(2) will insure the safe maintenance of such equipment; and

(3) will provide full insurance coverage as required by law and will comply with all state and federal motor vehicle laws, as well as all safety policies of _______________________________.
(Company)

**PROOF OF INSURANCE MUST BE ATTACHED TO THIS AGREEMENT PRIOR TO RIG BEING PLACED IN SERVICE ON THIS PROJECT**

DATE:___________________ Employee:_______________________ (Print Name)

_______________________ (Signature)

Social Security No. : _______________

*************************************************************************************

A. Employee classification: _______________________________

B. Describe rig and all equipment rented: _______________________

C. Rate per hour: ______(Company provides fuel): ________ (Welder provides fuel)

D. Per week maintenance: _______________________________
(Includes oil, grease, filters, wash job)

E. Job name/number: _______________________________

Received by authorized company representative: _______________________
(Signature)
Date: _______________

**Original to Home Office / Copy to Field Office / Copy to Employee**

PL-000169

# TAB 5

# International Brotherhood of Teamsters

## CONSTRUCTION PRE-JOB FORM

Joint Council 25 Local Union 179 Region: Central

| Three Copies to be Signed: | | Type of Construction: | | | |
|---|---|---|---|---|---|
| White Copy: | to be retained by the Employer | Pipeline: | ☒ | Residential: | ☐ |
| Yellow Copy: | to be retained by the Local Union | Heavy: | ☐ | N.M.A.: | ☐ |
| Pink Copy: | to be sent to IBT/Construction Division | Highway: | ☐ | G.P.A.: | ☐ |
| ALL COPIES MUST BE COMPLETE & SIGNED. | | Building: | ☐ | Other: | ☐ |

DATE: 6-7-01
TIME: 1:00 PM
Contracting Agency or Client: NORTHERN BORDER PIPELINE

Contractor: H.C. PRICE CO.
Job Address: P.O. Box 1127 PEOTONE
Firm Office Phone: 708 258-0765

Superintendent: PAUL CUMBIE
Pay Master: SHARLA SHERRY

Description of Project and Location: 34 MILES OF 30" PIPE IN WILL AND KANKAKEE COUNTIES

Starting Date: 6-18-01
Completion Date: MID AUGUST
Approximate Cost: ?

### Equipment to be used or classification:

Number of People to be filled in for each.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6 | Flat Bed Truck ② | | Hydra. Aerial Lift | | Transit Mix (under 5 yds.) | ① | A-Frame/Winch Truck ① Co. |
| | Straddle Truck | | Dumpsters (heavy) | | Transit Mix (over 5 yds.) | | Dry Batch Truck |
| | Pick-up Truck | | Euclids | | Transit Mix (tractor trailer) | | Form Truck |
| | Dump Truck (under 10 yds.) | | Oiler | | Pusher | 7 | Water Truck/Water Pull |
| | Dump Truck | | Greaser | | Truck Driver (Foreman) | 2 | Warehousemen/Stock Man ② Co. |
| | (over 10 yds.) | | Mech. Helper | | Double Bottom (over 20 ton) | ① | Receiving and Shipping ② PARTS |
| | Distributor Truck | | Mechanic | | Other | | Articulated Dump Trucks |
| | Semi-Truck | | Low Boy ⑥ Co. | | | | Quick Change/Barriers |
| ① | Fork Truck STEWARD/WHS. | | Fuel Truck ① Co. | | | 2-3 | Other STRINGING |
| | Vac Truck | 8-10 | Buses | | | | Other |
| | Other: | | Other: | | | | Other |
| | | | | | | | Other |

16-20

**TEAMSTERS CLAIM THE HAULING OF MEN, MATERIAL, WATER & EQUIPMENT, ETC., TO AND FROM, AND ON THE JOB SITE BY ANY MEANS USED, INCLUDING JOB SITE WAREHOUSING AND ALL LAYDOWN AREAS.**

Craft Foreman: JIM KENNEY
Pension: Weekly Hourly Daily — $93.00
Welfare: Weekly Hourly Daily — $153.00

Pay Day: FRIDAY
Shift Work: 6-10 HR
Starting Time: 7:00 AM

| Sub-Contractor | Type of Work | Address | Phone |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Please indicate any discussion or understanding relative to jurisdiction or other matters.

$100 STEEL TOE FOR EMPLOYEES
$30 PLUS GAS FOR STEWARDS

Sign Off for Company: [signature] H.C. Price Co.

Sign Off for Union: [signature] BUSINESS AGENT

PL-000171

For Office Use Only
Contractor # ____
Job # ____
Start ____
Finish ____
Form Sent ____

# I.U.O.E. PIPELINE PRE-JOB CONFERENCE REPORT

Meeting Place HAMPTON INN (KANKAKEE) Date 6-7-01

Contractor H.C. PRICE CO. Local Union(s) 150

Awarded By NORTHERN BORDER P.L. CO (Company Name) Superintendent PAUL CUMBEE 214-218-5570

Job Location WILL CO.

Warehouse Location 31045 88TH AVE. PEOTONE IL. 60468 Phone 708-258-0265

Job Description NEW PIPE LINE

Length 34.4 MILES Size of Pipe 30"

Radiographic Inspection By EDWARDS (TULSA)

| | | | |
|---|---|---|---|
| 16 Back Hoe | 12 Bulldozer | 1 Gin Truck | 1 Greaser |
| 1 Drag Line | Cleaning Mach. | Tow Tractor | Pot Fireman |
| Clam | 1 Coating Mach. | 2 Farm Tractor | Mechanic-Helper |
| 1 Crane | Back Filler | 2 Road Boring Mach. | 1 Fuel Man |
| 1 Ditching Mach. | 2 Tack Tractor | 1 Bending Mach. | 16 Oiler |
| 16 Side Booms | 1 Motor Grader | Small Equip. Operator | Mech.-Welder |
| 5 Mechanic | 1 End Loader | Boat | Hydrostatic Testing |
| Operators on Dredges | 2 Others COMB HOE | Directional Drilling | Well Points |

TOTAL 83

Job to Start 6-4-01 (Required) Approximate Completion AUG 15, 01 (Required)

Date of First Fringe Benefit Report 7-15-01

REPORTS TO BE MADE TO:

| | | |
|---|---|---|
| Central Pension Fund | Yes X | No |
| Pipeline Health & Welfare Fund | Yes X | No |
| Local Pension Fund | Yes X | No |
| Local Welfare Fund | Yes X | No |
| Other Local Fringes | Yes X | No |

Company to Get Basic Data Card Filled Out: Yes X No ____

Company to Furnish Payroll List Each Pay Period: Yes X

Hiring Plan: Yes ____ No X Hours 10 Days 6

Hire on 1 & 1 Basis: Yes ____ No X

Check Off of Union Dues: Yes X No ____ Pay Day FRIDAY

Local(s) to Furnish Forms: Yes X No ____ CPF Poster: Yes X No ____

Where Are Unemployment Comp. Payments Made: (State) IL. Notice Posted YES

Steward RODDIE THOMASON Date to Report ____

To Whom PAUL CUMBEE Work STARTING ENGINEER

Remarks: MECHANICS 10.00 PER HOUR FOR TRUCKS, SAFTEY SHOES 100.00 PER MAN, STEWARD 40. PER DAY + GAS & PHONE, 30. FOR OTHERS DRUG TEST, HARD HAT, SAFETY SHOES

Hourly Rates: Group 1 30.35 Group 2 25.38 Group 3 21.70

The undersigned hereby agree that this job is covered by the terms of the current National Pipe Line Agreement for the United States of America as executed by the International Union of Operating Engineers and the Pipe Line Contractors Association.

For Company: Paul Cumbee
Job Site Address 31045 88TH AVE. PEOTONE IL. 60468
Job Site Phone No. (708) 258-0265

For Union: [signatures]

MAIL REPORTING FORMS
To: SHARLA SPERRY
Address PO BOX 1127 PEOTONE IL 60468

White Copy To: Mr. Howard L. (Bud) Evans, International Union of Operating Engineers, 1125-17th Street, N.W., Washington, D.C. 20036

# UNITED ASSOCIATION PIPELINE PRE-JOB CONFERENCE REPORT
## U. A. LOCAL UNION NO. 597

In consideration of the mutual covenants, duties payments and obligations by and between the Union and H.C. Price Co. contractor, it is agreed that the following terms and conditions shall apply in the performance of this contract.

Contractor H.C. Price Co. Place of Pre-Job Peotone, IL Date 6-11-01

Warehouse Location Peotone, IL Phone 708-258-0165 Sub-Contractor —

Spread Sup't Paul Cumbie Welder Foreman Ralph Kirkland Pipe Foreman Curtis Wortham

Oil or Gas Co. Northern Border Job to Start 7-14-01 Approx. Completion 9-1-01

Job Description New Work Length of Job 34 mi Size of Pipe 30"

Continuous or Loops Continuous Pre Heat ✓ Method Propane

Pay Period: Weekly X Bi-Weekly ____ Work Week 10 Hrs. Per Day 6 No. Warehouse Locations 1

Stringer Bead 3 Hot Pass 4 Total: Welders 32 Journeymen 4 Helpers 52 Graded Helpers 6

UNION QUOTA: Welders 16 Journeymen 2 Helpers 26 Graded Helpers 3

DATE TO REPORT: Welders unknown Journeymen — Helpers — Graded Helpers —

RATE OF PAY: Welders 39.19 + 9.75 Journeymen 39.19+9.75 Helpers per County 1. 24.57 + 8.17

2. ____ 3. ____ 4. ____ 5. ____

Steward To Be Named Date to Report unknown to Whom Ralph Kirkland Work 7:00-5:30

Mud boards, ice water, umbrellas, wind boards, clear glass, color lenses and safety goggles will be furnished at no charge to employees.

It is further agreed by and between the Union and the Contractor that all of the terms and conditions of the current National Pipe Line Agreement for the United States of America will control and be binding upon the parties hereto as if set out herein and specific reference is made unto the current National Pipe Line Agreement for that purpose.

Contractor further agrees to be bound by the terms and provisions of all present trust agreements created and in effect pursuant to Article XXII of the National Pipe Line Agreement and specifically agrees to promptly pay all contributions required by such Article and by trust instruments, to the Pipe Line Industry Benefit Fund together with all reasonable and necessary fees, costs and expenses incurred as auditor fees or attorney fees in enforcing collection of the same. The terms and provisions of this Pipe Line Pre-Job Agreement shall be binding upon the successors, transferees, and assignees of the parties executing this agreement.

REMARKS: This Job will Be worked By The National Pipeline Agreement and Area Past Practices. Rig

Steel Toed Shoes are Required

Plus $25.00 Per week Maint. Wage Work Assessment will Be 1% of Hours Worked. Drug Testing is Mandatory and Random

SIGNED: [signature] Union Representative SIGNED: Paul Cumbie Company Representative

Original (White)—Contractor's Copy

Duplicate (Yellow)—Forward to: United Association Pipeline Dept. 901 Massachusetts Ave., N.W. Washington, D.C. 20001

Triplicate (Pink)—Forward to: Pipeline Industry Benefit Fund, 4845 South 83rd East Avenue Tulsa, Oklahoma 74145

Quadruplicate (Goldenrod)—Local Union copy

FORM 165
AMENDED 5/80

PL-000173

# TAB 6

# SUGGESTED RIG RENTAL RATE

## $ 7.00 PER HOUR

Effective March 1, 1992

The following rig rental policies have been suggested to the PIPE LINE CONTRACTORS ASSOCIATION for an effective date of March 1, 1992:

1. The rental rate for the equipment described below should not be less than $7.00 per hour, plus $25.00 per week in lieu of furnishing oil, grease, filters and wash jobs.

(a) Truck
(b) Welding machine
(c) The leads
(d) A cutting rig, including: 1) gauges, 2) hose, and 3) torch.
(e) Normal repairs to the truck or equipment. Any repairs required due to negligence or abuse of the equipment not attributable to the welder will be paid for by the contractor.

2. All equipment and supplies not listed above as being furnished by the welder should be furnished by the contractor, including gasoline.

3. Procedures applicable to rigs:

(a) Rig Pay on Single Qualification Test - The welder's rig will be entitled to be paid the same number of hours the man is paid on a single qualification test. As an example, if the welder took four (4) hours to complete his test and worked an additional five (5) hours, the welder would be entitled to eight (8) hours at the rate applicable for that day for the passed test, plus an additional five (5) hours pay for a total of thirteen (13) hours. The rig would similarly receive thirteen (13) hours of pay.

(b) Rig Pay on Multiple Tests - On multiple tests the welder's rig would be entitled to the number of hours it worked or the number of hours for which the job is set up, whichever is greater.

(c) Gassing Up - All trucks and welding machines will be gassed up during regular working hours <u>unless</u> the contractor has negotiated a rental and fuel rate. Welders are entitled to a full tank of gas for their truck and welding machine on the same day they complete work on that job and they are laid off; this does not include the drag-up tank.



National Pipeline Welding School

Board of Trustees
W. Scott North, Co-Chairman
H. Charles Price, Co-Chairman
John Budzinski
James E. O'Mara
Paul Somerville
R.H. Moetz

Welding School
Bob Kime, Director
Richard C. Ludlow, Director of Training
Wayne Williams, Senior Instructor
Tommy Harrell, Instructor
Ronald Evans, Instructor
Danny Hendrix, Instructor

May 24, 2001

Pat Tielborg
Pipeline Contractors Association
1700 Pacific Avenue, Ste 1400
Dallas, TX 75201-4675

Dear Pat,

Here is an estimate of what it costs to rig-up a welding rig from scratch. This is just the basic rig, not including any hand tools or welding supplies.

| | |
|---|---|
| 4-wheel drive cab-chassis truck | |
| Miller Pipe-Pro 304 | 33000.00 |
| 200 ft. welding lead | 11243.00 |
| Cutting Rig W/Hand Torch | 550.00 |
| Welding Bed (not including labor) | 600.00 |
| Remote Rheostat for welding machine | 2500.00 |
| Grinder | 600.00 (Miller Price) |
| | 195.00 |
| Total | |
| | **48688.00** |

This does not include pipe jacks 750.00, bevel machines (with are part of the rig on non-union jobs) 800.00 to 1000.00 per pipe size or any hand wrenches and tools that you are required to have which carry a substantial price tag.

If I can be of further assistance, feel free to contact me.

Sincerely,

Richard Ludlow
Director of Training

4845 S. 83rd E. Ave. | Box 470950 | Tulsa, Oklahoma 74147-0950 | (918) 622-0210 | Fax (918) 280-4899 | w...

HOWARD T. MORIARTY CO., INC.
143 BROADWAY • TOLEDO, OH 43602
(419) 243-3111 • FAX (419) 243-5708

ORIGINAL

Construction and Industrial Equipment
Sales • Rentals • Service

SERVING N.W. OHIO SINCE 1939

Welded Console — John Roberts

Quote — fax 419-874-3786

| | Daily | Weekly |
|---|---|---|
| 1 - Welder 250 Amp | $49.00 | $196.00 |
| 1 - Weld Clamp - 50' Stinger + Clamp | $13.00 | $40.00 |

Thanks
Jeanne

IMPORTANT CONTRACT PROVISIONS ON REVERSE SIDE

I have received safety & operational instructions on the above equipment/tools. I understand them and will instruct others in their safe & proper use. I have received items in safe, operable condition.

Insurance Certificate on file: Yes ☐ No ☐
If "No" Damage Waiver Lien required in amount of ____ of rental

RATE BASE
8-Hour Day,
40-Hour Week,
4-Week Month

ADDITIONAL CHARGES FOR OVERTIME USAGE

Initials

I HAVE READ THE TERMS ON REVERSE SIDE OF THIS AGREEMENT & UNDERSTAND THEY ARE PART OF THIS AGREEMENT Date: ________

Signed: ________________

Print Name: ________________

Extra charges will ... time beyond six ...

PL-000178

HE LESSOR:

American Rent-All (Tool)
2415 S. Byrne
Toldeo, OH 43614
419 382-4446 FAX 419 382-2053
www.toledorents.com

QUOTE Tue 05/29/01 09:15 AM

NAME: WELDEDED CONSTRUCTION
PHONE: ( 1143) 419 874-3548
DRIVERS LICENSE NO.: 24198743548
CONTRACT NO.:
RENTING FOR/ATTENTION OF: WELDEDED CONSTRUCTION
JOB DESCRIPTION:
AUTO LICENSE NO.:
STREET ADDRESS:
OTHER IDENTIFICATION:
CITY AND ZIP: Toldeo, OH 43614
PAYMENT METHOD: Cash
TIME AND DATE OUT: 09:00 AM 05/29/01

| QTY. | ITEM NO. | ITEM RENTED | INFORMATIONAL RATES | TIME & DATE DUE IN / RETURNED | RENTAL FEE | ADD'L CHARGES |
|---|---|---|---|---|---|---|
| 1 | 280 | WELAC225B WELDER, AC/DC 225 GAS<br>2Hr=40.00 4Hr=50.00 8Hr=60.00 1Dy=75.00 1Wk=300.00 4Wk=900.00 | | 09:00 AM 05/30/01 | 75.00 | |

*** QUOTE *** QUOTE *** QUOTE ***

| QTY. | ITEM NO. | MERCHANDISE PURCHASED | AMOUNT |
|---|---|---|---|
| | | | |

| INT'L'S | | | |
|---|---|---|---|
| | RENTAL SUB TOTALS | 75.00 | |
| | DAMAGE WAIVER | | |
| | MISC. CHARGES | | |
| | MERCHANDISE SALES | | |
| | SUB TOTAL | 75.00 | |
| | TAX | 4.69 | |
| | TOTAL | 79.69 | |

CONTRACT TOTAL: 79.69 PAID: 0.00

AMOUNT PAID THIS TRANSACTION: 0.00
AMOUNT DUE: 79.69

DEPOSIT RECEIVED: 150.00 DUE
DEPOSIT RETURNED:
SIGNATURE FOR DEPOSIT RETURNED
X

## RENTAL CONTRACT

THIS IS A CONTRACT. THE BACK OF THIS CONTRACT CONTAINS IMPORTANT TERMS AND CONDITIONS INCLUDING LESSOR'S DISCLAIMER FROM ALL LIABILITY FOR INJURY OR DAMAGE AND DETAILS OF CUSTOMER'S OBLIGATIONS. THESE TERMS AND CONDITIONS ARE PART OF THIS CONTRACT - READ THEM!

IF EQUIPMENT DOES NOT FUNCTION PROPERLY NOTIFY LESSOR WITHIN 30 MINUTES OF OCCURRENCE OR NO REFUND OR ALLOWANCE WILL BE MADE. IF THIS IS A RESERVATION, A RESERVATION CANCELLATION FEE UP TO 1/2 THE TOTAL AMOUNT MAY BE CHARGED IF RESERVATION IS CANCELLED WITHIN 72 HOURS OF THE SCHEDULED "TIME AND DATE OUT".

I CERTIFY THAT I HAVE READ AND AGREE TO ALL TERMS OF THIS CONTRACT.

SIGNATURE

If other than Customer, signer represents he is an agent of and authorized to sign for Customer.



Hertz Equipment Rental Corporation
6333 S. Dixie Hwy., Erie, MI 48133
Telephone: (734) 848-3092

Attn: John Roberts
Welded Construction

| | |
|---|---|
| 350 amp welder, Miller Big 40 | $290 week |
| 1 ton truck, Ford F250 | $350 week |

Thank You
Denis Aslinger

# HISTORICAL RIG RENTAL RATES

THE FOLLOWING REPRESENTS THE RIG RENTAL RATES SUGGESTED OR PAID SINCE 1960:

| | |
|---|---|
| 1960 | $2.50 PER HOUR |
| 1974 | $3.50 PER HOUR PLUS $15 PER WEEK MAINTENANCE |
| 1980 | $5.00 PER HOUR PLUS $25 WEEKLY MAINTENANCE |
| 1991 | $7.00 PER HOUR PLUS $25 WEEKLY MAINTENANCE |

THIS HISTORICAL REVIEW COVERS APPROXIMATELY 40 STATES WHICH ARE THE JURISDICTION OF PIPELINERS LOCAL 798.

# TAB 7

WELDED CONSTRUCTION, L.P.

May 30, 2001

RE: **Prusakiewicz, Jerome**
**Mechanic Rig**

| ITEM | VALUE |
|---|---|
| Truck Cost<br>2000 Freightliner FL60 | $ 52,000 |
| Bed, Crane, Air Compressor<br>PMW Mechanics Bed $33,000<br>AutoCrane-Drafthorse $8,200<br>Ingersoll-Rand 15T Model $3,000 | $ 45,000 |
| Welder and Leads<br>Miller Bobcat 225amp $2,700<br>Miscellaneous Leads, Torches<br>Grinders, Clamps $3,300 | $ 6,000 |
| Hand Tools & Air Tools<br>Wrenches, Ratchets, Sockets<br>Hammers, Drivers, Impact Wrenches | $ 50,000 |
| Porta-Powers & Rams<br>Up to 50 ton $8,000 | $ 8,000 |
| SUBTOTAL | $ 161,000 |
| Supplies: Parts, Bolts<br>Wire, Fittings | $ 10,000 |
| Parts and Service Books | $ 10,000 |
| TOTAL | $ 181,000 |

# TAB 8



Hertz Equipment Rental Corporation
1610 Woodstead Ct., Ste. 460, The Woodlands, TX 77380
Telephone: (281) 364-5100

May 31, 2001

Attn: Lloyd Ridings
H. C. Price Construction
15660 N. Dallas Pkwy. Suite 300
Dallas, TX 75248

Dear Lloyd,

As promised, I have compiled average costs for the truck rental activity. It appears that 1999 and 2000 had the most rental activity. This is the years in which we compiled our information. The information you requested is listed below.

<u>Average Rental Rates (Day/Week/4 Weeks)</u>

F-150 Trucks - 125/365/795
F-250 Trucks - 145/425/1100

- There were no charge backs for mileage.

<u>Damages</u>

There were 14 repair invoices totaling $17,708.00
Average repair was $1,264.00

If you have any questions or need addition information feel free to give me a call at 800-388-1525.

Thanks,

Mike Wiggins
Hertz Equipment Rental



CARS ☆ TRUCKS ☆ VANS
BY THE DAY, WEEK, MONTH, YEAR

P.O. BOX 28
1373 CONANT STREET
MAUMEE, OHIO 435
1-800-278-4790 OR
FAX 872-4429

May 29, 2001

TO: Welded Construction
John Roberts

FROM: Schmidt Lease Inc.
Diana Miller

RE: rates on 3/4 ton pickup truck

$49.50 per day 100 miles allowed per day overmiles at .20 per mile

$297.00 per week 700 miles allowed per week overmiles at .20 per mile

$891.00 per month 2100 miles allowed per month .20 per overmile
monthly rate: one month minimum keep
after first month prorate applies
monthly rentals are prebilled

# TAB 9

# GLOSSARY OF TERMS

1. JOURNEYMEN: MEANS WELDER, SPACER OR STABBER.

2. WELDER: JOURNEYMAN WHO WELDS. MUST BE QUALIFIED WELDER SUBJECT TO PIPELINE COMPANY OWNER REQUIRED TEST.

3. SPACER: JOURNEYMAN WHO SETS SPACE BETWEEN JOINTS OF PIPE PRIOR TO INITIAL WELDING PASS (STRINGER BEAD).

4. STABBER: JOURNEYMAN WHO HELPS ALIGN THE SPACE BETWEEN THE PIPE ENDS DURING THE INITIAL WELDING PROCESS (STRINGER BEAD).

5. HELPER: ASSISTS WELDER.

6. STRINGER BEAD: FIRST APPLIED WELDING PASS.

7. HOT PASS: SECOND APPLIED WELDING PASS.

8. FILLER: FIRING LINE WELDERS ADD ADDITIONAL WELDS AFTER HOT PASS. THESE ARE KNOWN AS FILLER BEADS.

9. CAP: FINAL WELDING PASS.

10. PIPE GANG: WELDING CREW THAT SETS UP AND WELDS THE STRINGER AND HOT PASS WELDS.

11. FIRING LINE: WELDING CREW THAT FOLLOWS PIPE GANG AND APPLIES FILLER AND CAP WELDS.

12. RIG WELDERS: WELDERS WHO ARE HIRED WITH THEIR WELDING RIGS.

13. WELDING RIG: INCLUDES –

    A. TRUCK
    B. WELDING MACHINE
    C. LEADS
    D. CUTTING TORCH/GAUGES

14. SINGLE HAND: CONTRACTOR WHO HIRES WELDERS BUT WHO DOES NOT RENT WELDING RIG FROM WELDER.

15. OPERATOR MECHANIC: OPERATING ENGINEER WHO REPAIRS HEAVY EQUIPMENT.

16. OPERATOR: EMPLOYEE WHO OPERATES HEAVY EQUIPMENT SUCH AS TRACTOR, SIDEBOOM OR BACKHOE.

17. WAITING TIME: PAYMENT MADE TO WELDER FOR LOST WORK DAY. FIVE (5) HOURS PAY BUT NO RIG RENTAL.

18. PIPELINE SPREAD: THE NECESSARY EQUIPMENT AND CREW TO BUILD A PIPELINE — A MOVING ASSEMBLY LINE.

# TAB 10

# The Problem: Some Companies Are Disguising Wage Payments as Equipment Rent Payments

| CASE | WAGES | EQUIPMENT |
|---|---|---|
| FSA 199940002 (2-16-99) Rigs | $10 | $20 |
| CCA 199921003 (2-2-99) Rigs | $10 | $20 |
| CCA 199917011 (1-13-99) Rigs (?) | $8 | $24 |
| *Baker v. Flint*, (10th Cir. 1998) Rigs | $10 | $17 |
| *Baker v. Barnard*, (D.N.M. 1993) Rigs | $8 | $22 |
| Pipeline Contractors Association | $39 | $7 |

# Rev. Rul. 68-624

## Issue:

- What percentage of the total amount paid by a Missouri corporation for the use of a truck and the services of a driver is allocable as wages of the driver?

## Facts:

- The corporation hires a truck and driver to haul stone from its quarry to its river loading dock, at a fixed amount per load.

- The Division of Workmen's Compensation has agreed that one-third of the amount paid to such an employee should be considered as wages and two-thirds as payment for the use of the truck.

# ARM'S LENGTH STANDARD

## (Rev. Rul. 68-624, 1968-2 C.B. 424)

"The allocation of the amount paid to an individual where the payment is in consideration of both personal services and the use of equipment must be governed by the facts in each case."

"If the contract of employment does not specify a reasonable division of the total amount paid between wages and equipment, **a proper allocation may be arrived at by reference to the prevailing wage scale** in a particular locality for similar services in operating the same class of equipment or the fair rental value of similar equipment."

# THE RENTAL PAYMENTS AND WAGE PAYMENTS IN OUR CASE ARE AT ARMS LENGTH

There are several independent and separately sufficient bases for finding that the payments here are at arms length.

1. The wages paid to employees are the same regardless of whether equipment is rented from employee. This is the Rev. Rul. 68-624 test ("a proper allocation may be arrived at by reference to the prevailing wage scale").

2. Overtime is paid on wages but not for equipment.

3. The $39 wage rate is a fair market value wage rate that was separately bargained for by the union, which had a duty of loyalty and fairness to both employees who rent equipment and employees who did not rent equipment.

4. FMV rental comparisons from 3rd parties.

# IS THE EMPLOYEE ENGAGED IN THE BUSINESS OF RENTING EQUIPMENT (RIGS)?

- "The tax treatment of the rentals paid by an employer to an employee **depends upon whether the employee is providing tools or heavy machinery**."
- "If an employee is merely providing his own tools, the rental payments are, in fact, reimbursements for employee business expenses, which must be paid pursuant to an "accountable plan" in order to be excluded from wages."
- "On the other hand, **when an employee provides a piece of heavy equipment to his employer, the employee is engaged in the trade or business of renting the equipment** separate and apart from performing services as an employee."
- "That individual is an independent contractor engaged in the trade or business of renting his heavy equipment and is also an employee performing services for his employer."
- "When renting the equipment, the owner is not performing services as an employee, he is engaged in a trade or business separate and apart from the performance of service as an employee."

Legal Memorandum April 21, 1994 from Jerry Holmes

# IS THE EMPLOYEE ENGAGED IN THE BUSINESS OF RENTING EQUIPMENT?

- "An employee who rents his heavy equipment to his employer is engaged in a trade or business because he is involved in the activity of renting the equipment with continuity and regularity."
- "In fact the equipment is rented to the employer every day the individual performs service as an employee."
- "Generally heavy equipment cannot be used for personal use; thus the owner's primary purpose in investing in and renting the heavy equipment is to make a profit."
- If an employee is providing his own tools, the rental payments are likely intended as reimbursements for employee business expenses, which must be paid pursuant to an "accountable plan," as defined in *section 62(c)* of the Code in order to be excluded from wages. On the other hand, when an employee supplies a piece of heavy equipment, the individual may be engaged in the trade or business of renting his heavy equipment while concurrently performing services for the employer.

Internal Revenue Service Memorandum April 10, 1996 from Jerry Holmes

# RENTALS OF HEAVY EQUIPMENT IN OTHER CONTEXTS

- In a Slip Opinion dated July 21, 1993, the Service considered the following three issues with respect to sand and gravel haulers who rent trucks:

  1.  Whether Rev. Rul. 68-624, 1968-2 C.B. 424, is still in effect to allow allocation of income of employee-drivers into a wage portion and an equipment rental portion. If not, should the reimbursement plan be considered a non-accountable expense reimbursement plan.

  2.  Whether employee-drivers and independent contractor-drivers are in the trade or business of renting their trucks, separate from their trade or business of hiring out their driving skills, such that the rental income and associated expenses should be reported on Schedule C, rather than Schedule E.

  3.  Whether the "rental income" arrangement actually constitutes a non-accountable plan employer expense arrangement.

- In the Slip Opinion, the Service concluded that skidders should be treated as renting equipment while sawyers should be treated  is having received wages (employee reimbursements).

# RENTALS OF HEAVY EQUIPMENT IN OTHER CONTEXTS, cont.

The Service concluded that:

- "Even if the skidder operators were employees for purposes of operating the skidders, for purposes of providing the skidder to their employers they were independent contractors engaged in the trade or business of renting the skidders to the employers.

- Thus, since they were independent contractors rather than employees for purposes of this function, section 62(c) did not apply to the expenses they incurred in renting the skidder.

- And because section 62(c) did not apply, it did not override the revenue ruling's application to the skidder operators."

- We believe these conclusions could apply to the sand and gravel haulers as well.

- Thus, as to issue one, Rev. Rul. 68-624 is still in effect and could allow income to be split into a wage portion and another portion for the trade or business of renting the truck.

- As to issue two, both the employees and independent contractors could be treated as being in the trade or business of renting their trucks, separately from being in the trade or business of being an employee or hiring out their driving skills. In that case, rental income and associated expenses should be reported on Schedule C.

- As to issue three, our answers to issues one and two indicate that for employee-drivers, the "rental income" is not an expense reimbursement and therefore is not a non-accountable plan employer expense reimbursement."

- The conclusion was based on "these factual differences:

  (1) a sawyer furnishes a handtool to perform his services, while a skidder provides a piece of heavy machinery;

  (2) all timberfallers supply their own saws, but all skidder operators do not provide their own skidders; and

  (3) although sawyers purchase saws to obtain employment as sawyers, skidder operators make a significant financial investment in their skidders and intend to make a profit from the use of the skidder, as well as using it to perform services as an employee."

Daniel J. Wiles, July 21, 1993

# ACCOUNTABLE PLAN RULES

- The Conference Report on the Family Support Act (H.R. Rep. No. 998m 100th Cong., 2d Sess. 202-206 (1988)), indicates that Congress was concerned that the so-called "nonaccountable" reimbursement and expense allowance arrangements were being used in a manner designed to circumvent the 2% floor on miscellaneous itemized deductions.

- The Conference Report gives an example comparing two employees. One employee is paid $40,000 in salary and incurs $2,000 in unreimbursed employee business expenses. The second employee is paid $37,000 in salary, plus $3,000 for expenses under a nonaccountable plan. Under the arrangement, the second employee is allowed to keep in full $3,000 whether or not he substantiates to the employer and regardless of the amount of the employee's actual business expenses. Prior to the Family Support Act, if the second employee spent $2,000 on business expenses, he would be able to claim that amount as an above-the-line deduction while the first employee would be allowed a deduction only "below-the-line" (and might not be able to deduct the full $2,000 because of the 2% floor) even though both employees had exactly the same income and expenses.

- Congress felt that this disparity could not be justified and that the standards for above-the-line deductions should be clarified so that under these so-called nonaccountable plans employee business expenses are deductible by the employee only as an itemized deduction subject to the 2% floor.

- All amounts paid under such nonaccountable arrangements are included in the employee's gross income. Thus, the first and second employees in the example will now receive equal treatment.

# FLSA CASES

## *Baker v. Barnard* (D.N.M. 1993)

- The court granted Four-Four, Inc.'s Motion for Summary Judgment because it found that Plaintiffs' wages were their true regular rate for purposes of calculating overtime compensation under the FLSA.

- The court based its decision on the fact that the company paid rig welders and single hand welders the same wage and therefore was not over compensating workers for rental of their rigs and understating wages.

- With respect to another Defendant, the courts found that $22 an hour for rent and $8 for wages was artificial and therefore not the "regular rate" for purposes of calculating overtime.

# FLSA CASES

## *Reich v. Bay* (5th Cir. 1994)

- Department of Labor alleged that contractor's method of calculating overtime violated the FLSA.

- To avoid paying overtime in the full rate for renting rigs, the Defendants changed the rate structure for rig welders for overtime hours.

- Although Defendants paid welders time-and-a-half for time worked in excess of 40 hours, Defendants correspondingly reduced the rental rate for rigs used more than 40 hours a week to offset roughly the increased hourly wage rate.

- During the first 40 hours, the man was paid at $10.50 per hour and the rig was rented at $12 per hour (total of $22.50).

- After 40 hours, however, the man's rate was increased to $15.75 per hour, but the rig rental was reduced to $7 per hour (total of $22.75).

- The 5th Circuit held that this scheme violated the FLSA because its net affect was to provide less than time-and-a-half compensation to Plaintiffs.

# CASES CITED IN SLIDE PRESENTATION

FSA 199940002 (2-16-99)

CCA 199921003 (2-2-99)

CCA 199917011 (1-13-99)

BAKER V. FLINT, 137 F.3D 1436 (10TH CIR. 1998)

BAKER V. BARNARD, 863 F. SUPP. 1498; (D.N.M. 1993)

REICH V. BAY, 23 F.3D 110 (5TH CIR. 1994)

REV. RUL. 68-624, 1968 – 2 C.B. 424

MEMORANDUM FROM DANIEL J. WILES, ASSISTANT CHIEF COUNSEL (FIELD SERVICE) TO DISTRICT COUNSEL (JULY 21, 1993)

# TAB 11

1ST ITEM of Focus printed in FULL format.

IRS FSA 199940002; 1999 FSA LEXIS 173

199940002, October 8, 1999, Released

THIS DOCUMENT IS NOT TO BE CITED AS PRECEDENT

Welding and Oilfield Workers

February 16, 1999

REFERENCE: *1 CC:EBEO:Br.2, WTA-N-122493-98, UILC: 62.02.00;3121.01.00

TEXT:
INTERNAL REVENUE SERVICE NATIONAL OFFICE FIELD SERVICE ADVICE

MEMORANDUM FOR TEXT REDACTED

FROM: Chief, Branch 2 (Employee Benefits and Exempt Organizations)

CC:EBEO:2

SUBJECT: Welding and Oilfield Workers

This Field Service Advice responds to your request of July 30, 1998. Field Service Advice is not *3 binding on Examination or Appeals and is not a final case determination. This document is not to be cited as precedent.

ISSUE

Whether Amounts Paid to Employees as Rig Rentals are Wages for Federal Employment Tax Purposes?

CONCLUSION

Whether rig rentals are wages depends upon whether the rentals are paid pursuant to an accountable plan. If so paid, the payments are not wages for employment tax purposes. Thus, the issue that must be resolved based upon the facts and circumstances of each case is whether the rig rentals are paid pursuant to an accountable plan.

FACTS

On July 30, 1998 your office submitted a request for Technical Advice with respect to rig rental payments. Under separate cover we advised that we were unable to process the request for Technical Advice because the requirements of *Revenue Procedure 1998-1 I.R.B. 74* were not met. In particular, the facts provided were not case specific. Accordingly we closed the request for Technical Advice and opened a Field Service Advice. Discussions with the Revenue Agent who prepared the request confirmed that Examination is seeking general advice on handling similar cases *4 involving rig rentals. Thus, we provide the following advice.

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NEXIS

We understand that there are many similar cases, and we recognize that Examination would like the same conclusion to apply to all cases. However, as explained herein, determining whether the rig rentals are paid pursuant to an accountable plan requires performing a factual analysis of the specific facts of each case.

Generally, an employer engaged in the business of specialized industrial construction will hire employee rig welders. Welders are highly skilled and when hired to perform welding services that is the only function they perform at the job site. They provide all of their own equipment, which generally includes a truck, welder, welding tanks and related items. On a non-union job, welders are required to provide all their own welding supplies. On a union job supplies are generally provided by the employer.

Typically, employers compensate the welders by paying them an hourly wage of about $ 10.00 per hour, which is treated as wages subject to employment taxes. The employer will also pay the welder an additional amount per hour, such as $ 20.00 to rent the employee's welding equipment. This payment is commonly referred *5 to as a rig rental. The welder is paid at the end of each week when he turns in his "rig ticket" which reports the hours worked each day, but does not indicate the expenses the welder incurred associated with his equipment. Thus, the amount of rig rental is based solely on hours worked and has no apparent relationship to expenses incurred. The employer issues the employee two checks, one for wages and one for rig rentals. The amount treated as wages will be reported to the employee on Form W-2, and the rig rental, if reported, will be reported on Form 1099.

Law & Analysis

*I.R.C. § 62*

As stated, the issue is whether the rig rentals are wages for employment tax purposes. The three Federal employment taxes are the Federal Insurance Contributions Act (FICA) taxes, Federal Unemployment Tax Act (FUTA) tax, and income tax withholding. In general, wages are defined for FICA, FUTA and income tax withholding purposes as all remuneration for employment unless otherwise excluded. *I.R.C.* §§ *3121(a)*, 3306(b) and 3401(a). There is no statutory exception from wages for amounts paid by employers to employees for employee *6 business expenses. However, *Treas. reg. § 1.62-2(c)(4)* provides that amounts an employer pays to an employee for employee business expenses under an "accountable plan" are excluded from the employee's gross income, are not required to be reported on the employee's Form W-2, and are exempt from the withholding and payment of employment taxes. *Treas. reg.* §§ *31.3121(a)-3*, 31.3306(b)-2, and *31.3401(a)-4 of the Employment Tax Regulations*, and *Treas. reg. § 1.6041-3(h)(1)* of the Income Tax Regulations.

Whether amounts are paid under an accountable plan is governed by *I.R.C. § 62* which includes the provisions on employee reimbursement or other expense allowance arrangements. Section 62 generally defines "adjusted gross income" as gross income minus certain ("above-the-line") deductions. Section 62(a)(2)(A) allows an employee an above-the-line deduction for expenses paid by the employee, in connection with his or her performance of services as an employee, under a reimbursement or other *7 expense allowance arrangement with the

LEXIS
A member of the Reed Elsevier plc group

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NE
A member of the Reed Elsevier

Page 25
IRS FSA 199940002; 1999 FSA LEXIS 173, *7
FOCUS

employer. Section 62(c) provides that an arrangement will not be treated as a reimbursement or other expense allowance arrangement for purposes of *I.R.C. § 62(a)(2)(A)* if the arrangement does not require the employee to substantiate the expenses covered by the arrangement to the person providing the reimbursement or gives the employee with the right to retain any amount in excess of the substantiated expenses covered under the arrangement.

Under *Treas. reg. § 1.62-2(c)(1)*, a reimbursement or other expense allowance arrangement satisfies the requirements of *I.R.C. § 62(c)*, if it meets the three requirements of business connection, substantiation, and returning amounts in excess of expenses, set forth in paragraphs (d), (e), and (f), respectively, of *Treas. reg. § 1.62-2* ("the three requirements").

If an arrangement meets the three requirements, all amounts paid under the arrangement are treated as paid under an "accountable plan." *Treas. reg. § 1.62-2(c)(2)(i)* *8 . The regulations further provide that if an arrangement does not satisfy one or more of the three requirements, all amounts paid under the arrangement are paid under a "nonaccountable plan." Amounts paid under a nonaccountable plan are included in the employee's gross income for the taxable year, must be reported to the employee on Form W-2, and are subject to withholding and payment of employment taxes. *Treas. Reg. §§ 1.62-2(c)(5)*, 31.3121(a)-3(b)(2), 31.3306(b)-2(b)(2) and 31.3401(a)-4(b)(2). n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Section 62(c) of the Code was enacted by the Family Support Act of 1988, Pub. L. 100-485. Through enactment of section 67 of the Code by section 132 of the Tax Reform Act of 1986, (1986 Act), Pub. L. 99-514, *1986-3 C.B. (vol 1) 30*, the Congress sharpened the distinction between the tax treatment of unreimbursed and reimbursed employee business expenses. Among other changes, unreimbursed employee business expenses plus other miscellaneous itemized deductions generally were made subject to a two-percent floor. At the same time, the Congress decided to retain the above-the-line deduction treatment for reimbursements received by an employee pursuant to a reimbursement arrangement. This rationale for allowing an above-the-line deduction to offset true reimbursement amounts does not apply in the case of nonaccountable plans. Under nonaccountable plans, the amount received by the employee from the employer is not determined by the actual amount of expenses incurred by the employee during the year.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

*9

An arrangement meets the business connection requirement of *Treas. Reg. § 1.62-2(d)* if it provides advances, allowances (including per diem allowances, allowances for meals and incidental expense, and mileage allowances), or reimbursements for business expenses that are allowable as deductions by Part VI (section 161 through section 196), subchapter B, Chapter 1 of the Code, and that are paid or incurred by the employee in connection with the performance of services as an employee. Section 1.62-2(d)(3)(i) provides that the business connection requirement will not be satisfied if the payor arranges to pay an amount to an employee regardless of whether the employee incurs or is reasonably expected to incur business expenses described in paragraphs (d)(1) or (d)(2).

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NEXIS
A member of the Reed Elsevier plc group

PL-000209

A member of the Reed Elsevier plc group

Section 1.62-2(e) of the regulations provides that the substantiation requirement is met if the arrangement requires each business expense to be substantiated to the payor (the employer, its agent or a third party) within a reasonable period of time. As for the third requirement that amounts in excess of expenses must be returned to the payor, the general rule of *Treas. reg. § 1.62-2(f)* *10 provides that this requirement is met if the arrangement requires the employee to return to the payor within a reasonable period of time any amount paid under the arrangement in excess of the expenses substantiated.

Section 1.62-2(k) provides that if a payor's reimbursement or other expense allowance arrangement evidences a pattern of abuse of the rules of section 62(c) and the regulation sections, all payments made under the arrangement will be treated as made under a nonaccountable plan.

*Revenue Ruling 68-624*

Employers typically rely on *Rev. Rul. 68-624, 1968-2 C.B. 424* as authority for designating a portion of an employee's compensation as a rental payment and excluding that amount from wages. The question raised in *Rev. Rul. 68-624,* is what percentage of the total amount paid by a corporation for the use of a truck and the services of a driver is allocable as wages of the driver for FICA purposes. The facts specify that the corporation hires a truck and driver to haul stone from its quarry to its river loading dock at a fixed amount per load and allocates *11 one-third of the amount paid the employee as wages and two-thirds as payment for the use of the truck. The ruling holds that an allocation of the amount paid to an individual when the payment is for both personal services and the use of equipment must be governed by the facts in each case. If the contract of employment does not specify a reasonable division of the total amount paid between wages and equipment, a proper allocation may be arrived at by reference to the prevailing wage scale in a particular locality for similar services in operating the same class of equipment or the fair rental value of similar equipment.

Although *Rev. Rul. 68-624,* has not been obsoleted, we believe it should not be relied upon to exclude rental payments for equipment from wages. The analysis in *Rev. Rul 68-624* is incomplete under current law because it does not consider whether the rental payments are paid under an accountable plan. Under current law, the rental payments can be excluded from wages only if they are paid under an accountable plan. An employment contract that merely allocates compensation between wages *12 and rentals will not satisfy the requirements of *I.R.C. § 62(c)*. To exclude employee reimbursements or other expense allowance payments from wages an employer must establish an accountable plan.

Case Law

Research has not revealed any private letter rulings or technical advice memoranda concerning whether rig rentals are wages for employment tax purposes. In addition, to our knowledge, no case has considered this specific issue. n2 However, two recent cases *Trans-Box Systems v. United States, No. C-97-2768 THE, 1998 U.S. Dist. LEXIS 3560* (N.D. Cal. August 28, 1998,), and *Welch v. Commissioner, T.C. Memo 1998-310* are helpful in analyzing the rig rental issue.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

LEXIS·NEXIS A member of the Reed Elsevier plc group

   

n2 In *Baker v. Barnard Construction Co., Inc., 1994 WL 371558* (D.N.M.) rig welders prevailed on a summary judgment motion that they were employees for purposes of the Fair Labor Standards Act. Although this decision is not relevant for tax purposes, it is interesting that the facts specify that the litigating rig welders filed as independent contractors for tax purposes.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -
*13

Trans-Box, a courier service, paid its courier drivers, who used their own cars to make deliveries, $ 8.95 per hour. Trans-Box treated 45% of the $ 8.95 as wages subject to employment taxes and treated the remaining 55% as either lease payments or vehicle expense payments. The government assessed employment taxes on the entire $ 8.95. In opposing the government's motion for summary judgment, Trans-Box's primary position was that the automobile lease payments or vehicle expenses were paid under an accountable plan and were exempt from employment taxes. Trans-Box asserted that it had substantially complied with the accountable plan requirements in *I.R.C. § 62* citing *American Air Filter Co., Inc. v. Commissioner, 81 T.C. 709 (1983)*.

Trans-Box raised two alternative arguments. First, it argued the drivers were independent contractors rather than employees for purposes of the automobile lease payments and thus, not subject to *I.R.C. § 62*. Second, Trans-Box argued that it was entitled to relief under Section 530 of the Revenue Act of 1978. The government argued that Trans-Box had treated *14 the drivers as employees for all purposes and the arrangement Trans-Box established was not an accountable plan because the drivers were not required to substantiate their expenses or return any amounts received that exceeded their expenses. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Although not asserted by the government, Trans-Box also did not satisfy the business connection requirement. *Treas. reg. § 1.62-2(d)(3)(i)* provides that the business connection is not satisfied if a payor arranges to pay an amount to an employee regardless of whether the employee incurs (or is reasonably expected to incur) business expenses.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

The court concluded that Trans-Box failed to create a triable issue of fact regarding whether the drivers were, at least for some purposes, independent contractors. The court noted that the facts in the record point to the conclusion that Trans-Box had treated the owner-operators as employees for all purposes. It had paid the drivers hourly wages, reported those on Form W-2 and not filed any Forms *15 1099 for the automobile payments.

The court pointed out that Trans-Box's primary argument was that the drivers were employees for all purposes and that it substantially complied with the requirements of *I.R.C. § 62(c)*. While acknowledging that Trans-Box was free to argue alternative or conflicting legal arguments the court stated "serious questions about the veracity of its allegations are raised because Trans-Box's alternative argument relies upon conflicting versions of the material facts at issue." Trans-Box Systems v. United States, 1998 U.S. Dist.3 Lexis *10-11. Thus, the court granted the government's motion for summary judgment on the



plaintiff's claims and summary judgment on the government's counterclaim for recovery of unpaid employment taxes. The court did not address the Section 530 argument. Although this decision rests on Trans-Box's failure to create a triable issue of fact on worker classification, it is significant because the court refused to apply a substantial compliance rule to *I.R.C. § 62(c)* or to allow Trans-Box to argue different versions of the facts.

In *Welch v. Commissioner, T.C. Memo 1998-310* *16 the Tax Court held that Mr. Welch's equipment leasing activities in 1993 were not passive activities. Mr. Welch, a carpenter, was hired by movie production companies as a construction coordinator. Mr. Welch and the production company would enter into a "deal memorandum" setting forth the terms of his employment including the rate that he would be paid and the rate at which he rented his equipment to the company. Typically, an inventory of his tools and equipment would be attached to the deal memo. The production company would report Mr. Welch's wages on a Form W-2 and the tool rentals on a Form 1099. As construction coordinator, he constructed movie sets, hired employees, arranged for the purchase of materials and furnished all the required tools. He was required to purchase, maintain, transport and repair the tools as needed. The facts also specify that in 1993, Mr. Welch rented tools to a third party for $ 1,500.00 for a project for which he was not the construction coordinator.

The court analyzed whether Mr. Welch's rental activity was a rental activity for purposes of *I.R.C. § 469* and concluded it was not because he provided equipment to production *17 companies for an average period of 30 days or less and he performed significant personal services in connection with making the property available for use by customers. The court noted that he acquired, maintained, transported and repaired the tools and equipment. The court concluded that Mr. Welch provided extraordinary personal services and the rental of the tools and equipment by the production companies was incidental to receipt of Mr. Welch's services as a construction coordinator. The court further held that Mr. Welch materially participated in his business as a construction coordinator and therefore, was not subject to the loss limitations imposed by *I.R.C. § 469*.

Although the Tax Court was not required to decide whether the rental arrangement was an accountable plan within the meaning of *I.R.C. § 62(c)* or whether Mr. Welch was an employee or independent contractor, the facts illustrate an arrangement for the rental of equipment that was an arms length transaction memorialized in a writing. Perhaps the most significant fact is that Mr. Welch actually rented his tools to a third party that did not also *18 employ him as the construction coordinator. Thus, at least in that instance his rental activity was separate from the services he performed as an employee.

Case Development, Hazards, and Other Considerations

It is our view that the best approach to address the rig rental issue TEXT REDACTED

If you have further questions, please call me at (202) 622-6040.

JERRY E. HOLMES

A member of the Reed Elsevier plc group
A member of the Reed Elsevier plc group
A member of the Reed ...

    

PL-000213

Page 7

2ND ITEM of Level 1 printed in FULL format.

1999 IRS CCA LEXIS 100; IRS CCA 199921003

Chief Counsel Advice 199921003, May 28, 1999, Released

Position Paper "Rig Rentals" UILC # 62.02.00

February 2, 1999

REFERENCE: *1 CC:EBEO:Br.2:

TEXT:
MEMORANDUM FOR DISTRICT COUNSEL

FROM: TEXT REDACTED CHIEF, BRANCH 2, (EMPLOYEE BENEFITS AND EXEMPT, ORGANIZATIONS)

SUBJECT: Position Paper "Rig Rentals" UILC # 62.02.00

This is in response to your memorandum of August 4, 1998 requesting our review of a position paper prepared by the TEXT REDACTED. The position paper, which is not case *3 specific, considers the treatment of amounts an employer pays to employees for use of the employees' rig welding equipment. These payments are commonly called "rig rentals". Specifically, you asked us to review the position paper and advise if there are any additional legal or policy issues related to the rig rentals.

Conclusion

The position paper suggests an analysis and conclusion that would apply in every case. We agree that the primary issue is whether the rig rentals are wages for Federal employment tax purposes, and the position paper sets forth an appropriate analysis. However, we cannot agree that the same conclusion will apply in every case. Whether the rig rentals are wages depends upon whether the rentals are paid pursuant to an accountable plan. If so paid, the payments are not wages for employment tax purposes. Thus, the issue that must be resolved based upon the facts and circumstances of each case is whether the rig rentals are paid pursuant to an accountable plan. We recommend that the Examination Division develop an appropriate case for litigation.

Facts

The position paper sets forth typical facts of a rig rental arrangement. In general, an employer engaged *4 in the business of specialized industrial construction will hire employee rig welders. Welders are highly skilled workers and when hired to perform welding services that is the only function they perform at the job site. They provide all of their own equipment, which generally includes a truck, welder, welding tanks and related items. On a non-union job, welders are required to provide all their own welding supplies. On a union job supplies are generally provided by the employer.

Employers compensate the welders by paying them a small hourly wage such as $ 10.00 per hour and treat that amount as wages subject to employment taxes. In

 LEXIS·NEXIS A member of the Reed Elsevier plc group  LEXIS·NEXIS A member of the Reed Elsevier plc group  A member of the Reed Elsevier plc group

PL-000214

addition, the employer will pay the welder an additional amount per hour, such as $ 20.00 to rent the employee's welding equipment. The position paper specifies that the welder is paid at the end of each week when he turns in his "rig ticket" which reports the hours worked each day, but does not indicate the expenses the welder incurred associated with his equipment. Thus, the amount of rig rentals is based solely on hours worked. The employer issues the employee two checks, one for wages and one for rig rentals. The amount treated as wages will be reported *5 to the employee on Form W-2, and the rig rental if reported, will be reported on Form 1099.

Law & Analysis

The position paper accurately discusses the applicable Federal employment tax law. However, for completeness in responding to your inquiry we include a discussion of the applicable law.

*I.R.C.* § *62*

As stated, the issue is whether the rig rentals are wages for employment tax purposes. The three Federal employment taxes are the Federal Insurance Contributions Act (FICA) taxes, Federal Unemployment Tax Act (FUTA) tax, and income tax withholding. In general, wages are defined for FICA, FUTA and income tax withholding purposes as all remuneration for employment unless otherwise excluded. *I.R.C.* §§ *3121(a)*, 3306(b) and 3401(a). There is no statutory exception from wages for amounts paid by employers to employees for employee business expenses. However, *Treas. reg.* § *1.62-2(c)(4)* provides that amounts an employer pays to an employee for employee business expenses under an "accountable plan" are excluded from the employee's gross income, are not required to be reported *6 on the employee's Form W-2, and are exempt from the withholding and payment of employment taxes. *Treas. reg.* §§ *31.3121(a)-3*, 31.3306(b)-2, and *31.3401(a)-4 of the Employment Tax Regulations*, and *Treas. reg.* § *1.6041-3(h)(1)* of the Income Tax Regulations.

Whether amounts are paid under an accountable plan is governed by *I.R.C.* § *62* which includes the provisions on employee reimbursement or other expense allowance arrangements. Section 62 generally defines "adjusted gross income" as gross income minus certain ("above-the-line") deductions. Section 62(a)(2)(A) allows an employee an above-the-line deduction for expenses paid by the employee, in connection with his or her performance of services as an employee, under a reimbursement or other expenses allowance arrangement with the employer. Section 62(c) provides that an arrangement will not be treated as a reimbursement or other expense allowance arrangement for purposes of *I.R.C.* § *62(a)(2)(A)* if the arrangement does not require the *7 employee to substantiate the expenses covered by the arrangement to the person providing the reimbursement or gives the employee with the right to retain any amount in excess of the substantiated expenses covered under the arrangement.

Under section 1.62-2(c)(1) of the regulations, a reimbursement or other expense allowance arrangement satisfies the requirements of *I.R.C.* § *62(c)*, if it meets the three requirements of business connection, substantiation, and returning amounts in excess of expenses, set forth in paragraphs (d), (e), and (f), respectively, of *Treas. reg.* § *1.62-2* ("the three requirements").

If an arrangement meets the three requirements, all amounts paid under the

A member of the Reed Elsevier plc group
A member of the Reed Elsevier plc group
A member of the Reed

arrangement are treated as paid under an "accountable plan." *Treas. reg. § 1.62-2(c)(2)(i)*. The regulations further provide that if an arrangement does not satisfy one or more of the three requirements, all amounts paid under the arrangement are paid under a "nonaccountable plan." Amounts paid under a nonaccountable plan are included in the employee's gross income for the taxable year, must be reported *8 to the employee on Form W-2, and are subject to withholding and payment of employment taxes. *Treas. Reg. §§ 1.62-2(c)(5)*, 31.3121(a)-3(b)(2), 31.3306(b)-2(b)(2) and 31.3401(a)-4(b)(2). n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Section 62(c) of the Code was enacted by the Family Support Act of 1988, Pub. L. 100-485. Through enactment of section 67 of the Code by section 132 of the Tax Reform Act of 1986, (1986 Act), Pub. L. 99-514, *1986-3 C.B. (vol 1) 30*, the Congress sharpened the distinction between the tax treatment of unreimbursed and reimbursed employee business expenses. Among other changes, unreimbursed employee business expenses plus other miscellaneous itemized deductions generally were made subject to a two-percent floor. At the same time, the Congress decided to retain the above-the-line deduction treatment for reimbursements received by an employee pursuant to a reimbursement arrangement. This rationale for allowing an above-the-line deduction to offset true reimbursement amounts does not apply in the case of nonaccountable plans. Under nonaccountable plans, the amount received by the employee from the employer is not determined by the actual amount of expenses incurred by the employee during the year.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

*9

An arrangement meets the business connection requirement of *Treas. Reg. § 1.62-2(d)* if it provides advances, allowances (including per diem allowances, allowances for meals and incidental expense, and mileage allowances), or reimbursements for business expenses that are allowable as deductions by Part VI (section 161 through section 196), subchapter B, Chapter 1 of the Code, and that are paid or incurred by the employee in connection with the performance of services as an employee. Section 1.62-2(d)(3)(i) provides that the business connection requirement will not be satisfied if the payor arranges to pay an amount to an employee regardless of whether the employee incurs or is reasonably expected to incur business expenses described in paragraphs (d)(1) or (d)(2).

Section 1.62-2(e) of the regulations provides that the substantiation requirement is met if the arrangement requires each business expense to be substantiated to the payor (the employer, its agent or a third party) within a reasonable period of time. As for the third requirement that amounts in excess of expenses must be returned to the payor, the general rule of *Treas. reg. § 1.62-2(f)* *10 provides that this requirement is met if the arrangement requires the employee to return to the payor within a reasonable period of time any amount paid under the arrangement in excess of the expenses substantiated.

Section 1.62-2(k) provides that if a payor's reimbursement or other expense allowance arrangement evidences a pattern of abuse of the rules of section 62(c) and the regulation sections, all payments made under the arrangement will be treated as made under a nonaccountable plan.

  

*Revenue Ruling 68-624*

Employers typically rely on *Rev. Rul. 68-624, 1968-2 C.B. 424* as authority for designating a portion of an employee's compensation as a rental payment and excluding that amount from wages. The question raised in *Rev. Rul. 68-624,* is what percentage of the total amount paid by a corporation for the use of a truck and the services of a driver is allocable as wages of the driver for FICA purposes. The facts specify that the corporation hires a truck and driver to haul stone from its quarry to its river loading dock at a fixed amount per load and allocates *11 one-third of the amount paid the employee as wages and two-thirds as payment for the use of the truck. The ruling holds that an allocation of the amount paid to an individual when the payment is for both personal services and the use of equipment must be governed by the facts in each case. If the contract of employment does not specify a reasonable division of the total amount paid between wages and equipment, a proper allocation may be arrived at by reference to the prevailing wage scale in a particular locality for similar services in operating the same class of equipment or the fair rental value of similar equipment.

Although *Rev. Rul. 68-624,* has not been obsoleted, we believe it should not be relied upon to exclude rental payments for equipment from wages. The analysis in *Rev. Rul 68-624* is incomplete under current law because it does not consider whether the rental payments are paid under an accountable plan. Under current law, the rental payments can be excluded from wages only if they are paid under an accountable plan. An employment contract that merely allocates compensation between wages *12 and rentals will not satisfy the requirements of *I.R.C. § 62(c)*. To exclude employee reimbursements or other expense allowance payments from wages an employer must establish an accountable plan.

Case Law

The Service has not issued any private letter rulings or technical advice memoranda concerning whether rig rentals are wages for employment tax purposes. In addition, to our knowledge, no case has considered this specific issue. n2 However, two recent cases *Trans-Box Systems v. United States, No. C-97-2768 The 1998 U.S. Dist. LEXIS 3560* (N.D. Cal. August 28, 1998,) (appeal pending 9th Cir.), and *Welch v. Commissioner, T.C. Memo 1998-310* are helpful in analyzing the rig rental issue.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n2 In *Baker v. Barnard Construction Co., Inc., 1994 WL 371558* (D.N.M.) rig welders prevailed on a summary judgment motion that they were employees for purposes of the Fair Labor Standards Act. Although this decision is not relev for tax purposes, it is interesting that the facts specify that the affected welders filed as independent contractors for tax purposes.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

*13

Trans-Box, a courier service, paid its courier drivers, who used their own cars to make deliveries, $ 8.95 per hour. Trans-Box treated 45% of the $ 8.95 a wages subject to employment taxes and treated the remaining 55% as either lease payments or vehicle expense payments. The government assessed employment taxe

    

Page 11

1999 IRS CCA LEXIS 100, *13; IRS CCA 199921003

on the entire $ 8.95. In opposing the government's motion for summary judgment, Trans-Box's primary position was that the automobile lease payments or vehicle expenses were paid under an accountable plan and were exempt from employment taxes. Trans-Box asserted that it had substantially complied with the accountable plan requirements in *I.R.C. § 62* citing *American Air Filter Co., Inc. v. Commissioner, 81 T.C. 709 (1983)*.

Trans-Box raised two alternative arguments. First, it argued the drivers were independent contractors rather than employees for purposes of the automobile lease payments and thus, not subject to *I.R.C. § 62*. Second, Trans-Box argued that it was entitled to relief under Section 530 of the Revenue Act of 1978. The government argued that Trans-Box had treated *14 the drivers as employees for all purposes and the arrangement Trans-Box established was not an accountable plan because the drivers were not required to substantiate their expenses or return any amounts received that exceeded their expenses. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Although not asserted by the government, Trans-Box also did not satisfy the business connection requirement. *Treas. reg. § 1.62-2(d)(3)(i)* provides that the business connection is not satisfied if a payor arranges to pay an amount to an employee regardless of whether the employee incurs (or is reasonably expected to incur) business expenses.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The court concluded that Trans-Box failed to created a triable issue of fact regarding whether the drivers were, at least for some purposes, independent contractors. The court noted that the facts in the record point to the conclusion that Trans-Box had treated the owner-operators as employees for all purposes. It had paid the drivers hourly wages, reported those on Form W-2 and not filed any Forms *15 1099 for the automobile payments.

The court pointed out that Trans-Box's primary argument was that the drivers were employees for all purposes and that it substantially complied with the requirements of *I.R.C. § 62(c)*. While acknowledging that Trans-Box was free to argue alternative or conflicting legal arguments the court stated "serious questions about the veracity of its allegations are raised because Trans-Box's alternative argument relies upon conflicting versions of the material facts at issue." Trans-Box Systems v. United States, 1998 U.S. Dist.3 Lexis *10-11. Thus, the court granted the government's motion for summary judgment on the plaintiff's claims and summary judgment on the government's counterclaim for recovery of unpaid employment taxes. The court did not address the Section 530 argument.

Although the court's decision rests on Trans-Box's failure to create a triable issue of fact on worker classification, the decision is significant because the court refused to apply a substantial compliance rule to *I.R.C. § 62(c)* or to allow Trans-Box to argue different versions of the facts.

In *Welch v. Commissioner, T.C. Memo 1998-310* *16 the Tax Court held that Mr. Welch's equipment leasing activities in 1993 were not passive activities. Mr. Welch, a carpenter, was hired by movie production companies as a construction coordinator. Mr. Welch and the production company would enter into

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NEXIS
A member of the Reed Elsevier plc group

A member of the Reed Elsevier plc group

PL-000218

a "deal memorandum" setting forth the terms of his employment including the rate that he would be paid and the rate at which he rented his equipment to the company. Typically, an inventory of his tools and equipment would be attached to the deal memo. The production company would report Mr. Welch's wages on a Form W-2 and the tool rentals on a Form 1099. As construction coordinator, he constructed movie sets, hired employees, arranged for the purchase of materials and furnished all the required tools. He was required to purchase, maintain, transport and repair the tools as needed. The facts also specify that in 1993, Mr. Welch rented tools to a third party for $ 1,500.00 for a project for which he was not the construction coordinator.

The court analyzed whether Mr. Welch's rental activity was a rental activity for purposes of *I.R.C. § 469* and concluded it was not because he provided equipment to production *17 companies for an average period of 30 days or less and he performed significant personal services in connection with making the property available for use by customers. The court noted that he acquired, maintained, transported and repaired the tools and equipment. The court concluded that Mr. Welch provided extraordinary personal services and the rental of the tools and equipment by the production companies was incidental to receipt of Mr. Welch's services as a construction coordinator. The court further held that Mr. Welch materially participated in his business as a construction coordinator and therefore, was not subject to the loss limitations imposed by *I.R.C. § 469*.

Although the Tax Court was not required to decide whether the rental arrangement was an accountable plan within the meaning of *I.R.C. § 62(c)* or whether Mr. Welch was an employee or independent contractor, the facts illustrate an arrangement for the rental of equipment that was an arms length transaction memorialized in a writing. Perhaps the most significant fact is that Mr. Welch actually rented his tools to a third party that did not also *18 employ him as the construction coordinator. Thus, at least in that instance his rental activity was separate from the services he performed as an employee.

Case Development, Hazards, and Other Considerations

It is our view that the best approach to address the rig rental issue is to develop an appropriate case for litigation. Accordingly, we make the following suggestions for case development. Analyzing whether a rig rental arrangement is an accountable plan requires factual development, including an understanding of the details of the arrangement. TEXT REDACTED

TEXT REDACTED

If you have further questions, please call me at (202) 622-6040.

JERRY E. HOLMES

NEXIS A member of the Reed Elsevier plc group





PL-000220

1ST ITEM of Level 1 printed in FULL format.

1999 IRS CCA LEXIS 82; IRS CCA 199917011

Chief Counsel Advice 199917011, April 30, 1999, Released

Payments to Employees for the Use of TEXT REDACTED

January 13, 1999

REFERENCE:    *1    UIL 9999.9800

TEXT:
MEMORANDUM FOR

    FROM: TEXT REDACTED Chief, Branch 2

    (Employee Benefits & Exempt Organizations)

    SUBJECT: Payments to Employees for the Use of TEXT REDACTED

    Legend:

    X =

    Issue

    This is in response to your E Mail of TEXT REDACTED concerning the proper
treatment of payments an employer makes to its employees for use of the
employees TEXT  *3   REDACTED. In addition to your E Mail, you provided
copies of materials from X, which we have enclosed. This response will discuss
"TEXT REDACTED" and then whether the arrangement TEXT REDACTED by X is an
accountable plan.

    Conclusion

    TEXT REDACTED

    We cannot conclude that the same result will apply in every case. However,
this memo suggests an analysis to follow in TEXT REDACTED cases. The issue is
whether the TEXT REDACTED are wages for Federal employment tax purposes. If
the TEXT REDACTED are paid pursuant to an accountable plan, the payments are
not wages for employment tax purposes. Thus, the issue that must be resolved in
these cases is whether the arrangement is an accountable plan.

    X

    We understand that X is an entity that TEXT REDACTED X maintains TEXT
REDACTED Based upon the information we have reviewed it is not clear whether X
offers TEXT REDACTED. As stated above, whether TEXT REDACTED are wages
subject to employment taxes depends upon whether they are paid pursuant to an
accountable plan. We cannot opine on whether TEXT REDACTED. However, we note
that certain comments included in X's TEXT REDACTED and are not correct.

    

Facts

Your *4 request is not case specific. We understand that in a typical arrangement the employer will pay an employee a small hourly wage, such as $ 8.00, and treat that amount as wages subject to employment taxes. The employer will also pay the employee an additional amount per hour, such as $ 24.00, to the employee's TEXT REDACTED. The amount treated as wages will be reported to the employee on Form W-2, and the TEXT REDACTED if reported, will be reported on Form 1099. We have assumed for purposes of this response, that the workers are employees. n1

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 In certain cases, worker classification may be an issue. To determine whether a worker is an employee or an independent contractor the common law test must be applied. See, IRS Publication 1976, Independent Contractor or Employee. If the analysis concludes that the workers are independent contractors, issues arise concerning the effect of converting workers to independent contractors, and Exam should contact the National Office.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

Law & Analysis

The three employment taxes *5 are the Federal Insurance Contributions Act (FICA) taxes, Federal Unemployment Tax Act (FUTA) tax, and income tax withholding. The discussion herein is limited to whether, for employment tax purposes, the employer is properly treating amounts paid under the arrangement. This memorandum does not discuss how an employee should report TEXT REDACTED payments not paid under an accountable plan that the employer does not treat as wages. n2

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n2 When an employer fails to characterize properly amounts paid to an employee as wages, issues arise concerning how the employee should report such payments and claim any related deductions.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

*I.R.C.* § *62*

As stated, the issue is whether the TEXT REDACTED payments are wages for employment tax purposes. In general, wages are defined for FICA, FUTA and income tax withholding purposes as all remuneration for employment unless otherwise excluded. *I.R.C.* §§ *3121(a)*, 3306(b) and 3401(a). There is no statutory exception *6 from wages for amounts paid by employers to employees for employee business expenses. However, *Treas. reg.* § *1.62-2(c)(4)* provides that amounts an employer pays to an employee for employee business expenses under an "accountable plan" are excluded from the employee's gross income, are not required to be reported on the employee's Form W-2, and are exempt from the withholding and payment of employment taxes. *Treas. reg.* §§ *31.3121(a)-3*, 31.3306(b)-2, and *31.3401(a)-4 of the Employment Tax Regulations*, and *Treas. reg.* § *1.6041-3(h)(1)* of the Income Tax Regulations.

  

Page 16
1999 IRS CCA LEXIS 82, *6; IRS CCA 199917011

Whether amounts are paid under an accountable plan is governed by *I.R.C. § 62* which includes the provisions on employee reimbursement or other expense allowance arrangements. Section 62 generally defines "adjusted gross income" as gross income minus certain ("above-the-line") deductions. Section 62(a)(2)(A) allows an employee an above-the-line deduction for expenses paid by the employee, in connection with his or her performance *7 of services as an employee, under a reimbursement or other expenses allowance arrangement with the employer. Section 62(c) provides that an arrangement will not be treated as a reimbursement or other expense allowance arrangement for purposes of *I.R.C. § 62(a)(2)(A)* if (1) such arrangement does not require the employee to substantiate the expenses covered by the arrangement to the person providing the reimbursement or (2) such arrangement provides the employee with the right to retain any amount in excess of the substantiated expenses covered under the arrangement.

Under section 1.62-2(c)(1) of the regulations, a reimbursement or other expense allowance arrangement satisfies the requirements of *I.R.C. § 62(c)*, if it meets the three requirements of business connection, substantiation, and returning amounts in excess of expenses, set forth in paragraphs (d), (e), and (f), respectively, of *Treas. reg. § 1.62-2* ("the three requirements").

If an arrangement meets the three requirements, all amounts paid under the arrangement are treated as paid under an "accountable plan." *Treas. reg. § 1.62-2(c)(2)(i)* *8 . The regulations further provide that if an arrangement does not satisfy one or more of the three requirements, all amounts paid under the arrangement are paid under a "nonaccountable plan." Amounts paid under a nonaccountable plan are included in the employee's gross income for the taxable year, must be reported to the employee on Form W-2, and are subject to withholding and payment of employment taxes. *Treas. Reg. §§ 1.62-2(c)(5)*, 31.3121(a)-3(b)(2), 31.3306(b)-2(b)(2) and 31.3401(a)-4(b)(2). n3

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n3 Section 62(c) of the Code was enacted by the Family Support Act of 1988, Pub. L. 100-485. Through enactment of section 67 of the Code by section 132 of the Tax Reform Act of 1986, (1986 Act), Pub. L. 99-514, *1986-3 C.B. (vol 1) 30*, the Congress sharpened the distinction between the tax treatment of unreimbursed and reimbursed employee business expenses. Among other changes, unreimbursed employee business expenses plus other miscellaneous itemized deductions generally were made subject to a two-percent floor. At the same time, the Congress decided to retain the above-the-line deduction treatment for reimbursements received by an employee pursuant to a reimbursement arrangement. This rationale for allowing the employee an above-the-line deduction to offset true reimbursement amounts does not apply in the case of nonaccountable plans. Under these plans, the amount received by the employee from the employer is not determined by the actual amount of expenses incurred by the employee during the year.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

*9

An arrangement meets the business connection requirement of *Treas. Reg. § 1.62-2(d)* if it provides advances, allowances (including per diem allowances, allowances for meals and incidental expense, and mileage allowances), or

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NEXIS
A member of the Reed Elsevier plc group

PL-000223
A member of the Reed Elsevier plc group

reimbursements for business expenses that are allowable as deductions by Part VI (section 161 through section 196), subchapter B, Chapter 1 of the Code, and that are paid or incurred by the employee in connection with the performance of services as an employee. Section 1.62-2(d)(3)(i) provides that the business connection requirement will not be satisfied if the payor arranges to pay an amount to an employee regardless of whether the employee incurs or is reasonably expected to incur business expenses described in paragraphs (d)(1) or (d)(2).

Section 1.62-2(e) of the regulations provides that the substantiation requirement is met if the arrangement requires each business expense to be substantiated to the payor (the employer, its agent or a third party) within a reasonable period of time. As for the third requirement that amounts in excess of expenses must be returned to the payor, the general rule of *Treas. reg. § 1.62-2(f)* *10 provides that this requirement is met if the arrangement requires the employee to return to the payor within a reasonable period of time any amount paid under the arrangement in excess of the expenses substantiated.

Section 1.62-2(k) provides that if a payor's reimbursement or other expense allowance arrangement evidences a pattern of abuse of the rules of section 62(c) and the regulation sections, all payments made under the arrangement will be treated as made under a nonaccountable plan.

*Revenue Ruling 68-624*

Employers typically rely on *Rev. Rul. 68-624, 1968-2 C.B. 424* as authority for designating a portion of an employee's compensation as a rental payment and excluding that amount from wages. The question raised in *Rev. Rul. 68-624*, is what percentage of the total amount paid by a corporation for the use of a truck and the services of a driver is allocable as wages of the driver for FICA purposes. The facts specify that the corporation hires a truck and driver to haul stone from its quarry to its river loading dock at a fixed amount per load and allocates *11 one-third of the amount paid the employee as wages and two-thirds as payment for the use of the truck. The ruling holds that an allocation of the amount paid to an individual when the payment is for both personal services and the use of equipment must be governed by the facts in each case. If the contract of employment does not specify a reasonable division of the total amount paid between wages and equipment, a proper allocation may be arrived at by reference to the prevailing wage scale in a particular locality for similar services in operating the same class of equipment or the fair rental value of similar equipment.

Although *Rev. Rul. 68-624*, has not been obsoleted, we believe it should not be relied upon to exclude TEXT REDACTED payments for TEXT REDACTED from wages. The analysis in *Rev. Rul. 68-624* is incomplete under current law because it does not consider whether the TEXT REDACTED are paid under an accountable plan. Under current law, the TEXT REDACTED can be excluded from wages only if they are paid under an accountable plan. An employment contract that merely allocates compensation *12 between wages and TEXT REDACTED will not satisfy the requirements of *I.R.C. § 62(c)*. To exclude employee reimbursements or other expense allowance payments from wages an employer must establish an accountable plan.

Case Law

A member of the Reed Elsevier plc group

A member of the Reed Elsevier plc group

A member of the Reed Elsevier plc group

     

Page 18

1999 IRS CCA LEXIS 82, *12; IRS CCA 199917011

The Service has not issued any private letter rulings or technical advice memoranda that address whether TEXT REDACTED payments are wages. In addition, to our knowledge no case has considered the issue. However, two recent cases *Trans-Box Systems v. United States, No. C-97-2768 THE, 1998 U.S. Dist. LEXIS 3560* (N.D. Cal. August 28, 1998,) (appeal pending 9th Cir.), and *Welch v. Commissioner, T.C. Memo 1998-310* are helpful in analyzing the TEXT REDACTED issue.

Trans-Box, a courier service, paid its courier drivers, who used their own cars to make deliveries, $ 8.95 per hour. Trans-Box treated 45% of the $ 8.95 as wages subject to employment taxes and treated the remaining 55% as either lease payments or vehicle expenses. The government assessed employment taxes on the entire $ 8.95. In opposing the government's motion for summary judgment, Trans-Box's *13 primary position was that the automobile lease payments or vehicle expenses were paid under an accountable plan and were exempt from employment taxes. Trans-Box asserted that it had substantially complied with the accountable plan requirements in *I.R.C. § 62* citing *American Air Filter Co., Inc. v. Commissioner, 81 T.C. 709 (1983)*.

Trans-Box raised two alternative arguments. First, it argued the drivers were independent contractors rather than employees for purposes of the automobile lease payments and thus, not subject to *I.R.C. § 62*. Second, Trans-Box argued that it was entitled to relief under Section 530 of the Revenue Act of 1978. The government argued that Trans-Box had treated the drivers as employees for all purposes and the arrangement Trans-Box established was not an accountable plan because the drivers were not required to substantiate their expenses or return any amounts received that exceeded their expenses. n4

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 Although not asserted by the government, Trans-Box also did not satisfy the business connection requirement. *Treas. reg. 1.62-2(d)(3)(i)* provides that the business connection is not satisfied if a payor arranges to pay an amount to an employee regardless of whether the employee incurs (or is reasonably expected to incur) business expenses.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

*14

The court concluded that Trans-Box failed to created a triable issue of fact regarding whether the drivers were, at least for some purposes, independent contractors. The court noted that the facts in the record point to the conclusion that Trans-Box had treated the owner-operators as employees for all purposes. It had paid the drivers hourly wages, reported those on Form W-2 and not filed any Forms 1099 for the automobile payments.

The court pointed out that Trans-Box's primary argument was that the drivers were employees for all purposes and that it substantially complied with the requirements of *I.R.C. § 62(c)*. While acknowledging that Trans-Box was free to argue alternative or conflicting legal arguments the court stated "serious questions about the veracity of its allegations are raised because Trans-Box's alternative argument relies upon conflicting versions of the material facts at issue." Trans-Box Systems v. United States, 1998 U.S. Dist. Lexis * 10-11. Thus, the court granted the government's motion for summary judgment on the

LEXIS·NEXIS

A member of the Reed Elsevier plc group

LEXIS·NEXIS

A member of the Reed Elsevier plc group

PL-000225

plaintiff's claims and summary judgment on the government's counterclaim for recovery of unpaid employment *15 taxes. The court did not address the Section 530 argument.

Although the court's decision rests on Trans-Box's failure to create a triable issue of fact on worker classification, the decision is significant because the court refused to apply a substantial compliance rule to *I.R.C. § 62(c)* or to allow Trans-Box to argue different versions of the facts.

In *Welch v. Commissioner, T.C. Memo 1998-310* the Tax Court held that Mr. Welch's equipment leasing activities in 1993 were not passive activities. Mr. Welch, a carpenter, was hired by movie production companies as a construction coordinator. Mr. Welch and the production company would enter into a "deal memorandum" setting forth the terms of his employment including the rate that he would be paid and the rate at which he rented his equipment to the company. Typically, an inventory of his tools and equipment would be attached to the deal memo. The production company would report Mr. Welch's wages on a Form W-2 and the tool rentals on a Form 1099. As construction coordinator, he constructed movie sets, hired employees, arranged for the purchase of materials and furnished *16 all the required tools. He was required to purchase, maintain, transport and repair the tools as needed. The facts also specify that in 1993, Mr. Welch rented tools to a third party for $ 1,500.00 for a project for which he was not the construction coordinator.

The court analyzed whether Mr. Welch's rental activity was a rental activity for purposes of *I.R.C. § 469* and concluded it was not because he provided equipment to production companies for an average period of 30 days or less and he performed significant personal services in connection with making the property available for use by customers. The court noted that he acquired, maintained, transported and repaired the tools and equipment. The court concluded that Mr. Welch provided extraordinary personal services and the rental of the tools and equipment by the production companies was incidental to receipt of Mr. Welch's services as a construction coordinator. The court further held that Mr. Welch materially participated in his business as a construction coordinator and therefore, was not subject to the loss limitations imposed by *I.R.C. § 469*.

Although *17 the Tax Court was not required to decide whether the rental arrangement was an accountable plan within the meaning of *I.R.C. § 62(c)* or whether Mr. Welch was an employee or independent contractor, the facts illustrate an arrangement for the rental of equipment that was an arms length transaction memorialized in a writing. Perhaps the most significant fact is that Mr. Welch actually rented his tools to a third party that did not also employ him as the construction coordinator. Thus, at least in that instance his rental activity was separate from the services he performed as an employee.

Case Development, Hazards, and Other Considerations

It is our view that the best approach to address the TEXT REDACTED issue is to go forward with a well developed case. Accordingly, we make the following suggestions for case development. Analyzing whether a tool TEXT REDACTED arrangement is an accountable plan requires factual development, including an understanding of the details of the arrangement. It may not be assumed that every TEXT REDACTED is a disguised payment of wages or that an employer cannot establish a arrangement that satisfies the accountable *18 plan

LEXIS·NEXIS A member of the Reed Elsevier plc group






requirements.

An important fact to ascertain is when did the employer begin compensating its employees in part with a TEXT REDACTED. Did the employer pay TEXT REDACTED prior to the enactment of the Tax Reform Act of 1986 or the Family Support Act of 1988? It is also important to ask the employer why it decided to pay a TEXT REDACTED, and whether the employer had motivations other than reducing its employment taxes.

It is also important to find out whether the arrangement is written. There may be a lease or the arrangement may be described in an employee handbook. Any writing should be evaluated to determine whether it reflects an arms length transaction and whether it specifies the employer's basis for allocating amounts between wages and rentals. Employers will likely maintain that the TEXT REDACTED reflects the fair market TEXT REDACTED value of the TEXT REDACTED. Thus, it is important to ask how the employer determined that amount. If there is a lease, factors to develop include whether the lease has a specific term and what happens if the employee terminates employment before the end of the lease term?

Even when there is a writing, it remains important to interview *19 workers and find out their understanding of the arrangement and whether the specified terms of the arrangement are actually followed. For, example, the written arrangement or the employer may specify that employees must agree to let other employees use their TEXT REDACTED. However, if another employee never actually uses the TEXT REDACTED the TEXT REDACTED requirement is meaningless. If the arrangement is unwritten, that is an important fact. Other factors to consider include whether employees must supply TEXT REDACTED, are the TEXT REDACTED left at the work site; are the TEXT REDACTED maintained and insured and if so, who bears those costs. How the arrangement fits within the decisions in Welch and Trans-Box, should also be considered.

X.

We have reviewed the TEXT REDACTED. The most important fact to know TEXT REDACTED is that IRS has not ruled on the validity of TEXT REDACTED arrangement, and TEXT REDACTED is incorrect. We also have not ruled that an employer may reduce liability for employment taxes by recharacterizing wages as TEXT REDACTED. In addition, the private letter ruling program does not allow the IRS to rule on whether commercial products *20 marketed and sold to the public comply with the provisions of the Internal Revenue Code. If a taxpayer purchased X's services and submitted a request for a private letter ruling on whether it had established an accountable plan, we might be able to issue a ruling, provided all other requirements of *Revenue Procedure 99-1* were met. n5 Finally, if a taxpayer TEXT REDACTED that is merely a factor to consider in determining whether the taxpayer's TEXT REDACTED arrangement is valid. TEXT REDACTED does not necessarily mean that the arrangement is accountable.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 TEXT REDACTED specify that rental income is not subject to SECA tax and that is incorrect. *I.R.C. § 1402(a)(1)* excludes rentals from real estate from the definition of net earnings from self-employment. The statute, however, does not exclude other rental income. See, *Stevenson v. Commissioner, T.C. Memo*

1989-357.

- - - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - -

If you have questions, please call me at (202) 622-6040. *21

JERRY E. HOLMES

S·NEXIS
A member of the Reed Elsevier plc group






PL-000229

1ST CASE of Level 1 printed in FULL format.

REX BAKER, JOSEPH N. BORDELON, GARY COON, MACK D. MANTLE, JAMES D. SPEARS, JR., GARY MILLER, SR., EDWARD McHENRY, Plaintiffs-Appellees, and ALAN BOYD, CHARLIE E. BRADSHAW, JR., ROBERT CORNETT, JR., LARRY CUNNINGHAM, DENNY HENSLEY, STEVEN D. HENSLEY, LEONARD L. MAHAN, TRACY R. McMANUS, EDDIE MILLER, GERALD MILLER, DAVID L. ROBINSON, DENNIS STILES, RAY E. FOWLER, WILLIAM R. CLARENCE, Plaintiffs, v. FLINT ENGINEERING & CONSTRUCTION COMPANY, Defendant-Appellant, and BARNARD CONSTRUCTION CO., INC.; DAVY McKEE CORPORATION; FOUR-WAY COMPANY, INC.; FOUTZ & BURSUM CONSTRUCTION COMPANY, INC.; MOUNTAIN WEST FABRICATION PLANTS & STATIONS, INC.; PIONEER CONTRACTING COMPANY, INC., Defendants.

No. 96-2133

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

1998 U.S. App. LEXIS 3904

March 6, 1998, Filed

PRIOR HISTORY: [*1] Appeal from United States District Court for the District of New Mexico. D.C. No. CIV-93-140-BB.

DISPOSITION: AFFIRMED.

COUNSEL: John T. Schmidt (Deirdre O. Dexter and Rebecca S. Woodward with him on the brief), of Conner & Winters, Tulsa, Oklahoma, for the appellant.

Michael L. Oja (J.E. Gallegos and Michael J. Condon with him on the brief), of Gallegos Law Firm, P.C., Santa Fe, New Mexico, for the appellees.

JUDGES: Before BRISCOE, McKAY, and LUCERO, Circuit Judges.

OPINIONBY: BRISCOE

OPINION:
BRISCOE, Circuit Judge.

Plaintiffs are a group of rig welders in the natural gas pipeline construction industry. They filed this action against Flint Engineering & Construction Company for overtime compensation under the Fair Labor Standards Act (FLSA), *29 U.S.C. § 201* et seq. Flint appeals the district court's entry of summary judgment in favor of plaintiffs, contending the court erred in concluding plaintiffs were employees of Flint rather than independent contractors. We exercise jurisdiction under *28 U.S.C. § 1291* and affirm.

I.

Flint is a corporation engaged in the construction, installation, and servicing of oil and gas pipelines and related facilities for the oil and gas industry in the [*2] "Four Corners" region of New Mexico. In particular, Flint is routinely hired as a general contractor by oil and gas companies to build natural gas pipelines and compressor stations which transport natural gas from the wellheads to the owner's main processing plants.

When Flint is the successful bidder on a project (or is otherwise hired to complete a project), it hires a variety of workers, including rig welders, to assist in completion of the project. Rig welders (a/k/a pipe welders) perform skilled welding on pipes, sheet metal, and other portions of gas industry facilities. They are routinely tested and certified by project owners to insure they can perform their jobs. They provide their own welding equipment, which is typically mounted on flat-bed pickup trucks. The equipped trucks are referred to as "welding rigs," and each welding rig costs between $ 35,000 and $ 40,000. Rig welders are also responsible for costs of stocking their welding rigs with supplies, as well as for necessary repairs to the rigs. Rig welders do not bid on jobs and do not have contractor's licenses that would enable them to do so. Flint simply hires rig welders at a set hourly rate to work on particular [*3] projects. Flint does not negotiate the hourly rate, and sometimes pays on a "straight contract" basis at approximately $ 27 to $ 30 per hour, and sometimes on a "split check" basis at a rate of $ 10 per hour for labor and $ 17 per hour for rig rental.

Work on a project is typically conducted six days a week, twelve to fourteen hours per day. Rig welders are






supervised by Flint foremen and are required to arrive, take breaks, and leave at times specified by the foremen. They are not allowed to complete their work when they want and, in most cases, it would be impossible for them to do so because they must coordinate their work with the other crafts and because other equipment and workers are necessary to move pipe for welding. Rig welders are not provided project blueprints. Instead, the foremen map out what pipes they want built and in what order. The foremen do not establish the welding specifications and standards, nor do they tell rig welders how to weld or how long a particular weld should take. Welding specifications and standards are established by the customer (i.e., the project owner) and the quality of welding is overseen by an inspector hired by the customer. Because of [*4] the nature of their work, rig welders (and other pipeline workers) would be unemployed after completion of a project if they did not seek work on new projects. Accordingly, it is common for rig welders to work for several different companies during the course of a year.

Prior to July 1, 1991, Flint considered rig welders as independent contractors and asked each rig welder to sign a document entitled "Agreement With Independent Contractor," which stated:

> It is the intent of the parties involved to establish and maintain an "independent relationship" rather than an employer-employee relationship. All Federal, State and Local laws, regulations, and guidelines should be adhered to accordingly. The Independent Contractor is responsible for maintaining adequate amounts of insurance."

R. I at 49. The agreements did not indicate how long the "independent relationship" was to last, did not refer to specific projects or project specifications, and did not indicate how much the welder was to be paid. Although Flint began characterizing rig welders as employees on and after July 1, 1991, no other substantial changes took place in the way they were hired or treated.

Flint treats [*5] the majority of workers on each project as employees. For example, job foremen are treated and paid as employees, as are laborers, pipefitters, and welders' helpers (all of whom, like rig welders, are hired on a per project basis). Flint treats a few other workers (e.g., insulation workers, electrical workers) on each project as subcontractors or independent contractors. These subcontractors are paid on a lump-sum basis or a unit basis.

Plaintiffs filed this action on February 5, 1993, claiming violations of the FLSA. The parties filed cross-motions for summary judgment, all of which focused on whether plaintiffs were employees of Flint prior to July 1, 1991, for purposes of the FLSA. The district court conducted an evidentiary hearing and, on May 26, 1994, granted summary judgment in favor of plaint[iffs] on the independent contractor/employee issue, concl[ud]ing plaintiffs were employees prior to July 1, 1991. Thereafter, the parties reached a settlement of other issues unrelated to the independent contractor/emplo[yee] issue. On June 3, 1996, the court entered final judgment in favor of plaintiffs on the independent contractor/employee issue, consistent with its May 24, 19[94] order, [*6] and concluded the settlement between [the] parties resolved all remaining issues asserted by plaintiffs against Flint. The court further found that, purs[uant] to Rule 54(b) of the Federal Rules of Civil Proced[ure], there was no just reason for delay of entry of final judgment on the order granting summary judgment in favo[r] of plaintiffs.

II.

The FLSA defines an employee as "any indivi[dual] employed by an employer." *29 U.S.C. § 203*(e)(1)[. In] turn, "employer" is defined as including "any perso[n] acting directly or indirectly in the interest of an employer in relation to an employee." *29 U.S.C. § 20[3(d)].* The FLSA "defines the verb 'employ' expansively [to] mean 'suffer or permit to work.'" *Nationwide Mut. In[s.] Co. v. Darden, 503 U.S. 318, 326, 117 L. Ed. [2d] 581, 112 S. Ct. 1344 (1992)* (quoting *29 U.S.[C. §] 203*(g)). The Supreme Court has emphasized that t[he] "striking breadth" of this latter definition "stretches t[he] meaning of 'employee' to cover some parties who [might] not qualify as such under a strict application of t[radi]tional agency law principles." Id. Thus, in determini[ng] whether an individual is covered by the FLSA, "o[ur in]quiry is not limited by any contractual terminolog[y] or by traditional common law concepts of 'employe[e]' or 'independent contractor.'" *Henderson v. Inter-C[hem] Coal Co., Inc., 41 F.3d 567, 570 (10th Cir. 1994* [(cit]ing *Dole v. Snell, 875 F.2d 802, 804 (10th Cir. 19[89]*). Instead, the economic realities of the relationship go[v]ern, and "the focal point is 'whether the individ[ual is] economically dependent on the business to which h[e ren]ders service . . . or is, as a matter of economic fa[ct,] in business for himself.'" Id. The economic reali[ty test] includes inquiries into whether the alleged employ[er has] the power to hire and fire employees, supervises a[nd] controls employee work schedules or conditions of e[m]ployment, determines the rate and method of pay[ment,] and maintains employment records. *Watson v. Gr[aves], 909 F.2d 1549, 1553 (5th Cir. 1990).*

In applying the economic reality test, courts ge[nerally] look at (1) the degree of control exerted by the alle[ged]

    

employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral [*8] part of the alleged employer's business. *Henderson, 41 F.3d at 570*. In deciding whether an individual is an employee or an independent contractor under the FLSA, a district court acting as the trier of fact must first make findings of historical facts surrounding the individual's work. Second, drawing inferences from the findings of historical facts, the court must make factual findings with respect to the six factors set out above. Finally, employing the findings with respect to the six factors, the court must decide, as a matter of law, whether the individual is an "employee" under the FLSA. *Id. at 571*. None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach. *Id. at 570*

In reviewing the district court's decision on appeal, we review the two types of factual findings (findings of historical fact, and findings with respect to the six factors) for clear error. The ultimate determination of whether an individual is an employee or an independent contractor for purposes of the FLSA is a question of law, which we review de novo. *Id. at 571*.

Control

The district court found Flint's "degree of control over [*9] the rig welders, and the Plaintiffs' lack of independence over setting their work hours, work crews and other details of their welding work, is more consistent with employee rather than independent contractor status." R. I. 272. After carefully reviewing the record on appeal, we conclude this finding is not clearly erroneous.

As in Dole, "the record does not support any inference that these [rig welders] act[] autonomously, or with any degree of independence which would set them apart from what one would consider normal employee status." *875 F.2d at 806*. Instead, Flint's foremen tell the rig welders when to report to work, when to take breaks, on what portion of the project they will be working, and when their workday ends. The record indicates rig welders cannot perform their work on their own schedule; rather, pipeline work has assembly line qualities in that it requires orderly and sequential coordination of various crafts and workers to construct a pipeline. The record further indicates plaintiffs work on only one project at a time and do not offer services to third parties while a project is ongoing. Indeed, the hours plaintiffs are required to work on a project (ten [*10] to fourteen hours a day, six days a week), coupled with driving time between home and often remote work sites each day, make it practically impossible for them to offer services to other employers. In short, very little about plaintiffs' work situation makes it possible to view plaintiffs as persons conducting their own businesses. See *id. at 808*.

Opportunity for profit or loss

In analyzing the second factor, the district court found plaintiffs are paid at a fixed hourly rate, plaintiffs have no opportunity to experience a loss on the job site, plaintiffs' ability to control costs of welding supplies does not necessarily enable them to make a profit, and plaintiffs' ability to maximize their wages by "hustling" new work is not synonymous with making a profit. Based on these findings, the court found "Plaintiffs had no opportunity to experience a profit or loss consistent with the characteristics of being independent businessmen." R. I. at 273. These findings are not clearly erroneous.

If plaintiffs could bid on jobs at a set amount and correspondingly set their own hours or schedule, they would have the opportunity for profit or loss. However, plaintiffs are hired on [*11] a per-hour basis rather than on a flat-rate-per-job basis. There is no incentive for plaintiffs to work faster or more efficiently in order to increase their opportunity for profit. Moreover, there is absolutely no risk of loss on plaintiffs' part. Plaintiffs exercise independent initiative only in locating new work assignments. While working on a particular assignment, there is little or no room for initiative (certainly none related to profit or loss). There is no indication plaintiffs share in the profits (or losses) of Flint's business. See *Dole, 875 F.2d at 809*. "In short, the [rig welders] have no control over the essential determinants of profits in a business, and no direct share in the success of the business." *Id. at 810*.

Investment in business

The district court found plaintiffs have substantial investments in their welding rigs and that twenty-five to fifty percent of their compensation is based on their furnishing rigs. Although the court further found Flint's investment in the overall business far exceeds plaintiffs' investments, it nevertheless found "Plaintiffs' investment in this industry, and their compensation which is based on this investment, [*12] is more consistent with finding the rig welders independent contractors." R. I. at 277.

The investment "which must be considered as a factor is the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Dole, 875 F.2d at 810*. This factor "is inter-





related to the profit and loss consideration." *Lauritzen, 835 F.2d at 1537.* "Courts have generally held that the fact that a worker supplies his or her own tools or equipment does not preclude a finding of employee status." *Dole, 875 F.2d at 810.* In making a finding on this factor, it is appropriate to compare the worker's individual investment to the employer's investment in the overall operation. See id. (comparing defendants' relative investment as cake decorators with employer's overall investment in bakery business); *Lauritzen, 835 F.2d at 1537* (comparing migrant workers' capital investment with employer's overall investment in pickle-farming operation).

The district court is clearly correct in finding plaintiffs' investments in their welding rigs are significant (at least when compared to other workers), and in finding a significant portion of [*13] plaintiffs' pay is based on their furnishing rigs. However, plaintiffs' investments are disproportionately small when compared to Flint's investment in the overall business. Several witnesses testified that Flint routinely had hundreds of thousands of dollars of equipment at each work site. Compared to Flint's investment in the overall business, plaintiffs' investments are not so significant as to indicate they are independent contractors.

Permanency of working relationship

The district court found plaintiffs rarely work for Flint more than two months at any one time, and rarely for more than three months during any twelve-month period. However, the court found plaintiffs remain on the job site until the necessary welding is done. Thus, the court found "Plaintiffs' lack of permanence is due to natural characteristics in the industry, and not the independent choice usually exhibited by one who intentionally chooses to be in business for oneself. Therefore, while rig welders are temporary workers, this finding is of little relevance in determining whether these Plaintiffs are employees or independent contractors." R. I. at 279.

Generally speaking, "'independent contractors' [*14] often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of indefinite duration." *Dole, 875 F.2d at 811.* However, "many seasonal businesses necessarily hire only seasonal employees, [and] that fact alone does not convert seasonal employees into seasonal independent contractors." *Lauritzen, 835 F.2d at 1537.*

We agree with the district court's findings on this factor. Although plaintiffs exhibit characteristics generally typical of independent contractors as regards the short duration of their employment relationships and their frequent relocation to find employment, these characteristics of plaintiffs' employment are clearly due to the intrinsic nature of oil and gas pipeline construction work rather than any choice or decision on the part of plaintiffs. Notably, the record indicates the majority of workers employed by Flint (e.g., pipefitters, laborers, etc.) work on the same basis as plaintiffs and are nevertheless treated as employees. We conclude it is appropriate to characterize plaintiffs' relationship with Flint as "permanent [*15] and exclusive for the duration of" the particular job for which they are hired. *Id. at 1537* (migrant workers' relationship with single farming operation was permanent and exclusive for duration of single harvest season).

Degree of skill required to perform work

The district court found plaintiffs "are highly skilled individuals" and are, in fact, "the most skilled employees on a transmission systems project." R. I. at 280. However, the court further found plaintiffs do not "make any independent judgments on the job site," and thus do not exercise their skills "in any independent manner." Id. The court further found Flint does not attempt to hire the most skilled available rig welders nor does it negotiate pay depending on the level of skill possessed.

> Most independent contractors develop a business relationship with many contractors based on their expertise. If they do superior work they are often sought out in the future. Part of the reason is that the contractor comes to trust their skills and depends upon their judgment in completing their tasks. Here there is no such judgment decisions expected of the rig welders and, consequently, Defendant[] does not discriminate [*16] between rig welders [it] hires. In light of the fact that the Plaintiffs do not exercise any initiative or make any judgment decisions on the job site, the Court finds that Plaintiffs' skills are not indicative of independent contractor status.

Id. at 281-82.

The district court's findings on this factor are not clearly erroneous. Although "the lack of the requirement of specialized skills is indicative of employee status," *Dole, 875 F.2d at 811,* "the use of special skills is not itself indicative of independent contractor status, especially if the workers do not use those skills in an independent way." *Martin v. Selker Bros., Inc., 949 F.2d 1286, 1295 (3d Cir. 1991).* As noted by the district court, plaintiffs are highly skilled but they did not exercise those skills in any independent fashion in their employment with Flint. Although plaintiffs are not told

by Flint how to complete a particular weld, they are told by Flint foremen when and where to weld. Accordingly, the fact that plaintiffs use special skills does not necessarily indicate they are independent contractors.

Integral part of business

After noting this factor focuses on whether workers' [*17] services are a necessary component of the business, the district court found "rig welders are necessary in the construction of all transmission systems projects," and, although "they do not remain on the job site from start to finish, their work is a critical step on every transmission system project." R. I. at 282. These findings are not clearly erroneous. The evidence in the record on appeal clearly indicates rig welders' work is an important, and indeed integral, component of oil and gas pipeline construction work.

Economic dependence of plaintiffs

Our final step is to review the findings on each of the above factors and determine whether plaintiffs, as a matter of economic fact, depend upon Flint's business for the opportunity to render service, or are in business for themselves. *Dole, 875 F.2d at 804; Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d Cir. 1988).* Although Flint urges us to focus on whether plaintiffs rely on Flint for their subsistence, we believe the question is whether plaintiffs are economically dependent upon Flint during the time period they work for Flint, however long or short that period may be. n1 In other words, "the dependence at [*18] issue is dependence on that job for that income to be continued and not necessarily for complete sustenance." *Halferty v. Pulse Drug Co., Inc., 821 F.2d 261, 267 (5th Cir. 1987).*

n1 Flint's suggested focus would lead to outcomes clearly at odds with the FLSA. For example, a low-skilled worker who regularly shifts jobs (e.g., fast food jobs) would never be dependent upon a single employer, or even a single industry, for annual subsistence. The worker would necessarily be classified as an independent contractor for purposes of the FLSA and would not be entitled to overtime pay.

In arguing plaintiffs are independent contractors, Flint relies heavily on *Carrell v. Sunland Const., Inc., 998 F.2d 330, 334 (5th Cir. 1993),* where the court held rig welders working for natural gas pipeline construction companies in Louisiana and other states were independent contractors for purposes of the FLSA. Although

we agree the facts here are strikingly similar to those in Carrell, there are factual differences. For [*19] example, the court in Carrell emphasized the rig welders before it were highly skilled, but made no mention of whether those welders were free to exercise their judgment in completing their work. Here, the district court specifically found that although plaintiffs are highly skilled, they are not free to exercise those skills in any independent manner when they work for Flint. Plaintiffs are specifically told when and where to weld and have no authority to override those decisions. They are told when to report to work, when to take breaks, and when to end their workday.

Aside from differences in historical fact, we also disagree with the finding in Carrell that rig welders have an opportunity to maximize their profits by controlling the costs of their welding supplies and by consistently finding work with other companies. Instead, we agree with the district court that this is not the type of "profit" typically associated with an independent contractor. Generally speaking, an independent contractor has the ability to make a profit or sustain a loss due to the ability to bid on projects at a flat rate and to complete projects as it sees fit. Here, plaintiffs have neither the [*20] ability to bid on projects nor to complete their work in an independent fashion.

Ultimately, we agree with the district court and conclude plaintiffs are employees of Flint, rather than independent contractors, for purposes of the FLSA. In most respects, plaintiffs are no different from any other workers hired by Flint and treated as employees. Plaintiffs are hired to complete a job, are told their working hours, are told their hourly pay rate, and are told on what portion of the project they will be working during a given workday. Although plaintiffs are the most skilled workers on the job site, they are not asked to exercise their discretion in applying their skills; they are told what to do and when to do it. The only substantial difference between plaintiffs and the other workers on the job site is that plaintiffs are required to supply equipment to perform their jobs. This fact alone, however, does not alter the realities of their working situation. Nor does it allow them to make any type of substantial profit above wages they are paid. Ultimately, plaintiffs, like other workers hired by Flint, are dependent upon Flint for the opportunity to render services for however long a [*21] particular project lasts.

IV.

The judgment of the district court is AFFIRMED.





863 F. Supp. 1498 printed in FULL format.

REX BAKER, et al., Plaintiffs, vs. BARNARD CONSTRUCTION CO. INC., et al., Defendants.
CIV. NO. 93-140 JB
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO
863 F. Supp. 1498; 1993 U.S. Dist. LEXIS 20477

September 10, 1993, Decided
September 15, 1993, FILED, ENTERED

CORE TERMS: summary judgment, wage, welding, rig, regular rate, partial, jobsite, welders, rental, genuine, issues of material fact, travel time, wage rate, indispensable, integral, motion to dismiss, cross-motion, Portal Act, rental rate, compensated, compensate, genuine issue of material fact, beyond a reasonable doubt, overtime compensation, equipment rental, lease agreement, matter of law, time spent, artificially, circumvent

COUNSEL: **1 For Plaintiff: J.E. Gallegos and David Sandoval, Santa Fe, NM.

For Defendants: Thomas J. Hynes, Farmington, NM. James L. Brown, Farmington, NM. David Brown, Poole, Kelly & Ramo, Albuquerque, NM. Nicholas Noeding, Hinkle, Cox, Easton Coffield & Hensley, Albuquerque, NM. John Schmidt & Deirdre O. Dexter, Conner & Winters, Tulsa, OK. David C. Davenport, Jr., Rodey, Dickason, Sloan, Akin & Robb, Santa Fe, NM. Gregory K. Hoskin & John T. Howe, Nelson, Hoskin & Farina, Grand Junction, CO. Dan A. McKinnon III, Marron, McKinnon & Ewing, Albuquerque, NM. Victor A. Titus, Titus & Gurley, Farmington, NM. Michael A. Ross, TIC Holdings, Inc., Steamboat Springs, CO.

JUDGES: Juan G. Burciaga, Chief Judge

OPINIONBY: Juan G. Burciaga

OPINION: *1499

ORDER

THIS MATTER is before the Court on Defendant Four-Way Company's March 15, 1993, motion for summary judgment; Defendant Four-Four, Inc.'s March 25, 1993, motion for (partial) summary judgment; Defendant Davy McKee Corporation's March 29, 1993, motion to dismiss; Plaintiffs' April 5, 1993, motion for summary judgment as to Defendant Four-Way Company; Plaintiffs' April 7, 1993, motion for sanctions against Pioneer Contracting Company; Defendant Foutz & Bursum Construction Company's**2 April 15, 1993, motion for summary judgment; Defendant TIC-The Industrial Company's April 15, 1993, motion to dismiss or alternatively, motion for more definitive statement; Plaintiffs' April 26, 1993, motion for summary judgment as to Defendant Four-Four, Inc.; Plaintiffs' May 7, 1993, motion for sanctions against TIC-The Industrial Company; Plaintiffs' May 7, 1993, motion for summary judgment as to Defendant Foutz & Bursum Construction Company; Defendant Four-Four, Inc.'s June 4, 1993, motion to amend its answer; Plaintiffs' June 8, 1993, motion for sanctions against Flint Engineering, Four-Four, Inc., Four-Way Company, Foutz & Bursum Construction Company, Pioneer Contracting, and TIC-The Industrial Company; and, Defendant Mt. West Fabrication Plants & Stations, Inc.'s June 18, 1993, motion for summary judgment. The Court having reviewed the record, the submissions of the parties and having heard the arguments of counsel and being otherwise fully advised in the premises and the Court having made its findings and conclusions in open court;

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED that Defendant Four-Way Company's March 15, 1993, motion for summary judgment, be, and hereby**3 is, denied.

IT IS FURTHER ORDERED that Defendant Davy McKee Corporation's March 29, 1993, motion to dismiss be, and hereby is, denied.

IT IS FURTHER ORDERED that Plaintiffs' April 5, 1993, cross-motion for summary judgment be, and hereby is, denied.

IT IS FURTHER ORDERED that Defendant Foutz & Bursum Construction Company's April 15, 1993, motion for summary judgment be, and hereby is, denied.





IT IS FURTHER ORDERED that Defendant TIC-The Industrial Company's April 15, 1993, motion to dismiss, or alternatively, motion for more definitive statement be, and hereby is, denied.

IT IS FURTHER ORDERED that Plaintiffs' April 26, 1993, cross-motion for summary judgment as to Defendant Four-Four, Inc. be, and hereby is, denied.

IT IS FURTHER ORDERED that Plaintiffs' May 7, 1993, cross-motion for summary judgment as to Defendant Foutz & Bursum *1500 Construction Company, be and hereby is, denied.

IT IS FURTHER ORDERED that Defendant Four-Four, Inc.'s June 4, 1993, motion to amend its answer be, and hereby is, granted.

IT IS FURTHER ORDERED that Plaintiffs' motions for sanctions against Pioneer Contracting Company, TIC-The Industrial Company, Flint Engineering, Four-Four, **4Inc., Four-Way Company, and Foutz & Bursum Contracting Company be, and hereby are, deferred until the motions to compel in this matter, currently before Magistrate Judge McCoy, are decided.

Further, the Court took under advisement Four-Four, Inc.'s motion for (partial) summary judgment as to Plaintiffs Leonard Mahan and Gerald Miller n1; and Defendant Mt. West Fabrication, Plants and Stations, Inc.'s June 18, 1993, motion for summary judgment. The following will constitute the Court's rulings as to those motions.

n1 The Court, at the end of oral argument, granted Defendant's motion for partial summary judgment as to Plaintiffs William Clarence, Gary Coon and Denny Hensley.

Defendant Four-Four, Inc. moved for summary judgment as to Count II (overtime compensation) of Plaintiffs Leonard Mahan, Denny Hensley, Gary Coon, and William Clarence's complaint. In their response brief Plaintiffs stated that they believed that Defendant's motion for partial summary judgment also applied to Plaintiff Gerald Miller, who opted-in**5 to the lawsuit under 29 U.S.C. § 216(b) after Defendant moved for partial summary judgment. In their reply brief, Defendant concurred that its motion for partial summary judgment should also be considered as to Gerald Miller. The Court overlooked this in its rulings in open court and will now grant Defendant's motion for summary judgment as to Gerald Miller but will deny Defendant's motion for partial summary judgment as to Leonard Mahan.

A motion for summary judgment may be granted only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(C); Adickes v. S. H. Kress & Co., 39[illegible] U.S. 144, 157-59, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fac[t] Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 [L.] Ed. 2d 265, 106 S. Ct. 2548 (1986), and as a matter of law, must show entitlement to summary dispositi[on] beyond a reasonable doubt. Norton v. Liddel, 620 F.[2d] 1375, 1381 (10th Cir. 1980); **6Madison v. Deseret Livestock Co., 574 F.2d 1027, 1037 (10th Cir. 1978). The Court must view the record in a light most favora[ble] to the existence of triable issues. Exnicious v. Uni[ted] States, 563 F.2d 418 (10th Cir. 1977).

Plaintiffs' complaint alleges that the wages they [re]ceived from Defendant are not their true regular rate, and therefore, Defendant violated the overtime provision of the Fair Labor Standards Act (FLSA). Plaintiffs [al]lege Defendant accomplished this by overcompensating Plaintiffs for rental of their welding rigs and correspondingly understating their wages as employees. Defend[ant] claims it paid welders, who did not own welding rigs, [the] same wage rate as they paid Plaintiffs. Defendant claims this undisputed fact entitles them to summary judg[ment] under Plaintiffs' regular rate claim.

29 U.S.C. § 207(a) requires employers to compensate employees at one-and-a-half times the regular [rate] for all hours worked over 40 hours in one week. [The] Supreme Court, in interpreting section 7(a), held tha[t] Congress intentionally left undefined the term "reg[ular] rate." Walling v. Helmerich, 323 U.S. 37, 89 L. [Ed.] 29, 65 S. Ct. 11 (1944).**7 Therefore, courts should carefully scrutinize "regular rate" designations to m[a]k[e] sure employees are getting the full excess compensa[tion] called for under the Act. Bay Ridge Operating Co. [v.] Aaron, 334 U.S. 446, 463, 92 L. Ed. 1502, 68 S. C[t.] 1186 (1948). While employers and employees are [free] to establish the regular rate at any point above the [min]imum wage as they see fit, "this freedom of contra[ct] does not include the right to compute the regular ra[te in] a wholly unrealistic and artificial manner...." Walli[ng v.] Youngerman-Reynolds Hardwood Co., 325 U.S. 41[9,] 89 L. Ed. 1705, 65 S. Ct. 1242 (1945).*1501

Plaintiffs Clarence, Coon, Hensley, and apparen[tly] Miller, n2 were all paid $ 10.75 an hour in wage[s]. Plaintiffs did not dispute Defendant's claim that wel

PL-000236

NEXIS the Reed Elsevier plc group
LEXIS·NEXIS A member of the Reed Elsevier plc group
LEXIS A member of the

without welding rigs, were also paid $ 10.75 an hour in wages. Instead Plaintiffs claim they were certified as highly skilled welders. Apparently the inference to be drawn is that the welders hired by Defendant, without welding rigs, were not certified, or highly skilled, welders. However, Plaintiffs put forth**8 no evidence to raise genuine issues of material fact on this point. Therefore, the only evidence before the Court is that Plaintiffs Clarence, Coon, Hensley and Miller were paid the same rate as welders whose wages were not under the "split-check" scheme. The Court finds there are no genuine issues of material fact that Plaintiffs Clarence, Coon, Hensley and Miller's wages of $ 10.75 an hour are anything but the "regular rate" under section 7(a) and, therefore, Defendant's motion for partial summary judgment is granted as to Plaintiffs Clarence, Coon, Hensley and Miller.

n2 Plaintiffs, after conceding the motion for summary judgment should also be directed towards Miller, did not state the wage or rental fee Miller was paid by Defendant. Therefore, Defendant's claim that Plaintiff Miller was paid the same amount in wages as welders without welding rigs, is undisputed.

As to Plaintiff Mahan, the Court finds there are material issues of fact that his $ 8.00 wage was not the "regular rate." Defendant claims Plaintiff**9 Mahan's statement in his affidavit that he was paid only $ 8.00 an hour in wages is unsubstantiated, and does not raise genuine issues of material fact. Defendant claims exhibit 2 to their response brief to Plaintiffs' cross-motion for summary judgment establishes beyond a reasonable doubt that Plaintiff Mahan was paid $ 10.75 an hour in wages as an employee. Without ruling on whether Defendant's wage records would entitle Defendant to summary judgment against Mahan, there is no exhibit 2 before the Court. n3 Therefore, the Court denies Defendant's motion for partial summary judgment as to Plaintiff Leonard Mahan.

n3 Although, since the record in this action is now six volumes thick the Court does not claim it is not in the record, only that it is not attached to Defendant's pleadings as they claim.

Defendant Mt. West moved for summary judgment against Plaintiff Hensley on all three of his claims under the FLSA. In their response brief, Plaintiff conceded that it had no claim for relief under 29 U.S.C. § 254**10 (Portal-to-Portal Act), regarding Plaintiff's claim for compensation for unpaid time spent loading and stocking his welding rig. Therefore, Plaintiff's only remaining claims is that he was not paid for travel time and that he was not paid overtime on the "regular rate."

Defendant claims the contract Plaintiff entered into (Defendant's exhibit B) did not contemplate compensating Plaintiff as an employee for his travel time. Defendant claims the lease agreement requires Plaintiff to have the welding rig at the jobsite each day and Defendant enjoys no benefit if the welding rig leaves the jobsite each day or not. Plaintiff contends his approximately twenty minutes of travel from his residence to Defendant's jobsite each day is an "indispensable and integral" part of the Defendant's activities and, therefore, is compensable under 29 U.S.C. § 254(a)(2). Further, Plaintiff contends it is irrelevant that the Defendant may have contracted with Plaintiff, under the lease agreement, to have the welding rig at the job site each day since an employee cannot waive his rights under the FLSA.

The Portal-to-Portal Act excludes compensation for time spent "traveling **11to and from the actual place of performance of the principal activity...." 29 U.S.C. § 254(a)(1). The Tenth Circuit has held that the Portal-to-Portal Act does not exclude compensation for travel time which is "integral and indispensable" to the employers principal activities. D.A. & S. Oil Well Servicing v. Mitchell, 262 F.2d 552 (10th Cir. 1958). However, an employer is permitted to separate excess payments for equipment rental from an employee's regular wage rate. See 29 U.S.C. § 207(e)(2); 29 C.F.R. § 778.224(b)(1)(1992).

In its motion for summary judgment, Defendant is not questioning Plaintiff's claim that the welding rig is "integral and indispensable" *1502 to Defendant's principal activities. See Crenshaw v. Quarles Drilling, 798 F.2d 1345 (10th Cir. 1986); D. A. & S, 262 F.2d at 552. Defendant is only claiming that they have already compensated Plaintiff for making the welding rig available at the jobsite under the rental portion of Plaintiff's wages. Therefore, the issue of whether the travel time is "integral **12 and indispensable" is irrelevant if Plaintiff has already been compensated and this compensation scheme does not violate the FLSA.

Under 29 C.F.R. § 778.224(b)(1)(1992) an employer is not in violation of the FLSA by allocating an employees wages into a wage and an equipment rental rate. The issue presently before the Court is whether an employer

may require, as rental, the transportation of the equipment to the employer's place of business under section 778:224(b)(1). If an employer could allocate too many services as rental payments, an employer could circumvent the FLSA. However, if an employer could not allocate any services under the rental portion of an employer-employee contract, then it would follow that employees should be compensated for services such as mechanical and other maintenance of their equipment. The Court refuses to read 29 C.F.R. § 778.224(b)(1)(1992) so narrowly. The Court holds that an employer does not violate the FLSA by contracting to compensate an employee for the use of his equipment, and the services required to have the equipment functioning at the jobsite, as a rental fee rather than as employee wages. Therefore, the issue remaining under Count I of Plaintiff's**13 complaint is whether there are genuine issues of material fact that the parties did not intend to compensate the transporting of the welding rig to the jobsite in the rental portion of Plaintiff's wages.

Plaintiff has not disputed Defendant's claim that the contract, exhibit B, required Plaintiff to have the welding rig at the jobsite each day. Plaintiff claims he does not remember entering into the exhibit B agreement. However, he does not dispute that the signature on exhibit B is in fact his. He has also failed to dispute Defendant's claim that the contract, as understood between the parties, excluded pay for travel time as an employee. n4 Therefore, the Court grants Defendant's motion as to Count I of Plaintiff's complaint.

n4 The contract states "for every day on which this employee works five (5) clock hours or more and works seventy-five or more miles from his city of residence, he will receive subsistence pay of $ ."

In the blank a zero has been entered and underneath the zero the words "no sub" appear.

**14

As to Count II (regular rate claim), the Court finds there are material issues of fact whether the wage rate of $ 8.00 an hour is the "regular rate." Defendant contends this Court has no subject-matter jurisdiction to disregard the intentions of the contracting parties. The Court disagrees. Since part of the intent of the FLSA is to increase employment for the public at large, the Supreme Court has held that employees may not contract away their rights under the FLSA. Aaron, 334 U.S. at 46 (quoting Youngerman-Reynolds, 325 U.S. at 424-25). Plaintiff contends that a fair rental rate for his welding rig is $ 7.00 an hour. He argues the Defendant artificially allocated $ 22.00 an hour as rental for his welding rig in an attempt to circumvent the Act's requirement to pay overtime compensation on the regular rate. While the Court has no evidence before it on what the fair rental value of Plaintiff's welding rig is, there are genuine issues of material fact Defendant artificially set Plaintiff's wages at $ 8.00 an hour. Defendant paid more than double the rental rate**15 paid by Defendant Four-Four, Inc., and fifty percent more than the rental rate paid by Defendant Foutz & Bursum Construction Company. While there may be reasons for this discrepancy, the Court finds this alone raises genuine issues of material fact that the $ 8.00 wage rate was artificial and, therefore, not the regular rate. Therefore, the Court denies Defendant's motion for summary judgment under Count II of Plaintiff's complaint.

Wherefore, *1503

IT IS FURTHER ORDERED that Defendant Four-Four, Inc.'s motion for partial summary judgment be, and hereby is, granted as to Plaintiffs William Clarence, Gary Coon, Denny Hensley, and Gerald Miller.

IT IS FURTHER ORDERED that Defendant Four-Four, Inc.'s motion for partial summary judgment as to Plaintiff Leonard Mahan be, and hereby is, denied.

IT IS FURTHER ORDERED that Defendant Mt West Fabrication, Plants & Stations, Inc.'s motion for summary judgment, as to Count I of Plaintiff's complaint, be and hereby is, granted.

IT IS FURTHER ORDERED that Defendant West Fabrication, Plants & Stations, Inc.'s motion summary judgment, as to Count II of Plaintiff's complaint, be and hereby is denied.

Dated this 10th day of September, **16 1993.

Juan G. Burciaga

Chief Judge

     

Page 2

Copyright 2001 SHEPARD'S - 10 Citing references

Baker v. Barnard Constr. Co., 863 F. Supp. 1498, 1993 U.S. Dist. LEXIS 20477 (D.N.M. 1993)

SHEPARD'S(R) Signal: Caution: Possible negative treatment
Restrictions: *Unrestricted*
FOCUS Terms: *None*
Print Format: *FULL*

PRIOR HISTORY (0 citing cases)

*Citation you entered*
*Baker v. Barnard Constr. Co., 863 F. Supp. 1498, 1993 U.S. Dist. LEXIS 20477 (D.N.M. 1993)*

SUBSEQUENT APPELLATE HISTORY (5 citing cases)

**Summary judgment granted by, Summary judgment denied by**
*Baker v. Barnard Constr. Co.*, 860 F. Supp. 766, 129 Lab. Cas. (CCH) P33178, 2 Wage & Hour Cas. 2d (BNA) 354 (D.N.M. 1994)

**Motion granted by, Motion denied by**
*Baker v. Barnard Constr. Co.*, 860 F. Supp. 779, 1994 U.S. Dist. LEXIS 17144, 2 Wage & Hour Cas. 2d (BNA) 364 (D.N.M. 1994)

**Opinions combined at**
*Baker v. Barnard Constr. Co.*, 860 F. Supp. 766, 1994 U.S. Dist. LEXIS 9535, 129 Lab. Cas. (CCH) P33178, 2 Wage & Hour Cas. 2d (BNA) 354 (D.N.M. 1994)

**Affirmed by**
*Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1998 U.S. App. LEXIS 3904, 1998 Colo. J. C.A.R. 1353, 135 Lab. Cas. (CCH) P33670, 4 Wage & Hour Cas. 2d (BNA) 673 (10th Cir. N.M. 1998)

**Remanded by**
*Baker v. Barnard Constr. Co.*, 146 F.3d 1214, 1998 U.S. App. LEXIS 12990, 1998 Colo. J. C.A.R. 3418, 135 Lab. Cas. (CCH) P33689, 4 Wage & Hour Cas. 2d (BNA) 1249 (10th Cir. N.M. 1998)

CITING DECISIONS (4 citing decisions)

6TH CIRCUIT - U.S. DISTRICT COURTS

**Distinguished by**
*Schneider v. City of Springfield*, 2000 U.S. Dist. LEXIS 6217, 140 Lab. Cas. (CCH) P34064 (S.D. Ohio Mar. 30, 2000)
**Distinguished by**
2000 U.S. Dist. LEXIS 6217
140 Lab. Cas. (CCH) P34064

7TH CIRCUIT - U.S. DISTRICT COURTS

**Cited by**
*Herman v. Anderson Floor Co.*, 11 F. Supp. 2d 1038, 1998 U.S. Dist. LEXIS 9990, 136 Lab. Cas. (CCH) P33751 (E.D. Wis. 1998)
**Cited by**
11 F. Supp. 2d 1038 p.1042

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NEXIS
A member of the Reed Elsevier plc group

PL-000239
A member of the Reed Elsevier plc group

8TH CIRCUIT - U.S. DISTRICT COURTS

**Cited by**
*Theisen v. City of Maple Grove*, 41 F. Supp. 2d 932, 1999 U.S. Dist. LEXIS 415, 137 Lab. Cas. (CCH) P33814 (D. Minn. 1999)
**Cited by**
41 F. Supp. 2d 932 p.936

10TH CIRCUIT - COURT OF APPEALS

**Cited by**
*Baker v. Barnard Constr. Co.*, 146 F.3d 1214, 1998 U.S. App. LEXIS 12990, 1998 Colo. J. C.A.R. 3418, 135 Lab. Cas. (CCH) P33689, 4 Wage & Hour Cas. 2d (BNA) 1249 (10th Cir. N.M. 1998)

ANNOTATED STATUTES (1 Citing Statute)

29 USCS £ 207







PL-000241

23 F.3d 110 printed in FULL format.

Robert B. REICH, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee, v. BAY, INC., BBI, Inc., a Corporation; and Allen Berry, Defendants-Appellants.
No. 93-7505.
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT
23 F.3d 110; 1994 U.S. App. LEXIS 14934; 128 Lab. Cas. (CCH) P33,104; 2 Wage & Hour Cas. 2d (BNA) 136
June 17, 1994, Decided

PRIOR HISTORY: **1 Appeal from the United States District Court for the Southern District of Texas. D.C. DOCKET NUMBER CA C90-0331. JUDGE Melinda Harmon

DISPOSITION: AFFIRMED.

CORE TERMS: rig, welder, overtime, wage, secretary, unified, truck, rental, overtime compensation, business purpose, entity, time-and-a-half, vice-president, willful, payroll, hourly, offset, rental fee, correctly, driver, assistant secretary, pay period, record-keeping, circumvented, advertising, bookkeeping, single-hand, recruitment, violating, statute of limitations

COUNSEL: For Defendants-Appellants: FULBRIGHT & JAWORSKI, Neil Martin, Houston, TX. out see 10/12/93. Neil Martin, GARDERE & WYNNE, Houston, TX.

For Plaintiff-Appellee: Anthony Parham, Office of the Solicitor, USDOL, Dallas, TX. Paula Wright Coleman, Cnsel., William J. Stone, U.S. Dept. of Labor, Washington, D.C.

JUDGES: Before WOOD, * SMITH, and DUHE, Circuit Judges.

* Circuit Judge of the Seventh Circuit, sitting by designation.

OPINIONBY: HARLINGTON WOOD

OPINION: *112 HARLINGTON WOOD, Jr., Circuit Judge.

This appeal arises from proceedings the Secretary of Labor (the Secretary) instigated against Bay, Inc. (Bay), BBI, Inc. (BBI), and BBI president Allen Berry for violations of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. (FLSA). Bay is a general contractor that provides construction management, materials, equipment, and other services to refineries. BBI, now defunct, was a subcontractor that provided labor and labor supervision to Bay and other companies. From February 2, 1988 until December 31, 1990, Bay obtained labor through BBI in order to minimize worker's compensation and insurance expenses.

BBI provided two different types of employees to Bay, rig welders and single-hand welders. Rig welders owned their own welding rigs and rented them to Bay for a separately negotiated fee. Single-hand welders, rather than owning their own welding rigs, would utilize equipment owned by Bay. BBI**2 paid both classifications of welders predetermined hourly rates for straight-time and overtime. In addition to the hourly wage payments BBI paid to rig welders, Bay negotiated equipment rental rates with the rig welders. Thus, in each pay period each rig welder received two checks, one from Bay for rig rental and one from BBI for earned wages.

The rate structure for rig welders changed significantly for overtime hours. Although BBI paid rig welders time-and-a-half for time worked exceeding forty hours, Bay correspondingly reduced the rental rate for rigs used more than forty hours a week to offset roughly the increased hourly wage rate. Because the reduction in rental fees offset overtime wage increases, rig welders effectively received little overtime compensation, although in name BBI was paying them the required time-and-a-half.

The Secretary charged Bay and BBI with violating the FLSA, contending that their pay structure intentionally circumvented FLSA overtime provisions. Bay and BBI argue that their practice of discounting rig rental rates simply was the result of economic considerations, and that wages and rental fees are two distinct and independent transactions. Bay and BBI**3 also contend that they are not sufficiently interrelated to justify examining in conjunction Bay's rig rental rates and BBI's hourly wage rates.

Regarding the interrelatedness of Bay and BBI, the two companies share the same principal office and place of business, a building wholly owned by Berry Contracting, Inc. n1 The building is identified only by the sign *113 "Berry." One person was responsible for maintaining the business records of both Bay and BBI,

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NEXIS
A member of the Reed Elsevier plc group

PL-000242

and did so in the same location of the Berry building. BBI paid an administration fee for payroll and accounts receivable to Bay.

n1 Although BBI's offices were recorded as the home of Kenneth Berry, Allen Berry, the president, worked out the fourth floor of the Berry building.

In addition, members of the Berry family owned and controlled both companies. n2 The officers of Bay include: Ken Luhan, President; K.L. Berry, Vice-President and Assistant Secretary; D.W. Berry, M.G. Berry, Robert M. Davis, Howard Kovar, James G. Gilbert, and Don Spangler, Vice Presidents; and**4 Charlene Washburn, Secretary-Treasurer. Bay directors include M.L. Berry, Laura Berry, and K.L. Berry. Marvin and Laura Berry own all shares of Lone Star Equipment, Inc. (Lone Star), which owns Berry Contracting, Inc., which in turn owns Bay.

n2 Marvin L. and Laura Berry are the parents of Kenneth, Allen, Dennis, and Marvin G. Berry.

BBI also was owned by the Berry family. From December 1987 to November 1988, brothers Kenneth, David, and Martin Berry owned BBI. Kenneth was president, and David and Allen were vice-presidents, and Marvin was a vice-president, assistant secretary, and treasurer. From November 1988 until the demise of BBI in December 1990, another Berry brother, Allen, wholly owned BBI. Allen served as president, and his wife Cathy became secretary and treasurer. Kenneth, David, Marvin, and Allen served as directors of BBI throughout its existence.

The following "Memorandum of Understanding" also illustrates how Bay and BBI were interrelated:

MEMORANDUM OF UNDERSTANDING

Pertaining to Pay Rate for

Rig**5 Welders and their Rigs

I ... understand and agree that while employed as a Rig Welder (WR) by Bay, Inc./BBI, Inc. that my pay will be calculated as follows:

FIRST 40 HOURS (each pay period) for welder at $ 10.50 per hour; first 49 hours for Rig (Equipment) at $ 12.00 per hour for a total of $ 22.50 per hour.

HOURS OVER 40 (Overtime) (each pay period) for welder at $ 15.75 per hour; hours over 40 for Rig (Equipment) at $ 7.00 per hour for a total of $ 22.75 per hour.

Other BBI employment forms contained the name of a Bay supervisor or the name or initials of Bay's personnel manager, Jim Hedges. These forms contained wage information, lease rate information for the rig welders' rigs; and federal withholding information. Bay used these forms to calculate the proper wage information and rental amount due to rig welders. Although rig welders received wage checks from BBI, Bay was responsible for calculating the wages pursuant to a payroll servicing agreement with BBI. Bay also performed the following other functions for BBI: (1) paid for and ran advertisements; (2) helped interview prospective employees; (3) supervised BBI employees in some instances, **6 and had the authority to fire; (4) scheduled, assigned, and reviewed the work of BBI's welder employees; and (5) performed random drug testing of BBI employees.

Although BBI had one other client, BBI went out of business in December, 1990, when Bay stopped using BBI employees. Bay accounted for at least 907 of BBI's business. From January 1, 1991 to December 31, 1991, Bay used the services of Professional Constructors, Inc. (PCI) to obtain labor, and after January 1, 1992, ceased the practice of "subcontracting" an intermediate company to obtain labor.

On December 24, 1990, the Secretary filed this action against Bay, BBI, and Allen Berry, the president of BBI, seeking injunctive relief under FLSA Sections 7 and 15(a)(2). The Secretary seeks to enjoin defendants from willfully violating the overtime and record-keeping provisions of the FLSA and "to restrain the defendants from withholding the back wages determined to be due their employees for defendants' willful violations of the Act, an injunction to prohibit future violations of the Act's overtime and record-keeping provisions, and prejudgment interest."

Both parties moved for summary judgment. The district court denied the defendants' **7 motion, but granted the Secretary's motion. The court entered judgment for the *114 Secretary in the amount of $ 152,186.93 plus prejudgment interest, and enjoined defendants from future violations of the overtime and record-keeping provisions of the FLSA. The defendant

NEXIS LEXIS·NEXIS A member of the Reed Elsevier plc group

    

filed a timely appeal from the district court judgment.

ANALYSIS

A. Single Enterprise

At the outset, we must determine whether Bay and BBI were a single enterprise for the purposes of 29 U.S.C. § 203(r). Whether Bay and BBI were a single enterprise is a question of law, which we review de novo. Donovan v. Weber, 723 F.2d 1388, 1391-92 (8th Cir.1984); Dunlop v. Ashy, 555 F.2d 1228, 1229 (5th Cir.1977). To establish that two entities functioned as a single enterprise, the Secretary must demonstrate that the entities: (1) engaged in related activities; (2) were a unified operation or under common control; and (3) shared a common business purpose. 29 U.S.C. § 203(r); Ashy, 555 F.2d at 1229. In addressing each of these elements, we must construe liberally the **8 FLSA while applying it "with reason and in a common sense fashion." Ashy, 555 F.2d at 1234.

1. Related Activities

Because the FLSA does not define the term "related activities," the district court relied on 29 C.F.R. § 779.206, citing S.Rep. No. 145, 87th Cong., 1st Sess. at 41, for a definition. That section of the Code of Federal Regulations indicates that

activities will be regarded as 'related' when they are the same or similar or when they are auxiliary or service activities such as warehousing, bookkeeping, purchasing, advertising, including, generally, all activities which are necessary to the operation and maintenance of the particular business.... The Senate Report on the 1966 amendments makes it plain that related, even if somewhat different, business activities can frequently be part of the same enterprise, and that activities having a reasonable connection with the major purpose of an enterprise would be considered related.

Id.

Under this definition the district court properly concluded that Bay and BBI engaged in related activities. The two companies shared office space under one name, "Berry," the family name of the owners**9 of both companies. Bay and BBI also shared several officers and directors. Bay provided BBI with bookkeeping, payroll, recruitment, and advertising services. Both companies kept business records in the same area, and the same individual controlled the records of both companies.

Although Bay is in the business of leasing equipment and BBI was in the business of providing labor, two different purposes, the two entities operations were inextricably linked. Supplying Bay with labor constituted 907 of BBI's business, Bay received the majority of its blue collar labor from BBI, and BBI closed its shop when Bay ceased utilizing its services. The examples discussed in Code of Federal Regulations support this conclusion. See 29 C.F.R. § 779.306; see also Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, 1366-67 (5th Cir.1973) (discussing the meaning of "related" and "auxiliary and service activities"). Bay and BBI had extensive related activities for the purposes of Section 203(r).

2. Unified Operation or Common Control

Section 203(r) also requires proof of either common control or unified operation of the companies. 29 U.S.C. § 203**10 (r); Dunlop v. Lourub Pharmacy, Inc., 525 F.2d 235, 236 (6th Cir.1975). The Code of Federal Regulations provides guidance as to what constitutes "common control":

The word "control" may be defined as the act of fact of controlling; power or authority to control; directing or restraining domination. "Control" thus includes the power or authority to control.... It includes the power to direct, restrict, regulate, govern, or administer the performance of the activities. "Common" control includes the sharing of control and it is not limited to sole control or complete control by one *115 person or corporation. "Common" control therefore exists where the performance of the described activities are controlled by one person or by a number of persons, corporations, or other organizational units acting together.

29 C.F.R. § 779.221.

The similarities between those in control of Bay and BBI were extensive:

Berry Family Member Bay Positions BBI Positions

---

Kenneth Vice-President, Assistant Secretary, and Director Director

Dennis Vice President Director

Marvin G. Vice President**11 Director

Marvin L. Director & Owner

Laura Director & Owner

Allen Sole Owner

11/88-12/90;

Director

The only individuals unrelated to the Berry family who held management positions in BBI were Howard Kovar, James G. Gilbert, Jr. and Donald Spangler, vice-presidents; and Charlene Washburn, Secretary-Treasurer.

In determining whether Bay and BBI had common control, "the determinative question is whether a common entity has the power to control the related business operations." Donovan v. Easton Land & Development, Inc., 723 F.2d 1549, 1552-53 (11th Cir.1984), citing Shultz v. Mack Farland & Sons Roofing Co., 413 F.2d 1296, 1301 (5th Cir.1969). At the time Bay and BBI entered into the labor arrangement at issue, three of the Berry brothers held positions of control in both companies, and members of the Berry family owned both companies. These facts support the conclusion that Bay and BBI were under common control. See Mack Farland, 413 F.2d at 1301 ("Common control may exist ... despite the separate management of the individual establishments.").

Bay and BBI also had a unified operation. **12 The Code of Federal Regulations also informs on the definition of a unified operation:

> Whether there is unified operation of related activities will thus be of concern primarily in those cases where the related activities are separately owned or controlled but where, through arrangement, agreement or otherwise, they are so performed as to constitute a unified business system organized for a common business purpose.

29 C.F.R. § 779.220 (1993). Bay performed many different functions for BBI, including advertising for recruitment, payroll, and bookkeeping. As the district court explained, Bay and BBI

> were mutually parasitic. Both Bay and BBI received benefits because of their unification. Bay saved money by having BBI administer the worker's compensation, insurance and unemployment coverage. BBI benefitted from its relationship with Bay through reduced administrative costs, increased rent, and combined recruitment costs.

These facts suggest that BBI and Bay were engaged in a unified business operation. See Easton Land, 723 F.2d at 1552.

3. Common Business Purpose

Having established that Bay and BBI were engaged in related activities and **13had unified operation or common control, it becomes manifest that Bay and BBI also shared a common business purpose. A common business purpose exists if "the separate corporations engaged in complementary businesses, *116 and were to a significant degree operationally interdependent." Donovan v. Janitorial Services, Inc., 672 F.2d 528, 530 (5th Cir.1982). See also Donovan v. Grim Hotel Co., 747 F.2d 966, 971 (5th Cir.1984); Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, 1367 (5th Cir.1973). As previously explained, Bay and BBI complemented and depended on each other; Bay filled its labor needs with BBI employees, and constituted over 907 of BBI's business. Bay and BBI do not raise any arguments that challenge this conclusion. Because all three elements of an enterprise are satisfied, the district court correctly held that Bay and BBI were a single enterprise for the purposes of the FLSA from February 2, 1988 to December 31, 1990.

B. Violation of the FLSA

Whether the compensation method used by Bay and BBI violated the FLSA is the central issue presented by this appeal. The defendants **14 rely on Durkin v. Santiam Lumber Co., 115 F. Supp. 548 (D.Or.1953), as persuasive authority that their compensation method was permissible. In Santiam Lumber, truck drivers who owned their own truck received two payments: their salary and a rental payment for use of their truck. Id. at 549. When the drivers were required to work overtime, their rental payment decreased and their wage rate increased. Id. The district court held that an owner-operator can occupy a dual role, as "both an entrepreneur owning capital equipment and a laborer operating such equipment." Id. at 550. The court reached that conclusion because the non-labor costs of operating log-hauling trucks decreased as use increased. Id. n3

n3 Although we have not conducted an in-depth study of the log-hauling industry, we wonder whether the district court in Santiam Lumber took into account the depreciation surely associated with

   

increased truck usage in reaching its cost determination.

**15

The district court in this case, however, found that Santiam Lumber was wrongly decided. The district court reasoned that Santiam Lumber treated the employees as independent contractors, which they were not. Instead, the district court relied on Donovan v. Global Divers & Contractors, Inc., 25 Wage & Hour Cas. (BNA) 605, 93 Lab. Cas. (CCH) P34,168, 1982 WL 2162 (W.D.La.1982), and Goldberg v. Maine Asphalt Road Corp., 206 F. Supp. 913 (D.Me.1962).

In Global Divers, the employer paid its employees an hourly rate plus overtime compensation, and a gear rental fee. 1982 WL 2162, at * 1. After the employee worked a specific number of hours, in most cases the daily rental fee was reduced by the amount of overtime compensation paid to the employee on that day. Id. The court held that this practice violated the FLSA, explaining that the FLSA was intended to reduce the burden of working lengthy hours and to put financial pressure on employers to spread employment, and that Global Divers' compensation scheme circumvented these goals. Id. at * 3. See also Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 42, 65 S. Ct. 11, 14, 89 L. Ed. 29 (1944). **16

Similarly, in Maine Asphalt the employer hired employees who owned their own trucks. 206 F. Supp. at 913. The employer paid each driver their wages and a truck rental fee. Id. When the employee worked overtime their wage was increased by 507 and the truck rental was reduced by an equal amount. Id. The court held that this practice violated the FLSA, noting the absence of an independent economic or other reason for the offsetting rates of compensation. Id. at 915-16.

The defendants attempt to distinguish Global Divers and Maine Asphalt by pointing out that in those cases, employees were required as a condition of employment to furnish their own equipment, whereas they were not at Bay and BBI. This argument is without merit for two reasons. First, nothing in the Maine Asphalt opinion reveals that employees were required to furnish their own equipment--the defendant's claimed distinction therefore does not exist. Second, giving employees the option of either renting their equipment out at reduced rates after 40 hours or not renting it out at all is a false choice. Bay and BBI could no more do that under **17 the FLSA than give their single-hand welders (those without rigs) the choice *117 of either forgoing additional overtime compensation or finding a different employer.

The reasoning of Global Divers and Maine Asphalt fits well in this case. As Global Divers and Maine Asphalt noted, one of the primary purposes of the FLSA is to financially pressure employers to spread employment. Permitting negligible net pay increases for overtime hours worked, as occurred with Bay and BBI, would eviscerate the incentive provided by the FLSA to use more workers for forty hours rather than fewer workers for longer hours. Although the defendants argue that the number of rig hours (the hours that the rig is utilized in any given week) did not necessarily correspond with the man hours (amount of time that the rig welders actually work) for each employee, a review of the record suggests that on the whole the number of man hours and rig hours largely offset, in effect avoiding the overtime provisions of the FLSA. The net effect was to provide less than time-and-a-half compensation to Bay and BBI employees, violating the FLSA.

The defendants also argue that their method of computing wages was not **18a scheme to circumvent the FLSA, but rather was necessary to compete in the marketplace. That argument is fallacious, however, for all employers competing in the marketplace must comply with the overtime provisions of the FLSA. The defendants have provided no credible economic or other explanation of why the reduction in rental rates largely offsets the overtime pay increases mandated by the FLSA. The district court therefore correctly concluded that the compensation method of Bay and BBI impermissibly circumvented the FLSA.

C. Wilfulness

As a final issue, the defendants argue that their violations of the FLSA were not willful, and therefore were subject to a two-year, rather than three-year, statute of limitations. See 29 U.S.C. § 255(a). The proper test for determining whether a party acted willfully is contained in McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 1681, 100 L. Ed. 2d 115 (1988). n4 In Richland Shoe, the Court held that violations under the FLSA are willful if the employer "knew or showed reckless disregard for the matter of whether its conduct**19 was prohibited by the statute." Id.

n4 The district court incorrectly applied a slightly different test. To find willfulness "entails a determination of whether "there is substantial evidence in the record to support a finding that the employer knew or

  

suspected that his actions might violate the FLSA." Donovan v. Sabine Irrigation, 695 F.2d 190, 196 (5th Cir.1983). The court in Sabine Irrigation cited Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139, 1142 (5th Cir.1971), cert. denied, 409 U.S. 948, 93 S. Ct. 292, 34 L. Ed. 2d 219 (1972), as the source for the test on willfulness. Jiffy June, however, was criticized and rejected by the Richland Shoe Court because it "virtually obliterates any distinction between willful and nonwillful violations." Richland Shoe, 486 U.S. at 132-34, 108 S. Ct. at 1681-82.

The conduct of Bay**20 and BBI falls within the Richland Shoe definition of wilful. Bobby Scott, the District Director for the local Wage and Hour office, contacted Don Spangler, one of the defendants' representatives, and informed him that the overtime payment practices of Bay and BBI violated the FLSA. Continuing the payment practices without further investigation into the alleged violation could constitute "reckless disregard" of the FLSA. Bay and BBI had sufficient time after hearing from Mr. Scott to investigate their payment practices and correct the problem. The fact that Bay continued a substantially similar arrangement with PCI after BBI became defunct bolsters this conclusion. The district court correctly decided to apply the three-year statute of limitations.

The district court order granting summary judgment in favor of the plaintiff, enjoining the defendants from paying less than time-and-a-half overtime compensation, and awarding their employees $ 152,186.93 in withheld overtime compensation is AFFIRMED.





Copyright 2001 SHEPARD'S - 8 Citing references

Reich v. Bay, Inc., 23 F.3d 110, 1994 U.S. App. LEXIS 14934, 128 Lab. Cas. (CCH) P33104, 2 Wage & Hour Cas. 2d (BNA) 136 (5th Cir. Tex. 1994)

**SHEPARD'S(R) Signal: Citation Information Available**
Restrictions: *Unrestricted*
FOCUS Terms: *None*
Print Format: *FULL*

**PRIOR HISTORY** (0 citing cases)

*Citation you entered*
*Reich v. Bay, Inc., 23 F.3d 110, 1994 U.S. App. LEXIS 14934, 128 Lab. Cas. (CCH) P33104, 2 Wage & Hour Cas. 2d (BNA) 136 (5th Cir. Tex. 1994)*

**CITING DECISIONS** (3 citing decisions)

**5TH CIRCUIT - U.S. DISTRICT COURTS**

**Cited by**
*Friou v. L.E. Coppersmith Inc.*, 1998 U.S. Dist. LEXIS 15062, 4 Wage & Hour Cas. 2d (BNA) 1422 (S.D. Tex. July 24, 1998)
  **Cited by**
  1998 U.S. Dist. LEXIS 15062
  4 Wage & Hour Cas. 2d (BNA) 1422 p.1427

**9TH CIRCUIT - COURT OF APPEALS**

**Cited by**
*Reich v. Japan Enters. Corp.*, 1996 U.S. App. LEXIS 17677 (9th Cir. July 10, 1996)

**FEDERAL CLAIMS COURT**

**Cited by**
*Hickman v. United States*, 43 Fed. Cl. 424, 1999 U.S. Claims LEXIS 68 (1999)
  **Cited by**
  43 Fed. Cl. 424 p.444

**ANNOTATED STATUTES (2 Citing Statutes)**

29 USCS £ 203

29 USCS £ 216

**LAW REVIEWS AND PERIODICALS (3 Citing References)**

**Cited by**
*NOTE: REYNOLDS V. INTERNATIONAL AMATEUR ATHLETIC FEDERATION: THE NEED FOR AN INDEPENDENT TRIBUNAL IN INTERNATIONAL ATHLETIC DISPUTES*, 10 Conn. J. Int'l L. 653 (1995)

**Cited by**
*NOTES AND COMMENTS:Downloading a Defendant: Is Categorizing InternetContacts a Departure from the Minimum Contacts Test?*, 4 Roger Williams U. L. Rev. 293 (1998)

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NEXIS
A member of the Reed Elsevier plc group

PL-000248

Page 3
SHEPARD'S - 23 F.3d 110 - 8 Citing references

**Cited by**
*SURVEY: LABOR AND EMPLOYMENT LAW*, 27 Tex. Tech L. Rev. 881 (1996)

PL-000249

NEXIS
he Reed Elsevier plc group

LEXIS·NEXIS
A member of the Reed Elsevier plc group

LEXIS·NEX
A member of the Reed Elsevier







PL-000250

**Factors to be considered in determining what portion of amounts paid for the use of a truck and the services of a driver is allocable to wages; S.S.T. 104 superseded.**

26 CFR 31.3121(a)–1: Wages. Rev. Rul. 68–624[1]
(Also Sections 3306, 3401; 31.3306(b)–1, 31.3401(a)–1.)

The purpose of this Revenue Ruling is to update and restate, under the current statute and regulations, the position set forth in S.S.T. 104, C.B. 1937–1, 481.

The question presented is what percentage of the total amount paid by a Missouri corporation for the use of a truck and the services of a driver is allocable as wages of the driver for purposes of the Federal Insurance Contributions Act, the Federal Unemployment Tax Act, and the Collection of Income Tax at Source on Wages (chapters 21, 23, and 24, respectively, subtitle C, Internal Revenue Code of 1954).

The corporation hires a truck and driver to haul stone from its quarry to its river loading dock, at a fixed amount per load. In similar cases the Division of Workmen's Compensation (formerly the Missouri Workmen's Compensation Commission) has agreed that one-third of the amount paid to such an employee should be considered as wages and two-thirds as payment for the use of the truck. The corporation asks whether it will be permitted to report on the same basis, for Federal employment tax purposes, wages paid under the contract of employment with the employee.

With certain exceptions not material here, sections 3121(a) and 3306(b) of the Code define the term "wages" as all remuneration for employment. Section 3401(a) of the Code relating to the withholding of income tax contains a similar definition of "wages."

The allocation of the amount paid to an individual where the payment is in consideration of both personal services and the use of equipment must be governed by the facts in each case. If the contract of employment does not specify a reasonable division of the total amount paid between wages and equipment, a proper allocation may be arrived at by reference to the prevailing wage scale in a particular locality for similar services in operating the same class of equipment or the fair rental value of similar equipment.

If the allocation adopted by the Division of Workmen's Compensation is determined by reference to the factors stated above, it may be accepted for purposes of the Federal Insurance Contributions Act, the Federal Unemployment Tax Act, and the Collection of Income Tax at Source on Wages.

S.S.T. 104 is superseded, since the position set forth therein is restated under current law in this Revenue Ruling.

---

26 CFR 31.3121(a)–1: Wages.

Treatment of the rental value of a shoeshine stand. See Rev. Rul. 68–517, page 454.

[1] Prepared pursuant to Rev. Proc. 67–6, C.B. 1967–1, 576.

PL-000251

10TH ARTICLE of Level 1 printed in FULL format.

Slip Opinion

THIS DOCUMENT IS NOT TO BE RELIED UPON OR OTHERWISE CITED AS PRECEDENT

TEXT REDACTED

TEXT REDACTED

REFERENCE: CC:TL-N-TEXT REDACTED, DOM:FS:IT&A:TEXT REDACTED

TEXT:
date: TEXT REDACTED

   to: District Counsel, TEXT REDACTED CC:TEXT REDACTED

   from: Assistant Chief Counsel (Field Service) CC:DOM:FS

   subject: TEXT REDACTED

   This responds to your TEXT REDACTED, request for field service advice.

   DISCLOSURE STATEMENT

   This document may contain taxpayer information subject to section 6103. This document may also contain confidential information subject to the attorney-client and deliberative process privileges and may also have been prepared in anticipation of litigation. Therefore, this document shall not be disclosed beyond the office or individual(s) to whom it is addressed and in no event shall it be disclosed to taxpayers or their representatives.

   Specifically, if this memorandum is addressed to a District Counsel, then only office personnel working on the specific case or subject matter may use this document. If this memorandum is addressed to a District Director, then only office personnel working the specific case or subject matter may use this document. This memorandum shall not be disclosed or circulated beyond such office personnel having the requisite "need to know."

   ISSUES

   1. Whether Rev. Rul. 68-624, 1968-2 C.B. 424, is still in effect to allow allocation of income of employee-drivers into a wage portion and an equipment rental portion. If not, should the reimbursement plan be considered a non-accountable expense reimbursement plan.

   2. Whether employee-drivers and independent contractor-drivers are in the trade or business of renting their trucks, separate from their trade or business of hiring out their driving skills, such that the rental income and associated expenses should be reported on Schedule C, rather than Schedule E.

   3. Whether the "rental income" arrangement actually constitutes a non-accountable plan employer expense arrangement.

   

FACTS

According to your advice request, the facts are as follows:

Sand and gravel haulers in your district, whether employees or independent contractors, are receiving a portion of their remuneration as "rental" of their gravel trucks. They report that portion on Schedule E. For the independent contractors, one-third of the compensation is shown on a Form 1099 as payment for services and two-thirds is shown on a separate Form 1099 as rental income. For employees, one-third of the compensation is shown on a Form W-2 and two-thirds is shown on a Form 1099 as rental income. Neither the employees nor the independent contractors are paying employment taxes on the rental income. In most instances, the truck expenses are deducted on the Schedule E. However, some independent contractors deduct a portion of their expenses on schedule C, further reducing their self-employment tax.

DISCUSSION

In your advice request, you assert that our prior advice, dated TEXT REDACTED, apparently conflicted with subsequent advice on related issues rendered by the Associate Chief Counsel, Employee Benefits/Exempt Organizations (EBEO). EBEO determined that "a skidder operator who rents a skidder to his or her employer is actually engaged in the trade or business of renting the skidder." You questioned whether this conclusion squared with our determination in our prior advice that Rev. Rul. 68-624, 1968-2 C.B. 424, and Rev. Rul. 111, 1953-1 C.B. 390, are overridden to the extent that they conflict with section 62(c).

You interpreted our prior advice as denying a logger who furnishes his own saw the benefit of Rev. Rul. 111 and Rev. Rul. 68-624. That is, with the passage of section 62(c), a logger can no longer rely on the rulings to split his compensation between wages and rent for his saw. We agree with your interpretation of our advice. EBEO, however, has concluded that, notwithstanding section 62(c), a skidder operator who provides his own skidder can allocate the compensation he receives between wages and rent of the skidder. In your advice request, you state:

> Who is correct here, you or EBEO? We do not see any distinction between the two arrangements, except that a chain-saw is a $ 1,200.00 piece of equipment, while a skidder is a $ 100,000.00 piece of equipment. In each situation, the owner and the equipment are being "hired" to do a job, be it cutting a stand of trees or hauling the cut trees, or, as in the present case, hauling gravel. As we understand it, in none of these situations does anyone other than the owner of the equipment operate the equipment.

You go on to question the logic applying Rev. Rul. 68-624 to skidders but not the loggers. However, you note in your advice request that you have seen only a summary of EBEO's memorandum on this issue and not the memorandum itself.

We have reviewed EBEO's memorandum and have concluded that it does not conflict with our prior advice to your office. (A copy of EBEO's memorandum is attached to this advice.) As noted above, our prior advice focused on whether section 62(c) overrode the two revenue rulings at issue. We concluded that it did, to the extent that the rulings conflicted with the statute.





EBEO, on the other hand, focused on a factual situation involving a skidder operator. In their advice, they concluded that expenses incurred by a skidder operator were not incurred in connection with performing services as an employee. Instead, according to EBEO, the expenses were incurred in the trade or business of renting the skidder. They stated that their analysis of this issue differed from their analysis of the saw rent issue because of "significant factual differences between a timberfaller and a skidder owner/operator."

These factual differences were as follows: (1) a sawyer furnishes a handtool to perform his services, while a skidder provides a piece of heavy machinery; (2) all timberfallers supply their own saws, but all skidder operators do not provide their own skidders; and (3) although sawyers purchase saws to obtain employment as sawyers, skidder operators make a significant financial investment in their skidders and intend to make a profit from the use of the skidder, as well as using it to perform services as an employee.

On these facts, EBEO made the following conclusions: (1) the skidder-related expenses a skidder operator incurs are not employee business expenses; (2) the amounts designated as skidder rentals are not wages as defined by section 3121(a) and Treas. Reg. § 31.3121(a)-1(c) and therefore are not subject to employment taxes; and (3) the skidder rental payments are self-employment income, which the skidder operator derives from being engaged in the trade or business of renting his skidder. These payments must be reported on Schedule C of Form 1040.

We agree with EBEO's conclusions. Furthermore, we believe that their conclusions do not conflict with our conclusions in our prior advice to you, since our primary conclusion in that memorandum was that the revenue rulings were overridden to the extent that they conflict with section 62(c). EBEO concluded that even if the skidder operators were employees for purposes of operating the skidders, for purposes of providing the skidder to their employers they were independent contractors engaged in the trade or business of renting the skidders to the employers. Thus, since they were independent contractors rather than employees for purposes of this function, section 62(c) did not apply to the expenses they incurred in renting the skidder. And because section 62(c) did not apply, it did not override the revenue ruling's application to the skidder operators.

We believe these conclusions could apply to the sand and gravel haulers as well. Thus, as to issue one, Rev. Rul. 68-624 is still in effect and could allow income to be split into a wage portion and another portion for the trade or business of renting the truck. As to issue two, both the employees and independent contractors could be treated as being in the trade or business of renting their trucks, separately from being in the trade or business of being an employee or hiring out their driving skills. In that case, rental income and associated expenses should be reported on Schedule C. As to issue three, our answers to issues one and two indicate that for employee-drivers, the "rental income" is not a an expense reimbursement and therefore is not a non-accountable plan employer expense reimbursement.

However, based on the facts you gave us, we cannot provide a final answer to your questions. We can only advise that, theoretically, the amount paid to the truckers can be allocated between a portion for driving services and an

   

equipment rental portion. On the facts provided, we cannot advise that the one-third/two-thirds split is appropriate. Further factual development is necessary. Of particular importance is the amount of the hauler's investment in the truck and the amounts paid to the hauler for his services and for the use of his truck.

CONCLUSIONS

Subject to further factual development, our conclusions are as follows:

1. As to employee drivers, Rev. Rul. 68-624 is still in effect to allow income to be split into a wage portion and an equipment rental portion.

2. Drivers, whether employees or independent contractors, can be treated as being in the trade or business of renting their trucks, separate from their trade or business of being employees or hiring out their driving skills.

3. In situations covered by issues one and two above, rental income to an employee-driver for the use of his truck is not an expense reimbursement and therefore is not a non-accountable plan employer expense reimbursement.

If you have any questions or need further information, contact TEXT REDACTED at TEXT REDACTED.

DANIEL J. WILES

By: TEXT REDACTED, Income Tax and Accounting Branch, Field Service Division

Attachment:

Memorandum of July 21, 1993

   

# EXHIBIT 3




1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201-4675 • (214) 969-2700 • Fax (214) 969-2705

December 18, 2001

Mr. Martin J. Maddaloni
General President
United Association
901 Massachusetts Avenue, N.W.
Washington, D.C. 20001

*Re: Negotiated Changes – National Pipe Line Special Agreement*

Dear President Maddaloni:

On October 6th, the United Association Pipe Line Negotiating Committee and the Labor Committee for the Pipe Line Contractors Association, met in San Francisco to discuss changes in the United Association Special Agreement. Both parties agreed to the following changes with effective dates as noted:

I. **Wage Rates and Fringes**

The following wage rates and fringe benefits will apply under the Special Agreement for all states in the Continental United States and District of Columbia except California, Illinois, New Jersey, Oregon, Washington and Wisconsin. These wage rates and fringe benefits apply to work bid on or after October 8, 2001, until May 1, 2004.

| | |
|---|---|
| Journeymen | $29.00 |
| Fringes | 5.30 |
| Total | $34.30 |
| | |
| Welder Helper | $13.15* |
| Fringes | 4.22 |
| Total | 17.37 |

*(Compare Laborers' basic rate)

II. **Conditions For All Areas Covered Under Special Agreement**

These conditions will be effective January 1, 2002, to May 1, 2004. The conditions currently in the Special Agreement will remain unchanged except as provided below:

A. *Portability*

Once a crew is hired the contractor can move that crew from job to job without change regardless of location of job.

B. *Composite Crews*

All employees will work under a composite crew concept as determined by contractor.

OFFICERS

Scott E. Summers, President
James H. Nolan, II, 1st Vice President
Peter M. Bilkey, 2nd Vice President
Paul C. Gregory, Treasurer
J. Patrick Tielborg, Managing Director and General Counsel

DIRECTORS

Peter M. Bilkey
Bobby A. Crauls
Paul C. Gregory
Robert Johnston
W. A. "Bill" Leone
William F. Murphy
James H. Nolan, II
H. Charles Price
Paul Somerville
Dave Stotts
Scott E. Sum
Don W. Thor
Robert H. W

C. *Rig Pay*

Rig Pay will be $12 per hour plus $25 per week maintenance and Welder provides fuel. If contractor provides fuel the Rig Pay will be the amount established for the area plus $25 per week maintenance.

D. *Assembly Point*

There will be no restrictions on Assembly Point(s) distance from living accommodations and may be on or near right-of-way. The establishing of Assembly Point or Points will not affect the location of the warehouse.

E. *Hiring*

The contractor will have the right to hire five (5) of the first six (6) U.A. employees (of each class – Journeymen, Welders and Helpers). After the sixth (6th) employee is hired, hiring will be in accordance with hiring formula under the National Pipe Line Agreement so that 50/50 hire will begin after sixth (6th) hire.

This letter will confirm that the above subjects were negotiated and agreed upon by the respective Committees.

**ACCEPTED BY:**

**UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA**

**By:** ______________________
**Martin J. Maddaloni, General President**

**By:** ______________________
**John Budzinski, Director of Pipeline and Gas Distribution**

**PIPE LINE CONTRACTORS ASSOCIATION**

**By:** ______________________
**Scott E. Summers, President**

**By:** ______________________
**J. Patrick Tielborg, Managing Director and General Counsel**

#511281

C. *Rig Pay*

Rig Pay will be $12 per hour plus $25 per week maintenance and Welder provides fuel. If contractor provides fuel the Rig Pay will be the amount established for the area plus $25 per week maintenance.

D. *Assembly Point*

There will be no restrictions on Assembly Point(s) distance from living accommodations and may be on or near right-of-way. The establishing of Assembly Point or Points will not affect the location of the warehouse.

E. *Hiring*

The contractor will have the right to hire five (5) of the first six (6) U.A. employees (of each class – Journeymen, Welders and Helpers). After the sixth (6th) employee is hired, hiring will be in accordance with hiring formula under the National Pipe Line Agreement so that 50/50 hire will begin after sixth (6th) hire.

This letter will confirm that the above subjects were negotiated and agreed upon by the respective Committees.

**ACCEPTED BY:**

**UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA.**

**By:** ______________________________
**Martin J. Maddaloni, General President**

**By:** ______________________________
**John Budzinski, Director of Pipeline and Gas Distribution**

**PIPE LINE CONTRACTORS ASSOCIATION**

**By:** [signature]
**Scott E. Summers, President**

**By:** [signature]
**J. Patrick Tielborg, Managing Director and General Counsel**

#511281

# EXHIBIT 4



1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201-4675 • (214) 969-2700 • Fax (214) 969-2705

January 22, 2002

Mr. John Budzinski
United Association
901 Massachusetts Avenue, N.W.
Washington, D.C. 20001

***Re: Negotiated Changes – National Pipe Line Special Agreement***

Dear John:

Attached is a fully executed Letter of Agreement regarding the negotiated changes on the National Pipe Line Agreement Special Agreement dated December 18, 2001, which both the U.A. and the PLCA have signed.

If you have any questions, please let me know.

Sincerely yours,

J. Patrick Tielborg

JPT/imk

Cc: Mr. Scott E. Summers, PLCA President

#538659

OFFICERS

Scott E. Summers, *President*
James H. Nolan, II, *1st Vice President*
Peter M. Billey, *2nd Vice President*
Paul C. Gregory, *Treasurer*
J. Patrick Tielborg, *Managing Director and General Counsel*

DIRECTORS

Peter M. Billey
Bobby A. Crotts
Paul C. Gregory
Robert Johnston
W. A. "Bill" Leone
William F. Murphy
James H. Nolan, II
H. Charles Price
Paul Somerville
Dave Stotz
Scott E. Summers
Don W. Thorn
Robert H. Westphal

# EXHIBIT 5

Service: **Get by LEXSEE®**
Citation: **Rev. Proc. 2002-41**

*Rev. Proc. 2002-41; 2002-1 C.B. 1098;*
*2002 IRB LEXIS 245, *; 2002-23 I.R.B. 1098*

Revenue Procedure 2002-41

Rev. Proc. 2002-41; 2002-1 C.B. 1098; 2002 IRB LEXIS 245; 2002-23 I.R.B. 1098

June 10, 2002

**[*1]**

**APPLICABLE SECTIONS:**

26 CFR 1.62-2: Reimbursements and other expense allowance arrangements.

**REFERENCE:** (Also Part I, § 62.)

**TEXT:**

The purpose of this revenue procedure is to provide an optional expense substantiation rule so that businesses in the pipeline construction industry can provide reimbursements under an accountable plan to employees who also furnish welding rigs or mechanics rigs as part of their performance of services as employees. This revenue procedure is not intended to suggest that all workers providing such services and equipment are employees. Rather, the method in this revenue procedure may be applied when businesses choose to use an accountable plan to reimburse individuals who are employees for rig-related expenses incurred as employees.

As part of the Industry Issue Resolution Pilot Program, announced in Notice 2000-65, representatives of the pipeline construction industry requested clarification of the proper treatment of amounts paid to employee welders and heavy equipment mechanics who provide heavy equipment in connection with the performance of services. At issue was whether the amounts should be treated as payments of rent, payments of wages, or as the reimbursement of expenses subject to the **[*2]** accountable plan requirements.

Employers in the pipeline construction industry encounter several challenges to reimbursing under an accountable plan the costs relating to employee-provided welding rigs and mechanics rigs, particularly in determining the proper amount of the expense incurred. Rig welders and heavy equipment mechanics work for multiple companies for relatively short periods. Therefore, the proper allocation of fixed costs related to the equipment among employers is unclear. Moreover, although the rigs are mobile, the existing mileage-based expense substantiation provision does not accurately reflect rig-related costs because rigs are used primarily while stationary. Further, these employees incur substantial expenses as employees in providing these rigs as a condition of employment. Due to these unique features, reimbursing employees for rig-related expenses under the existing accountable plan requirements is unworkable for this industry. In order to enable this industry to reimburse rig-related expenses to employees under an accountable plan, this revenue procedure provides an optional expense substantiation rule under which rig-related expenses may be treated as substantiated **[*3]** when reimbursing these expenses under an accountable plan.

Under this revenue procedure an employer may pay certain welders and heavy equipment mechanics an amount of up to $ 13 per hour for rig-related expenses that is deemed

substantiated under an accountable plan when paid in accord with this revenue procedure (up to $ 8 per hour if the employer provides fuel or otherwise reimburses fuel expenses). This revenue procedure provides for an annual inflation adjustment to these amounts after 2003, if necessary and is effective for payments made on or after January 1, 2003. The rules are provided in Questions and Answers below.

The Service recognizes that employers in other industries may similarly provide payments to employees for the costs of providing equipment as employees used in the performance of services as employees. To the extent that the unique features of other industries creates similar challenges to implementing accountable plans, the Service welcomes comments regarding the appropriateness and design of similar relief. We specifically request comments concerning other categories of qualified nonpersonal use vehicles owned by employees and used by the employees in the course **[*4]** of providing services as employees, especially where the nature of an industry results in employees working for multiple employers during each year, for which a deemed substantiation rule would be appropriate.

**TABLE OF CONTENTS**

**SECTION 1. PURPOSE AND SCOPE**

*Q - 1. Must an employer use this revenue procedure to reimburse employees for rig-related expenses?*

*Q - 2. What is the tax treatment of amounts deemed substantiated under this revenue procedure?*

*Q - 3. Which employers may use the deemed substantiation rule provided in this revenue procedure?*

*Q - 4. For which vehicles and equipment may eligible employers use the deemed substantiation rule provided in this revenue procedure?*

**SECTION 2. BACKGROUND**

*Q - 5. What provisions of the tax law apply when an employer reimburses an employee for employee business expenses?*

*Q - 6. What are the tax consequences to an employee when an employer reimburses expenses under a nonaccountable plan?*

*Q - 7. What are the tax consequences to an employee when an employer reimburses expenses under an accountable plan?*

**SECTION 3. DEEMED SUBSTANTIATION FOR RIG-RELATED EXPENSES**

*Q - 8. What is the amount of rig-related expenses that can be deemed substantiated under this revenue* **[*5]** *procedure?*

*Q - 9. For what types of vehicles may rig-related expenses be deemed substantiated?*

*Q -10. May expenses be deemed substantiated for pickup trucks under this revenue procedure?*

*Q -11. Are welding rigs and mechanics rigs qualified nonpersonal use vehicles?*

*Q -12. For which employees may an eligible employer deem rig-related expenses*

*substantiated under this revenue procedure?*

*Q -13. Under what circumstances may an eligible employer anticipate that an employee would incur rig-related expenses while performing services as an employee for an eligible employer under the deemed substantiation rule?*

*Q -14. Will the amount deemed substantiated under this revenue procedure be adjusted for inflation?*

*Q -15. May an independent contractor determine deductible expenses under this revenue procedure?*

**SECTION 4. EMPLOYEE TREATMENT OF RIG-RELATED EXPENSES**

*Q -16. May an employee exclude from income amounts reimbursed and deemed substantiated under this revenue procedure?*

*Q -17. May an employee claim deductions for rig-related expenses that exceed amounts reimbursed under an accountable plan or deemed substantiated under this revenue procedure?*

*Q -18. May an employee treat payments made under a nonaccountable* **[*6]** *plan as if they were made under an accountable plan by voluntarily substantiating expenses and returning any excess to the employer?*

*Q -19. May an employee deduct any rig-related expenses that exceed those reimbursed by an employer and deemed substantiated under this revenue procedure on Schedule C, Profit or Loss From Business?*

*Q -20. May an employee deduct any rig-related expenses that exceed those reimbursed by an employer and deemed substantiated under this revenue procedure on Schedule E, Supplemental Income and Loss?*

*Q -21. May an employee deduct expenses that an eligible employer has already reimbursed under an accountable plan?*

**SECTION 5. SPECIAL RULES FOR EMPLOYERS**

*Q -22. May an eligible employer establish an accountable plan to reimburse rig welders or heavy equipment mechanics for non-rig-related business expenses?*

*Q -23. May an eligible employer substitute a rig-related reimbursement for a portion of wages otherwise payable to an employee?*

*Q -24. What are the tax consequences if an employer that uses the deemed substantiation rule in this revenue procedure provides an additional reimbursement of rig-related expenses?*

**SECTION 6. EFFECTIVE DATE**

**SECTION 7. REQUEST FOR COMMENTS**

**SECTION 8. [*7] DRAFTING INFORMATION**

**SECTION 1. PURPOSE AND SCOPE**

*Q - 1. Must an employer use this revenue procedure to reimburse employees for rig-related*

*expenses?*

**A - 1. No. Use of the rule described in this revenue procedure is not mandatory, and an employer may, outside the scope of this revenue procedure, reimburse actual expenses under an arrangement that meets the accountable plan requirements of 62(c) of the Internal Revenue Code (Code) and regulations thereunder. Alternatively, an employer may reimburse employee business expenses under a nonaccountable plan (defined in Answer 6), or may choose not to reimburse employee business expenses.**

*Q - 2. What is the tax treatment of amounts deemed substantiated under this revenue procedure?*

**A - 2. If the other requirements described in Answer 5 are satisfied, the amounts substantiated in accordance with this revenue procedure are treated as paid under an accountable plan. Thus, the amounts are not reported as wages on Form W-2 and are exempt from the withholding and payment of income and employment taxes. Also, no return of information (e.g., Form 1099) is required for payments made under an accountable plan. 1.6041-3(h)(1).**

*Q - 3. Which employers may* **[*8]** *use the deemed substantiation rule provided in this revenue procedure?*

**A - 3. This substantiation rule may be used by any "eligible employer." An eligible employer is any employer that hires employee rig welders or heavy equipment mechanics and requires, as a condition of employment, that the rig welders and heavy equipment mechanics provide a welding rig or mechanics rig and use the rig in performing services as an employee employed in the construction, repair, or maintenance of transportation mainline pipeline. The business of transportation mainline pipeline construction or repair includes the construction, maintenance, or repair of transportation mainline pipeline up to the first metering station or connection. This includes mainline pipeline whether it transports coal, gas, water, or other transportable materials, vapors, or liquids. The first metering station or connection means the point where a valve, consumer connection, or town border station divides mainline transmission lines or higher pressure lateral and branch lines from lower pressure distribution systems.**

*Q - 4. For which vehicles and equipment may eligible employers use the deemed substantiation rule provided in this* **[*9]** *revenue procedure?*

**A - 4. Eligible employers may use the deemed substantiation rule in this revenue procedure only to reimburse employees for expenses related to the use of welding rigs and mechanics rigs described in Answer 9.**

**SECTION 2. BACKGROUND**

*Q - 5. What provisions of the tax law apply when an employer reimburses an employee for employee business expenses?*

**A - 5. The tax rules that apply when an employer reimburses an employee for employee business expenses depend upon whether the reimbursement is made under an accountable plan or nonaccountable plan. An accountable plan is a reimbursement or other expense allowance arrangement that meets three requirements under 1.62-2: business connection, substantiation, and return of amounts in excess of substantiated expenses. The business connection requirement is satisfied if the arrangement provides advances, allowances or reimbursements**

**only for business expenses allowable as deductions under 161-198 that are paid or incurred by an employee (or that the employer reasonably expects the employee to incur) in connection with the performance of services as an employee. The substantiation requirement is satisfied if the arrangement requires [*10] each business expense to be substantiated to the employer within a reasonable period of time. The return of excess requirement is satisfied if the arrangement requires the employee to return to the payor within a reasonable period of time any amount paid under the arrangement in excess of the expenses substantiated. A nonaccountable plan is a reimbursement or other expenses allowance arrangement that does not satisfy one or more of the three requirements.**

*Q - 6. What are the tax consequences to an employee when an employer reimburses expenses under a nonaccountable plan?*

**A - 6. Generally, 162(a) allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including the trade or business of being an employee. Under 1.62-2(c)(5), amounts treated as paid under a nonaccountable plan are included in the employee's gross income, must be reported as wages on the employee's Form W-2, and are subject to withholding and payment of income and employment taxes (Federal Insurance Contributions Act (FICA), Federal Unemployment Tax Act (FUTA), and income tax withholding). See also Employment Tax Regulations 31.3121(a)-3 [*11] (FICA); 31.3306(b)-2 (FUTA); 31.3401(a)-4 (income tax withholding); and Income Tax Regulation 1.6041-3(h)(1) (return of information exemption) (for exemption from reporting requirements for payments made under an accountable plan before January 1, 2001, see 1.6041-3(i)(1)). The employee may still deduct the expenses. However, those deductions may only be claimed as miscellaneous itemized deductions, which are limited by 67 to the amount exceeding 2 percent of adjusted gross income.**

*Q - 7. What are the tax consequences to an employee when an employer reimburses expenses under an accountable plan?*

**A - 7. Section 1.62-2(c)(4) provides that amounts treated as paid under an accountable plan are excluded from the employee's gross income, are not reported as wages or other compensation on the employee's Form W-2, and are exempt from the withholding and payment of income and employment taxes.**

**SECTION 3. DEEMED SUBSTANTIATION FOR RIG-RELATED EXPENSES**

*Q - 8. What is the amount of rig-related expenses that can be deemed substantiated under this revenue procedure?*

**A - 8. If an eligible employer either provides fuel or separately reimburses fuel expenses, expenses of up to $ 8 per hour for welding [*12] rigs or mechanics rigs may be deemed substantiated if the other requirements in this revenue procedure are met. If an eligible employer does not provide fuel or separately reimburse fuel expenses, rig-related expenses of up to $ 13 per hour for welding or mechanics rigs may be deemed substantiated if the other requirements in this revenue procedure are met.**

*Q - 9. For what types of vehicles may rig-related expenses be deemed substantiated?*

**A - 9. Under this revenue procedure, rig-related expenses may be deemed substantiated only with respect to welding rigs and mechanics rigs. For purposes of this revenue procedure, welding rigs are 3/4 ton or heavier trucks equipped with a**

**welding machine and other necessary equipment, such as tanks and generators. For purposes of this revenue procedure, mechanics rigs are heavy trucks equipped with a permanently installed mechanics bed and other necessary equipment that is used to repair and maintain heavy machinery on a job site. As explained in Answer 11, mechanics rigs and welding rigs are qualified nonpersonal use vehicles. The rule in this revenue procedure is not available for any other vehicles.**

*Q -10. May expenses be deemed substantiated for* **[*13]** *pickup trucks under this revenue procedure?*

**A -10. No. Expenses for pickup trucks may not be deemed substantiated as rig-related expenses under this revenue procedure unless the pickup truck is part of a welding rig as described in Answer 9. (See Rev. Proc. 2001-54 for rules under which the amount of ordinary and necessary expenses of local travel or transportation incurred by an employee will be deemed substantiated under 1.274-5 when an employer provides a mileage allowance under an accountable plan.)**

*Q -11. Are welding rigs and mechanics rigs qualified nonpersonal use vehicles?*

**A -11. Under the authority of 1.274-5T(k)(2)(ii)(S), the Commissioner, solely for purposes of applying the deemed substantiation rule in this revenue procedure, designates the welding rigs and mechanics rigs as described in Answer 9 as qualified nonpersonal use vehicles.**

*Q -12. For which employees may an eligible employer deem rig-related expenses substantiated under this revenue procedure?*

**A -12. An eligible employer may deem rig-related expenses substantiated only for employee rig welders and heavy equipment mechanics who are required, as a condition of employment, to provide a welding or mechanics rig for [*14] use in providing personal services as an employee.**

*Q -13. Under what circumstances may an eligible employer anticipate that an employee would incur rig-related expenses while performing services as an employee for an eligible employer under the deemed substantiation rule?*

**A -13. An eligible employer's reimbursement will meet the business connection requirement of 1.62-2(d) if the eligible employer reasonably anticipates that the employee will incur rig-related expenses in connection with the performance of services for the employer. It would not be reasonable for an eligible employer to anticipate that an employee would incur rig-related expenses for hours that it actually knew the employee's rig was not used (such as during a work stoppage for inclement weather).**

*Q -14. Will the amount deemed substantiated under this revenue procedure be adjusted for inflation?*

**A -14. Yes. For calendar years after 2003, the hourly rate will be adjusted annually for inflation under 1(f)(3), except that the base year for such adjustment will be calendar year 2002 and no adjustment will be made unless the increase is at least one dollar. Any adjustment will be rounded to the nearest dollar. Any adjustment [*15] to the rates provided in this revenue procedure will be published annually.**

*Q -15. May an independent contractor determine deductible expenses under this revenue procedure?*

**A -15. No. Independent contractors engaged in the trade or business of providing welding services or services as heavy equipment mechanics may not use the deemed substantiation method in this revenue procedure to determine deductible expenses in their trade or business.**

**SECTION 4. EMPLOYEE TREATMENT OF RIG-RELATED EXPENSES**

*Q -16. May an employee exclude from income amounts reimbursed and deemed substantiated under this revenue procedure?*

**A -16. Yes. This is true even if the amounts reimbursed and deemed substantiated exceed the actual rig-related expenses. For example, assume an employee incurs $ 20,000 in rig-related expenses, and the employer reimburses $ 20,800 at the $ 13 per hour rate for welding rigs provided under this revenue procedure. Because the reimbursement was paid under an accountable plan, the entire reimbursement is excluded from the employee's income.**

*Q -17. May an employee claim deductions for rig-related expenses that exceed amounts reimbursed under an accountable plan or deemed substantiated under* **[*16]** *this revenue procedure?*

**A -17. Yes. To the extent employee business expenses exceed those reimbursed under an accountable plan, they may be claimed as miscellaneous itemized deductions on Schedule A. To do this, the employee must report all reimbursed amounts, including those deemed substantiated, and must offset expenses on Form 2106.**

*Q -18. May an employee treat payments made under a nonaccountable plan as if they were made under an accountable plan by voluntarily substantiating expenses and returning any excess to the employer?*

**A -18. No. An employee cannot create an accountable plan. Under 1.62-2(c)(3), if an employer provides a nonaccountable plan, an employee who receives payments under the plan cannot compel the employer to treat the payments as paid under an accountable plan by voluntarily substantiating the expenses or returning any excess to the employer.**

*Q -19. May an employee deduct any rig-related expenses that exceed those reimbursed by an employer and deemed substantiated under this revenue procedure on Schedule C, Profit or Loss From Business?*

**A -19. No. Expenses incurred in connection with the trade or business of being an employee may not be deducted on Schedule C.**

*Q* **[*17]** *-20. May an employee deduct any rig-related expenses that exceed those reimbursed by an employer and deemed substantiated under this revenue procedure on Schedule E, Supplemental Income and Loss?*

**A -20. No. Expenses incurred in connection with the trade or business of being an employee may not be deducted on Schedule E.**

*Q -21. May an employee deduct expenses that an eligible employer has already reimbursed under an accountable plan?*

**A -21. No.**

**SECTION 5. SPECIAL RULES FOR EMPLOYERS**

*Q -22. May an eligible employer establish an accountable plan to reimburse rig welders or heavy equipment mechanics for non-rig-related business expenses?*

**A -22. Yes. An employer may establish a separate accountable plan to reimburse non-rig-related employee business expenses incurred by rig welders or heavy equipment mechanics in addition to the arrangement provided under this revenue procedure. For example, Rev. Proc. 2001-47 provides rules under which an employer may establish an accountable plan for which the amount of ordinary and necessary business expenses of an employee for lodging, meal, and incidental expenses or for meal and incidental expenses incurred while traveling away from home will be deemed [*18] substantiated under 1.274-54.**

*Q -23. May an eligible employer substitute a rig-related reimbursement for a portion of wages otherwise payable to an employee?*

**A -23. This revenue procedure is not intended to permit the recharacterization of wages otherwise payable to an employee. For example, if an employer normally pays an employee $ 35 per hour in wages and does not provide a rig reimbursement in the event of inclement weather, the employer may not recharacterize a portion of the $ 35 hourly wage into rig reimbursement during inclement weather. If an employer's reimbursement or other expenses allowance arrangement evidences a pattern of abuse of the accountable plan rules, then all payments made under the arrangement will be treated as paid under a nonaccountable plan.**

*Q -24. What are the tax consequences if an employer that uses the deemed substantiation rule in this revenue procedure provides an additional reimbursement of rig-related expenses?*

**A -24. If an employer that uses the deemed substantiation rule separately reimburses an employee for any rig-related expenses, the additional payment is treated as paid under a nonaccountable plan. Thus, the additional payment is reported as [*19] wages or other compensation of the employee's Form W-2, and is subject to withholding and payment of income and employment taxes.**

**For example, employee A is reimbursed for rig-related expenses deemed substantiated under this revenue procedure, and A incurs expenses for cleaning the rig and an oil change. The employer pays employee A an additional $ 25 per week to cover cleaning and the oil change. Because the employer also pays a rig reimbursement under this revenue procedure, the $ 25 paid by the employer is treated as paid under a nonaccountable plan. Thus, the additional payment is reported as wages or other compensation of the employee's Form W-2, and is subject to withholding and payment of income and employment taxes.**

**SECTION 6. EFFECTIVE DATE**

This revenue procedure is effective for payments made on or after January 1, 2003.

**SECTION 7. REQUEST FOR COMMENTS**

We welcome comments regarding this revenue procedure. We specifically request comments concerning other categories of qualified nonpersonal use vehicles owned by employees and used by the employees in the course of providing services as employees, especially where the nature of an industry results in employees working for multiple **[*20]** employers during each year, for which a deemed substantiation rule would be appropriate.

Comments regarding this revenue procedure should be sent by September 9, 2002 in writing, and should reference Rev. Proc. 2002-41. Comments can be addressed to:

CC:ITA:RU (Rev. Proc. 2002-41), room 5226 Internal Revenue Service POB 7604, Ben Franklin Station Washington, DC 20044

Comments also may be hand delivered between the hours of 8 a.m. and 5 p.m. to:

CC:ITA:RU (Rev. Proc. 2002-41) Courier's Desk Internal Revenue Service 1111 Constitution Avenue NW Washington, DC.

Alternatively, taxpayers may transmit comments electronically via the following e-mail address:

Notice.Comments@irscounsel.treas.gov

**SECTION 8. DRAFTING INFORMATION**

The principal author of this revenue procedure is Joe Spires of the Office of the Division Counsel/Associate Chief Counsel (Tax Exempt and Government Entities), IRS. However, other personnel from the IRS and Treasury Department participated in its development. For further information regarding this revenue procedure, call Mr. Spires on (202) 622-6040 (not a toll free number).

Service: **Get by LEXSEE®**
Citation: **Rev. Proc. 2002-41**
View: Full
Date/Time: Tuesday, March 20, 2007 - 10:47 AM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 6



PIPELINERS
P. O. Box 470798 • Tulsa, OK 74147-0798 • FAX: 918-627-9327 • PH: 918-622-19
UNION 798
UNITED ASSOCIATION
AFFILIATED A.F.L.-C.I.O.

W. SCOTT NORTH
BUSINESS MANAGER
FINANCIAL SECRETARY/TREASURER

June 19, 2002

For Steering

RE: CHANGES TO THE RIG REIMBURSEMENT POLICIES

Dear Sir or Madam:

This is to notify your company that due to a new ruling from the IRS, the rig reimbursement policies will change.

Enclosed with this letter is a copy of the suggested changes submitted to the Pipe Line Contractors Association. The effective date for these changes is July 1, 2002.

Also, due to the recently negotiated changes, enclosed is an updated scale for hourly wage rates and fringe benefits.

If you have any questions concerning these changes, you may call our office at 918/622-1900, or the Pipe Line Contractors Association at 214/969-2700.

Sincerely yours,

W. Scott North

W. Scott North
Business Manager/
Financial Sec.-Treas.

WSN/jg

## Suggested Rig Reimbursement Rates

**$8.00 Per Hour (Contractor furnishes fuel)**
**$13.00 (Welder furnishes fuel)**

**Due to the recently released revenue procedure and ruling from the IRS, the following rig reimbursement policies have been suggested to the PIPE LINE CONTRACTORS ASSOCIATION for an effective date of July 1, 2002.**

1. The rig reimbursement rate for the equipment described below should not be less than $8.00 per hour, when the Contractor furnishes the fuel or not less than $13.00 per hour when the welder furnishes the fuel. The $25.00 per week that has been paid in the past for oil changes, grease, filters and wash jobs will no longer be paid. It is understood that on Special Agreement work the rig reimbursement rate will not be less than $13.00 per hour and the welder will furnish the fuel, unless job specific considerations are agreed upon at the time of the Contractor bidding the job.

    (a) Truck
    (b) Welding machine
    (c) The leads
    (d) A cutting rig, including: 1) gauges, 2) hose, and 3) torch.
    (e) Normal repairs to the truck or equipment. Any repairs required due to negligence or abuse of the equipment not attributable to the welder will be paid for by the contractor.

2. All equipment and supplies not listed above as being furnished by the welder should be furnished by the Contractor, including fuel unless Contractor agrees to pay a rig reimbursement rate of not less than $13.00 per hour, in which case, the welder will furnish his or her own fuel. It is understood that these rig reimbursement rates are considered deemed substantiated by the IRS.

3. Procedures applicable to rigs:

    (a) Rig Pay on Single Qualification Test – The Welder's rig will be entitled to be paid the same number of hours the man is paid on a single qualification test.
    (b) Rig Pay on Multiple Qualification Test – On multiple tests the Welder's rig would be entitled to the number of hours it worked or the number of hours for which the job is set up, whichever is greater.
    (c) Gassing Up - If the contractor elects to pay not less than the $8.00 per hour rig reimbursement rate, all trucks and welding machines will be gassed up during regular working hours. Welders are entitled to a full tank of gas for their truck and welding machine on the same day they complete work on that job and they are laid off; this does not include

the drag-up tank. If the Contractor agrees to pay not less than the $13.00 per hour rig reimbursement and fuel rate, the Welder will arrive at the warehouse with sufficient fuel for the days work.

4. If it becomes necessary for a Contractor to employ a welder on the front end, the rig reimbursement shall be paid on that welder's equipment even though it is not in use, so long as it is on the job-site and available for work.

5. The applicable rig reimbursement rate of not less than $8.00 per hour or not less than $13.00 per hour shall still be paid even if the welding machine is taken off the truck and mounted on a sled or other equipment.

6. When equipment is unavailable for use for any reason, no rig reimbursement should be paid for such equipment until it is again available for use.

**In respect to the contractors who have work now in progress, we suggest that these above policies be put into effect on all work started on or after July 1, 2002. The suggested rig reimbursement rates are not intended to establish the effective date of the IRS ruling on rig expenses being deemed substantiated.**

W. Scott North

W. Scott North
Business Manager/Financial Secretary Treasurer
**PIPELINERS UNION 798**
P.O. Box 470798
Tulsa, OK 74147
PH: 918-622-1900
FAX: 918-627-9327

WSN/rcl

# EXHIBIT 7



PIPE LINE CONTRACTORS ASSOCIATION

*1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201-4675 • (214) 969-2700 • Fax: (214) 969-2705*

2002/15

June 12, 2002

**TO: ALL REGULAR MEMBERS**

***Re: Rig Rental***

Ladies and Gentlemen:

U.A. Local 798 has provided each of you with a letter dated June 19, 2002, with suggested rig rental rates. The Association and the United Association have reached an agreement that the U.A. Local 798 suggested rig rental rates for both mainline and the Special Agreement will become effective **for all work bid on or after July 1, 2002**. The language which will appear in the Special Agreement with respect to the rig pay is noted on the attached letter.

If you have any questions, please let me know.

Sincerely yours,

J. Patrick Tielborg

JPT/imk

Cc: Mr. John Budzinski, United Association
Mr. Scott North, Pipeliners Local 798

#584814

**OFFICERS**
James H. Nolan, II, *President*
J. Patrick Tielborg, *Managing Director and General Counsel*
Thomas G. Buchanan, *Executive Director*

**LABOR COMMITTEE**
Charles P. Joyce, *Chairman*
Peter M. Billey
Paul C. Gregory
Robert Johnston
Mike Murphy
James H. Nolan, II
Scott E. Summers
Don W. Thorn
J. Tom White



PIPELINERS P. O. Box 470798 • Tulsa, OK 74147-0798 • FAX: 918-627-9327 • PH: 918-622-1900

UNION 798
UNITED ASSOCIATION

AFFILIATED A.F.L.-C.I.O.

W. SCOTT NORTH
BUSINESS MANAGER
FINANCIAL SECRETARY/TREASURER

June 19, 2002

For Steering

**RE: CHANGES TO THE RIG REIMBURSEMENT POLICIES**

Dear Sir or Madam:

This is to notify your company that due to a new ruling from the IRS, the rig reimbursement policies will change.

Enclosed with this letter is a copy of the suggested changes submitted to the Pipe Line Contractors Association. The effective date for these changes is July 1, 2002.

Also, due to the recently negotiated changes, enclosed is an updated scale for hourly wage rates and fringe benefits.

If you have any questions concerning these changes, you may call our office at 918/622-1900, or the Pipe Line Contractors Association at 214/969-2700.

Sincerely yours,

W. Scott North

W. Scott North
Business Manager/
Financial Sec.-Treas.

WSN/jg

# Suggested Rig Reimbursement Rates

## $8.00 Per Hour (Contractor furnishes fuel)
## $13.00 (Welder furnishes fuel)

**Due to the recently released revenue procedure and ruling from the IRS, the following rig reimbursement policies have been suggested to the PIPE LINE CONTRACTORS ASSOCIATION for an effective date of July 1, 2002.**

1. The rig reimbursement rate for the equipment described below should not be less than $8.00 per hour, when the Contractor furnishes the fuel or not less than $13.00 per hour when the welder furnishes the fuel. The $25.00 per week that has been paid in the past for oil changes, grease, filters and wash jobs will no longer be paid. It is understood that on **Special Agreement** work the rig reimbursement rate will not be less than $13.00 per hour and the welder will furnish the fuel, unless job specific considerations are agreed upon at the time of the Contractor bidding the job.

   (a) Truck
   (b) Welding machine
   (c) The leads
   (d) A cutting rig, including: 1) gauges, 2) hose, and 3) torch.
   (e) Normal repairs to the truck or equipment. Any repairs required due to negligence or abuse of the equipment not attributable to the welder will be paid for by the contractor.

2. All equipment and supplies not listed above as being furnished by the welder should be furnished by the Contractor, including fuel unless Contractor agrees to pay a rig reimbursement rate of not less than $13.00 per hour, in which case, the welder will furnish his or her own fuel. It is understood that these rig reimbursement rates are considered deemed substantiated by the IRS.

3. Procedures applicable to rigs:

   (a) Rig Pay on Single Qualification Test – The Welder's rig will be entitled to be paid the same number of hours the man is paid on a single qualification test.
   (b) Rig Pay on Multiple Qualification Test – On multiple tests the Welder's rig would be entitled to the number of hours it worked or the number of hours for which the job is set up, whichever is greater.
   (c) Gassing Up - If the contractor elects to pay not less than the $8.00 per hour rig reimbursement rate, all trucks and welding machines will be gassed up during regular working hours. Welders are entitled to a full tank of gas for their truck and welding machine on the same day they complete work on that job and they are laid off; this does not include

the drag-up tank. If the Contractor agrees to pay not less than the $13.00 per hour rig reimbursement and fuel rate, the Welder will arrive at the warehouse with sufficient fuel for the days work.

4. If it becomes necessary for a Contractor to employ a welder on the front end, the rig reimbursement shall be paid on that welder's equipment even though it is not in use, so long as it is on the job-site and available for work.

5. The applicable rig reimbursement rate of not less than $8.00 per hour or not less than $13.00 per hour shall still be paid even if the welding machine is taken off the truck and mounted on a sled or other equipment.

6. When equipment is unavailable for use for any reason, no rig reimbursement should be paid for such equipment until it is again available for use.

**In respect to the contractors who have work now in progress, we suggest that these above policies be put into effect on all work started on or after July 1, 2002. The suggested rig reimbursement rates are not intended to establish the effective date of the IRS ruling on rig expenses being deemed substantiated.**

W. Scott North

W. Scott North
Business Manager/Financial Secretary Treasurer
**PIPELINERS UNION 798**
P.O. Box 470798
Tulsa, OK 74147
PH: 918-622-1900
FAX: 918-627-9327

WSN/rcl

# EXHIBIT 8



From-Pipe Line Contractors 214 969 2705 T-842 P.002/002 F-171

PIPE LINE CONTRACTORS ASSOCIATION

1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201-4675 • (214) 969-2700 • Fax (214) 969-2705

June 26, 2002

Mr. John Budzinski
United Association
901 Massachusetts Avenue, N.W.
Washington, D.C. 20001

***Re: Rig Rental***

Dear John:

This letter is to confirm the understanding reached between the Pipe Line Contractors Association and the United Association on the recent changes to the rig reimbursement policies which affect the states and areas within the jurisdiction of U.A. Local 798. The parties agree that the changes to the rig reimbursement policy as noted in the June 19th letter by W. Scott North, Business Manager for Pipeliners Union 798 will be effective for all work bid on or after July 1, 2002. We have also agreed that the language in the suggested rig reimbursement rate letter regarding the Special Agreement will be included in the Special Agreement under Paragraph 2(h) as follows:

**Rig Pay.**

Rig pay (for work bid on or after 7/1/02) will not be less than $13 per hour and the Welder will furnish the fuel, unless job specific considerations are agreed upon at the time of the contractor bidding the job.

If you agree that the above represents our understanding please sign in the space below and return a copy of this letter to me.

Sincerely yours,

J. Patrick Tielborg

J. Patrick Tielborg

UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA

By: John Budzinski

John Budzinski

Cc: PLCA Labor Committee
Mr. Scott North, Pipeliners Local 798

#583238

OFFICERS

James H. Nolan, II, *President*
Peter M. Billey, *1st Vice President*
Paul C. Gregory, *2nd Vice President*
Robert H. Westphal, *Treasurer*
J. Patrick Tielborg, *Managing Director and General Counsel*
Thomas G. Buchanan, *Executive Director*

DIRECTORS

Peter M. Billey
Bobby A. Crotts
Paul C. Gregory
Robert Johnston
W.A. "Bill" Leone
James H. Nolan, II
H. Charles Price
Larry G. Saho
Paul Somerville
Dave Stolz
Scott E. Summers
Don W. Thorn
Robert H. Westphal

# EXHIBIT 9

SPECIAL AGREEMENT FOR SMALL DIAMETER PIPE
BETWEEN THE PIPE LINE CONTRACTORS ASSOCIATION
AND THE UNITED ASSOCIATION OF JOURNEYMEN AND
APPRENTICES OF THE PLUMBING AND PIPE FITTING
INDUSTRY OF THE UNITED STATES AND CANADA

The wage rates, fringes and conditions set out herein will apply for the Continental United States and for the type of work described below. The terms and conditions of this Special Agreement will remain in effect from August 1, 2004 until July 31, 2005. Termination of this Special Agreement will be in accordance with the provisions of Article XXIX of the National Pipe Line Agreement.

a. States

1. Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Kansas, Louisiana, Mississippi, Nevada, New Mexico, Oklahoma, South Carolina, Texas, Utah and Wyoming.

2. All other states.

b. Scope of Work

All pipeline 16" and under any length.

c. Wage Rates, Fringes and Conditions:

1. Wage rates and fringes for all States set out in a.1 above. (Effective for work bid on or after August 1, 2004):

| | |
|---|---|
| Journeymen | $ 27.00 |
| Fringes | 6.30 |
| | $ 33.30 |
| Per Diem | $ 30.00 per day |
| Helper * | $ 10.65 |
| Fringes | 5.22 |
| | $ 15.87 |
| Per Diem | $ 30.00 per day |

* (Use $13.65 for Laborer's comparison)

2. Wage rates and fringes for all States set out in a.2 above. (Effective for work bid

on or after August 1, 2004):

| | |
|---|---|
| Journeymen | $ 27.00 |
| Fringes | 7.30 |
| | $ 34.30 |
| Per Diem | $ 30.00 per day |
| Helper * | $ 11.15 |
| Fringes | 5.22 |
| | $ 16.37 |
| Per Diem | $ 30.00 per day |

* (Use $14.15 for Laborer's comparison)

3. Conditions for all States set out above (effective August 1, 2004 to July 31, 2005):

a. There will be no Graded Welder Helpers other than the Graded Welder Helper on hydrostatic testing, clampmen and the Graded Welder Helper using a power buffer or power grinder immediately behind the stringer bead and/or hot pass welders when the pipe gang is set up on a production basis. Such Graded Helpers will receive .70 per hour above the basic welder helper rate. The Graded Helper using a power buffer or grinder immediately behind the Stringer bead and/or hot pass welders under this section will receive $2.00 per hour above the basic Welder Helper rate.

b. There will be no restrictions on Assembly Points(s) distance from living accommodations and may be on or near right-of-way. The establishing of Assembly Point or Points will not affect the location of the warehouse.

c. The Welder Helper will receive the basic hourly rate listed hereinabove, or the Laborer's basic hourly rate less $3.00 for per diem adjustment for the area in which the job is located, whichever is greater. Fringes are not involved in the comparison.

d. Per dien will be paid for number of days in the work week set out on the pre-job form.

e. Once a crew is hired the contractor can move that crew from job to job without change, regardless of location of job.

f. The contractor will have the right to hire five (5) of the first six (6) U.A. employees (of each class – Journeymen, Welders and Helpers). After the sixth (6th) employee is hired, hiring will be in accordance with the hiring formula under the National Pipe Line Agreement so that 50/50 hire will begin after the sixth (6th) hire.

g. Composite Crews. All employees will work under a composite crew concept as determined by contractor.

h. Rig Pay. Rig pay (for work bid on or after 7/1/02) will not be less than $13 per hour and the Welder will furnish the fuel, unless job specific considerations are agreed upon at the time of the contractor bidding the job.

All other terms and conditions of the National Pipe Line Agreement between the Pipe Line Contractors Association and the United Association will remain in effect.

IN WITNESS WHEREOF, the parties hereto have executed this Special Agreement For Small Diameter Pipe.

UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA

By: Martin J. Maddaloni
Martin J. Maddaloni,
General President

By: John Budzinski
John Budzinski, Director of Pipeline and Gas Distribution

PIPE LINE CONTRACTORS ASSOCIATION

By: Paul C. Gregory
Paul C. Gregory,
President

By: J. Patrick Tielborg
J. Patrick Tielborg,
Managing Director and General Counsel

280705
11/03/04 4:13 PM

PL-000291

# EXHIBIT 10

32 595 Monster Road S.W., # 213, Renton, WA 98055

**Steering Committee Recommendations**

January 24, 2006

Dear Sirs:

We are pleased to report after six (6) meetings, which took place over the past eight weeks, the Steering Committee's work is complete.

We have agreed to changes in the National Pipe Line Agreement and recommend to the respective Negotiating Committees, these changes be incorporated as part of the National Pipe Line Agreement.

We also recommend that a Steering Committee remain in place during the term of the National Pipe Line Agreement. We believe the Steering Committee should meet a minimum of two (2) times per year to discuss any matters that relate to this Agreement. We also believe the Steering Committee should be used to promote our new Maintenance Agreement to potential customers.

Finally, we urge the respective Negotiating Committees to reach a long-term agreement (5 years) to ensure stability for the Industry with the upcoming expansion in Pipe Line construction.

Sincerely,

James P. Moss
Chairman
UA Steering Committee

Don W. Thorn
Chairman
PLCA Steering Committee

JPM/pg
Opeiu#8
Afl-cio

NATIONAL PIPE LINE AGREEMENT

AGREEMENT made by and between the PIPE LINE CONTRACTORS ASSOCIATION, its contractor members and such other mainline pipe line contractors who execute an acceptance of the terms and provisions of this Agreement, hereinafter referred to as the "Employer," and THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO, hereinafter referred to as the "Union."

WITNESSETH:

That, WHEREAS, the parties hereto desire to stabilize employment in the Mainline Pipe Line Industry, and agree upon wage rates, hours and conditions of employment;

NOW, THEREFORE, the undersigned Employer and the Union, in consideration of the mutual promises and covenants herein contained, agree as follows:

I.

COVERAGE

(A) This Agreement and the Attachments covering (1) small diameter pipe (16" and under), (2) stations, (3) Maintenance, and (4) Mechanized Welding Agreement which are included and made a part of this Agreement shall apply to and cover all transportation mainline pipe line and underground cable (cable covered only when cable work is combined with or an integral part of pipe line project) work coming within the jurisdiction of Union contracted for or performed by Employer within the continental United States as such work is more fully described in Paragraphs (B), (C), (D), (E) and (F) below. Work done in the State of Alaska shall also be covered by the terms of this Agreement; provided, however, that Employer and Union shall meet to agree upon the wage rates and any conditions relating to transportation, subsistence and camp jobs which may be necessary in that State. By mutual agreement, this contract may be extended to cover other territory.

(B) Transportation mainline pipe lines coming under this Agreement are defined as follows:

The construction, installation, double-jointing, rebevelling, treating, reconditioning, testing taking-up, re-laying, or relocation of cross-country pipe lines or any segments thereof transporting coal, gas, oil, water* or other transportable materials, vapors or liquids, including portions of such pipe lines within private property boundaries up to the final metering station or connection.

Deleted: first

The phrase "final metering station or connection" means that point where a valve, consumer

Deleted: first

* (Parties will negotiate special wages and conditions for water lines.)

connection, or town border station divides mainline transmission lines or higher pressure lateral and branch lines from lower pressure distribution systems. If a metering station or connection is located on such mainline transmission line or higher pressure lateral or branch line or between two or more mainline transmission lines or higher pressure lateral or branch lines then such work is covered by this Agreement.

(C) Gathering lines which connect directly from the wells to the mainline pipe lines, gathering lines to or from gasoline extraction and gas dehydration plants, gathering lines to or from gas storage fields and water flood lines are included.

(D) All marine work, including "push" jobs in-shore and work done from barges in-shore or off-shore, is covered by this Agreement.

(E) Fabrication and installation of all launchers, receivers and appurtenant piping and related facilities on mainline pipe lines including those portions within private property boundaries which are an integral part of the pipe line system. Employer shall have the right to perform all fabrication work on mainlines or pumping stations under either (1) the terms and conditions of this Agreement, or (2) in a permanent fabrication shop under the terms and conditions of the National Minimum Standard Agreement for a Commercial Pipe Fabricating Shop. All fabrication performed in a permanent fabrication shop must carry the United Association Union label.

(F) ***Small Diameter Pipe Agreement (16" and under)** All ~~pumping~~ Sstations. ** Maintenance and Mechanized Welding Agreement.

(G) Welding, cutting and setting of steel pipe supports as well as the setting, adjusting, aligning, repairing and maintaining of associated rollers is work that is covered by this Agreement.

(H) Such pipe line construction, installation, repair, maintenance, replacement or reconditioning as may be combined with or associated or comprising an integral part of other work more particularly and usually defined as Engineering or Building Construction, tank farms, refineries, single owner plant to plant connecting lines within a city limit and city distribution lines are not covered by this Agreement.

(I) For purposes of this Agreement, wherever the words "special work" are used, they shall refer to and include the following work (except that work covered by the Attachments), and special provisions pertaining to such work are set out in Article XIX hereafter.

1. Gathering lines as described in Paragraph (C) above.
2. Marine work as described in Paragraph (D) above.
3. Short lines
4. Highway relocation
5. Change outs
6. Congested area work
7. Road crossings and cable
8. River crossings
9. Bridge crossings

Formatted
Formatted
Deleted: .
Deleted: on
Deleted: s

10. Fabrication
11. Testing and rehabilitation

* (See Attachments for Small Diameter Pipe Agreement, U.A. National Station Agreement, National Maintenance Agreement, Mechanized Welding Agreement, and Maintenance Agreement which are incorporated in and made part of this Agreement)

Deleted: )

Deleted: **(See

Formatted

12. Take-up and salvage
13. Double jointing in the field
14. Water lines including pipe made of material other than steel

(J) If and when Employer shall perform work covered by this Agreement under its own name, under the name of another, as a corporation, company, partnership, enterprise, or any combination, including a joint venture, this Agreement shall be applicable to all such work performed under the name of Employer or the name of any other corporation, company, partnership, enterprise, combination or joint venture.

(K) All of the work covered by this Agreement shall be done under and in accordance with the terms and conditions of this Agreement, whether done by Employer or any subcontractor of said Employer.

(L) In order to preserve work customarily performed by Employees working under this Agreement, it is agreed that as a primary working condition, all double-jointing and rebevelling of pipe shall be performed by an Employer bound to this Agreement, except as otherwise mutually agreed upon in writing by the Union and the Pipe Line Contractors Association with relation to any particular job or project. It is further agreed that no subterfuge shall be used to avoid the intent and scope of this provision, and this Agreement shall apply to all firms, corporations or contractors owned, financed or in any way controlled by an employer bound to this Agreement. A violation of this provision shall be considered a material breach of the Agreement and shall be grounds for the Union's immediate cancellation of the Agreement with the individual Employer which has violated this provision. The Union's right to terminate the Agreement under this provision shall not be exclusive and shall not impair any and all remedies which the Union might otherwise seek for a breach of this provision.

Deleted: employee

(M) In the event new methods or new equipment (including double-jointing racks) for cutting, welding, or lining up pipe are utilized, the manning of such equipment and the methods to be used in operating such equipment shall be agreed upon by the Pipe Line Contractors Association and the Union.

Deleted: (N) If an automatic welding process is successfully developed, and its use on work covered by this Agreement results in the displacement of employeeEmployees who would otherwise have been hired to perform such work, at the request of either party, representatives of the Pipe Line Contractors Association and the Union will meet for the purpose of determining an equitable means of continuing the benefits to which such employees Employees are entitled under the Pipe Line Industry Benefit Fund and the Pipe Line Industry Pension Fund.¶

Inserted: Employee

Inserted: Employees

(N) It is the intent of the Union to have uniform wages and working conditions in the industry. However, the parties recognize that in connection with the Unions' organizing efforts to increase the market share of the union industry, it may be necessary to permit newly organized employers to complete existing projects or projects where bids have been accepted under the conditions which the employer bid the work; The Union also agrees that Employers granted any concessions under this paragraph will be obligated to sign the current National Pipe Line Agreement

Deleted: (O)

Deleted: it may be necessary for the Union to, on a temporary basis, represent

Deleted: employee

Deleted: Employees who perform work outside the Union's tradition jurisdiction and, on a temporary basis, it may be necessary to make adjustment to accommodate existing market segments where there is not currently significant union market share.

Inserted: Employee

for future covered work. It is further agreed that the Union and the Association will meeting on a regular basis (minimum two times annually) to review progress in planning under this Article. Absent the above exception, the following continues to apply: In no event shall Employer be required to pay higher rates of wages, or be subject to more unfavorable working rules than those established by Union for any other employer engaged in similar work.

Deleted: u

(O) If any provision of this Agreement is in conflict with the laws or regulations of the United States or of the State in which the work is to be performed, such provision shall be superseded by such law or regulation, but all other provisions of this Agreement shall continue in full force and effect; provided that in no case shall wage rates be paid which are lower than those set out in this Agreement.

Deleted: (P)

(P) Employer and Union agree that neither of them shall take any action or refuse to take any action which shall discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, age, color, religion, sex, national origin or disability.

Deleted: (Q)

(Q) This Agreement shall supersede all other agreements between Employer and any local of the Union for any work covered herein and described above.

Deleted: (R)

(R) In order to be more competitive in certain areas in the country, the Pipe Line Contractors Association and the United Association may mutually agree to put into effect special wages and conditions for specific areas or projects. These special wages and conditions will apply to the areas or projects involved for the period of time to be established by the principal parties.

Deleted: (S)

(S) All personal nouns or pronouns used in this Agreement refer to both the male and female gender.

Deleted: (T)

## II.

## UNION RECOGNITION, UNION SECURITY

(A) The Employer recognizes the Union as the sole bargaining representative for all the Employees covered by this Agreement with respect to wages, hours and other terms and conditions of employment.

Deleted: employee

(B) It is the intent and purpose of the parties hereto that all of the terms and conditions of employment for work covered under this Agreement shall be set out herein, and that neither the Union nor any representative thereof shall demand of any individual contractor any wages, hours or other terms and conditions of employment not specified herein, nor shall any individual Employer or representative thereof offer any wages, hours or other terms and conditions of employment not specified herein.

(C) Job site agreements or understandings made in the field between union representatives and contractor representatives that are not covered by this Agreement or that are in

variance with the terms and conditions of this Agreement will not be effective until a joint letter covering the matter and confirming the agreement or understanding has been signed by the Union and the Association.

(D) If, without prior mutual approval by the Pipe Line Contractors Association and the United Association, any individual Employer pays in excess of the wages set out in this Agreement in the form of extra money, extra hours, extra travel or stand-by time or in the form of a bonus by any subterfuge, and the Pipe Line Contractors Association and the United Association both agree that such excess payment is in violation of this Agreement, then such individual Employer shall be required to pay the same extra compensation to all journeymen covered by this Agreement and a proportionate additional compensation to all other Employees covered by this Agreement, and such requirement shall continue until that particular job is completed. In no event shall any penalty payment be made by any Employer until such time as the International Representative of the United Association and the Managing Director of the Pipe Line Contractors Association have reviewed the facts and mutually agree that such payment is due. When no mutual agreement between the Pipe Line Contractors Association and the United Association can be reached, the question shall be resolved by arbitration in accordance with the procedure set out in Article XVII, Sections (C), (D) and (E) of this Agreement. It is understood and agreed, however, that any profit-sharing, retirement or pension plan which an individual Employer may have established and which has not been set up for one particular job shall not be considered an excess payment or bonus.

Deleted: employee

(E) All Employees covered by this Agreement, as a condition of continued employment, shall, commencing on the 8th day following the beginning of such employment, or the effective date of this Agreement, whichever is later, acquire and, for the duration of this Agreement, maintain membership in the Union. This provision shall not apply in any State where such a requirement for continued employment is prohibited by law. In interpreting good standing, an Employer shall not discharge an employee for non-membership in the Union:-(1) If he has reasonable grounds for believing that such membership was not available to the employee on the same terms or conditions generally applicable to other members; or (2) That membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fee uniformly required as a condition of acquiring or retaining membership. Either party to this Agreement shall have the right to reopen the negotiations pertaining to Union Security should the federal laws or any state laws applicable thereto be changed, by giving the other party thirty (30) days written notice.

Deleted: employee

(F) The business representative of the Union shall have access to any job at any time, but shall notify the field office of his presence on the job. The representative of the Union shall use their best efforts not to hinder ongoing production.

III.

UNION DUES AND CHECK-OFF

(A) Upon request of the Local Union having jurisdiction of the work being performed, and upon presentation of proper authorization forms executed by the individual Employees, the individual Employers agree to deduct from the wages of such individual Employees Union initiation fees and dues, and shall pay over to such Local Union the amount so deducted. The proper authorization forms for deductions will be provided to the Employer at the time of hire.

Deleted: employee

Deleted: employee

(B) All sums of money withheld by an Employer from the paychecks of Employees as Union initiation fees or dues for the benefit of the Employees' local union shall be transmitted to the Local Union no later than thirty (30) days after the date on which said sums of money were withheld.

Deleted: employee

Deleted: employee

(C) If Employer fails to transmit all sums of money so withheld within the thirty (30) day period, he shall be subject to an additional payment of up to 15% of the amount due but not less than $100. If it becomes necessary for the Union to employ an attorney to collect such sums of money withheld by Employer, Employer shall also pay all court costs and attorneys' fees.

(D) Each Local Union shall have the authority to bring suit in a court of competent jurisdiction in the area where the Local Union has its headquarters for the purpose of collecting initiation fees and dues withheld but not transmitted within such thirty (30) day period.

(E) Any Employer more than three (3) months delinquent transmitting monies withheld pursuant to this article can, at the Unions option, be required to supply a bond to secure future liabilities before pre-jobbing any new projects with the delinquent Employer.

(F) For the purpose of venue and jurisdiction, each individual Employer hereby designates and appoints the Clerk of the United States District Court for the Northern District of Oklahoma, or the Clerk of the United States District Court in the area where the job is located, as agent for the service of process, and the Local Union shall promptly furnish the delinquent Employer, by certified mail, a copy of all pleadings and notices of suit.

Deleted: (E)

(G) The arbitration provisions in Article XVII of this Agreement shall not be applicable to the rights and liabilities created by this Article.

Deleted: (F)

IV.

EMPLOYMENT, LAY-OFF AND DISCHARGE OF PERSONNEL

(A) The Employer shall have full responsibility for management, and shall be the sole judge as to the number of Employees required, subject to the conditions hereinafter stated.

Deleted: employee

(B) The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and the Employer shall respect jurisdiction of the Union in assigning the work to be done.

Deleted: past custom and practice

(C) The word "journeyman" shall mean all persons seeking employment as welders, spacers, stabbers, and persons carrying the line in pipe line construction. The word "helper" shall mean all persons seeking employment as welder helpers. The clamp man is classified as a graded helper.

(D) The Employer shall be the sole judge as to the competency of any Employee and shall have the right to discharge any Employee.

Deleted: Employee

Deleted: employee

(E) At the start of each job all journeymen and welder helpers shall be hired by the employers signatory hereto in accordance with the following formula and subject to the conditions set out in Paragraph (G) hereinafter.

| Number of Employees Required | Number Hired Directly By Employer | Number Dispatched By Union | Number of Employees Required | Number Hired Directly By Employer | Number Dispatched By Union |
|---|---|---|---|---|---|
| 1 | 0 | 1 | 7 | 4 | 3 |
| 2 | 1 | 1 | 8 | 4 | 4 |
| 3 | 2 | 1 | 9 | 5 | 4 |
| 4 | 2 | 2 | 10 | 5 | 5 |
| 5 | 3 | 2 | 11 | 6 | 5 |
| 6 | 3 | 3 | 12 | 6 | 6 |

Thereafter, the Employer shall have the right to hire the thirteenth (13th) journeyman and welder helper, and the Union shall dispatch the fourteenth (14th) journeyman and welder helper, and they shall alternate thereafter until the full crew has been employed.

(F) Once a job has started, replacements of additional journeymen and welder helpers needed will behired either directly by the Union-Employer or referred by the Union in accordance with the formula in effect at that time so that at all times the ratio of Employees on the job shall be as set forth in the applicable formula. **Leave original language!**

(G) The conditions to be followed in the initial hiring or replacement of Employees are:

1. The Employer retains the right to reject any job applicant for cause and may exercise the right before the Union dispatches any Employees required by Employer. Upon request, Employer will confirm by letter or telegram any verbal rejections made.

2. The selection of applicants for referral by Union or hired directly by Employer shall not be based on, or in any way affected by, Union membership, bylaws, rules, regulations, constitutional provisions or any other aspect of or obligation of Union membership,

Deleted: hired either

Formatted

Deleted:

Formatted

Deleted: Employer or referred by the Union in accordance with the formula in effect at that time so that at all times the ratio of employeeEmployees on the job shall be as set forth in the applicable formula.

Inserted: Employee

Deleted: ¶

Inserted:

Deleted: employee

Deleted: employee

PL-000352

policy or requirements.

3. There shall be no limitation on Employer's right to select Employees with particular classifications or skills from among the Employees hired by Employer direct. Nor shall there be any limitation on Employer's right to assign Employees to particular classifications because of the Employee's membership or non-membership in a particular local union.

Deleted: employee

Deleted: employee

Deleted: employee

Deleted: employee

4. The Union must dispatch the Employees requested by the Employer at the start of a job within forty-eight (48) hours. The Union must dispatch the Employees requested after a job has started within twenty-four (24) hours. If such Employees are not actually enroute to the job site within the time required, Employer may hire any Employees from any source. In this event, Union shall not interfere with Employer's right to hire Employees direct.

Deleted: employee

Deleted: employee

Deleted: employee

Deleted: employee

Deleted: employee

5. Union agrees that unless the Employer requests otherwise, no journeymen or welder helpers will be dispatched to the Employer's job until the welders required through the referral procedure have actually been dispatched.

(H) The Employer shall be the sole judge as to the number of Employees required. The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect the jurisdiction of the Union in assigning the work to be done. In addition to the welder foreman, the welders, and their helpers, Employer shall be required to employ journeymen spacers, stabbers and persons carrying the line as needed.

Deleted: employee

Deleted: past custom and practice

Deleted:

Inserted:

(I) Once the original crew has been hired, the Employer shall have the right to keep such crew intact for the duration of the job, regardless of the local union jurisdiction.

(J) The Employer shall have the right to keep and transfer such original crew from one job to another within the jurisdiction of the same local union, provided journeymen are paid waiting time for any days intervening between the two jobs, and travel pay in accordance with this Agreement.

(K) At the end of the job, the Employer will lay off welders, journeymen and welder helpers who are no longer needed. The layoff procedure should be such that the ratio of Employees hired directly by Employer and those referred by the Union shall be the same as that set out in the formula above.

Deleted: employee

V.

STEWARDS

(A) The Union and Employer representatives shall mutually agree upon the appointment of a steward at the pre-job conference. Separate stewards shall not be required on remote segments of a mainline pipe line construction job. If the steward on the mainline job is given sufficient time and transportation to perform his duties as steward among the Employees on such remote segments.

Deleted: if

Deleted: employee

(B) Following the pre-job conference, the steward shall be placed on the Employer's payroll on the date corresponding to one of the following three occurrences, whichever date is earliest.

1. The date of testing welders;

2. The date that rigging up welding equipment, such as sleds, tack rigs, hot-pass rigs, etc., on the right-of-way begins;

Delete Item 3 entirely.

Deleted: 3. The date on which Employer employs the second utility welder in rigging up any other equipment on the right-of-way.

Deleted: ¶

Deleted: employee

(C) The steward shall be a working steward and shall perform his duties the same as any other journeyman, and shall not be discharged for Union activities. The steward's duties shall not include any matters relating to referral, hiring, retention, termination, or discipline of Employees.

(D) The steward shall not be permitted to take time away from his job duties to handle administrative work for the Union. The steward will be allowed a reasonable time to process grievances or complaints. Whenever the steward is occupied away from his job duties, his helper may be assigned to other work.

(E) It is agreed that the steward has no authority from the Union to cause a work stoppage.

(F) Where the steward has been regularly working on a job and for some unanticipated reason does not show up for work on a particular day, the Employees shall start and continue to work and the welder foreman shall notify the local union office of the steward's absence.

Deleted: employees

(G) The steward shall remain on the Employer's payroll until the tie-in work has been completed. After the firing line has finished its work, the steward may, at Employer's option, be used as one of the tie-in welders.

VI.

FOREMEN

(A) The appointment of all foremen is the responsibility of Employer. Such appointments shall not be interfered with by Union. Such foremen may be paid on an hourly, weekly or monthly basis, as determined by Employer.

The welder foreman shall be covered by the Pipe Line Industry Benefit Fund or the Pipe Line Industry Pension Fund. Contributions shall be made by Employer for the same number of hours that the job is set up on per week except as provided in (B).

(B) When twelve 12 or fewer welders are employed, the welder foreman will be allowed to work with the tools, at the discretion of Employer. Such working foreman shall be paid a minimum of $$1.50 per hour more than the regular journeyman rate and contributions shall be made by Employer to the Pipe Line Industry Benefit Fund and the Pipe Line Industry Pension Fund for all hours worked by such foreman.

Deleted: (12)

Deleted: 1.00

VII.

JOB NOTIFICATION AND ENFORCEMENT

(A) Employer agrees to notify Union promptly before starting any job covered under the terms of this Agreement. Such notification is to be sent to the Union's General Office, 901 Massachusetts Avenue, N.W., Washington, D.C. 20001, and shall describe for each job the location, size and proposed starting date. It is a violation of this Agreement to start a job without prior notification to the General Office and a local pre-job conference assigned by the General Office.

Deleted: or

(B) Employer and Union shall hold a pre-job conference before the start of any job and Union's representatives at such conference shall be authorized by the Union to represent Union for the entire area covered by the job. It shall be the purpose of the pre-job conference to agree upon such matters as the length of the work week, the number of men to be employed, the applicable wage rates in accordance with the contract, and any other matters not including any interpretation of the clauses of this Agreement, it being agreed that any interpretation of the Agreement should be made between the Pipe Line Contractors Association and the United Association, so that proper application thereof may be made on the jobs. No representative of any individual contractor and no representative of the Union shall demand at the pre-job conference or at any other time during the continuance of the job any term or condition not covered by this Agreement. A copy of the report made on each pre-job conference shall be furnished to the Pipe Line Contractors Association and the United Association, and no agreement made at any pre-job conference which adds to or modifies in any way the terms and conditions of this Agreement shall be binding on any individual contractor or the Union unless approved and ratified by the Pipe Line Contractors Association and the United Association.

(C) Union agrees to send a copy of this Agreement to each of its locals having pipe line

jurisdiction and agrees that the terms of this Agreement shall be recognized by each local union. The enforcement of this Agreement by Union is vested in the local union designated by the Union to handle work covered under this Agreement.

VIII.

ASSEMBLY POINT AND WAREHOUSE

(A) The time of each Employee shall start in the morning at his designated Assembly Point, which shall be agreed upon at the pre-job conference, but which in no event shall be on the pipe line right-of-way.

Deleted: employee

(B) If possible, there should be only one Assembly Point for all Employees and in no event shall there be more than two Assembly Points.

Deleted: employee

(C) If one city, town or community large enough to provide living accommodations for all Employees is located near the job site, then one Assembly Point may be designated not more than ten (10) miles outside the city limits and all Employees shall report to and their time shall begin at that Assembly Point. This distance may be increased beyond the ten (10) miles when circumstances warrant as agreed to by the principal parties.

Deleted: employee

Deleted: employee

(D) If one such city, town or community is not located near the job site, then one Assembly Point may be designated which is approximately the same distance from several cities, towns or communities where living accommodations are available.

(E) If living accommodations for all of the Employees cannot be found in the one large city, town or community contemplated in Paragraph (C), or in several cities, towns and communities contemplated in Paragraph (D), then a second Assembly Point which qualifies according to either Paragraph (C) or Paragraph (D), so far as available nearby living accommodations is concerned, may be designated by Employer, to which only the remaining Employees shall report and at which only their time shall begin.

Deleted: employee

Deleted: employee

(F) Notwithstanding the provisions of Paragraphs (C), (D), and (E) above, contractors bidding work in remote areas of the western part of the country may use assembly points closer to the job site so that non-productive riding time may be eliminated or reduced. It is agreed that the number of miles involved will vary.

(G) Employer shall make suitable and prompt transportation available from each Assembly Point agreed upon to the job site and back. The time of the Employees shall end at quitting time on the job site; however, the lunch period which may start at anytime between 11:45 A.M. and 12:15 P.M. and continue for 30 uninterrupted minutes (pipe gang/firing line excluded) shall be excluded. The Employer shall return the Employees to the Assembly Points in the shortest possible time. It is intended that the lapse of time used to transport the Employees from normal quitting time at the job site back to each Assembly Point shall not exceed the lapse of time from starting time at each Assembly Point in the morning to the job site.

Deleted: employee

Deleted: employee

Deleted: employees

IX.

WORKING AND SAFETY RULES

(A) There shall be no inequitable minimum or maximum amount of work which an Employeemay be required to perform during the working day, and there shall be no restriction imposed against the use of any type machinery, tools or labor saving devices, except as provided in Article I, Paragraph (L), above. At the discretion of Employer, Employees may be changed from one classification to another within the jurisdiction of the Union. During emergencies, any Employee of Employer may be assigned to any work; provided, however, that no Employee 's hourly rate shall be lowered under this provision, and provided further that in the event an Employee is assigned to work calling for a higher rate of pay, he shall receive such higher rate for hours so employed.

Deleted: employee

Deleted: employee

Deleted: employee

Deleted: employee

Deleted: employee

(B) Stringer bead and hot-pass welders and helpers can be required to weld back on incompleted welds, as long as their wage rate is not lowered.

(C) All maintenance and repair of micro-wire equipment from the lugs out shall be done either by the welder using such equipment or, at Employer's option, by some other journeyman.

(D) Employer shall have the right to make and revise from time to time safety and working rules which are not inconsistent with any of the terms of this Agreement. Union agrees to cooperate in the enforcement of such safety and working rules. Employer, Union, and all Employees shall at all times abide by all Federal and State Safety Regulations.

Deleted: employee

(E) No Employee will be required to take a physical examination as a prerequisite to employment.

Deleted: employee

(F) No foreman or other Employee shall be subject to any penalties or fines assessed by Union so long as he is in compliance with the terms and conditions of this Agreement.

Deleted: employee

(G) ~~The~~ Employers shall have the sole right to determine the number and classifications of the Employees to be hired provided such assignments are not inconsistent with this Agreement.

X.

WAGE RATES AND CLASSIFICATIONS

(A) The hourly wage rates and fringe benefits shown in Exhibits "A" and "B" shall apply to journeymen and helpers respectively for the periods indicated.

(B) The graded helper rate shall be 70 cents per hour above the welder helper rate.

(C) No premium shall be paid for any job assignment unless specifically provided in this Agreement.

(D) Journeymen employed as "stringer bead" welders and journeymen who are regularly employed as "hot-pass" welders shall receive $- $1.00per hour more than other journeymen. The journeyman employed carrying the line shall receive $1.00 per hour more than other journeymen.

Deleted: 1.00

Deleted:

(E) Welders running "stringer bead" or "hot-pass" on "cutouts" or "tie-ins" on a production basis shall be paid $-$1.00 per hour above the journeyman rate. "Production basis" shall mean those situations where one or more welders have been assigned to welding the stringer bead or hot-pass as a permanent or semi-permanent assignment, and to cover areas of skips and/or large amounts of pups in one location. It is not intended to cover the temporary assignment on a daily basis in a cut-out or tie-in crew where any such assignment is for the express purpose of expediting the movement of the tie-in tractors.

Deleted: 1.00

(F) Whenever a - welder helper is employed using a power buffer or power grinder immediately behind the stringer bead and/or hot-pass welders, and the pipe gang is set up on a production basis, he shall be paid $2.00 per hour above the helper rate. Whenever an extra welder helper is employed using a power buffer or power grinder anywhere else on the job, he shall be paid the graded helper rate. Employer retains right to hire ~~an extra~~ welder helper to use power buffer or power grinder immediately behind the stringer bead and/or hot pass welders on a production basis and he shall be paid $2.00 per hour above the helper rate. The $2.00 premium set out above will not apply on work listed in Article I, Paragraph (H). (Exception for marine work, see Article XIX, Marine No. 8.)

Deleted: n

Deleted: extra

(G) The helper assigned to operate the bending mandrel of the bending machine shall be paid the graded helper rate.

(H) The employer may at his sole discretion appoint a welder Helper straw(s) who will be paid the graded Helper rate.

Formatted: Bullets and Numbering

I) ( Pre-heating with oxygen or acetylene torches and stress relieving shall be assigned to a journeyman. Preheating with liquefied petroleum gas shall be performed by the welder's assigned helper. If an extra welder helper is hired to perform this work he shall be paid at the regular helper rate. Setting the heat on welding machines and hooking and unhooking of welding machines to tow cats shall also be performed by the welder's assigned helper.

Deleted: ¶

Formatted

Deleted: H)

Formatted

(J) ~~(H)~~ Journeymen acting as job stewards shall wherever possible be assigned to the firing line and shall be paid $1.00 an hour above the journeyman rate for all hours worked by him, or for the number of hours up to a maximum of thirteen (13) worked by any UA journeymen on the job except the UA mechanic and except for journeymen and/or welders working on testing. Provided that if the UA mechanic performs any welding after the end of the regular shift, such hours shall be counted in computing the steward's pay. It is intended that the steward shall, wherever possible, and at Employer's option, actually work the number of hours for which he is paid.

Formatted

Deleted: I

Deleted: .

(K) ~~(J)~~ In the event back welding is performed inside the pipe under either or both of the following conditions, then Employer will pay such welder engaged in back welding at a wage rate $3.00 per hour above his regular rate for the job only for the days on which such back welding is

Formatted

Deleted: J

Deleted: 2.00

PL-000358

performed. If the welder helper is required to go inside the pipe for the purpose of brushing, buffing and grinding the weld, he shall receive a wage rate $1.00 per hour above the regular helper rate for the days involved.

Deleted: 70 cents

1. If Employer elects, as a regular procedure, to back weld each line-up, then one welder will be selected each day to perform all of such back welding. This condition is not intended to apply to occasional back welding performed by the pipe gang to repair a bead, to rectify a "hi-lo" condition or wall thickness change, etc.

2. Whenever a welder is required to back weld a completed weld behind the firing line.

(L) ~~(J)~~ Welders working on "hot work" shall be paid $2.00 an hour above the regular journeyman rate and helpers working on "hot work" shall be paid the graded helper rate for each day engaged in such work. Journeymen and helpers on "hot work" shall not receive such premium pay unless required by Employer to be in the area of danger. "Hot work" is defined as work on lines in service where there is the danger of fire or explosion. - Premium pay shall not be required on work on lines not in service where such lines have been purged with air movers, water, or other acceptable methods. Even if such lines have been purged by such methods, if fire or explosion results, then premium pay shall be required. Welder Foreman and Steward will agree on what constitutes "Hot Work" at Employers' option

Deleted: K

Deleted: 2.00

Formatted

Deleted: Premium pay shall not be required on work on lines not in service where such lines have been purged with air movers, water or other acceptable methods. Even if such lines have been purged by such methods, if fire or explosion results, then premium pay shall be required.

Deleted: Clarification of "Hot Work" to be developed by UA and PLCA.

Inserted: Clarification of "Hot Work" to be developed by UA and PLCA. Welder Foreman and Steward will agree on what constitutes "Hot Work"

(M) ~~(K)~~ The payday shall be once each week, unless the Employer agrees to allow Employees one draw on money earned; under such conditions, pay day may be once every two weeks. ~~It is agreed that~~ all Employees shall [may] be given the option to be paid by direct deposit of wages on a weekly basis to the bank or financial institution of the Employee's choice, in which case pay stubs will be provided to the Employees within the time period referenced above. This optional manner of payment, once adopted by the Employer, may not be changed except upon advance notification to the Employees and the Union. Employees are to be paid during their regular shift. When Employees are laid off or discharged, their check for wages due them at the time of the layoff or discharge must be delivered during their regular shift.
Employer and Union may agree at the pre-job conference to alternate plan.

Formatted

Deleted: L

Deleted:

Deleted: employee

Deleted: employee

(N) ~~(L)~~ When no work is performed on pay day, Employer shall not be required to deliver checks for wages before the expiration of the number of hours which would ordinarily have been worked during that day.

Formatted

Deleted: M

(O) ~~(M)~~ Employer shall make arrangements in each locality where Employees are employed to enable such Employees to cash their pay checks, at no cost to the Employees.

(P) ~~(N)~~ The wage rate for all Employees covered by this Agreement shall be that of the County or State in which the pipe gang is currently working or in which it was located when the pipe was laid out.

Deleted: N

Deleted: employee

Formatted

Deleted: employee

Deleted: employee

Formatted

Deleted: O

Deleted: employee

XI.

OVERTIME AND HOLIDAY PAY

(A) The work week shall begin Monday and shall end Sunday. All hours worked by an Employee in excess of eight hours per day and in excess of forty straight time hours per week shall be paid for at the rate of time and one-half the straight time rate. In all states after an employee has worked eight (8) hours, he will be on overtime until he is relieved and provided with at least an eight (8) hour break before returning to work. Reporting time pay provisions will not apply when on overtime pay; however, waiting time as provided for in this Agreement will apply. Work performed on Christmas, Thanksgiving, Labor Day, New Year's Day and July 4 shall be paid for at double the straight time hourly rate; provided, however, that in the event one of the holidays hereinabove named occurs during the first forty hours of any work week, hours worked on such holidays shall not be counted in computing the forty hours after which the Employee is entitled to a rate of time and one-half the straight time rate.

Deleted: employee

Deleted: and all hours worked on Sunday

Deleted: employee

(B) If one of the holidays named in Paragraph (A) above falls on Sunday, it shall be observed on Monday. Accordingly, if such an event occurs, work performed on Sunday shall be paid for at the regular rate for that day; work performed on Monday will be paid for at double the straight time hourly rate. If no work is performed on Monday, no pay other than waiting time to journeymen shall be required.

(C) ~~Need decision for work in excess of twenty four (24) straight hours.~~

Formatted

XII.

WAITING TIME

(A) Journeymen shall be paid waiting time for any days lost during the normal scheduled work week. For any day lost during any one work week, the waiting time payment shall be a lump sum which is the equivalent of five (5) hours' pay at the straight time rate applicable on that particular job.

(B) The applicable waiting time for each State is based on the journeyman rate and not the stringer bead, hot-pass, steward or other premium rates. In no event shall the waiting time payment be included in counting the eight or forty hours after which overtime is payable.

(C) If no work is performed on a holiday designated by this Agreement, journeymen shall be paid waiting time. However, if an official holiday as designated by this Agreement comes on a Sunday, and the Employer is working a regular six day week, such journeymen will not be paid waiting time for that day.

(D) If the regularly scheduled work week is less than seven (7) days, journeymen shall not be paid any waiting time for the days lost which are not part of the regularly scheduled work week.

(E) If a journeyman's Assembly Point is moved from one location to another he shall be paid eight hours at the straight time rate whether any working time is actually lost or not. Such hours shall not be counted in computing the forty hours after which overtime is payable, and no contributions shall be required to the Pipe Line Industry Benefit, Pension and Advancement Funds for such moving time hours.

(F) If the Assembly Point for a helper or graded helper on loop work is moved in excess of 100 miles such helper or graded helper shall be paid four hours at the straight time rate whether any working time is actually lost or not. Such hours shall not be counted in computing the forty hours after which overtime is payable, and no contributions shall be required to the Pipe Line Industry Benefit, Pension and Advancement Funds for such moving time hours.

(G) If one or more days of work are lost during the work week and journeymen are paid waiting time for such lost days, then Employer may require journeymen to make up such lost days in the future by working on days which are not part of the regularly scheduled work week without incurring any liability for payment of waiting time on such days not worked in the future. However, once the contractor declares a make-up day, such day must then be worked or, if no work is provided on such day, then waiting time will be paid. Employer must declare intent to work no later than ~~starting time~~ 10 am the day prior to the day the Employer plans to work. Informing the Steward shall constitute sufficient notice.

question on this – What if client loads Sunday work.

Deleted: quitting

Deleted: two (2)

Deleted: s

Deleted: wishes to make up

Inserted: two (2)

(H) Even if no days are lost during the regularly scheduled work week, those journeymen regularly employed in utility, tie-in crews, gate or valve settings, road crossings or fabrication work may work on the days not part of the regularly scheduled work week or on holidays without the Employer becoming liable for waiting time payments to the other journeymen. Those journeymen regularly employed as stringer bead welders, hot-pass welders, firing line welders, spacers, stabbers or clamp men may be worked in tie-in crews, gate or valve settings, road crossings, or utility or fabrication work on the days not part of the regularly scheduled work week or on holidays, when needed, without the Employer becoming liable for waiting time payments to other journeymen provided each journeyman in the classifications needed is given equal opportunity to work, starting with the firing line.

(I) If the regularly scheduled work week is less than seven (7) days, in emergencies, when the Business Agent of the Local Union is notified beforehand, Employer may require journeymen to work on the days not part of the regularly scheduled work week without incurring liability for waiting time payments on future such days not worked.

(J) In the absence of an emergency if Employer is working a regularly scheduled work week which is less than seven (7) days and works the pipe gang and/or firing line two (2) consecutive weeks on days which are not part of the regularly scheduled work week he will incur liability for waiting time payments on such days not worked in the future on said job.

XIII.

TRAVEL EXPENSES

(A) The journeyman will receive the applicable IRS allowable rate per mile travel pay via the nearest route from the city or town in which he is located at the time he receives his dispatch to the location of the job site. The journeyman will be entitled to travel pay to the job site (initial travel pay) and an equal amount of travel pay upon completion of the job (return travel pay). The journeyman WILL NOT receive either initial or return travel pay unless he remains on the job from the date he is hired until the job is completed, or until he is released by employer. If he fails to complete the job for any reason he shall not be entitled to any travel pay.

Deleted: 30¢

Deleted: 40.5 cents per mile

Deleted: where

Deleted: hired

(B) Journeymen or helpers hired directly by Employer or dispatched by Union to jobs in the continental United States from Alaska will only be entitled to receive travel pay from the point at which they enter the continental United States to the job site.

(C) When a job converts from micro-wire to stick rod and vice versa, all journeymen welders shall be entitled to travel pay at that time. However, other journeymen employed will be entitled to travel pay only as otherwise provided in this Agreement.

(D) The welder helper will receive 66% of the applicable IRS allowable rate per mile travel pay via the nearest route from the city or town in which he is located at the time he receives his dispatch to the location of the job site. The welder helper will be entitled to travel pay to the job site (initial travel pay) and an equal amount of travel pay upon completion of the job (return travel pay). The welder helper WILL NOT receive either initial or return travel pay unless he remains on the job from the date he is hired until the job is completed, or until he is released by employer. If he fails to complete the job for any reason he shall not be entitled to any travel pay.

Deleted: 20¢

Deleted: 30.5 cents

Deleted:

Deleted: where

Deleted: hired

(E) The cost of any transportation provided by Employer shall be charged against the travel expense to which a journeyman or helper is entitled under this clause; provided, however, that such charge shall not exceed the cost of a commercial airline ticket.

(F) Travel expense provided for herein shall not be applicable when the Employee's Assembly Point is moved from one location to another on the same job.

Deleted: employee

(G) When a helper is hired direct by Employer or dispatched by Union, and no work at all is available for him, he shall be paid eight (8) hours at the straight time rate applicable for that job. If work is available for the helper, but not on the day assigned for his arrival to the job site, then he shall be paid four (4) hours' pay at the applicable wage rate for that job at the straight time rate for each day for which work is not provided.

(H) Whenever any dispute arises over travel pay, the final decision shall be made by agreement between a representative of the Pipe Line Contractors Association and a representative of the Union.

XIV.

REPORTING TIME PAY

(A) After a welder helper has been hired and ordered to report for work at the regular starting time, and no work is provided for him on the day that he has so reported, he shall receive pay equivalent to four (4) hours at the rate applicable for that day. This pay shall be provided notwithstanding he has not been ordered to report for work on that particular day, if the welder helper has been working regularly and the Employer has failed to notify him not to report for work the preceding day at or before the end of his regular shift or 5:30 p.m., whichever is later. The reporting time pay of four hours at the straight time rate is based upon the basic helper rate and not any premium rate.

(B) Any welder helper who reports to work and for whom any work is provided, regardless of the time that he works, shall receive the equivalent of not less than four (4) hours pay.

(C) Any welder helper who reports to work and works more than four (4) hours in any one day shall receive pay equal to the number of hours for that day for which the job has been set up not to exceed ten (10) hours.

Stays in

Remains unchanged

Deleted: not to exceed ten (10) hours.

(D) If a journeyman who is entitled to waiting time performs some work during the day and is then prevented from completing a full day's work for any reason, he shall receive five (5) hours pay at the rate for that work day. If he works more than four hours and is then prevented from completing a full day's work for any reason, then such journeyman shall be entitled to receive pay equal to the number of hours for that day for which the job has been set up; provided, however, that such journeyman shall not leave the job site unless specifically directed by his foreman. If he leaves the job site or stops work without being directed to do so by his foreman, he shall be entitled to receive pay only for hours actually worked.

(E) If, under any of the circumstances described above, any Employee leaves the job site or stops work without being directed to do so by his foreman, he shall be entitled to receive pay only for hours actually worked.

Deleted: employee

(F) Fringe contributions shall be required on any hours paid under these provisions even though not actually worked. Hours paid for under this provision shall be counted in computing the forty (40) hours after which overtime is payable.

(G) It is expressly provided, however, that when any Employee refuses to work or to continue to work or work stoppage conditions brought about by a third party or third parties prevent or make ill-advised in the opinion of the Employer the performance of any work or the continuance of work once started, no pay for time not worked shall be required under any of the above enumerated conditions.

Deleted: employee

(H) Where notification of the men is required under this Agreement to the effect that work shall not be performed on a particular day, notification of such fact to the steward shall be

sufficient notification to the men, provided such notification is made during working hours.

XV.

TESTING TIME

(A) Before any welder is given a test (single or multiple) for qualification he shall be placed on Employer's payroll.

(B) Single Test. Where a welder successfully completes a single qualification test he shall be entitled to receive pay equal to the number of hours for that day for which the job has been set up (defined as normally scheduled work day); however, Employer may require the welder to work any remaining hours of the normally scheduled work day after completing his test without additional pay. A welder will be entitled to additional pay for any hours he is required to work beyond the normally scheduled work day. If a welder fails a single qualification test he shall receive four (4) hours pay at the straight time rate. No fringe benefit contributions are required on a failed test.

(C) Multiple Tests. If a welder is required to take more than one test for qualification at the start of the job he shall be entitled to receive:

1. Four (4) hours pay at the straight time rate with no fringe benefit contributions if he fails the first test; or

2. Pay equal to the number of hours for that day for which the job has been set up (normally scheduled work day) provided he successfully completes the first test.

The welder will be paid work time and fringe benefit contributions under this Agreement for any additional tests required regardless of the outcome of the tests and regardless of the day taken. Welders, however, must pass all required tests to be eligible for employment.

(D) Welders will not be entitled to any separate test pay for single or multiple tests other than as set out in this Article.

(E) Welders reporting for qualification tests must arrive at the job site at the designated work time on the day designated by Employer for their arrival. If not, they shall not be entitled to receive waiting time pay for that day.

(F) A welder shall be tested or placed on waiting time upon arrival at the job site, provided that it is the day designated by Employer for his arrival. Hours paid for under this provision shall be counted in computing the 40-hour week.

(G) Welder helpers who perform no work while the welder is taking a qualification test are entitled to no pay.

XVI.

WORK STOPPAGES, SECONDARY BOYCOTTS AND JURISDICTIONAL DISPUTES

(A) No local union nor the International Union, nor any representative of either, shall cause or promote a strike, slowdown, stoppage of work or any interference, directly or indirectly, with the operation and progress of the work; nor shall any Employer or the Pipe Line Contractors Association engage in any lockout during the life of this Agreement, it being the good faith intention of the parties hereto that by the execution of this Agreement industrial peace shall be maintained. All grievances, disputes, differences of opinion and other questions concerning this Agreement shall be settled in accordance with the procedure for settlement of grievances and disputes set out in Article XVII below. Any settlement where hours or pay are involved shall be retroactive.

(B) If either the local union or the International Union or any representative of either causes or promotes a strike, slowdown, stoppage of work or any interference with the operation or progress of the work, or if the Employer breaches this Agreement, then the Employer (where the Union interfered with the work) or the International Union (where Employer has breached the Agreement) may at its option declare the provisions of Article XVII inoperative and seek whatever remedy may be available from the National Labor Relations Board or any Federal or State court having jurisdiction of the matter.

(C) It shall not be a violation of this Agreement or of the no-strike clause if members of the United Association refuse to cross a picket line established by another craft union within the pipe line industry.

(D) Questions regarding the interpretation of this Agreement are to be resolved by the parties to this Agreement in accordance with Article XVII. Questions regarding work coverage or jurisdictional disputes between or among local unions affiliated with the United Association will be resolved by the United Association, and shall be binding on all parties to this Agreement. Work coverage or jurisdictional disputes between local unions affiliated with the United Association shall not be cause for work stoppages.

XVII.

PROCEDURE FOR SETTLEMENT OF GRIEVANCES AND DISPUTES

(A) Any grievances, disputes or differences of opinion which arise between the contractors' supervisory personnel and Union representatives in the field shall be settled on the job, wherever possible; provided that such settlements shall not vary any of the wages, terms or conditions of this Agreement.

1. Any Employee who believes that he has a grievance shall first take the

Deleted: employee

matter up with the welder foreman.

2. If the matter is not satisfactorily adjusted by the foreman, the grievance shall be referred to the job steward. The job steward and the foreman will attempt to resolve the grievance.

3. If the grievance is not settled between the steward and foreman, the Employer's superintendent will be summoned to enter the discussion. When the matter cannot be settled at this level, it will be referred to the Union's Business Agent and Employer's superintendent.

4. In the event the grievance, dispute, or difference of opinion shall not have been satisfactorily settled during the preceding steps within forty-eight (48) hours, then the Union representative shall refer it to the appropriate International Union representative, and the Employer's superintendent shall refer it to the Managing Director or Executive Director of the Pipe Line Contractors Association. These parties shall immediately make every effort to settle the difference, grievance or dispute.

(B) Any other grievance, dispute, difference of opinion or controversy of any kind or character between the Union and the Association and/or individual Employer signatory hereto involving or relating to the interpretation or application of the terms of this Agreement, and the relations between the parties arising during the term of this Agreement which cannot be settled by the parties, shall be settled by the arbitration procedure which is set out below.

(C) If, within forty-eight (48) hours, no adjustment or settlement is reached by the procedure set out above, the matter shall immediately be referred in writing to an Arbitration Board consisting of six (6) members, all of whom shall be familiar with the mainline, cross country pipe line construction industry, three (3) to be appointed by the International Union, and three (3) by the Pipe Line Contractors Association. These six (6) individuals shall constitute the Arbitration Board.

(D) The Members of the Arbitration Board shall not have the power to amend or alter the provisions of this Agreement but shall within fourteen (14) days of their appointment determine the procedure that they will use in considering the evidence and render a decision based on the evidence submitted by the parties, such decision to be consistent with the terms and provisions of this Agreement. The decision of the Arbitration Board shall be binding upon both parties.

(E) In the Unlikely Event that the six (6) member Arbitration Board is unable to reach a decision, then either party may institute the following procedure:

1. Within seven (7) days after notification by the Arbitration Board that it is unable to reach a decision, the Pipe Line Contractors Association and the International Union shall attempt to mutually agree upon one (1) person to whom the matter shall be referred.

2. If within forty-eight (48) hours no mutual agreement has been reached by the procedure set out above, the Association will immediately contact the Federal Mediation & Conciliation Service to obtain a list of three (3) individuals with as much experience and knowledge as possible in the pipe line construction industry. A copy of this list will be furnished to the Union, and thereafter, the Association and Union shall attempt to mutually agree upon one (1) of the

individuals listed. If no agreement can be reached, the Union and the Association will each strike one (1) name from the list and the remaining individual will be the Arbitrator.

3. A statement of the facts shall be presented to the Arbitrator within forty-eight (48) hours after his selection either:

(a) Jointly, if the Union and the Association mutually agree; or

(b) Separately, if no mutual agreement and the Association will submit a written statement of the facts setting out the Employer's position and the Union will submit a written statement setting out the Union's position.

4. All information submitted to the Arbitrator will be in writing. No personal appearances or oral testimony will be allowed. The Arbitrator will then issue, within five (5) days, a decision based upon the evidence submitted.

(F) The Union and Employer involved shall bear the expense of their appointed Arbitrators. In the event an Arbitrator from the Federal Mediation & Conciliation Service is selected, then the Union and Employer shall be jointly responsible for that person's expenses.

(G) In the event Employer fails or refuses to comply with the grievance procedure set out hereinabove, the provisions of Article XVI shall not be binding upon the Union. If Union fails or refuses to comply with the grievance procedure set out hereinabove, then Employer shall have the right to declare this entire Agreement null and void.

XVIII.

JURISDICTIONAL DISPUTES

The Pipe Line Contractors Association and the four International Unions with which National Pipe Line Agreements have been negotiated have established a Policy Committee for the purpose of hearing and considering matters of concern to the pipe line construction industry, such as jurisdictional disputes and any other matters affecting the welfare of the industry.

Whenever a jurisdictional dispute arises between Union and any other union over proper jurisdiction of work assigned by an individual contractor, no work stoppage shall occur, and the individual signatories hereto agree to abide by any decision reached by the Policy Committee.

The Policy Committee decisions are incorporated and made a part of this Agreement, and should be referred to specifically as if set out herein. The Policy Committee decisions may be obtained by contacting the Union or the Pipe Line Contractors Association.

XIX.

SPECIAL WORK

(A) Whenever the Employer performs any of the special work described in Article I, Paragraph (H) above except that covered by the Attachments, the special provisions set out herein shall apply and, to the extent they differ from the provisions in other parts of this Agreement, they shall supersede such provisions.

(B) The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect jurisdiction of the Union in assigning the work to be done.

Deleted: past custom and practice

TAKEUP JOBS (SALVAGE PIPE)

1. Roughcutters will be paid $2.00 per hour above the regular helper rate.

2. One helper will be employed for each roughcutter.

3. Bevelers will be paid $2.00 per hour above the regular helper rate.

4. Utility Welder or some other journeyman designated by Employer will act in the capacity of foreman. In the event the pipe being salvaged is also being re-laid or re-conditioned as part of the same job, and where the distance is such that the welder foreman is readily available, then no other welder foreman will be required.

RECONDITIONING

(A) Over the Trench -- Line In or Out of Service.

1. Journeymen welders will be used for all welding.

2. One helper will be hired for each welder.

3. One journeyman other than the welders will be employed.

4. Welder foreman.

(B) In the Yard (Where Manual Double Jointing Is Performed)

1. Welders may make their own stringer beads and finish welds.

2. One helper will be employed for each welder. Helpers will be employed to

roll all pipe on the welding rack.

3. Bevelers will be paid $2.00 per hour above the regular helper rate.

4. One helper will be employed for every two bevelers.

5. Roughcutters will be paid $2.00 per hour above the regular helper rate.

6. One helper at a rate 70 cents per hour above the rate paid to other welder helpers on the job will be employed as attendant for oxygen manifold and acetylene generator.

7. Welder foreman.

8. It is recognized that rigging up of equipment on a double joint rack that is to be used in the lining-up and welding of pipe is the work of the United Association.

NOTE: When pipe is not being double jointed in the reconditioning yard, the journeyman and helper at a rate 70 cents per hour above the rate paid to other welder helpers on the job need not be employed.

NOTE: The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect jurisdiction of the Union in assigning the work to be done.

Deleted: past custom and practice

(C) Re-Laying Reconditioned Pipe.

1. If certain joints, portions of joints, or infrequent sections are removed to be replaced with new or better pipe, then when the pipe line is relaid, Employer shall have the sole right to determine the number and classifications of the Employees to be hired; provided that Employer shall respect jurisdiction of the Union in assigning the work to be done so that welder helpers will not be assigned to work heretofore done by graded helpers or journeymen, and graded helpers will not be assigned to work heretofore done by journeymen.

Deleted: employee

Deleted: respect

Deleted: past custom and practice

2. The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect jurisdiction of the Union in assigning the work to be done.

Deleted: past custom and practice

MARINE BARGE AND MARINE PUSH-JOBS

On marine barge and marine push-jobs, Employer shall have the sole right to determine the number and classifications of the Employees to be hired; provided that Employer shall respect jurisdiction of the Union in assigning the work to be done so that welder helpers will not be assigned to work heretofore done by graded helpers or journeymen, and graded helpers will not be assigned to work heretofore done by journeymen.

Deleted: employee

Deleted: past custom and practice

1. The contractor will make every effort to secure safe water transportation and adequate and safe loading and unloading facilities for the men (ladder on barges, docks, lifebelts, seating for all, radar where possible).

2. Employees will be paid riding time on the first trip from land to quarter boat, and on the last trip from quarter boat to dock of origin or back to the dock last left from.

3. Board and room shall be furnished at no cost to the men, when required to live on quarter boats.

4. Contractor will provide crew boats for trips to shore, except when the distance to be traveled to and from shore is excessive.

Contractor shall regulate time schedules and decide when crew boats will go to and from shore. If no work is done on a particular day, the men shall be paid for their full shifts unless they are brought to shore or given an opportunity to be brought to shore. In such event they shall be paid their regular waiting time only.

5. Contractor will make every effort to provide daily mail service and once a week laundry service. Laundry service will be paid for by the Employee.

Deleted: employee

6. A crew room shall be made available for off-duty men, with reading material, radio and television; soft drinks and cigarettes will be made available at regular prices.

7. Marine push-jobs will also include shoves on a main line job where ramps or racks with dollies and rollers are set up as opposed to the pipe being carried in by tractors.

8. When the stringer bead welders' regularly assigned helpers are using a power buffer or power grinder, such helpers shall receive $2.00 per hour above the basic helper rate for that job. This premium applies in the "Pipe Gang" area only, and is applicable on "push" jobs in-shore and on work done from barges in-shore and off-shore.

GATHERING LINES, RIVER & BRIDGE CROSSINGS, HIGHWAY RELOCATION, CHANGE OUTS, SHORT LINES AND WORK IN CONGESTED AREAS

1. Employer shall have the sole right to determine the number and classifications of the Employees to be hired; provided that Employer shall respect jurisdiction of the Union in assigning the work to be done so that welder helpers will not be assigned to work heretofore done by graded helpers or journeymen, and graded helpers will not be assigned to work heretofore done by journeymen.

Deleted: employee

Deleted: past custom and practice

2. On River and Bridge Crossings and Highway Relocation work all welders will receive premium pay when running their own beads and finishing welds.

3. On all such work the manning shall be decided by the contractor, but it is recognized that the work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect jurisdiction of the Union ~~past custom and practice~~ in assigning the work to be done.

Formatted

DOUBLE JOINTING IN THE FIELD

Employer will respect Union jurisdiction for all double jointing in the field.

HYDROSTATIC TESTING

(OQ qualified when required)

1. Journeymen and/or welders and graded helpers will be employed to assist in the lining-up, beveling and testing of these lines. The Employer and the Union recognize that journeymen and welders who are qualified to perform hydrostatic testing on Pipe Lines possess a special skill. Furthermore, the Union and the Employer recognize that safety requirements dictate that only qualified journeymen and/or welders will be employed to perform hydrostatic testing on Pipe Lines. Employer in accordance with Article IV shall be the sole judge as to the competency of any journeymen or welders assigned for hydrostatic testing. Journeymen and/or welders for hydrostatic testing will be dispatched Employees. The graded helper will be a contractor hire.

Deleted: pipeline

Deleted: pipeline

Deleted: employee

2. The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect jurisdiction of the Union in assigning the work to be done.

Deleted: past custom and practice

3. If any night work is performed under this section by employees of any other craft, a U.A. Employee will be assigned to that crew.

Deleted: employee

## FABRICATION

1. Where a fabrication crew is set up, the following formula will be used to determine the number of journeymen and graded helpers required in addition to the welders and their helpers.

| Welders | Journeymen | Graded Helpers |
|---|---|---|
| 1-3 | 0 | 0 |
| 4 | 1 | 0 |
| 5-10 | 1 | 1 |
| 11 or more | 2 | 1 |

2. If the fabrication crew is set up as part of a mainline job, and where the distance is such that the welder foreman is readily available, then no other welder foreman will be required for the fabrication crew.

Employer may designate one welder to act as the lead welder or fabricator or tack and layout man and pay him a rate $1.00 above the regular journeyman rate.

3. In the event a welder is required to go completely inside the pipe in order to back weld on fabrication work, the Employer will pay such welder engaged in such back welding at the wage rate of $3.00 per hour above his regular rate for the job only for the days on which such back welding is performed.

Deleted: $2.00

## ROAD BORING, CASING AND CABLE

1. One welder and one helper shall work on road casings where the casing is to be welded.

2. On other types of casing where no welding is required, one journeyman and one helper shall be employed.

3. The welding and aligning of pipe for road casing and slick bore pipe shall be performed by a welder and helper as defined in this Agreement.

4. The work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect jurisdiction of the Union in assigning the work to be done.

Deleted: past custom and practice

WATER LINES INCLUDING THE
LAYING OF PIPE MADE OF MATERIAL
OTHER THAN STEEL

It is recognized that the work coming under the jurisdiction of the Union includes, regardless of the materials and mode or method used, the preparation of the pipe for joining, lining up of the pipe and the handling of the clamps, and joining of the pipe, and Employer shall respect jurisdiction of the Union in assigning the work to be done. Parties will negotiate special wages and conditions for water lines on a per job basis.

Deleted: past custom and practice

XX.

AUTOMATIC DOUBLE JOINTING RACKS

The manning requirements and other special provisions for double jointing racks are as follows:

(A) First O.D. Head Position

1. Two Journeymen

2. One welder

3. One graded helper to line up seams and to help with line-up.

4. Levers or buttons to be operated by one of the journeymen or the welder listed above.

(B) Second O.D. Head Position.

1. One welder

2. One graded helper

(C) I.D. Head Position

1. One I.D. head welder

2. One graded helper

NOTES: (The following notes apply to all double-jointing racks.)

1. One spell-off welder per rack per shift will be employed to relieve at all head positions. The spell-off welder will receive premium pay of $1.00 per hour above the journeyman rate only when he is required to go inside the pipe.

2. No additional helper shall be required for the spell-off welder.

3. One patch welder shall perform utility and cut-outs and patch welds on rack. This welder may be the steward. In the event, however, there is more utility or cut-out work than this one patch welder can reasonably perform during his regular shift, then another journeyman will be employed to help with this work, or at Employer's option the patch welder will be allowed to perform the extra work after his regular shift.

4. I.D. Head welder shall receive premium pay of $1.00 per hour above the journeyman rate.

5. Helpers shall roll all pipe from grinders through inspection.

6. Employees operating the automatic grinding stations on double-jointing racks will receive a rate 75 cents per hour below the applicable journeyman rate.

7. Other helpers or graded helpers shall be employed as needed, depending upon the work required.

8. It is understood that all fabrication of double-jointing racks, rigging them up in the field, tearing them down and moving will be done by the United Association personnel.

9. Premium pay will not be paid for back welding inside the pipe on double-jointing, nor shall any additional pay be due to welders for tearing down the rack on the theory of "welding back."

10. A U.A. mechanic will be allowed to do maintenance and repair welding on the rack whenever required.

Deleted: XXI

Deleted: AUTOMATIC WELDING

Deleted: Separate manning agreements have been reached on the Automatic Welding Processes, and these Agreements are incorporated and made a part of this National Pipe Line Agreement. Copies may be obtained by contacting the Union or the Pipe Line Contractors Association.

## XXI.

Deleted: XXII

## PIPE LINE INDUSTRY FRINGE CONTRIBUTIONS

(A) All Employers working under the terms of this Agreement shall make contributions for each hour paid to Employees covered hereunder, including hours paid to journeymen for waiting time, and for passing a test, and to welder helpers for reporting time:

Deleted: employee

1. For journeymen, the sum of $9.15 per hour to the Pipe Line Industry Benefit Fund; for non-journeymen, the sum of $6.65 per hour to the Pipe Line Industry Benefit Fund. The

Deleted: Pipeline

Agreement and Declaration of Trust of the Pipe Line Industry Benefit Fund is incorporated and made a part of this Agreement by reference thereto.

2. For journeymen, the sum of $3.85 per hour to the Pipe Line Industry Pension Fund; for non-journeymen, the sum of $2.77 per hour to the Pipe Line Industry Pension Fund. The Agreement and Declaration of Trust of the Pipe Line Industry Pension Fund is incorporated and made a part of this Agreement by reference thereto.

3. For all Employees, the sum of 50 cents per hour to the Pipe Line Industry Advancement Fund. The 50 cents contribution to the PLIAF will not be applicable on Special Agreement work. Contributions to the Pipe Line Industry Advancement Fund are irrevocable; however, this contribution is elective for any Employer who is not a member of the Pipe Line Contractors Association. The Pipe Line Industry Advancement Fund is administered by the Pipe Line Contractors Association and the rules and regulations of this Fund are incorporated and made a part of this Agreement by reference thereto.

Deleted: employee

4. For all Employees, effective January 1, 2000, the sum of 5 cents per hour to the United Association Training Fund. The Agreement and Declaration of Trust of the United Association Training Fund is incorporated and made a part of this Agreement by reference thereto.

Deleted: employee

5. For all Employees, effective August 1, 2004, the sum of 50 cents per hour to the United Association Local 798 Training Center. The Agreement and Declaration of Trust of the United Association Local 798 Training Center is incorporated and made a part of this Agreement by reference thereto.

Deleted: employee

(B) For all Employees, Employer shall deduct and remit when authorized by Employee amounts for the "U.A. 401(k) Plan." Amounts remitted for the 401(k) plan are deductions only. There are no matching employer contributions. The "U.A. 401(k) Plan" referred to herein will initially be administered through the existing Oklahoma State Pipe Trades Annuity Fund. Contributions shall be remitted to the Pipe Line Industry Benefit Fund for transfer to that fund. Establishment of a separate fund for this purpose to receive a spinoff from the Oklahoma State Pipe Trades Annuity Fund and to receive future 401(k) contributions is subject to the discretion of the Employers and the Union. The Agreement and Declaration of Trust of the Oklahoma State Pipe Trades Annuity 401(k) Fund is incorporated and made a part of this Agreement by reference thereto.

Deleted: employee

Deleted: employee

401(k) money to go to home Local

(C) The submitting of contributions/deductions provided for in this Article shall be governed by the provisions of Article XXIII.

XXII

Deleted: XXIII.

SUBMITTING REPORTS AND CONTRIBUTIONS, LATE FILING CHARGES AND DELINQUENCIES

(A) All contributions due and owing to the Pipe Line Industry Benefit Fund, the Pipe Line Industry Pension Fund, Oklahoma State Pipe Trades Annuity Fund, and the Local 798 Training Center, shall be deemed and are considered to be the assets of each such trust fund.

(B) Upon the written request of any Employee who is a member of a local union having jurisdiction of work covered by this Agreement, the Director of the Benefit and Pension Funds provided for in this Agreement shall immediately transfer to the fringe funds established by the Employee's local union all contributions made on his behalf to such Funds by Employers working under this Agreement, subject to approval by the Board of Trustees.

Deleted: employee

Deleted: employee

(C) Changes in the amounts to be contributed to each Fund may be made by agreement between the Pipe Line Contractors Association and the Union.

(D) The Pipe Line Industry Benefit Fund, the Pipe Line Industry Pension Fund, and the U.A. Local 798 Training Center, shall be administered by a Board of Trustees appointed in accordance with the Trust Agreements.

Deleted: consisting of three (3) members appointed by the Union, and three (3) members appointed by the Pipe Line Contractors Association.

(E) There have heretofore been prepared and executed Trust Agreements for the Benefit Fund, Pension Fund, and Training Center. The parties have also adopted the Trust Agreements for the Oklahoma State Pipe Trades Annuity Fund and consent to the appointment and retention of its current and future governing boards of trustees. Such Trust Agreements set out the type of health and welfare, pension, training and other benefits which are provided by the Funds and the manner and procedure to be followed in qualifying for such benefits. The Trustees shall have the authority to determine the amount of each of such benefits which can be provided by the resources of the Funds and the time when such benefit payments may begin.

(F) Each Employer working under this Agreement agrees to be bound by the terms and provisions of the Trust Agreements referred to hereinabove, and to promptly pay all contributions to the office of the Pipe Line Industry Benefit Fund upon forms supplied by that office.

(G) If, in the opinion of the Board of Trustees of any of the above named Funds, any individual Employer has had a record of delinquent contributions to such an extent that it is necessary for the protection of the beneficiaries of such Funds that some security for the contributions be obtained, said Board of Trustees is authorized to require such individual Employer to deposit the sum of $300 per Employee in an escrow account designated by the Director of the Funds. Upon completion of the job, any amounts in excess of the contributions due shall be refunded to the individual Employer.

Deleted: employee

(H) No Employer working under the terms of this Agreement shall be obligated or required to make any other contributions or payments in and to any other Trust Fund administered for the purpose of any of the provisions authorized pursuant to the National Labor Relations Act, as

amended, when engaged in work covered by the terms of this Agreement.

(I) When a man is taken from any crew to be used temporarily as a welder helper, and such man's wage rate is higher than the welder helper wage rate, he shall be paid the higher wage rate; and if Employer is required to pay into other fringe funds for that man, Employer will not be required to make any contributions to the fringe funds called for in the National Pipe Line Agreement; provided, that contributions to the fringe funds called for by this National Pipe Line Agreement shall be required if the temporary welder helper has worked more than eight hours in that capacity. Nevertheless, if Employer has called upon Union to supply a permanent welder helper, and Union has failed to do so, Employer shall not be required to make such contributions for hours worked by the temporary welder helper.

(J) Each Employer shall report and pay regularly, and no less frequently than its regular payroll period, all contributions due.

(K) All contributions become delinquent after thirty (30) days from the end of the reporting period, and a late report charge of up to 15% of the amount due but not less than $100.00 shall be paid into the Funds by said delinquent Employer; provided, further, that if it becomes necessary in the opinion of the Board of Trustees to refer such delinquency to an attorney for collection, said Employer agrees to pay all court costs and all attorneys' fees in addition to the late report charge.

(L) For the purpose of venue and jurisdiction, each individual Employer hereby designates and appoints the Clerk of the United States District Court for the Northern District of Oklahoma as agent for the service of process, and the Funds' Director shall promptly furnish all delinquent contractors, by certified mail, a copy of all pleadings and notices of suit.

(M) The arbitration provisions in Article XVII of this Agreement shall not be applicable to the rights and liabilities created by this Article.

(N) Notwithstanding any other provision of this Agreement, the Union shall be authorized to withhold labor and refuse Employee referrals to any Employer that becomes more than 60 days delinquent in its fringe benefit contributions to any trust fund. No Employee shall be terminated or retaliated against by any Employer for participating in any work stoppage or cessation initiated by the Union pursuant to this subsection. The exercise of this right by the Union shall not impair the rights of the Union or Trustees of the Funds to pursue collection of delinquent contributions through litigation or administrative collection on any surety bond.

Deleted: employee

Deleted: employee

XXIII.

Deleted: XXIV

SUBSTANCE ABUSE POLICY

A Substance Abuse Policy has been negotiated by the Pipe Line Contractors Association and the United Association and is attached hereto and made a part of this Agreement as an Attachment.

Deleted: Exhibit C.

XXIV.

Deleted: XXV

ALCOHOL MISUSE PREVENTION POLICY

Attachment

An Alcohol Misuse Prevention Policy has been negotiated by the Pipe Line Contractors Association and the United Association and is made part of the Agreement. Refer to ~~Exhibit~~ F for information on this Policy.

XXV

Deleted: XXVI.

HISTORICAL PRECEDENT

Since the inception of the National Pipe Line Agreements, which cover all mainline cross-country pipe line construction, only four (4) unions have been recognized, and all work relating to such pipe line construction has been performed by these four (4) unions. They are: The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, The United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, The International Union of Operating Engineers, and The Laborers International Union of North America. The recognition of only these four (4) unions on such work is hereby reaffirmed.

XXVI

Deleted: XXVII.

INTERPRETATIONS

Interpretations to this Agreement have been agreed upon between the Pipe Line Contractors Association and the United Association and are attached hereto and made a part of this Agreement as an Attachment.

Deleted: Exhibit D.

XXVII

Deleted: XXVIII.

INDIAN PREFERENCE IN EMPLOYMENT

The hiring procedures contained in this Agreement shall not apply in the "territorial jurisdiction" of any Indian Nation which has adopted an Indian Preference in Employment Law, provided that those persons covered by the law and seeking covered employment under this Agreement possess the "necessary qualifications" which are essential to the performance of that specific job.

XXVIII.

Deleted: XXIX

EFFECTIVE DATE, TERMINATION AND RENEWAL

(A) This Agreement shall become effective, when signed by the parties hereto and shall remain in full force and effect until its termination as provided hereinbelow.

Deleted: August 1, 2004

(B) The provisions of this Agreement shall continue in full force and effect until, and thereafter from year to year unless terminated at he option of either party after sixty (60) days notice in writing to the other.

Deleted: July 31, 2005

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this 8th day of November, 2004.

Deleted: ¶

THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA

By: William P. Hite/signed
General President

Deleted: Martin J. Maddaloni

By: Phillip B. Stephenson/signed
Department of Pipe Line and
Gas Distribution

Deleted: John Budzinski

Deleted: Director of

Deleted: Pipeline

PIPE LINE CONTRACTORS ASSOCIATION

By: Robert H. Westphal~~Paul G. regory~~/signed
President

Formatted

Deleted: G

By: J. Patrick Tielborg/signed
Managing Director and
General Council

280705
1/25/2006 4:32 PM

Deleted: 1/25/2006 1:18 PM

Inserted: 1/25/2006 1:18 PM

Deleted: 6/10/2005 11:09 AM

Inserted: 6/10/2005 11:09 AM

Deleted: 6/10/2005 11:09 AM6/8/2005 1:28 PM

Inserted: 6/10/2005 11:09 AM

SPECIAL AGREEMENT FOR SMALL DIAMETER PIPE
BETWEEN THE PIPE LINE CONTRACTORS ASSOCIATION
AND THE UNITED ASSOCIATION OF JOURNEYMEN AND
APPRENTICES OF THE PLUMBING AND PIPE FITTING
INDUSTRY OF THE UNITED STATES AND CANADA

The wage rates, fringes and conditions set out herein will apply for the Continental United States and for the type of work described below. The terms and conditions of this Special Agreement will remain in effect during the from November 1, 2005 through the term of the National Pipe Line Agreement.

a. States

1. Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Kansas, Louisiana, Mississippi, Nevada, New Mexico, Oklahoma, South Carolina, Texas, Utah, and Wyoming.

2. All other states with the exception of California, Illinois, Indiana (Jasper, Lake, La Port, Newton, and Porter Counties only), New Jersey, Oregon, Pennsylvania (Buck, Chester, Delaware, Montgomery, Philadelphia Counties only), Washington, and Wisconsin.

a. States - All states are covered with the exception of California, Illinois, Indiana (Jasper, Lake, La Port, Newton, and Porter Counties only), New Jersey, Oregon, Pennsylvania (Buck, Chester, Delaware, Montgomery, Philadelphia Counties only), Washington, and Wisconsin.
1. Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Kansas, Louisiana, Mississippi, Nevada, New Mexico, Oklahoma, South Carolina, Texas, Utah, and Wyoming.

All States are covered with the exception of California, Illinois and the five counties in Indiana under Local #597's jurisdiction New Jersey, Oregon, Washington, Wisconsin, and the five county area of Pennsylvania for Local 420.
2. All other states.

b. Scope of Work

All pipeline 16" and under any length.

c. Wage Rates, Fringes and Conditions:

1. Wage rates and fringes for all Southern tier States set out in a 1. above. (Effective November 1, 2005 to December 31, 2006):

Formatted
Deleted: August 1, 2005
Deleted: 4
Deleted: until ____________
Inserted: 5
Inserted: ____________
Deleted: July 31, 2005
Deleted: .
Deleted: Termination of this Special Agreement will be in accordance with the provisions of Article XXIX of the National Pipe Line Agreement.¶
Formatted: Bullets and Numbering
Formatted: Bullets and Numbering
Formatted
Deleted: —a.—
Formatted: Bullets and Numbering
Deleted: —1. Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Kansas, Louisiana, Mississippi, Nevada, New Mexico, Oklahoma, South Carolina, Texas, Utah and Wyoming.
Deleted: ,
Inserted: ,
Deleted:
Deleted: ,
Inserted: , New Jersey,
Deleted: and
Deleted: ,
Inserted: ,
Deleted: ¶
Deleted: ¶
Deleted: 2. All other states.
Deleted: ¶
Formatted
Deleted: .
Inserted: .
Deleted: set out in a.1 above
Deleted: for work bid on or after August 1, 2005
Inserted: 5
Deleted: 4
Deleted: ):

PL-000380

| | |
|---|---|
| Journeymen | $ 27.32 |
| Fringes | 7.55 |
| | $ 34.87 |
| Per Diem | $ 32.50 per day |

| | |
|---|---|
| Helper * | $ 11.07 |
| Fringes | 5.62 |
| | $ 16.69 |
| Per Diem | $ 32.50 per day |

* (Use $14.32 for Laborer's comparison)

2. Wage rates and fringes for all ~~Northern tier~~ States set out in a. 2 above (Effective November 1, 2005 to December 31, 2006): ~~(Effective for work bid on or after August 1, 2005)~~:

| | |
|---|---|
| Journeymen | $ 27.32 |
| Fringes | 8.55 |
| | $ 36.87 |
| Per Diem | $ 32.50 per day |

| | |
|---|---|
| Helper * | $ 11.57 |
| Fringes | 5.62 |
| | $ 17.19 |
| Per Diem | $ 32.50 per day |

* (Use $14.82 for Laborer's comparison)

3. Conditions for all States set out above: ~~(effective November 1, 2005 through December 31, 2006)~~:

a. There will be no Graded Welder Helpers other than the Graded Welder Helper on hydrostatic testing, clampmen and the Graded Welder Helper using a power buffer or power grinder immediately behind the stringer bead and/or hot pass welders when the pipe gang is set up on a production basis. Such Graded Helpers will receive $.70 per hour above the basic welder helper rate. The Graded Helper using a power buffer or grinder immediately behind the Stringer bead and/or hot pass welders under this section will receive $2.00 per hour above the basic Welder Helper rate.

Deleted: 00
Deleted: 6.30
Deleted: 33.30
Deleted: 30.00
Deleted: 10.65
Deleted: 22
Deleted: 15.87
Deleted: 30.00
Deleted: 13.65
Formatted
Deleted: .
Inserted: .
Deleted: set out in a.2 above.
Formatted
Deleted: 4
Deleted: 27.00
Deleted: 7.30
Deleted: 34.30
Deleted: 30.00
Deleted: 11.15
Deleted: 5.22
Deleted: 16.37
Deleted: 30.00
Deleted: 14.15
Deleted:
Formatted
Deleted: ~~August 1, 2005~~
Inserted: 5
Deleted: 4
Deleted: ~~to~~
Deleted: ~~July 31, 2005~~
Deleted: ):¶
Inserted:

revisit

will

b. Assembly Point(s) will not be established more than twenty (20) miles distance from living accommodations. This distance may be increased beyond the twenty (20) miles when circumstances warrant as agreed to by the principal parties. The establishing of Assembly Point or Points will not affect the location of the warehouse.

c. The Welder Helper will receive the basic hourly rate listed hereinabove, or the Laborer's basic hourly rate less $3.25 for per diem adjustment for the area in which the job is located, whichever is greater. Fringes are not involved in the comparison.

d. Per diem will be paid for number of days in the work week set out on the pre-job form.

e. Once a crew is hired the contractor can move that crew from job to job without change, regardless of location of job.

Journeymen/Welders

f. The contractor will have the right to hire five (5) of the first six (6) U.A. Employees (of each class - Journeymen, Welders and Helpers). After the sixth (6th) Employee is hired, hiring will be in accordance with the hiring formula under the National Pipe Line Agreement so that 50/50 hire will begin after the sixth (6th) hire.

g. Composite Crews. All Employees will work under a composite crew concept as determined by contractor. The parties understand that the nature of this work requires working in a cooperative effort, making it sometimes difficult to adhere to strict jurisdictional guidelines. Thus, the Employer shall make every reasonable effort to man specific tasks according to the jurisdiction of the Union and shall maintain a fair and balanced craft ratio in the overall manning of the job.

h. The Employer shall have the sole right to determine the number and classifications of the employees to be hired provided such assignments are not inconsistent with the provisions of the Special Agreement or the National Pipe Line Agreement.

All other terms and conditions of the National Pipe Line Agreement between the Pipe Line Contractors Association and the United Association will remain in effect.

IN WITNESS WHEREOF, the parties hereto have executed this Special Agreement For Small Diameter Pipe.

UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA

Deleted: There will be no restrictions on

Deleted: s

Deleted: and may be on or near right-of-way.

Deleted: 3.00

Deleted: n

Deleted: employee

Deleted: employee

Deleted: employee

Deleted: The intent of this paragraph is not to circumvent traditional craft guidelines. It is intended to relax strict guidelines when used.

Inserted: The intent of this paragraph is not to circumvent traditional craft guidelines. It is intended to relax strict guidelines when used.

Deleted: Rig Pay. Rig pay (for work bid on or after ______

Inserted: ______

Deleted: 7/1/02

Deleted: ) will not be less than $13 per hour and the Welder will furnish the fuel, unless job specific considerations are agreed upon at the time of the contractor bidding the job.



By: William P. Hite/signed
General President

Deleted: Martin J. Maddaloni

By: Phillip B. Stephenson/signed
Department of Pipe Line and Gas Distribution

Deleted: John Budzinski

Deleted: irector

Deleted: Pipeline

PIPE LINE CONTRACTORS ASSOCIATION

By: Robert H. Westphal~~Paul C. Gregory~~/signed
President

Formatted

By: J. Patrick Tielborg/signed
Managing Director and General Counsel

J. Patrick T

280705
01/25/06 4:32 PM

Deleted: 01/25/06 1:18 PM

Deleted: 06/10/05 11:09 AM

Inserted: 06/10/05 11:09 AM

Deleted: 06/10/05 11:09 AM06/08/05 1:28 PM

Inserted: 01/25/06 1:18 PM

Inserted: 06/10/05 11:09 AM

# UNITED ASSOCIATION
# NATIONAL MAINTENANCE ADDENDUM
# TO THE
# NATIONAL PIPE LINE AGREEMENTS

The conditions set out below will apply in the Continental United States for the type of work described below through completion of jobs involving such work, ~~when the Unions receives the attached Job Notification Request and approve this Addendum's application.~~

A. **States**

**1. Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Kansas, Louisiana, Mississippi, Nevada, New Mexico, Oklahoma, South Carolina, Texas, Utah, and Wyoming.**

**2. All other states with the exception of California, Illinois, Indiana, (Jasper, Lake, La Port, Newton, and Porter Counties only), New Jersey, Oregon, Pennsylvania (Buck, Chester, Delaware, Montgomery, Philadelphia Counties only), Washington, and Wisconsin.**

~~To be determined on a job to job basis.~~

~~2. All other states.~~

B. **Coverage**

~~1.~~This Addendum shall apply to cover maintenance of all existing transportation mainline pipelines (existing pipelines) coming within the jurisdiction of the Unions. This Addendum is intended to cover on-going maintenance, integrity work, repair, renovation, restoration, removal, modification, addition and/or replacement of existing pipelines.

1. **Replacement of existing pipelines of less than 1 (one) mile, per location, regardless of size.**
2. **Hydrostatic testing of existing pipelines for re-qualification regardless of size or length.**
3. **Anomaly investigation and repair including recoating and/or replacement of pipe.**
4. **Installation/replacement of mainline valves and/or launchers/receivers for integrity programs.**

~~2. Should the Employer require a production style operation with the assignment of separate Stringer Bead welders, Hot Pass welders and Firing Line welders, the conditions of this Maintenance Agreement will not apply.~~

~~C. Scope of Work~~

~~This Addendum shall apply to the work outlined on the "Request for Maintenance Addendum" form when approved by the Unions. This scope of work shall become a~~

~~part of this Agreement for that project, and this scope may be expanded by mutual agreement of the parties.~~

C. ~~D.~~ Existing Pipelines

The term "existing pipelines" used within the terms of this Addendum is limited to a constructed pipeline already completed and shall not apply to any new pipeline (unless specified in Request for Addendum) to be constructed in the future.

**D.~~E.~~ Wage Rates and Fringe Benefits used for this Agreement will be the same as the Special Agreement for Small Diameter Pipe.**

~~**1. All states are covered with the exception of California, Illinois, Indiana (Jasper, Lake, La Port, Newton, and Porter Counties only), New Jersey, Oregon, Pennsylvania (Buck, Chester, Delaware, Montgomery, Philadelphia Counties only), Washington, and Wisconsin.**~~

~~**2. a) Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Kansas, Louisiana, Mississippi, Nevada, New Mexico, Oklahoma, South Carolina, Texas, Utah, and Wyoming.**~~

~~**b) All Other States.**~~

**Over 16" – Rates to be requested. May be 16" rates, intermediary rates, or full rates.**

~~To be determined on a job-to-job basis (prior to bid) depending on location of work.~~

E. ~~(F).~~ Conditions

**1. Hiring/Discharge**

The Employer has the right to hire the first employee on the project. **If only one employee is hired, he will be the Steward.** The second (2nd) and seventh (7th) employee shall be determined by the Union at the pre-job conference. **At least 50% of all hires (if qualified) must be represented by the Local Unions in whose jurisdiction the work will be performed.** Thereafter, the Employer retains the right to hire 75% of the employees. The Steward~~, as needed,~~ shall be appointed by the Union, **except as noted above,** and will be discussed at the pre-job.

**2. Portability**

PL-000385

Once the crew is hired, the Employer can move that crew within the covered project without change regardless of the Local Union jurisdiction.

3. **Composite Crew**

**All Employees will work under a composite crew concept as determined by the contractor. The parties understand that the nature of this work requires working in a cooperative effort, making it sometimes difficult to ahere to** ~~**Employer may** establish for the maintenance work a crew or crews known as "composite" which shall consist of the required crafts in such proportions as are respective to the type of work to be performed. Such composite crews will not be subject to~~ strict ~~craft~~ jurisdictional **guide**lines. **Thus, the Employer shall make every reasonable effort to man specific tasks according to the jurisdiction of the Union and shall maintain a fair and balanced craft ratio in the overall manning of the job.**

4. **Work Week**

Work week will be determined by the Employer and will be discussed at the pre-job conference.

5. **Assembly Point/Warehouse**

~~There will be no restrictions on~~ Aassembly Ppoint(s) **will not be established more than twenty (20) miles** distance from living ~~conditions~~ accommodations ~~and may be on or near the right of way.~~ **This distance may be increased beyond the twenty (20) miles when circumstances warrant as agreed to by the principal parties.** The establishing of ~~any~~ Aassembly Ppoint or points will not affect the location of the warehouse.

6. **Pre-Job Conference**

Employer agrees to notify the Unions of jobs obtained by Employer. Employer and representatives for the International Unions ~~involved~~ will hold an initial pre-job conference so that the start and continuation of the work may progress without interruption and the Union representatives at such pre-job conference shall be authorized by Unions to represent Unions for the entire area covered by the job. **Union will invite each Local Union with jurisdiction to the pre-job.** A pre-job will **not** be necessary each time the crew moves from one location or local jurisdiction to another after the initial pre-job.

7. **Bonus**

If any individual Employer pays any wages in excess of the wages negotiated in this Agreement with any Union(s) in the form of extra money, extra hours, extra travel or standby time or in the form of a bonus by any subterfuge, and if the Pipe Line Contractors Association and the Union(s) shall jointly determine that such bonus is for the purpose of pirating men from other individual employers, or results in conditions injurious to the pipeline construction industry, then such individual Employer shall be required to pay a proportionate additional

compensation to all employees covered by this Agreement and such requirement shall continue until that particular job is completed. It is understood and agreed, however, that any profit-sharing, retirement or pension plan which an individual Employer may have in effect which has not been set up for that particular job shall not be considered a bonus.

**8. Miscellaneous**

The following Articles of the National Pipe Line Agreements will be incorporated by reference into this Agreement:

(a) Union Recognition and check-off (any regular monthly union dues or other fees) will be paid to the home Local of the employee **only**. Working dues will be paid to the Local where the work is performed;

(b) Safety Rules including Substance and Alcohol Policies;

(c) Overtime and Holiday Pay;

(d) Welder Testing Time;

(e) Jurisdictional Disputes;

(f) Work Stoppages;

(g) Procedures for Settlement of Grievances;

~~(h) Fringe Benefits;~~ ~~**Fringe benefit contributions will be made in accordance with the National Pipe Line Agreement or as determined at the pre-job.**~~

~~1) Teamsters — fringe benefit contributions will be made in accordance with the National Pipe Line Agreement or as determined at the pre-job;~~

~~2) United Association — fringe benefit contributions will be made in accordance with the National Pipe Line Agreement or as determined at the pre-job;~~

~~3) Operating Engineers — fringe benefit contributions will be made in accordance with the National Pipe Line Agreement or as determined at the pre-job;~~

~~4) Laborers — fringe benefit contributions such as health and welfare and pension contributions shall be paid to the home Local of the employee. Other fringe benefits such as training and indirect fringe benefits shall be paid to the Local where the work is being performed. All fringe benefits and other deductions shall be paid to the Laborers' Employers Benefit Plan Collection Trust (LEBPCT) as provided in the National~~

~~Pipe Line Agreement. All other terms of Article XIV shall apply.~~

(h) ~~(i)~~Liability:

The terms of this **Attachment** ~~Addendum~~ will be **from January 1, 2006 to December 31, 2006, unless mutually extended by the parties.**~~the same as the National Pipe Line Agreements.~~ This **Attachment** ~~Addendum~~ includes the entire Agreement on maintenance work reached by the parties and no past practice or precedence will apply to work covered by this **Attachment.** ~~Addendum. This Agreement must be approved by all four pipeline Unions.~~

What about extended years?

If other unions agree on longer term VA will.

PL-000388

green line

# MAINLINE MECHANIZED WELDING AGREEMENT

The manning requirements and other special provisions for the use of mechanical welding under the National Pipe Line Agreement are as follows:

I. Pre-construction Rigging-Up at Job Site or Other Designated Location

Contractors performing pre-construction rigging-up for mechanized welding at the job site or any other designated location for pipeline construction projects under the National Pipe Line Agreement will be obligated to pay the wage rates and fringe benefits under the National Pipe Line Agreement or applicable Project Agreement.

II. Welding Procedures

For all welding procedures related to a project covered under the National Pipe Line Agreement using mechanized welding, the Contractor will pay the wages and fringes as set out in the National Pipe Line Agreement or applicable Project Agreement regardless of whether procedures are being run at the jobsite or any other location.

III. Foreman

The appointment of all foremen is the responsibility of the Contractor. Foremen may be paid on an hourly, weekly, or monthly basis as determined by the Contractor.

IV. Technicians

A U.A. Technician (or Technicians) will be assigned for the repair and maintenance of the mechanized welding equipment (excluding that normally done by other crafts on tractors and generating sets). The U.A. Technician (or Technicians) will be a qualified employee who has received actual training on the repair and maintenance of the mechanized welding equipment. The U.A. Technician(s) will be obligated to show proof of training. Union Agrees that U.A. Technicians must be available for any jobs on which Contractors use mechanized welding equipment. The Owner or Supplier of the mechanized welding equipment can place a designated Technician Representative (who may make actual repair if U.A. Technicians are unable to make repair) in a supervisory capacity over the Technician or Technicians comprising the repair and maintenance crew. Additional conditions for Technician(s) are as follows:

1. Wages

The U.A. Technician (or Technicians) will be paid the basic Journeyman wage rate and fringe benefits.

2. Manning

The following manning requirements for U.A. Technicians will apply:

A) One U.A. Technician and one Helper will be assigned for each internal welder being used on the job. This Technician can be used to maintain the hot pass bugs;

B) One U.A. Technician and one Helper will be assigned to the mini-crew so long as five or fewer welding stations/shacks are used. If more than five welding stations/shacks are used, an additional U.A. Technician and Helper will be employed;

C) One U.A. Technician and one Helper will be assigned to the mainline crew for every five welding stations/shacks;

It is understood that in the event the Contractor is short on Helpers, these U.A. Technician Helpers can be used at the Contractor's discretion. ~~as extras.~~

3. Work Week

U.A. Technicians will be assigned the same work week hours as the mainline crews and will work on equipment during breaks and during lunch periods at the discretion of the Contractor. U.A. Technicians will receive no additional payments for lunch provided they are allowed an uninterrupted 30 minutes during the day for lunch. Additional hours worked above the workweek by any Technician(s) will not attach to any other U.A. employee or the Steward.

V. Welding Rigs

Welder/Technicians will be paid rig pay as follows: (1) Standby - $8.00 per hour plus fuel to be provided by Contractor so long as the rig is on the jobsite and available for work~~.~~; (2) Used – on the same basis as paid under the National Pipeline Agreement. ~~Rig pay will be $8.00 plus fuel or $13.00 and Welder/Technician provides fuel.~~

VI. Welder/Technician Qualification Test

Welders/Technicians hired by the Contractor will be required to take a Welder qualification test (or tests) specified by the Owner of the Contractor.

VII. Spell-Off Welder(s)

Spell-Off Welder(s) will be hired. Assignment of Spell-off welder(s) will be at discretion of the Contractor. ~~There shall be two (2) Spell-Off Welders for every five welding stations/shacks assigned to the mechanized welding operation. These Spell-Off Welders may be used as needed by the Contractor in emergencies. One (1) Spell-Off Welder will be used in a Mini Gang as long as four (4) or fewer welding stations/shacks are utilized.~~ The Steward may be assigned ~~will be allowed~~ to spell-off.

VIII. End Facer

If an end facer is used, the manning of such equipment shall consist of a Journeyman and one Graded Helper. If a Welder is dispatched to man the end facer, he will be dispatched as a Journeyman and no rig pay will be required.

IX. Line Up and ID Welding or OD Welding

The provisions of the National Pipe Line Agreement covering the work of handling the clamps and lining up the pipe shall apply. The ID Welder shall be paid premium pay of $1.00 ~~$0.50~~ per hour above the regular Journeyman rate. In the event back welding is performed for misfires and such inside the pipe, Contractor will pay such Welder engaged in back welding in accordance with the National Pipe Line Agreement. If a clamp utilizing internal backing in conjunction with OD Welders depositing the stringer bead is used, such Welders shall be paid premium pay of $1.00 ~~$0.50~~ per hour above the regular Journeyman rate.

X. Bands

In the operation of the mechanized welding equipment, bands are placed on the pipe and there shall be employed one Journeyman or Welder at the Contractor's discretion on the front

end who will place, measure, and secure the bands for the necessary position and alignment for the O.D. welding device. He shall be assisted by a Helper. One or more Helpers to be determined by the Contractor shall be employed on the back end to remove the bands upon completion of the process. This manning requirement will also apply to the mini-crew.

**XI. O.D. Welder**

There may be two devices (one or more may be used) set up on the band to complete each O.D. weld. There shall be one Welder and one Helper employed for each device.

**XII. Mechanic Work**

The work of servicing welding heads, both internally and externally, and servicing the mechanized welding equipment from the lugs out, will be performed by a U.A. Technician or Welder.

**XIII. Premium Pay/Hiring**

No premium pay shall be paid for any job assignment unless specifically provided for in this Agreement. Hiring shall be in accordance with the formulas set out in the National Pipe Line Agreement.

**XIV. Term**

The terms and conditions of this Attachment will remain in effect during the term of the National Pipe Line Agreement. All other terms and conditions of the National Pipe Line Agreement shall apply.



# UNITED ASSOCIATION
# NATIONAL STATION AGREEMENT

This **UNITED ASSOCIATION NATIONAL STATION AGREEMENT** is hereby made a part of the National Pipe Line Agreement. ~~by and between the Pipe Line Contractors Association, and its contractor members and such other contractors who execute this Agreement evidencing their intent to be bound by its terms and conditions (hereinafter referred to as the "Employer"), and the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO (hereinafter referred to as the "United Association" or "Union").~~

ARTICLE I
COVERAGE

This Agreement shall apply to all work relating to the construction, fabrication, installation, maintenance, reconditioning and/or repair of all pipeline stations, including without limitation, meter stations, meter sets, compressor stations, pumping stations, and reducing stations, performed by the Employer within the United States. ~~The Local Building Trade Agreements and wage rates will apply on station work effective June 1, 1999, for the states of Illinois, Michigan, Oregon, Washington and Wisconsin. The terms and conditions of the U.A. National Station Agreement will apply in all other states (except Michigan where the Local Building Trade Agreement will apply.~~ Building Trade wages and fringes will apply when they exceed the Station Agreement for all other States.~~)~~

ARTICLE II
CLASSIFICATIONS

The classifications of employees which the Employer may employ on work performed under this Agreement, and the general definition of the duties of such classifications, are as follows:

A. Welder:

The term "Welder" shall mean a person who is qualified by training, skill and experience in the welding and/or joining of pipe. The duties of persons so qualified shall also include any other functions as assigned including supervision.

B. Journeyperson:

PL-000392

The term "Journeyperson" shall mean a person qualified by skill and experience to work on all materials utilized in the construction, fabrication, installation, maintenance, reconditioning and/or repair of pipeline stations and related work. The duties of persons so qualified shall also include any other functions as assigned including supervision.

C. Helper/ AM

The term "Helper" shall mean a person employed to assist in the performance of all work covered by this Agreement.

## ARTICLE III
## UNION RECOGNITION AND UNION SECURITY

A. The Employer recognizes the Union as the sole and exclusive bargaining representative for all employees covered by this Agreement with respect to wages, hours and other terms and conditions of employment.

B. All employees covered by this Agreement as a condition of continued employment shall, commencing on the eighth day following the beginning of their employment, or the effective date of this Agreement, whichever is later, acquire and, for the duration of their employment, shall remain members in good standing of the Union to the extent provided by law. This provision shall not apply in any state where such a requirement for continued employment is prohibited by law.

C. Either party to this Agreement shall have the right to reopen the negotiations pertaining to this Article should the federal laws applicable thereto be changed, by giving the other party thirty (30) days written notice.

D. The Employer shall not discharge any employee for non-membership in the Union if it has reasonable grounds for believing that such membership was not available to the employee on the same terms or conditions generally applicable to other members, or that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

E. Union dues shall be deducted and remitted when authorized to the Local Union having jurisdiction of the work. If the work is being performed in the area of a Local Union which does not have jurisdiction over the work, then Union initiation fees and dues, when authorized, shall be paid to the Local Union for any Local Union members working on that project. All other dues, when authorized, will be remitted to the Local having jurisdiction over the work. The United Association reserves the right, pursuant to Article V, to determine which Local Union shall have territorial jurisdiction over the work.

F. All sums of money withheld by the Employer from the paycheck of employees as union initiation fees or dues for the benefit of employees' Local Union shall be transmitted to the Local Union no later than thirty (30) days after the date on which said sums of money were withheld.

G. If the Employer fails to transmit all sums of money so withheld within the thirty (30) day period, it shall be subject to additional payment of 15% of the amount due but not less than $100.00. If it becomes necessary for the Union to employ an attorney to collect such sums of money withheld by the Employer, the Employer shall also pay all court costs and attorney fees.

H. The Union, or the UA Local Union to whom work under this Agreement has been assigned, shall have the authority to bring suit in a court of competent jurisdiction in the area in which the Union or the Local Union, as the case may be, is headquartered, for the purpose of collecting initiation fees and dues withheld but not transmitted within such thirty (30) day period. The arbitration provisions of Article XI of this Agreement shall not be applicable to the rights and liabilities created by this Article.

ARTICLE IV
HIRING PROCEDURE

A. The Employer shall have the full responsibility for the management and operation of its business, the direction of its working force, the right to maintain efficiency on its jobs, and the right to determine the number of employees required for each job, subject to the provisions of this Agreement. Furthermore, the Employer shall be the sole judge as to the competency of any Employee and shall have the right to discharge any employee for just cause.

A B. It is agreed that the Employer may man the original crew at the start of any job without restriction.

C. The selection of applicants for referral shall not be based on, or in any way affected by, Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspect or obligation of Union membership, policy, or requirements.

D. The need for, determination and designation of foremen are the sole responsibilities of Employer.

E. The Employer retains the absolute and unconditional right to reject any job applicant and may exercise the right before the Union refers any applicant requested by the Employer, provided that this is done in writing.

B F. Once the original crew has been established, the Employer shall have the right to keep all or part of the original crew on all work covered by this Agreement.

ARTICLE V

TERRITORIAL JURISDICTION

No Local Union shall have territorial jurisdiction over work performed under this Agreement except as specifically determined by the United Association on a day-to-day basis.

ARTICLE VI

WAGES AND FRINGE BENEFITS

**A.** **Wages and Fringe Benefits will be the same as Small Diameter Pipe Agreement (16" and under)** or Building Trade wages and fringes whichever are greater.

~~A. The Employer shall pay the following hourly wages to employees performing work under this Agreement:~~

| | |
|---|---|
| ~~Journeymen and Welders~~ | ~~$27.00~~ |
| ~~*Helpers~~ | ~~$10.65~~ |
| ~~Per Diem~~ | ~~$30.00 per day based on work week~~ |

~~* (Helper to receive Laborers' rate if higher. Laborers must be working on project for this adjustment—Use $13.65 to compare to Laborers' rate).~~

~~B. The Employer shall make the following fringe benefit contributions:~~

~~1. The Employer shall make health and welfare contributions, as set forth below, to the Pipe Line Industry Benefit Fund and pension contributions, as set forth below, to the Pipe Line Industry Pension Fund for each hour worked by employees performing work under this Agreement. Additionally, the Employer shall make contributions to the National Training Fund, in the amounts set forth below, for each hour worked by employees performing work under this Agreement:~~

| | ~~Total~~ | ~~H&W~~ | ~~Pens.~~ | ~~NTF~~ |
|---|---|---|---|---|
| ~~Journeymen and Welders~~ | ~~$6.35~~ | ~~$4.55~~ | ~~$1.75~~ | ~~$0.05~~ |
| ~~Helpers~~ | ~~5.27~~ | ~~4.55~~ | ~~.67~~ | ~~.05~~ |

~~2. The Employer agrees to be bound by the Declaration of Trust(s) establishing all trust funds to which the Employer is required to contribute under this Agreement and the Employer agrees to be bound thereby to all amendments made thereto the same as if the Employer was a party to said Declaration of Trust(s). The Employer hereby authorizes the employer trustees to these trust fund agreements to~~

~~name employer trustees to administer these trust funds, and hereby ratifies and accepts such employer trustees.~~

~~3. If the Employer fails to make contributions to the trust funds as required by this Article, the Employer shall be liable for all costs of collecting the payment together with any other fees assessed by the Trustees, including attorney's fees and costs, audit fees, interest and liquidated damages.~~

~~4. If an Employer fails to make contributions to any of the funds to which contributions are required to be made pursuant to this Article, the Union shall have the right to take whatever steps are required to secure compliance, including removing employees from the Employer providing advance notice of not less than twenty-four (24) hours is given for such action to the delinquent Employer. Such removal of employees and cessation of work by employees for such delinquent Employer shall not be a violation of the "no-strike" clause or any other provisions of this Agreement and shall not bar or limit the other remedies allowable under the contract, the applicable trust agreements, or under the law.~~

~~5. The arbitration provisions in Article XI of this Agreement shall not be applicable to the rights and liabilities created by this Article VI (B).~~

B.~~C~~. During emergencies, any employee of the Employer may be assigned to any work provided; however, no employee's hourly rate shall be lowered under this provision. Emergencies shall be defined as an imminent threat to life or property.

C.~~D~~. All overtime will be paid at one and one-half times the straight-time rate, except for work performed on the following holidays which will be paid at double the straight-time rate:

New Year's Day; Memorial Day; July Fourth; Labor Day; Thanksgiving Day and Christmas Day.

If any of the above holidays falls on a Sunday, the Monday following shall be considered a holiday.

D.~~E~~. The Employer shall have the right to select all foremen. The foremen shall be paid a minimum of an additional $1.50 ~~$1.00~~ per hour above his regular wage rate.

E.~~F~~. The following conditions for Stewards under this Agreement shall apply:

1. Wage Rates – The Steward shall be paid $1.00 per hour above the basic Welder or Journeyperson rate.

2. Hours – The Steward shall be paid for the number of hours for which the job is set up or for the number of hours worked. The Steward's hours will not attach to any other employee on the job. The Steward will be a working steward.

ARTICLE VII
JOB NOTIFICATION, PRE-JOB CONFERENCE AND ADMINISTRATION

out

A. The Employer agrees to notify the United Association promptly before starting any job covered under the terms of this Agreement. Such notification is to be sent to:

United Association General Office,
C/o Pipe Line Department,
901 Massachusetts Avenue, N.W.,
Washington, D.C. 20001

and shall describe for each job, the location, size and extent of the job to be performed, and proposed starting date. Until and unless such notification has been given, it shall be a violation of this Agreement to conduct a pre-job conference as described below.

B. Following the Employer's notification to the United Association, and prior to the start of work, the Employer and representatives of the United Association and the Local Union(s) determined to have jurisdiction over the proposed work shall hold a pre-job conference so that the start and continuation of work may progress without interruption. The Union's representatives at such conference are authorized to represent the Union for the entire area covered by the job. It shall be a violation of this Agreement to start work unless a pre-job conference has been conducted in accordance with the provisions of this section.

C. It shall be the purpose of the pre-job conference for the Employer and the Union to agree on such matters as the length of the workweek, the number of workers to be employed, the applicable wage rates in accordance with the contract, and any other matters not including any interpretation of the clauses of this Agreement, it being agreed that any interpretation will be made by the Union and the Pipe Line Contractors Association ("PLCA").

D. The United Association agrees to send a copy of this Agreement to each and every one of its Local Unions assigned jurisdiction over any area in which the Employer becomes obligated to perform work covered by this Agreement, and further agrees that the terms of this Agreement shall be recognized by such Local Union and enforced by the United Association so that industrial peace will not be disturbed and so that employees may perform the Employer's work efficiently and continuously. The Employer agrees as well to furnish its supervisory personnel with a copy of this Agreement so that they may be familiar with its terms. The day-to-day administration of this Agreement by the United Association is vested in the Local Unions as may be designated by the United Association to handle work covered by this Agreement.

ARTICLE VIII
SAFETY AND WORKING RULES

A. The job starts at the jobsite and shall end at quitting time at the jobsite; however, the lunch period shall be excluded. The work week and work day shall be established at the pre-job conference.

B. The pay day shall be once a week. Employees are to be paid for the actual hours they work. Employees are to be paid before the end of their regular shift, whether working in the Employer's yard or in the field. When employees are laid off or discharged, they must be paid wages due them at the time of the layoff or discharge.

C. Employers shall make arrangements in each locality where employees are employed to enable such employees to cash their pay checks at no cost to the employees. It is agreed that all Employees shall be given the option to be paid by direct deposit of wages on a weekly basis to the bank or financial institution of the Employee's choice, in which case pay stubs will be provided to the Employees within the time period referenced above. This optional manner of payment, once adopted by the Employer, may not be changed except upon advance notification to the Employees and the Union.

B D. J ~~Journeypersons and Welders~~ shall be paid waiting time for any days lost during the normal scheduled work week as follows:

1. If the jurisdiction of the work is awarded to a U.A. Pipe Line Local Union the waiting time provisions of the National Pipe Line Agreement will apply; or

2. If the jurisdiction of the work is awarded to a Building Trades Local Union then the waiting time provisions (if any) of the Local Building Trades Agreement will apply.

E. Travel pay for ~~Welders, Journeypersons~~ man and Helpers/Apprentices shall apply as follows:

1. If the jurisdiction of the work is awarded to a U.A. Pipe Line Local Union the travel expense provisions of the National Pipe Line Agreement will apply; or

2. If the jurisdiction of the work is awarded to a Building Trades Local Union then the travel expense provisions (if any) of the Local Building Trades Agreement will apply.

F. Reporting time pay for ~~Welders,~~ Journey~~persons~~ and Welder Helpers will be applicable as follows:

1. If the jurisdiction of the work is awarded to a U.A. Pipe Line Local Union the reporting time provisions of the National Pipe Line Agreement will apply; or

2. If the jurisdiction of the work is awarded to a Building Trades Local Union then the reporting time provisions (if any) of the Local Building Trades Agreement will apply.

G. There shall be no inequitable minimum or maximum amount of work which an employee may be required to perform during the working day and there shall be no restrictions imposed against the use of and type of machinery, tools or labor saving devices. At the discretion of the Employer, employees may be changed from one classification to another within the jurisdiction of the Union.

H. The Employer shall have the right to make and revise, from time to time, safety and working rules which are not inconsistent with any of the terms of this Agreement. The Union agrees to cooperate in the enforcement of such safety and working rules.

I. The employees needed to carry out the instrumentation and threaded piping will be hired at the discretion of Employer.

J. Rig pay **to be paid on the same basis as the National Pipe Line Agreement.** ~~(for work bid on or after 7/1/02) will not be less than $13 per hour and the Welder will furnish the fuel, unless job specific considerations are agreed upon at the time of the contractor bidding the job.~~

K. The parties agree to abide by the attached Substance Abuse Policy, which is made a part of this Agreement and is incorporated herein by reference. Additional requirements may be mandated by the customer and be required by the Employer. The parties agree to abide by these additional requirements as long as they do not violate federal regulations.

L. The parties agree to abide by the attached Alcohol Misuse Prevention Policy, which is made a part of this Agreement and is incorporated herein by reference.

## ARTICLE IX
## UNION REPRESENTATION AND ACCESS TO JOBS

A. Authorized representatives of the Union or of the Local Union having jurisdiction over the work to be performed shall have access to the jobs where employees covered by this Agreement are employed; provided, however, that such representatives shall not interfere with the Employer's employees during working hours.

B. A Steward shall be a working journeyman selected by the Union. The Steward shall perform his/her work the same as any other employee. The Steward shall be allowed a reasonable amount of time during the working hours to perform the work of the Union

which cannot be performed at other times, but he shall not abuse the privilege. It is understood and agreed that the Steward's duties or activities shall not include any matters relating to referral, hiring, termination or disciplining of employees.

ARTICLE X

WORK STOPPAGES

A. There shall be, during the term of this Agreement and as to any work covered hereby, no slow-down, no stoppage of work, no strike and no lock-out over the terms and conditions of this Agreement, it being the good faith intention of the parties hereto that by the execution of this Agreement industrial peace shall be brought about and maintained, and that the parties shall cooperate to the end that work may be done efficiently and without interruption. In the case of any violation of this Agreement, the Employer and the Union shall be notified immediately. All grievances, disputes, differences of opinion and other questions concerning this Agreement shall be settled in accordance with the procedure for settlement of grievances and disputes set forth in Article XI below, except as otherwise agreed to by the parties. Any settlement where hours or pay are involved shall be retroactive.

B. It shall not be a violation of this Agreement or of the no-strike clause if members of the United Association refuse to cross a picket line established in accordance with the rules of the Building and Construction Trades Department.

ARTICLE XI

GRIEVANCE PROCEDURE AND ARBITRATION

A. Any grievances, disputes, or differences of opinion which arise concerning the interpretation or application of this Agreement shall be resolved in accordance with the following procedure:

1. Any employee who believes he has a grievance shall first take the matter up with his foreman.

2. If the grievance is not settled between the foreman and the employee, the grievance shall be referred to the job steward who will then meet with the foreman in an attempt to resolve the grievance.

3. If the grievance is not settled between the steward and the foreman, the Employer's superintendent will be summoned to enter the discussion. If the matter cannot be resolved at this level, it will be referred to the Business Manager of the Local Union to whom jurisdiction over the job in question has been assigned.

4. If the grievance is not settled between the Employer's superintendent and the Local Union Business Manager, the grievance shall be referred to a representative of the United Association Pipe Line Department and the Employer's chief officer or designee or to the PLCA if the Employer is a Member.

5. If the grievance is not settled between the Pipe Line Department and the Employer's chief officer or designee or the PLCA, the grievance shall be referred to arbitration.

B. In the event the grievance remains unresolved after exhaustion of the preceding steps, either party may submit the matter for binding and full resolution to an arbitrator mutually agreed to by the parties. If the parties are unable, within ten working days of the date the matter is referred to arbitration, to agree on the selection of a neutral arbitrator, either party shall have the right to request a panel of arbitrators from the Federal Mediation and Conciliation Service ("FMCS"). The parties shall thereafter utilize the procedures of the FMCS to strike arbitrators from the panel provided, leaving one arbitrator who shall be designated to hear the dispute. The parties agree that the costs of the arbitrator shall be borne equally. The parties further agree that the arbitrator shall have no authority to modify or change this Agreement in any way. The parties further agree that the decision of the arbitrator shall be final and binding on all parties, subject only to appeal to the appropriate federal district court.

## ARTICLE XII
## MISCELLANEOUS

A. If any provision of this Agreement is in conflict with the laws of regulations of the United States, or any state in which the work is to be performed, such provision shall be superseded by such law or regulation, but all other provisions of this Agreement shall continue in full force and effect.

B. There shall be no discrimination against anyone, by either party, for reasons of color, race, religion, national origin, sex, age, or disability. Any reference to the male gender in this Agreement shall be deemed to include the female gender.

C. This Agreement shall supersede all other Agreements between the Employer and any United Association local union for any work covered herein and described herein.

## ARTICLE XIII
## EFFECTIVE DATE, TERMINATION AND RENEWAL

**The terms and conditions of this Attachment will remain in effect during the term of the National Pipe Line Agreement.**

~~A. This Agreement shall become effective when signed by the parties hereto and shall remain in full force and effect until its termination as provided below.~~

~~B. It is understood and agreed that, except as provided below, this Agreement, and any Amendments thereto, shall continue in full force and effect until April 30, 1999, and thereafter from year to year, until termination at the option of either party by written notice no less than sixty (60) days prior to the expiration date of this Agreement.~~

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this _____ day of ____________________, 2005.

**UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA**

By: ______________________________
**William P. Hite**
**General President**
**901 Massachusetts Avenue, N.W.**
**Washington, D.C. 20001**
**Tele: 202-628-5823**

By: ______________________________
**Philip Stephenson**
**Pipeline & Gas Distribution Representative**
**901 Massachusetts Avenue, N.W.**
**Washington, D.C. 20001**
**Tele: 202-628-5823**

**PIPE LINE CONTRACTORS ASSOCIATION AND ITS CONTRACTOR MEMBERS**

By: ______________________________
**Robert H. Westphal**
**President**

By: ______________________________
**J. Patrick Tielborg**
**Managing Director and General Counsel**
**1700 Pacific Avenue #4100**
**Dallas, TX 75201-4675**
**Tele: 214-969-2700**

**FOR NON-PLCA CONTRACTORS**

______________________________
**Name of Employer**

______________________________
**Name of Representative**

______________________________
**Address**

______________________________

**City, State, Zip Code**

___________________________________

**Telephone No.**

12

PL-000403

# EXHIBIT 11

# ATTACHMENT 4

## SPECIAL AGREEMENT FOR MAINLINE MECHANIZED WELDING

This Special Agreement to the National Pipe Line Agreement sets forth the terms and conditions under which Mainline Mechanized Welding Work, as defined in Article I below, shall be performed. Except as otherwise specifically set forth below, all other terms and conditions of the National Pipe Line Agreement shall apply in full to such work.

I.

COVERAGE

This Special Agreement shall apply to mechanized welding performed on mainline work covered by the National Pipe Line Agreement.

II.

CLASSIFICATIONS

(A) UA Technician

A U.A. Technician (or Technicians) will be assigned for the repair and maintenance of the mechanized welding equipment (excluding that normally done by other crafts on tractors and generating sets). The U.A. Technician (or Technicians) will be a qualified employee who has received actual training on the repair and maintenance of the mechanized welding equipment. The U.A. Technician(s) will be obligated to show proof of training. Union Agrees that U.A. Technicians must be available for any jobs on which Employers use mechanized welding equipment. The Owner or Supplier of the mechanized welding equipment can place a designated Technician Representative (who may make actual repair if U.A. Technicians are unable to make repair) in a supervisory capacity over the Technician or Technicians comprising the repair and maintenance crew.

(B) Foreman

The appointment of all foremen is the responsibility of the Employer Foremen may be paid on an hourly, weekly, or monthly basis as determined by the Employer.

III.

WAGES AND FRINGE BENEFITS

(A) Wages and Fringe Benefits

1. The UA Technician(s) will be paid the Journeyman wage rate and fringe benefits under the National Pipe Line Agreement or applicable Project Agreement.

2. The Helper shall be paid the Helper wage rate and fringe benefits under the National Pipe Line Agreement or applicable Project Agreement.

(B) Pre-construction Rigging-Up at Job Site or Other Designated Location

Employers performing pre-construction rigging-up for mechanized welding at the job site or any other designated location for pipeline construction projects under the National Pipe Line Agreement will be obligated to pay the wage rates and fringe benefits under the National Pipe Line Agreement or applicable Project Agreement.

(C) Welding Procedures

For all welding procedures related to a project covered under the National Pipe Line Agreement using mechanized welding, the Employer will pay the wages and fringes as set out in the National Pipe Line Agreement or applicable Project Agreement regardless of whether procedures are being run at the jobsite or any other location.

IV.

HIRING AND EMPLOYMENT PROCEDURES

(A) Manning

The following manning requirements for UA Technicians will apply:

1. One UA Technician and one Helper will be assigned for each internal welder being used on the job. This Technician may be used to maintain the hot pass bugs.

2. One UA Technician and one Helper will be assigned to the mini-crew so long as five or fewer welding stations/shacks are used. If more than five welding stations/shacks are used, an additional UA Technician and Helper will be employed.

3. One UA Technician and one Helper will be assigned to the mainline crew for every five welding stations/shacks.

It is understood that, in the event the Employer is short on Helpers, these U.A. Technician Helpers may be used at the Employer's discretion.

(B) Welder/Technician Qualification Test

Welder/Technicians hired by the Employer will be required to take a Welder qualification test (or tests) specified by the Owner or the Employer.

(C) Spell-Off Welder(s)

Spell-Off Welder(s) will be hired. Assignment of Spell-off welder(s) will be at discretion of the Employer. The Steward may be assigned to spell-off.

(D) End Facer

If an End Facer is used, the manning of such equipment shall consist of a Journeyman and one Graded Helper. If a Welder is dispatched to man the end facer, he will be dispatched as a Journeyman and no rig pay will be required.

V.

OTHER CONDITIONS

(A) Work Week

U.A. Technicians will be assigned the same work week hours as the mainline crews and will work on equipment during breaks and during lunch periods at the discretion of the Employer. U.A. Technicians will receive no additional payments for lunch provided they are allowed an uninterrupted 30 minutes during the day for lunch. Additional hours worked above the workweek by any Technician(s) will not attach to any other UA employee or the Steward.

(B) Welding Rigs

Welder/Technicians will be paid rig pay as follows: (1) standby - $8.00 per hour plus fuel to be provided by the Employer so long as the rig is on the jobsite and available for work; (2) Used - on the same basis as paid under the National Pipeline Agreement.

(C) Line Up and ID Welding or OD Welding

The provisions of the National Pipe Line Agreement covering work of handling the clamps and lining up the pipe shall apply. The ID Welder shall be paid premium pay of $1.00 per hour above the regular Journeyman rate. In the event back welding is performed for misfires and such inside the pipe, the Employer will pay such Welder engaged in back welding in accordance with the National Pipe Line Agreement. If a clamp utilizing internal backing in conjunction with OD Welders depositing the stringer bead is used, such Welders shall be paid premium pay of $1.00 hour above the regular Journeyman rate.

(D) Bands

In the operation of the mechanized welding equipment, bands are placed on the pipe and there shall be employed one Journeyman or Welder at the Employer's discretion on the front end who will place, measure, and secure the bands for the necessary position and alignment for the O.D. welding devices. He shall be assisted by a Helper. One or more Helpers to be

determined by the Employer shall be employed on the back end to remove the bands upon completion of the process. This manning requirement will also apply to the mini-crew.

(E) O.D. Welder

There may be two devices (one or more may be used) set up on the band to complete each O.D. weld. There shall be one Welder and one Helper employed for each device.

(F) Mechanic Work

The work of servicing welding heads, both internally and externally, and servicing the mechanized welding equipment from the lugs out, will be performed by a U.A. Technician or Welder.

(G) Premium Pay/Hiring

No premium pay shall be paid for any job assignment unless specifically provided for in this Agreement. Hiring shall be in accordance with the formulas set out in the National Pipe Line Agreement.

# EXHIBIT 12

# ATTACHMENT 2

## SPECIAL AGREEMENT FOR STATION WORK

This Special Agreement to the National Pipe Line Agreement sets forth the terms and conditions under which Station Work, as defined in Article I below, shall be performed. Except as otherwise specifically set forth below, all other terms and conditions of the National Pipe Line Agreement shall apply in full to such work.

I.

COVERAGE

This Special Agreement shall apply to all work relating to the construction, fabrication, installation, maintenance, reconditioning and/or repair of all pipeline stations, including without limitation, meter stations, meter sets, compressor stations, pumping stations, and reducing stations, performed by the Employer within the United States except for the states of Michigan (local Building Trades Agreement applies) and Pennsylvania (local Building Trades Agreement applies in Bucks, Chester, Delaware, Montgomery and Philadelphia Counties). Building Trade wages and fringes will apply when they exceed the Station Agreement for all other States.

II.

CLASSIFICATIONS

The classifications of employees which the Employer may employ on work performed under this Agreement, and the general definition of the duties of such classifications, are as follows:

(A) "Journeyman" shall mean a person seeking employment as a welder or journeyman pipefitter.

(B) "Helper/Apprentice" shall mean a person seeking employment as a welder helper or otherwise employed to assist in the performance of all work covered by this Agreement.

III.

HIRING PROCEDURE

(A) It is agreed that the Employer may man the original crew at the start of any job without restriction.

(B) Once the original crew has been established, the Employer shall have the right to keep all or part of the original crew on all work covered by this Agreement.

## IV.

## WAGES AND FRINGE BENEFITS

(A) Wages and Fringe Benefits will be the same as the Special Agreement for Small Diameter Pipe (16" and under) (except that the contribution to the Local 798 Training Fund shall be $.25 per hour) or Building Trade wages and fringes whichever are greater.

(B) During emergencies, any employee of the Employer may be assigned to any work provided; however, no employee's hourly rate shall be lowered under this provision. Emergencies shall be defined as an imminent threat to life or property.

(C) All overtime will be paid at one and one-half times the straight-time rate, except for work performed on the following holidays which will be paid at double the straight-time rate: New Year's Day; Memorial Day, July Fourth, Labor Day, Thanksgiving Day and Christmas Day. If any of the above holidays falls on a Sunday, the Monday following shall be considered a holiday.

(D) The Employer shall have the right to select all foremen. The foremen shall be paid a minimum of an additional $1.50 per hour above his regular wage rate.

(E) The following conditions for Stewards under this Agreement shall apply:

1. Wage Rates — The Steward shall be paid $1.00 per hour above the basic Welder or Journeyperson rate.

2. Hours — The Steward shall be paid for the number of hours for which the job is set up for the number of hours worked. The steward's hours will not attach to any other employee on the job. The Steward will be a working steward.

## V.

## WORKING RULES

(A) The job starts at the jobsite and shall end at quitting time at the jobsite; however, the lunch period shall be excluded. The work week and work day shall be established at the pre-job conference.

(B) Journeymen shall be paid waiting time for any days lost during the normal scheduled work week as follows:

1. If the jurisdiction of the work is awarded to a U.A. Pipeline Local Union the waiting time provisions of the National Pipe Line Agreement will apply; or

2. If the jurisdiction of the work is awarded to a Building Trades Local Union then the waiting time provisions (if any) of the Local Building Trades Agreement will apply.

(C) Travel Pay for Journeymen and Helpers/Apprentices shall apply as follows:

1. If the jurisdiction of the work is awarded to a U.A. Pipeline Local Union the travel expense provision of the National Pipe Line Agreement will apply; or

2. If the jurisdiction of the work is awarded to a Building Trades Local Union then the travel expense provisions (if any) of the Local Building Trades Agreement will apply.

(D) Reporting time for Journeymen and Helpers/Apprentices will be applicable as follows:

1. If the jurisdiction of the work is awarded to a U.A. Pipeline Local Union the reporting time provisions of the National Pipe Line Agreement will apply; or

2. If the jurisdiction of the work is awarded to a Building Trades Local Union then the reporting time provisions (if any) of the Local Building Trades Agreement will apply.

(E) The employees needed to carry out the instrumentation and threading piping will be hired at the discretion of Employer.

(F) Rig pay to be paid on the same basis as the National Pipe Line Agreement.

# EXHIBIT 13

# ATTACHMENT 7

## NATIONAL PIPE LINE AGREEMENT INTERPRETATIONS BETWEEN THE PIPE LINE CONTRACTORS ASSOCIATION AND THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO

**(Effective June 17, 1999)**

The Interpretations set out below have been agreed to by the Pipe Line Contractors Association and the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada and are made a part of the National Pipe Line Agreement as if set out therein.

1. Road Boring: When a Welder is assigned and working with the road boring crew on any particular day, he will be entitled to the hours of the road boring crew for that day. For example, if the full road boring crew continues to work after regular quitting time and the Welder assigned to that crew that day is sent in before quitting time or at quitting time and not allowed to remain with the crew while it continues working after regular quitting time, he will be entitled to any additional hours worked by that crew that day. If the Welder assigned to the road boring crew is temporarily reassigned to perform other work and the full road boring crew continues to work performing regular road boring crew work that day, the Welder will be entitled to the same hours worked provided he returns to that crew or is relieved by the contractor from returning to the road boring crew.

2. Welding Rigs: The PLCA and the United Association do not negotiate rig rentals; however, there are certain procedures applicable to rigs when performing work under the National Pipe Line Agreement. These are as follows:

(a) Rig Pay on Single Qualification Test - The Welder's rig will be entitled to be paid the same number of hours the man is paid on a single qualification test.

(b) Rig Pay on Multiple Tests - On multiple tests the Welder's rig will be entitled to be paid the same number of hours the man is paid for multiple tests.

(c) Gassing Up - All trucks and welding machines will be gassed up during regular working hours unless the contractor has negotiated a rental and fuel rate. Welders are entitled to a full tank of gas for their truck and welding machine on the same day they complete work on that job and they are laid off; this does not include the drag-up tank.

3. Dispatching Employees: The contractor will provide the Union with the same advance notice of starting date for the Union's quota to be dispatched as it provides for its contractor-hired employees.

4. Drug Testing: The Substance Abuse Policy negotiated by the Association (PLCA) and the United Association (UA) will be applicable on all jobs covered by the National Pipe Line Agreement. The Journeyman shall be paid waiting time for any days lost during the normal scheduled work week in those cases which require completed testing before employment. In such cases, the Journeyman shall receive for any day lost during any one work week the sum of five hours plus fringes, and the Helper will receive a sum of four hours plus fringes. No payment or fringe contributions will be made if a test is positive for a prohibited drug.

5. Reporting time for Welder Helper: The Agreement provides that the Welder Helper shall receive the equivalent of not less than four hours pay at the straight time rate for any hours he misses during the normal scheduled work week unless he is told the night before that there will be no work the following day. These four hours are cumulative.

6. Job Steward Hours: Under the National Pipe Line Agreement a journeyman acting as job steward is entitled to be paid for all hours worked by him or for the number of hours up to a maximum of thirteen (13) worked by any UA journeymen on the job except the UA mechanic and except for journeymen or welders working on testing.

It has been agreed by the PLCA and United Association that the maximum of thirteen (13) hours is based on a 10 hour work day, and that if the work day is set up on or extended to 11 hours or more the steward will be entitled to 3 hours above the number of hours the job is set up or extended, provided some other journeymen, except the UA mechanic, journeymen or welder on testing, works those hours. As an example, if the contractor sets the work week at 6-12's, and a UA journeyman other than the UA mechanic, journeymen or welder on testing works 16 hours the steward would be entitled to 15 hours.

5929460

# EXHIBIT 14

X TIELBORG notes

File Negs UA - 2006

(JPT) Johnston PLCA - LC - DFW Nov 29, 2006

ARB 1 Sommers/Strong, Joyce, Gamble, Linney, Nolan, Thorn, Gray, White
Assoc 2 RIGS
Folty 3 (X) KM - meeting - Fri 2008 Kevin Dankey
H+M 4
Miller 5 Get - L info for Steve School. Rocket Scientist
Minn Ltd
Otis 7 JPT reviewed basis of meeting. Moss has small
Price 8 Splinter group of Ws. Danny Hendrix.
ST 9 Price - You want to avoid Canada bonus.
United Pipe 10 Ws neg separate deal on Job.
US 11 Thorn - Steering Committee was first he heard of
Welded 12 rig pay. Said letter to Rig Ws asking for $200
Tex- for assoc. Ws wanted gas. Thorn said
Snelson- Artigo understood that $14 rate and welder supplied Fuel.

Joyce - Hendricks said Ws at new jobs will demand rig increase or single hand.
Average rig is 7 years old.
What we are paying is adequate.

Thorn - 8 survey - Average cost $50,400 for rig.
4x4 (1 Ton) decently Equipment $8,000
using 1200 hours - 7 year write off - $6.00 covers

Joyce - Buchanan told us Rig rate was ok.

Bob J - Ws want fuel. *

Joyce - Why not work out at pre job rig cost if long driving distance -

Rigs hold 10-15 gallons

Truck holds 20 gallons

Est. $50 fuel a day.

Real Problems -

Manning - lack of Ws

- lack of H's

Increase +5%

Sommers - may price ourselves out.

Bob J - Ws want +$50 more a day.

Joyce.

Stotz - Issue over steel toed shoes. paying $80 - Ws want $100.

Thom - CRC will supply Equip

KM will supply Pipe

Rockies Express - No requirement for passing Stick test. Only test required is on Auto Weld.

Stotz - CRC Equip in Tulsa not being used

VA / PLCA – 11/29/06
DFW Hyatt

Jim Buchanan
Danny Hendry
Phil Stevenson
Jim Moss
Mike O Connell ~~Eatin~~
Jim Laite
Norm
Grimes
White
Nolan
Lewis
Johnston
Cushe
Stoty
Gregory
Joyce
JPT

UA distributed Rig Survey – Est cost $26 hour. ★

Joyce opened:

after review we feel rig rental is adequate except where long drive. We know long drives / living are issues. We are willing to address this. UA Study assumes all Ws have need rigs.

PS – Our concern is where do we get Ws. New hands will have to have rigs.

Joyce – Capacity in Lo 798 is not enough. Need to look at other locals.

Rigs – We amortize.

We have work under contract.

Moss – We have talked about work already bid. We don't want insurrection of Rig Ws. on jobs. Concern that Ws may just park Rigs.

1994 Lambert letter – 8.50 hour + fuel and Kn pays fuel. +$25 maintenance.

Now 8 + 6 under Rev Rule. In 2007 that goes to 8+7 – $15.

On some jobs Kns are now fueling on Kor time.

Moss – Rigs in Colo / Why about 2 or 3 years.

New Lincoln Welder takes 6 weeks to get'

Moss told members that if no agreement

PL-000424

Moss

If Kons go sing hand then Kons have to get rigs.

Agr says we do not ~~need~~ req rigs but at pre jobs rigs are req.

1994 rig is more than 2006.

Joyce – We increased wages higher than any in past expecting help. Now Ws want more $.

When we talked about new Agr w/ Jim B we talked about rigs.

We are worried about downturn in 3 years. $70 TP + Rig and no work.

Need to look at productivity / Manning

Danny Hendrix – If some profit is not in rig then rig Ws will drop rigs.

JB – cost of rig goes up. We need to use NPLA increase to attach to rigs.

Manpower is major issue. How will he get rig?

Scott S – We are Kons. But also we are in equip business.

Moss – What do ~~tom~~ Contractors charge for rig?

Resp – most $14.00

Joyce – We do bid against each oth

PL-000425

Joyce – Rigs noted from WA are better for us.
Has to be some middle ground.

Moss ① UA wants out of fuel business. How?
② Rig must have increase.
③ Rig paid more in 1994 than today.

SS – Can parties go to IRS?

PS – We will join PLCA to ask for increase.

SS – We run over $14 and all taxable. What do we do?

We in Calif dropped rig increase but made wage increase.

Joyce – This seems inconsistent w/ what we negotiated.

PS – If Greg has Job in WYOW w/ 200 mile drive + Stotz in GEO has 20 miles both get paid same.

SS – RPI is trying to get 150 prnp.

Stotz – New Hires w/o rigs to go to Auto Mater.

597 to present from Jan 2005 – 500 retired only 300 replaced.
In next 10 years we will lose 40% of WF.

PS – If 20 year old passes 20" Test he goe

Moss – I do not want to lose control of 798.

Thom – Our Co cost per rig is $140 on 10 hr day.

Moss – Energy Transfer would not talk to us. Now call into union.

– Caucus – 10 am

Thom – use 50 miles driving

PS – use Per diem up $80. Leave rig alone. Total $122.50

Joyce – Rig 8 + 6

Any future increase goes on rig.

Comments – ~~[illegible]~~ Ladder it.

(1) Keep rig on accountable plan – def $14 to $15 Jan 1 pay IRS increase

% inc Eff 09

(2) Do not want reopen Neg. Offer $20 1st year 07

$20 2nd year 08

~~[illegible] Commitment~~ [illegible]

1/07 4½%

1/08 4½%

Caucus

Final — Joyce
UA Now at $40 07 (Jan 1)
$40 08 (Jan 1)
+ IRS Pulled

Counter — maybe

Prejobbed before Jan 1 — No increase applies.

Ws or J ?

— Resume 11 am —
* Joyce — we need another meeting in Dec.

Joyce other issues —
Manning
1. PS — UA trying to recruit.
2. 798 — How Many? — Moss — prior to trusteeship there were books sold to non union Ws who would come when work broke. This didn't work.
Ws — 1000 to 1200 total

Thorn — Rockies Express — Can 798 Try set up if CRC / KM supplies equip + material?
PS — yes — may get grant

Bob J - WHs

Ex: WH does not show up + Co pulls L off job. Should not have to pay twice Ls fund / PLIBF.

Moss - To must collect for covered work.

XXX Note Exception in Agr: Moss This applies only to Union Quota.

Remember 16" 75%

Reciprocity - Jim B. ~~too~~ "money follows man"

Moss -

Comparison -

Low Rate - WH per diem Sub tracted - Ls not subtracted.

VA Dec 18, 19, 20 XXX

Moss - We will not hold out on ~~an~~ a slower W.

Joyce - What are Past Practices.

Moss - J carrying line.

# EXHIBIT 15



UNITED ASSOCIATION
of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada

Founded 1889

B. STEPHENSON
al Representative
5 N. Cromwell
a City, OK 73112
(405) 947-7664
(405) 947-8021
phils@uanet.org

General Office File Reference: PBS

Stephen K. Mikich
Local 342 Pipeline Bus. Rep.
935 Detroit Avenue
Concord, CA 94518-2501

April 24, 2006

Dear Sir and Brother:

Per your request, for clarification. Please find enclosed a copy of a letter from January of 1992.

A welding rig consists of the following:
a. Truck
b. Welding machine
c. Welding leads
d. Cutting rig, consisting of: 1) gauges, 2) hose, and 3) torch.
"All equipment and supplies not listed above as being furnished by the welder should be furnished by the contractor, including gasoline".

International Representative George Lambert Director of Pipeline and Gas Distribution sent this guideline to the PLCA in 1991. To my knowledge the only changes are that the rig rental rate has risen to $14.00 per hour if used and the rig rental rate is $8.50 per hour for mechanized welding jobs where the rig is parked. These are the negotiated rates on the current National Mainline Pipeline Agreement. I am unaware of any changes to any additional equipment being added or deleted from the above original description.

The UA/PLCA sub-committee is scheduled to meet on May 10, 2006. I would be happy to negotiate any additional equipment for an increase in compensation to the applicable wage package.

I trust this clarifies the stance of the United Association on what a welding rig consists of. With best wishes I remain;

Fraternally,

Phillip B. Stephenson
Pipeline and Gas Distribution Representative

CC: PLCA Pat Tielborg
Jim Moss Trustee LU 798

William P. Hite
General President

Patrick R. Perno
General Secretary-Treasurer

Stephen F. Kelly
Assistant General President

# EXHIBIT 16

PLCA GRIEVANCE
"Rig Rental Rates"
January 2007

In accordance with Article XVIII (B) of the collective bargaining agreement between, inter alia, the Pipe Line Contractors Association ("PLCA") and the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO ("Union") (on behalf of its affiliated Local Unions), PLCA hereby files the following grievance on its behalf, and on behalf of all its member contractors:

**Statement of Grievance:**

On January 27, 2006, PLCA (among others) and the Union entered into a collective bargaining agreement ("Agreement") to be in effect from November 1, 2005 through December 31, 2010. As part of this Agreement, the parties negotiated and agreed to a specific hourly "rig" rate (the IRS Substantiated Rate) that Union members employed by PLCA contractors would charge such PLCA contractors for the rental of their personal welding rigs to be utilized in connection with, and as an integral part of, their employment by such contractors. Despite the Agreement, the Union, its affiliated Local Unions and its members/PLCA contractor employees have threatened to, and have, unilaterally, unlawfully, and in breach of the Agreement increased this hourly rig rental rate. The Union further has threatened that its members will withhold their rigs from PLCA contractor use unless PLCA contractors agree to pay the increased rig rate, which, in this industry, is tantamount to striking. Such strike threat is in direct violation of Agreement Article XVII.

**Remedy Requested:**

PLCA seeks an order requiring the Union, its affiliated Local Unions and its members/PLCA contractor employees to cease and desist these unlawful efforts unilaterally to increase the rig rental rate as well as any and all strike or threatened strike activity related thereto. Additionally, PLCA seeks from the Union reimbursement of any amount in excess of the negotiated per hour rig rate paid (under protest) by any PLCA contractor in response to the Union's unlawful rate increase. PLCA further seeks reimbursements for any and all damages occasioned by any Union, Affiliated Local Union and/or member strike against any PLCA contractor. PLCA also seeks costs and attorneys fees.

**Further Steps:**

In accordance with Article XVIII (C) of the Agreement, PLCA requests the immediate empanelling of an Arbitration Board to resolve this dispute. PLCA reserves all rights available to it in Article XVII(B).

January 10, 2007
Date

J. Patrick Tielborg
J. Patrick Tielborg
Managing Director

AMENDED PLCA GRIEVANCE
"Rig Rental Rates"
February 2007

In accordance with Article XVIII (B) of the collective bargaining agreement between, inter alia, the Pipe Line Contractors Association ("PLCA") and the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO ("Union") (on behalf of its affiliated Local Unions), PLCA hereby files the following amended grievance on its behalf, and on behalf of all its member contractors:

**Statement of Grievance**:

In addition to the conduct alleged in PLCA's grievance filed in January 2007, since on or about January 30, 2007, UA Local 798 has unlawfully, unilaterally, and in breach of the collective bargaining agreement increased the amount paid by certain PLCA contractors working in New Mexico and Arizona to UA Local 798 welders for the rental of the welders' rigs by requiring that those PLCA contractors, as a condition of renting UA Local 798 welders' welding rigs, pay an additional two hours of rig pay per day as a "Western Fuel Adjustment."

**Remedy Requested:**

As with its previous grievance, PLCA seeks an order requiring the Union, its affiliated Local Unions and its members/PLCA contractor employees to cease and desist these unlawful efforts unilaterally to increase the rig rental rate as well as any and all strike or threatened strike activity related thereto. Additionally, PLCA seeks from the Union reimbursement of any amount of additional hourly rig pay paid (under protest) by any PLCA contractor in response to the Union's unlawful demand for additional hours of rig pay. PLCA further seeks reimbursements for any and all damages occasioned by any Union, Affiliated Local Union and/or member strike against any PLCA contractor. PLCA also seeks costs and attorneys fees.

**Further Steps:**

In accordance with Article XVIII (C) of the Agreement, PLCA requests the immediate empanelling of an Arbitration Board to resolve this dispute. PLCA reserves all rights available to it in Article XVII(B).

February 2, 2007
Date

J. Patrick Tielborg
J. Patrick Tielborg
Managing Director

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Pipe Line Contractors Association,
1700 Pacific Avenue, #4100
Dallas, Texas 75201-4675.

Plaintiff,

v.

Case No. 1:07-cv-00973

United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO,
901 Massachusetts Avenue, NW
Washington, D.C. 20001 and its constituent Local Unions

Defendants.

---

[PROPOSED] ORDER

---

Upon consideration of Plaintiff's Motion To Compel Arbitration, and any opposition thereto, the Court finds that the Motion should be GRANTED, and it is hereby:

ORDERED that Defendant, the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO, and its constituent Local Unions, shall comply with the grievance/arbitration provision of the parties' collective bargaining agreement and proceed with the empaneling of an arbitration panel within seven days of the entering of this Order.

ORDERED that Defendant pay to Plaintiff reasonable attorneys' fees and costs incurred as a result of Defendant's unlawful refusal to arbitrate Plaintiff's grievance in accordance with the explicit provisions of the parties' collective bargaining agreement.

Entered this ____ day of June 2007.

______________________________

Honorable Paul L. Friedman